1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MISSOURI
2                          EASTERN DIVISION

3

4    UNITED STATES OF AMERICA,    )
                                  )
5          Plaintiff,             )
                                  )
6          v.                     )No. 4:09-CR-00679 HEA
                                  )
7    KATHERINE A. MOCK and        )
     ELAIN KAY YOUNG,             )
8                                 )
           Defendants.            )
9

10                                 JURY TRIAL

11                                **VOLUME 6**

12              BEFORE THE HONORABLE HENRY E. AUTREY
                   UNITED STATES DISTRICT JUDGE
13

14                            MARCH 19, 2012

15

16   APPEARANCES:

17   For Plaintiff:         Thomas E. Dittmeier, Esq.
                            Michael A. Reilly, Esq.
18                          Patrick T. Judge, Sr., Esq.
                            OFFICE OF U.S. ATTORNEY
19                          111 South Tenth Street, 20th Floor
                            St. Louis, MO  63102
20                          **(APPEARANCES CONTINUED ON PAGE 2)**

21

     REPORTED BY:           ANGELA K. DALEY, CSR, RMR, FCRR, CRR
22                          Official Court Reporter
                            United States District Court
23                          111 South Tenth Street, Third Floor
                            St. Louis, MO  63102
24                          (314) 244-7978

25        PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

Volume 6

2

1  APPEARANCES CONTINUED

2

3  For Deft. Mock:      Kevin Curran, Esq.
                        FEDERAL PUBLIC DEFENDER
4                       1010 Market Street, Suite 200
                        St. Louis, MO  63101
5
                        Christopher E. McGraugh, Esq.
6                       LERITZ AND PLUNKERT, P.C.
                        555 Washington Avenue, Suite 600
7                       St. Louis, MO  63101

8

9  For Deft. Young:     Jennifer Herndon, Esq.
                        224 N. Hwy 67, #122
                        St. Louis, MO  63031
10
                        Michael J. Gorla, Esq.
11                      555 Washington Avenue, Suite 600
                        St. Louis, MO  63101
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **(PROCEEDINGS STARTED AT 9:10 A.M.)**

2    **(The Following Proceedings Were Held Outside the Hearing and**

3    **Presence of the Jury.)**

4    THE COURT:  I noted from the e-mails that there were

5    some issues, so do you want to take those up first?

6    MR. CURRAN:  Okay.  There is one instruction that

7    both defendants are going to object on.  I think what I'll do

8    is I can start the record, and I know Mr. Gorla has more

9    things to say, and I also think then Ms. Young's lawyers have

10   some instructions that they want to submit.

11   MR. GORLA:  I do.

12   MR. CURRAN:  But we don't have anything else to

13   submit.

14   THE COURT:  Okay.

15   MR. CURRAN:  Our concern, it's 5.01, the aiding and

16   abetting instruction, Judge, and it is page 34 in the

17   Government's packet.  If you have a dirty set, it's 34.

18   THE COURT:  Yes, okay.

19   MR. CURRAN:  All right.  We don't think this applies

20   in this case, Judge.  Aiding and abetting, if we look at the

21   notes on Use that I am going to quote in a second, usually the

22   setup is there are principals involved in the ultimate act and

23   then there is another actor that may aid or abet the

24   principals.  Well, in this case, we don't have that situation.

25   Both the people charged here are charged as principals, and it

4

```
 1   also says aiding and abetting murder for hire, so there is no

 2   other minor actor that is aiding and abetting, so you can't

 3   have a situation where you are a principal and then you are

 4   also aiding and abetting your own cause.  I mean, you're

 5   either a principal or you are not a principal.  I think that

 6   is it in a nutshell.

 7        I am reading from the note on Use, and they cite

 8   Standefer v. U.S. -- it's a U.S case -- "In order to sustain

 9   the conviction of a defendant who has been charged as an aider

10   and abettor, it is necessary that there be evidence showing an

11   offense to have been committed by a principal and that the

12   principal was aided or abetted by the accused, although it is

13   not necessary that the principal be convicted or even that the

14   identity of the principal be established."  And that last

15   sentence doesn't relate to this, but we are talking about two

16   principals here.  You can't be a principal and be an aider and

17   abettor, so we don't think this is appropriate in this case.

18        Now I understand overall, generally when we have

19   conspiracy instructions, it's usually these multi defendant

20   drug charges or maybe frauds.  It's sort of unusual to see in

21   this sort of situation, so I think some of these instructions,

22   we use them based on our experience with other types of cases,

23   but aiding and abetting is not appropriate with this because

24   both women as I said are charged as principals.  Mr. Gorla I

25   know has something to add to the argument.
```

5

1        MR. GORLA:  I really don't, Judge.  He pretty much

2  hit it on the head, you know, that the aider and abettor

3  instruction assumes that someone commits the offense and then

4  the aider and abettor, you know, helps in the commission of

5  the offense, and in this case, under the Government's theory,

6  you have got two principals, and they are both principals, so

7  they can't aid and abet themselves.

8        THE COURT:  Mr. Reilly.

9        MR. REILLY:  Judge, of course, we have a different

10  opinion.  Murder for hire by definition requires acting

11  together.  By definition with this offense, somebody enlists

12  someone else to assist them to do a murder and in exchange

13  agrees to give them a quid pro quo or some type of

14  consideration.  So by definition, this offense involves acting

15  with another.  Here there is evidence they both played a role

16  in the murder.  If we start from the beginning, we know they

17  are acting together.  Shortly after Ms. Mock had contact with

18  Ms. Young on two occasions, once at the farm -- strike that --

19  on the telephone on March 14th, almost immediately thereafter

20  she attempted to solicit Keri Ponder to do the killing, and

21  then shortly after Ms. Mock returned from her visit with

22  Ms. Young on the 16th and/or 17th, she solicited Thomas Ponder

23  to do the killing.  Thereafter, Ms. Mock purchased a ski mask

24  on her way to Novinger.  The ski mask certainly was involved

25  in the killing.  The evidence, the forensic evidence, would

1    support that.

2            Aside from that, there is evidence that they were

3    acting together at the barnyard when the victim was killed

4    with Ms. Young's rifle, and Ms. Mock's DNA, gunshot residue

5    were on the ski mask and gloves found together after the

6    killing.  Aside from that, they both gave each other an alibi.

7    Their statements were in lockstep.  There is significant

8    evidence to show that they were acting together.  So Young was

9    going to pay somebody to kill her husband.  Mock killed her

10   husband and/or assisted in the killing.  There is evidence to

11   support that, and there is evidence to support giving the

12   instruction.  Thank you.

13           THE COURT:  Mr. Curran.

14           MR. CURRAN:  If I can respond just briefly.  All that

15   evidence is what I expected.  It is what the Government used

16   to show the conspiracy between the two women, that they both

17   had this planned, they were coconspirators.  That all supports

18   the conspiracy.  Aiding and abetting historically or

19   traditionally goes to sort of a lesser player or lesser actor

20   that somehow helps, you know, the principals.  I know I am

21   repeating myself, but all that evidence that the Government

22   just talked about, they are using to show the conspiracy

23   between the two women, that they were principals in this

24   scheme.  So you can't be both.  You can't be an aider and

25   abettor and a principal.

7

1        THE COURT:  Well, articulate those facts that support

2   the concept that the Government's perspective is that they are

3   both principals within the conspiracy as opposed to aiders and

4   abettors of one or the other or each other.

5        MR. CURRAN:  Well, when we are talking about -- you

6   know, the Government's theory is that these two women were

7   conspiring to commit a murder for monetary benefit.  That is

8   it in a nutshell.

9        THE COURT:  Okay.

10       MR. CURRAN:  And the evidence they have that Ms. Mock

11  asked others to get involved in this, that was a principal --

12  that was their plan that they were trying to complete, to get

13  somebody else, you know, to do the act.  So that is the

14  principals deciding -- now this is based on the Government's

15  evidence -- we want to do this murder, and we want to do the

16  murder because there is a monetary benefit and whatever

17  reasons -- you know, there is other reasons the Government I

18  think will probably argue -- and then the agreement was to

19  them -- because remember, these statements that got in over

20  Ms. Young's lawyer's objections were that Kathy Mock was

21  acting on behalf of both of them, all right?  She quotes Kay

22  Young.  You know, they brought that out through both the

23  Ponders that, you know, Kay Young wants this done.  You know,

24  for a sum of money, will you do the act.  And that was the

25  agreement between the two of them.  So it was part of the

1   planning to get somebody else to do it.  It's not a situation

2   where there was a lesser player.

3          You know, usually in conspiracies, sometimes you see

4   somebody that is involved for a short period of time in the

5   conspiracy.  You know, aiding and abetting in this situation

6   would be some third party that solicits on behalf of the

7   principals.  You know, say there is another son or something

8   that goes and talks to Thomas.  He might be charged with

9   aiding and abetting because he is helping solicit.  But when

10  the principals, you know, the people who hatch the plan, are

11  carrying out the plan as the Government said, that is not

12  aiding and abetting.  That is hatching the plan.  So I think

13  all the evidence that they have got -- you know, when we were

14  arguing at the bench about all this and these statements

15  getting in, the Government's argument was it was in

16  furtherance of the conspiracy.  You know, we haven't heard the

17  word "aiding and abetting" until this instruction.  You didn't

18  hear it once during the trial.  I mean, all the evidence that

19  got in, all the arguments we had about what could get in or

20  not get in was based on these two were coconspirators.

21          THE COURT:  Let me ask you this then.  The basic

22  concept of a conspiracy is what?

23          MR. CURRAN:  Well, it's two people acting together to

24  commit an act.

25          THE COURT:  All right.  And factually those two

1   people acting together engage in certain conduct to execute on

2   the conspiracy; right?

3          MR. CURRAN:  Yes.

4          THE COURT:  All right.  So if you look at this

5   instruction, the aiding and abetting instruction, whether

6   there are principals or lessers or principals and lessers,

7   doesn't this aiding and abetting instruction necessarily more

8   typically than not in all instances of a conspiracy become a

9   consideration for instructing because isn't that the essence

10  of the conspiracy?  You can't have a conspiracy by yourself;

11  right?

12         MR. CURRAN:  We have yet to see -- I'll say we have

13  yet to see that.

14         THE COURT:  Okay.  Or at the least, nobody has proved

15  that there has been a conspiracy by one person.  So if you

16  need at least two people mathematically speaking and

17  grammatically speaking and definitionally speaking, too, for

18  there to be a conspiracy, don't those two persons if we are

19  talking about a two-person conspiracy engage in acts, conduct,

20  that put them in a position of being an aider and abettor

21  necessarily?

22         MR. GORLA:  I think, Judge, the problem with the

23  Government's argument is the aider and abettor instruction

24  doesn't apply to the conspiracy.  The aider and abettor

25  instruction applies to the murder for hire.  The murder for

1    hire, okay, under their theory, Ms. Young promised to pay

2    Ms. Mock money to kill her husband.  That is their theory.  So

3    we are not talking about the conspiracy charge because if you

4    look at the conspiracy charge, they don't cite the aider and

5    abettor statute.  We are only talking about Count Two, and in

6    Count Two, both Ms. Mock and Ms. Young under their theory are

7    principals.  They are both principals in the case, and it is

8    not like Mr. Curran said that there is a third party out there

9    that is kind of helping with the murder for hire.  They are

10   both actively participating in the murder for hire.  They are

11   the principals, and that is what the aider and abettor

12   instruction goes to, not the conspiracy.  It goes to the

13   murder for hire.

14        THE COURT:  I don't disagree with that, but doesn't

15   that also if you take the logical steps from the conspiracy to

16   the actual commission of the offense and then actually

17   executing on the offense, from what you have indicated, the

18   evidence suggests, does it not, that one aided and abetted the

19   other or at the very least they aided and abetted each other

20   in the commission of the murder for hire?

21        MR. GORLA:  Well, I guess that's where the

22   disagreement comes in because we think if they are both

23   principals, then they are acting together.  As opposed to

24   aiding and abetting each other, they are both active

25   principals committing the offense, and that is our argument.

1          THE COURT:  All right.

2          MR. CURRAN:  Judge, I think this is designed for, you

3   know, the individual that takes one small role in the

4   conspiracy.  Like in a drug conspiracy, the individual that

5   maybe drives one load or, you know, makes one sale or

6   something like that, and that person will say, Hey -- you

7   know, you have seen it, they are going to say, All I did was I

8   just stored some stuff at my house or something.  Well, then

9   that is aiding and abetting the conspiracy, and I think that

10  is a distinction that is traditionally made.  You know, if I

11  can use it, it seems to me -- to use a guideline term -- it's

12  double counting.  The same conduct that they are alleging is a

13  part of the conspiracy, now they are also calling aiding and

14  abetting.  I don't think that's the intent of this

15  instruction.

16         MR. REILLY:  Judge, the evidence supports it, and

17  just because you can charge a myriad of people who assist in a

18  myriad of different ways -- for instance, Tonya Hyles in the

19  Hyles and Cannon murder for providing the gun or giving

20  Amesheo Cannon a place to stay or whatever it may be, you can

21  charge a number of people with aiding and abetting under a

22  myriad of different circumstances.  That doesn't mean you

23  can't charge Amesheo Cannon with aiding and abetting by doing

24  the shooting in the murder for hire.  And similarly here, the

25  evidence fits.  There is evidence to support it.  Aiding and

1  abetting conspiracy and aiding and abetting are not mutually

2  exclusive, and they are charged -- the statute allows a charge

3  for conspiracy and the substantive count of which they are

4  charged, murder for hire, and they are acting together, aiding

5  and abetting each other.  There is evidence to support that.

6          THE COURT:  Anything else?

7          MR. GORLA:  No, Your Honor.

8          MR. CURRAN:  No, Judge.

9          THE COURT:  The defendant's collective objection to

10 the tender of 5.01 as modified from the Eighth Circuit Model

11 Criminal Jury Instructions is overruled on the arguments and

12 discussions previously noted on the record.

13         MR. CURRAN:  Judge, that's all I have.  I think Mr.

14 Gorla has something.

15         THE COURT:  Yes, sir.

16         MR. GORLA:  Judge, I just want to offer a few

17 instructions, and I don't believe that Mr. Reilly has any

18 objection to it.  I want to offer an instruction based on

19 2.18.

20         THE COURT:  Do you have a dirty copy of this, too,

21 Mr. Gorla?

22         MR. GORLA:  Yes, I do, Judge.

23         THE COURT:  Oh, okay, prior convictions --

24         MR. GORLA:  Yes, Judge.

25         THE COURT:  -- of a witness as it references Keri and

1    Thomas Ponder and Amanda Bax.  Do you have any objection to

2    that, Mr. Reilly?

3         MR. REILLY:  I have no objection to that, Judge.  The

4    Government has no objection.  No objection to Defendant's 4.02

5    either, Judge.

6         THE COURT:  No objection to that, okay.  Any other

7    submissions?

8         MR. GORLA:  I do, Judge, and I understand that the

9    Court has previously -- we objected to the testimony of Thomas

10    Ponder as to what Kathy Mock told him, and we also objected to

11    the testimony of Keri Ponder as to what Kathy Mock told her,

12    and I understand, you know, that the Court overruled our

13    objection, but just to make my record, I would just like to

14    submit these limiting instructions.

15         THE COURT:  2.14 as to each of those; is that

16    correct?

17         MR. GORLA:  I'm sorry?

18         THE COURT:  You are submitting 2.14 as to each of

19    those witnesses?

20         MR. GORLA:  I am, Your Honor.

21         THE COURT:  Mr. Reilly.

22         MR. REILLY:  Judge, I think it's inconsistent with

23    the law on coconspirator statements.  The Government's

24    instruction, the instruction related to coconspirator

25    statements on the marked set that you have -- it's instruction

14

1   5.06I, it's page 32 of our proposed instructions -- "You may

2   consider acts knowingly done and statements knowingly made by

3   a defendant's coconspirators during the existence of the

4   conspiracy and in furtherance of it as evidence pertaining to

5   each defendant even though they were done or made in the

6   absence and without the knowledge of each defendant."  Judge,

7   these statements that came in were the Defendant Mock's

8   efforts to solicit killers on behalf of Defendant Young.

9   These are statements made in furtherance of the conspiracy.

10  That is why the Court admitted that evidence at trial.  It's

11  highly probative, and that is what the law says.  Section

12  5.06I is the jury's instruction.  What Mr. Gorla has tendered

13  is inconsistent with the Court's ruling.  It's also

14  inconsistent with the law on coconspirator statements.

15          THE COURT:  Mr. Gorla, what say you in response?

16          MR. GORLA:  Judge, I understand that these

17  instructions are what we -- we asked for a limiting

18  instruction prior to Keri Ponder and Thomas Ponder's

19  testimony, and the Court refused to give us a limiting

20  instruction.  I am just trying to preserve the record and

21  again ask that the Court give this instruction again based

22  upon our theory that there was no evidence of an agreement or

23  conspiracy shown and that these statements then are hearsay

24  statements that should not come in and, therefore, they

25  shouldn't be admissible against Ms. Young.

15

1    THE COURT:  Okay.  Defendant's tender of 2.14

2    submitted by Defendant Young --

3    MR. REA:  Can we mark one A, Judge, and one B?

4    THE COURT:  Uh-huh.  Will be denied and refused.  The

5    first, Instruction A, will be with regard to the testimony

6    regarding Katherine Mock's attempt to solicit Keri Ponder to

7    kill Melvin Griesbauer.  Instruction B will be the tender by

8    defendant of the instruction regarding the testimony relating

9    to Katherine Mock's inquiry as to whether Thomas Ponder knew

10   someone who would kill Melvin Griesbauer.  Both of those

11   instructions again will be noted as offered but refused.

12   All right.  Any other tenders or offers, Mr. Gorla?

13   MR. GORLA:  Judge, I think, and I talked to Mr.

14   Reilly about this, it's not so much an objection to any of the

15   instructions but as to the order of the instructions.

16   THE COURT:  Yes.

17   MR. GORLA:  Instruction 3.08 -- I think, Judge, that

18   is page 11.

19   THE COURT:  Uh-huh.

20   MR. GORLA:  I believe, Judge, that that instruction

21   should go before -- it should be followed by I believe

22   instruction 12 on page 12 and then the instruction on page 10.

23   So I think that order should go that 11 should be 10 and 12

24   should be 11 and 10 should be 12.  It just makes more sense

25   that way, at least to me.

16

1          THE COURT:  All right.  So you are saying that 3.08

2     should be first?

3          MR. GORLA:  Correct.  And then the 404(b)

4     instruction, which is 2.08.

5          THE COURT:  Okay.

6          MR. GORLA:  And then 2.14, which is page 10.

7          THE COURT:  Oh, "As you know, there are two

8     defendants on trial here"?

9          MR. GORLA:  Yes, Judge.

10          THE COURT:  Okay.  Do you have any problem with that?

11          MR. REILLY:  Not at all, Judge.

12          THE COURT:  And then the burden of proof instruction

13     following that one?

14          MR. GORLA:  Correct, Judge.

15          THE COURT:  All right.  Anything else regarding the

16     order?

17          MR. REILLY:  Nothing else regarding the order from

18     the Government.

19          MR. GORLA:  As to where to put the instructions,

20     Judge, that I submitted, I believe after the credibility of

21     witnesses, Judge, wherever that one is.

22          MR. REILLY:  It's page 6.  So we would put those

23     after page 6.  Is that what you are proposing?

24          MR. GORLA:  That would be fine, Judge.

25          THE COURT:  All right.  So you would request that

1    those come before the 2.07 instructions --

2              MR. REILLY:  Judge, I guess from the Government's

3    perspective --

4              THE COURT:  -- regarding Kathy Mock's statements made

5    to law enforcement?  Because I was going to put them after

6    that.

7              MR. REILLY:  We would rather have them after that as

8    well, Judge.

9              MR. GORLA:  After that would be fine, Judge.

10             THE COURT:  Okay.  So I was going to put --

11             MR. GORLA:  Right before the 4.10 instructions.

12             THE COURT:  Correct.

13             MR. GORLA:  That would make sense.

14             THE COURT:  Which would be the expert testimony.

15             MR. GORLA:  Correct.

16             THE COURT:  All right.  Anything else?

17             MR. GORLA:  No, Your Honor.

18             MR. REILLY:  Judge, the only other thing I had as a

19   bookkeeping matter, we sent you an instruction earlier this

20   morning.  The statutory definition under which Count Two is

21   based in part on is Section 2, and it's a short statutory

22   definition from aiding and abetting.

23             THE COURT:  Right, regarding Count Two.

24             MR. REILLY:  We said it was regarding Count One, and

25   there was a typo.  It should be Count Two.  I have a clean and

1    dirty copy if the Court needs that.

2          THE COURT:  All right.  So the submission that

3    indicates regarding Count One you are withdrawing and

4    substituting regarding Count Two.

5          MR. REILLY:  Only with regard to the acting Section 2

6    definition.

7          THE COURT:  Okay.

8          MR. REILLY:  There was another definition that said

9    "Counts One and Two are based on 1958."

10         THE COURT:  Right, exactly.

11         MR. REILLY:  That is correct.

12         THE COURT:  I think the one that followed that began

13    with reference to Count One --

14         MR. REILLY:  And that should reference Count Two.

15         THE COURT:  -- and should reference Count Two.

16         MR. REILLY:  Yes, Judge.

17         THE COURT:  Okay.  All right.  Well, why don't you

18    give me that again.  I know I got it, and I think I put it in

19    the packet, but just to be sure.  All right.  Anything else?

20         MR. GORLA:  No, Your Honor.

21         THE COURT:  So here's what we've got.  Number 8 will

22    be 3.01.  Nine will be 3.02.  Ten will be 3.03.  Eleven will

23    be 2.03.  Twelve will be 4.17.  Thirteen will be 3.04.

24    Fourteen will be 2.07 as to Katherine Mock's statements.

25    Fifteen will be 2.07 as to Elain Young's statements.  Sixteen

1  will be 2.18 regarding the convictions of witnesses and

2  credibility.  Seventeen will be the reputation of Normane

3  Newlin, 4.02.  Eighteen will be 4.10, experts.  19 will be

4  3.08, "Under Count One, the indictment charges that each

5  defendant committed the crime of conspiracy."  Twenty will be

6  2.08, "You have heard evidence that the defendant, Kay Young,

7  previously offered another person United States currency."

8  Twenty-one will be 2.14, "As you know, there are two

9  defendants on trial here.  Each defendant is entitled to have

10  her case decided solely on the evidence."  Twenty-two, burden

11  of proof, 3.11.  Twenty-three, "Counts One and Two of the

12  indictment are based upon a statute."  Twenty-four is "Count

13  Two of the indictment is based upon a statute which is federal

14  law" submitted by the Government.  Twenty-five is the

15  indictment, Title XVIII, 1958.

16          Twenty-six is O'Malley and Grenig, Section 13.05,

17  "The indictment charges that the offenses were committed in

18  and around."  Twenty-seven is 3.09, conspiracy to commit

19  murder for hire.  Twenty-eight is 5.06B.  Twenty-nine is

20  5.06C.  Thirty is 5.06D.  Thirty-one is 5.06E.  Thirty-two is

21  5.06I.  Thirty-three is 3.09, murder for hire.  Thirty-four is

22  aiding and abetting.  Thirty-five is Missouri Revised Statute

23  565.020.  Thirty-six, anything of pecuniary value.

24  Thirty-seven, facility of interstate commerce.  Thirty-eight,

25  as consideration for.  Thirty-nine, 7.05, intent or knowledge.

20

1   Forty, Devitt and Blackmar, Section 17.18.  Forty-one,

2   deliberation mechanics.  And then finally the verdict forms.

3   And you all have seen that; right?

4            MR. GORLA:  We have, Judge.

5            THE COURT:  Anybody have any objections to the forms

6   of verdict?

7            MR. GORLA:  No, Your Honor.

8            THE COURT:  Any objections to the instructions that

9   the Court intends to read and give to the jury either as to

10  their substance or order?

11           MR. GORLA:  Not as to the order, Judge, but just to

12  renew our previous objection to the aider and abettor

13  instruction.

14           THE COURT:  All right.

15           MR. CURRAN:  We have the same objection.  Your Honor,

16  can I ask two questions.  Do you let the instructions go back?

17           THE COURT:  Yes.

18           MR. CURRAN:  And then when do you read them?  Do you

19  read them before or after?

20           THE COURT:  Like I've been reading them since 1986,

21  before you guys start talking.

22           MR. CURRAN:  Okay.

23           THE COURT:  Argument, how much time?

24           MR. DITTMEIER:  Judge, we have talked.  I would like

25  an hour, and I believe we're in agreement on that and they are

21

```
1   going to split it.

2           THE COURT:  How do you want it split, Mr. Dittmeier?

3           MR. DITTMEIER:  I would like a warning at 40 minutes.

4           THE COURT:  Okay, so 40 and 20.  What kind of

5   warning, two-minute, five-minute?

6           MR. DITTMEIER:  Just tell me when it is 40 minutes.

7           THE COURT:  So at 40 minutes?

8           MR. DITTMEIER:  Yes, sir.

9           THE COURT:  Mr. Gorla, Ms. Herndon --

10          MS. HERNDON:  Yes, Judge.

11          THE COURT:  -- Mr. Curran, and Mr. McGraugh, how do

12  you want your time divided?  How are we doing this?

13          MR. GORLA:  She will take it all.

14          MR. MCGRAUGH:  Could I get a five-minute warning,

15  Judge?

16          MS. HERNDON:  That is good for me, too, Judge.

17  Thanks.

18          THE COURT:  So are you dividing it in half, 30

19  minutes and 30 minutes, or are you each going to take an hour?

20          MR. MCGRAUGH:  I think we are dividing it, Judge.

21          MS. HERNDON:  I don't need an hour.  Thank you.

22          THE COURT:  Just checking.  Five-minute warning for

23  you, five-minute warning for you, warning at 40 for you, right

24  of encroachment.  All right.  Motions in limine or protective

25  orders for closing argument, anybody?  Nobody.  Good enough.
```

22

1   All right.  Now I need a few minutes to reorganize and double

2   check the clean copies, the versions that are actually going

3   to be read, and once I do that, we will be ready to go.  So if

4   you all need to take care of personal matters, feel free.

5                **(Court Recessed from 9:47 a.m. until 10:15 a.m.)**

6        **(The Following Proceedings Were Held Within the Hearing and**

7                       **Presence of the Jury.)**

8            THE COURT:  Good morning, ladies and gentlemen.  Good

9   morning, Counsel.  Are we ready to proceed?

10           MR. DITTMEIER:  The Government's ready, Judge.

11           MR. MCGRAUGH:  Defendant Mock is ready, Your Honor.

12           MS. HERNDON:  Yes, Your Honor.

13           THE COURT:  Ladies and gentlemen, please listen

14   carefully.  Instruction number 8, Members of the jury, the

15   instructions I gave you at the beginning of the trial and

16   during the trial remain in effect.  I now give you some

17   additional instructions.  You must, of course, continue to

18   follow the instructions I gave you earlier as well as those I

19   give you now.  You must not single out some instructions and

20   ignore others because all are important.  This is true even

21   though some of those I gave you at the beginning of and during

22   the trial are not repeated here.  The instructions I am about

23   to give you now as well as those I gave you earlier are in

24   writing and will be available to you in the jury room.  I

25   emphasize, however, that this does not mean that they are more

1    important than my earlier instructions.  Again, all

2    instructions, whenever given and whether in writing or not,

3    must be followed.

4         Instruction number 9, It is your duty to find from

5    the evidence what the facts are.  You will then apply the law

6    as I give it to you to those facts.  You must follow my

7    instructions on the law even if you thought the law was

8    different or should be different.  Do not allow sympathy or

9    prejudice to influence you.  The law demands of you a just

10   verdict unaffected by anything except the evidence, your

11   common sense, and the law as I give it to you.

12        Instruction number 10, I have mentioned the word

13   "evidence".  The evidence in this case consist of the

14   testimony of witnesses, the documents and other things

15   received as exhibits, and the facts that have been stipulated,

16   that is, formally agreed to by the parties.  You may use

17   reason and common sense to draw deductions or conclusions from

18   facts which have been established by the evidence in the case.

19   Certain things are not evidence.  I will list those things for

20   you now.  One, statements, arguments, questions, and comments

21   by lawyers representing the parties in the case are not

22   evidence.  Two, objections are not evidence.  Lawyers have a

23   right to object when they believe something is improper.  You

24   should not be influenced by the objection.  If I sustained an

25   objection to a question, you must ignore the question and must

24

1    not try to guess what the answer might have been.  Three,

2    testimony that I struck from the record or told you to

3    disregard is not evidence and must not be considered.  Four,

4    anything you saw or heard about this case outside the

5    courtroom is not evidence.  Finally, if you were instructed

6    that some evidence was received for a limited purpose only,

7    you must follow that instruction.

8         Instruction number 11, The Government and the

9    defendants have stipulated, that is, they have agreed, that

10   certain facts are as counsel have stated.  You must,

11   therefore, treat those facts as having been proved.

12        Instruction number 12, Some of you have heard the

13   terms "direct evidence" and "circumstantial evidence".  You

14   are instructed that you should not be concerned with those

15   terms.  The law makes no distinction between direct and

16   circumstantial evidence.  You should give all evidence the

17   weight and value you believe it is entitled to receive.

18        Instruction number 13, In deciding what the facts

19   are, you have to decide what testimony you believe and what

20   testimony you do not believe.  You may believe all of what a

21   witness said or only part of it or none of it.  In deciding

22   what testimony to believe, consider the witness's

23   intelligence, the opportunity the witness had to have seen or

24   heard the things testified about, the witness's memory, any

25   motives that witness may have for testifying a certain way,

1    the manner of the witness while testifying, whether that

2    witness said something different at an earlier time, the

3    general reasonableness of the testimony, and the extent to

4    which the testimony is consistent with any evidence that you

5    believe.  In deciding whether or not to believe a witness,

6    keep in mind that people sometimes hear or see things

7    differently and sometimes forget things.  You need to

8    consider, therefore, whether a contradiction is an innocent

9    misrecollection or lapse of memory or an intentional

10   falsehood, and that may depend on whether it has to do with an

11   important fact or only a small detail.

12          Instruction number 14, You have heard testimony that

13   the defendant, Katherine A. Mock, made statements to law

14   enforcement.  It is for you to decide first whether the

15   defendant made the statements, and second, if so, how much

16   weight you should give to them.  In making these two

17   decisions, you should consider all the evidence including the

18   circumstances under which the statements may have been made.

19          Instruction number 15, You have heard testimony that

20   the defendant, Elain Kay Young, made statements to law

21   enforcement.  It is for you to decide first whether the

22   defendant made those statements, and second, if so, how much

23   weight you should give to them.  In making these two

24   decisions, you should consider all of the evidence including

25   the circumstances under which the statements may have been

1   made.

2        Instruction number 16, You have heard that Keri

3   Ponder, Thomas Ponder, and Amanda Bax were convicted of

4   crimes.  You may use that evidence only to help you decide

5   whether to believe those witnesses and how much weight to give

6   their testimony.

7        Instruction number 17, You have heard testimony about

8   the reputation of Normane L. Newlin for untruthfulness.  You

9   may consider this evidence only in deciding whether to believe

10  the testimony of Normane L. Newlin and how much weight to give

11  it.

12       Instruction number 18, You have heard testimony from

13  persons described as experts.  Persons who by knowledge,

14  skill, training, education, or experience have become expert

15  in some field may state their opinions on matters in that

16  field and may also state the reasons for their opinion.

17  Expert testimony should be considered just like any other

18  testimony.  You may accept or reject it and give it as much

19  weight as you think it deserves, considering the witness's

20  education and experience, the soundness of the reasons given

21  for the opinion, the acceptability of the methods used, and

22  all the other evidence in the case.

23       Instruction number 19, Under Count One, the

24  indictment charges that each defendant committed the crime of

25  conspiracy to commit murder for hire.  Under Count Two, the

1   indictment charges that each defendant committed the crime of

2   murder for hire.  Each defendant has pleaded not guilty to

3   each crime with which she is charged.  As I told you at the

4   beginning of the trial, an indictment is simply an accusation.

5   It is not evidence of anything.  To the contrary, each

6   defendant is presumed to be innocent.  Thus, each defendant

7   even though charged begins the trial with no evidence against

8   her.  The presumption of innocence alone is sufficient to find

9   each defendant not guilty and can be overcome only if the

10  Government proves beyond a reasonable doubt each element of

11  the crime charged.  Keep in mind that you must give separate

12  consideration to the evidence about each individual defendant.

13  Each defendant is entitled to be treated separately, and you

14  must return a separate verdict for each defendant.  Also, keep

15  in mind that you must consider separately each crime charged

16  against each individual defendant and must return a separate

17  verdict for each of those crimes charged.  There is no burden

18  upon a defendant to prove that she is innocent.  Accordingly,

19  the fact that a defendant did not testify must not be

20  considered by you in any way or even discussed in arising at

21  your verdict.

22          Instruction number 20, You have heard evidence that

23  the defendant, Elain Kay Young, previously offered another

24  person United States currency and other things of value as

25  consideration for the agreement to murder one of her previous

1   husbands, David Crawford.   You may consider this evidence only

2   if you unanimously find it is more likely true than not true.

3   This is a lower standard than proof beyond a reasonable doubt.

4   If you find that this evidence is more likely true than not

5   true, you may consider it to help you decide motive, intent,

6   knowledge, or plan.   You should give it the weight and value

7   you believe it is entitled to receive.   If you find that it is

8   not more likely true than not true, then you shall disregard

9   it.   Remember, even if you find that the defendant may have

10  committed a similar act in the past, this is not evidence that

11  she committed such an act in this case.   You may not convict a

12  person simply because you believe she may have committed

13  similar acts in the past.   The defendant is on trial only for

14  the crimes charged, and you may consider the evidence of prior

15  acts only on the issue of motive, intent, knowledge, or plan.

16          Instruction number 21, As you know, there are two

17  defendants on trial here, Katherine A. Mock and Elain Kay

18  Young.   Each defendant is entitled to have her case decided

19  solely on the evidence which applies to her.   Some of the

20  evidence in this case is limited under the rules of evidence

21  to one of the defendants and cannot be considered against the

22  other.   You have heard evidence in relation to Elain Kay

23  Young's previous offer of United States currency or other

24  things of value for the agreement to murder David Crawford.

25  You must not consider that evidence when you are deciding if

1    the Government has proved beyond a reasonable doubt its case

2    against Defendant Katherine A. Mock.

3          Instruction number 22, A reasonable doubt is a doubt

4    based upon reason and common sense and not the mere

5    possibility of innocence.  A reasonable doubt is the kind of

6    doubt that would make a reasonable person hesitate to act.

7    Proof beyond a reasonable doubt, therefore, must be proof of

8    such a convincing character that a reasonable person would not

9    hesitate to rely and act upon it.  However, proof beyond a

10   reasonable doubt does not mean proof beyond all possible

11   doubt.

12         Instruction number 23, Counts One and Two of the

13   indictment are based upon a statute which is federal law.

14   That statute, Title XVIII, United States Code, Section

15   1958(a), reads in pertinent part as follows:  Whoever travels

16   in or causes another to travel in interstate commerce or uses

17   or causes another to use any facility of interstate commerce

18   with intent that a murder be committed in violation of the

19   laws of any state or the United States as consideration for

20   the receipt of or as consideration for a promise or agreement

21   to pay anything of pecuniary value or who conspires to do so

22   if death results shall be punished by law.

23         Instruction number 24, Count Two of the indictment is

24   based upon a statute which is federal law.  That statute,

25   Title XVIII, United States Code, Section 2, reads in pertinent

1   part as follows:  Whoever commits an offense against the

2   United States or aids, abets, counsels, commands, induces, or

3   procures its commission is punishable as a principal.

4          Instruction number 25, Omitting the formal caption

5   and signature blocks, the indictment in this case reads in

6   pertinent part as follows:  Superseding Indictment, Count One,

7   the Grand Jury charges that, Introduction, One, At all times

8   pertinent to this indictment, A, Elain Kay Young was a

9   resident of Adair County, Missouri residing in Novinger,

10  Missouri; B, Katherine A. Mock was a resident of Barry County,

11  Missouri residing in Cassville, Missouri; C, Melvin B.

12  Griesbauer, now deceased, was a resident of Adair County,

13  Missouri residing at 17631 Penny Royal Road, Novinger,

14  Missouri, 63559.

15         The Conspiracy, Two, Beginning at a time unknown but

16  including 2006, the exact beginning date being unknown to the

17  Grand Jury, up to and through 2009 and the time of this

18  indictment in the Eastern District of Missouri and elsewhere,

19  Katherine A. Mock and Elain K. Young, the defendants herein,

20  together with other persons both known and unknown to the

21  Grand Jury did unlawfully, knowingly, and intentionally

22  combine, conspire, and agree to commit an offense against the

23  United States of America, that is, the crime of murder for

24  hire, in violation of Title XVIII, United States Code,

25  Section 1958 by using and causing another to use United States

1    mails and other facilities of interstate commerce with the

2    intent that the murder of Melvin B. Griesbauer be committed in

3    violation of the laws of the State of Missouri as

4    consideration for the receipt of and as consideration for a

5    promise and agreement to pay things of pecuniary value, namely

6    money along with other benefits.  Said conspiracy offense

7    resulted in the death of Melvin B. Griesbauer on March 23,

8    2006.

9            Object and Purpose, Three, The objects and purposes

10   of the conspiracy were the murder of Elain Kay Young's

11   husband, Melvin B. Griesbauer, and the obtaining of money and

12   property as a result of and in exchange for the commission of

13   Melvin B. Griesbauer's murder.

14           Four, more specifically, Elain Kay Young sought to

15   have her husband Melvin B. Griesbauer murdered, and further,

16   she sought money and property.

17           Five, Elain Kay Young knew that her husband, Melvin

18   B. Griesbauer, had a basic life insurance policy issued by the

19   Army and Air Force Mutual Aid Association, AAFMA, through

20   Melvin B. Griesbauer's service in the United States Army

21   National Guard.  Melvin B. Griesbauer named his wife, Elain

22   Kay Young, as the beneficiary to that policy.  Elain Kay Young

23   knew that the basic life insurance policy would among other

24   things pay to the beneficiary a sum of at least $600,000 upon

25   Melvin B. Griesbauer's death.

1          Six, between on or about August 24, 2005 and

2     September 1, 2005, Elain Kay Young enrolled her husband,

3     Melvin B. Griesbauer, in an accidental death and dismemberment

4     insurance policy that would among other things pay to Elain

5     Kay Young as the beneficiary the sum of $37,500 upon the

6     accidental death of Melvin B. Griesbauer.  Elain Kay Young

7     obtained that accidental death and dismemberment insurance

8     policy through Monumental Life Insurance Company, Monumental

9     Life, in connection with her employment at the Milan schools

10    and her association with the Missouri State Teachers

11    Association, later known as the Association for Educational

12    Support and Development.  Elain Kay Young knew that upon the

13    death of her husband, Melvin B. Griesbauer, the insurance

14    policy would among other things pay to the beneficiary the sum

15    of at least $37,500.

16          Seven, Elain Kay Young and her husband, Melvin B.

17    Griesbauer, enrolled in an accidental death and dismemberment

18    insurance policy that would among other things pay to Elain

19    Kay Young as the beneficiary the sum of at least $10,000 --

20    strike that -- the sum of at least $100,000 upon the

21    accidental death of Melvin B. Griesbauer.  Elain Kay Young and

22    Melvin B. Griesbauer enrolled in that accidental death and

23    dismemberment insurance policy through Continental Casualty

24    Company, a subsidiary of CNA.  Elain Kay Young knew that upon

25    the death of her husband, Melvin B. Griesbauer, the insurance

33

1    policy would among other things pay to the beneficiary the sum

2    of at least $100,000.

3          Eight, Elain Kay Young recruited Katherine A. Mock to

4    help facilitate the murder of Melvin B. Griesbauer.  Further,

5    Elain Kay Young agreed to pay Katherine A. Mock and others

6    sums of money and other benefits for facilitating the death of

7    Melvin B. Griesbauer.  As a result of said conspiracy, Melvin

8    B. Griesbauer was, in fact, murdered, thereby eliminating

9    Melvin B. Griesbauer as Elain Kay Young's husband and allowing

10   for the prospect of obtaining money, property, and other

11   benefits by Elain Kay Young and Katherine A. Mock.

12         Means and Methods, Ten, The means and methods by

13   which the conspiracy was sought to be accomplished included

14   among other things the following:  A, it was part of the

15   conspiracy that in or about 2006, Elain Kay Young solicited

16   Katherine A. Mock to pursue a scheme to murder Elain Kay

17   Young's husband, Melvin B. Griesbauer; B, it was further part

18   of the conspiracy that in or about 2006, Katherine A. Mock and

19   Elain Kay Young agreed to pursue a scheme to murder Elain Kay

20   Young's husband, Melvin B. Griesbauer; C, it was further part

21   of the conspiracy that in or about March 2006, Katherine A.

22   Mock attempted to recruit K.P. to murder Melvin B. Griesbauer

23   for $6,000; D, it was further part of the conspiracy that in

24   or about March 2006, Katherine A. Mock attempted to recruit

25   T.P. to murder Melvin B. Griesbauer for $10,000; E, it was

34

1    further part of the conspiracy that on or about March 22,

2    2006, Katherine A. Mock began to travel from her residence in

3    Cassville within Barry County, Missouri to the residence of

4    Melvin B. Griesbauer and Elain Kay Young in Novinger within

5    Adair County, Missouri.

6         F, it was further part of the conspiracy that on

7    March 22, 2006, Katherine A. Mock attempted to conceal her

8    involvement in the conspiracy by concealing from some of her

9    family members her actual destination, the residence of Melvin

10   B. Griesbauer and Elain Kay Young; G, it was further part of

11   the conspiracy that on or about March 22, 2006, Katherine A.

12   Mock purchased a three hole ski mask from Wal-Mart in

13   Republic, Missouri and thereafter utilized a three hole ski

14   mask in the course of the conspiracy; H, it was further part

15   of the conspiracy that on March 22, 2006, Katherine A. Mock

16   arrived at the residence of Melvin B. Griesbauer and Elain Kay

17   Young in Novinger, Missouri and contacted Elain Kay Young; I,

18   it was further part of the conspiracy that during the late

19   evening hours of March 22, 2006 or the early morning hours of

20   March 23, 2006, Elain Kay Young departed her residence to

21   travel to the vicinity of Kirksville, Missouri to meet Melvin

22   B. Griesbauer and drive him to their residence following the

23   conclusion of his work shift.

24        J, it was further part of the conspiracy that during

25   the late evening hours of March 22nd and the early morning

1   hours of March 23, 2006, Katherine A. Mock remained at the

2   residence of Melvin B. Griesbauer and Elain K. Young in

3   Novinger, Missouri; K, it was further part of the conspiracy

4   that during the early morning hours of March 23, 2006, Elain

5   K. Young returned Melvin B. Griesbauer to their residence from

6   the vicinity of Kirksville, Missouri; L, it was further part

7   of the conspiracy that during the early morning hours of

8   March 23, 2006 near the vicinity of the barn at said

9   residence, Katherine A. Mock and Elain Kay Young caused the

10  death of Melvin B. Griesbauer by causing him to be shot in the

11  head with a .30-30 Winchester caliber rifle, a firearm

12  previously in the possession of Elain Kay Young and her

13  family; M, it was further part of the conspiracy that

14  Katherine A. Mock and Elain Kay Young attempted to conceal

15  their involvement in the conspiracy; N, it was further part of

16  the conspiracy that Katherine A. Mock and Elain Kay Young

17  attempted to conceal their involvement in the conspiracy by

18  making false statements to other persons; O, it was further

19  part of the conspiracy that Elain Kay Young attempted to

20  conceal her own involvement and the involvement of Katherine

21  A. Mock in the conspiracy by providing Katherine A. Mock with

22  pills containing hydrocodone and acetaminophen and directing

23  Katherine A. Mock to consume the pills in order to receive a

24  short term in a mental hospital and avoid a penitentiary

25  sentence.

36

1          P, it was further part of the conspiracy that between

2    on or about March 23rd and March 24, 2006, Katherine A. Mock

3    attempted to conceal her involvement in the conspiracy by

4    receiving pills containing hydrocodone and acetaminophen from

5    Elain Kay Young, consuming a quantity of said pills and

6    thereafter seeking medical treatment; Q, it was further part

7    of the conspiracy that Elain Kay Young used or caused another

8    to use the mail and used or caused another to use any facility

9    of interstate commerce as part of processing the insurance

10   policies including but not limited to claims for proceeds

11   payable upon the death of Melvin B. Griesbauer; R, it was

12   further part of the conspiracy that on or about March 29,

13   2006, Elain Kay Young utilized facilities of interstate

14   commerce to initiate the claims processing through the AAFMA,

15   thereby causing the AAFMA on or about April 6, 2006 to use the

16   mail to deliver a claim form and other documents to Elain Kay

17   Young in relation to AAFMA policy number 132054; S, it was

18   further part of the conspiracy that on or about August 2,

19   2007, Elain Kay Young took steps to initiate the claims

20   process on the accidental death and dismemberment insurance

21   policy that was later determined to be issued by Monumental

22   Life under policy number MZ24028 and thereafter used or caused

23   another to use the mail in relation to the claims process.

24          T, it was further part of the conspiracy that from on

25   or about August 2007 and up to and including on or about

1    February 12, 2008, Elain Kay Young mailed or caused to be

2    mailed documents including but not limited to a Proof of Death

3    Form and a Lost Policy Affidavit to Forrest T. Jones and

4    Company, Incorporated, Forrest T. Jones, Fidelity Security

5    Life Insurance Company, FSL, and other entities in an attempt

6    to process the claim for the policy that was later determined

7    to be issued by Monumental Life under policy number MZ24028;

8    U, it was further part of the conspiracy that on or about

9    March 3, 2008, Elain Kay Young mailed or caused to be mailed a

10   claim form to the Benefits Payment Department affiliated with

11   Forrest T. Jones and Monumental Life through which Elain Kay

12   Young sought among other things the payment of benefits

13   associated with the accidental death and dismemberment policy

14   that named her as the beneficiary upon the death of Melvin B.

15   Griesbauer.  In violation of Title XVIII, United States Code,

16   Section 1958.

17        Count Two, The Grand Jury further charges that

18   beginning at a time unknown but including 2006, the exact

19   beginning date being unknown to the Grand Jury, up to and

20   through 2009 and the time of this indictment in the Eastern

21   District of Missouri and elsewhere, Katherine A. Mock and

22   Elain Kay Young, the defendants herein, used and caused

23   another to use the mail and other facilities of interstate

24   commerce with the intent that the murder of Melvin B.

25   Griesbauer be committed in violation of the laws of the State

38

1   of Missouri as consideration for the receipt of and as

2   consideration for a promise and agreement to pay things of

3   pecuniary value, that is, money and other items of pecuniary

4   value.  Said offense resulted in the death of Melvin B.

5   Griesbauer.  In violation of Title XVIII, United States Code,

6   Sections 1958 and 2.

7        Instruction number 26, The indictment charges that

8   the offenses were committed "in and around" or "on or about" a

9   certain date.  Although it is necessary for the Government to

10  prove beyond a reasonable doubt that the offense was committed

11  on a date reasonably near the dates alleged in the indictment,

12  it is not necessary for the Government to prove that the

13  offense was committed precisely on the date charged.

14       Instruction number 27, The crime of conspiracy to

15  commit murder for hire as charged in Count One of the

16  indictment has four elements which are, One, two or more

17  persons reached an agreement or came to an understanding to

18  use interstate commerce facilities with the intent that a

19  murder for hire be committed and death resulted; and Two, the

20  defendant voluntarily and intentionally joined in the

21  agreement or understanding either at the time it was reached

22  or at some later time while it was still in effect; and Three,

23  at the time the defendant joined in the agreement or

24  understanding, she knew the purpose of the agreement or

25  understanding; and Four, while the agreement or understanding

 1    was in effect, the defendant or one or more other persons who

 2    had joined in the agreement knowingly used or caused another

 3    to use a facility of interstate commerce, to wit, phone calls,

 4    an electronic banking facility, and the United States mail for

 5    the purpose of carrying out or carrying forward the agreement

 6    or understanding.  If all of these elements have been proved

 7    beyond a reasonable doubt as to each defendant, then you must

 8    find each defendant guilty of the crime charged.  Otherwise,

 9    you must find each defendant not guilty of this crime.

10              Instruction number 28, Under the statute upon which

11    Count One of the indictment is based, the Government must

12    prove that each defendant reached an agreement or

13    understanding with at least one other person.  It makes no

14    difference whether that person is a defendant or named in the

15    indictment.  The agreement or understanding need not be an

16    expressed or formal agreement or be in writing or cover all

17    the details of how it is to be carried out, nor is it

18    necessary that the members have directly stated between

19    themselves the details or purpose of the scheme.  You should

20    understand that merely being present at the scene of an event

21    or merely acting in the same way as others or merely

22    associating with others does not prove that a person has

23    joined in an agreement or understanding.  A person who has no

24    knowledge of a conspiracy but who happens to act in a way

25    which advances some purpose of one does not thereby become a

1  member.  But a person may join in an agreement or

2  understanding as required by this element without knowing all

3  the details of the agreement or understanding and without

4  knowing who all the other members are.

5       Further, it is not necessary that a person agree to

6  play any particular part in carrying out the agreement or

7  understanding.  A person may become a member of a conspiracy

8  even if that person agrees to play only a minor part in the

9  conspiracy as long as that person has an understanding of the

10  unlawful nature of the plan and voluntarily and intentionally

11  joins in it.  You must decide after considering all the

12  evidence whether the conspiracy alleged in Count One of the

13  indictment existed.  If you find that the alleged conspiracy

14  did exist, you must also decide whether each defendant

15  voluntarily and intentionally joined in the conspiracy either

16  at the time it was first formed or at some later time while it

17  was still in effect.  In making that decision, you must

18  consider only evidence of each defendant's own actions and

19  statements.  You may not consider actions and pretrial

20  statements of others except to the extent that pretrial

21  statements of others describes something that had been said or

22  done by each defendant.

23       Instruction 29, To assist you in determining whether

24  there was an agreement or understanding to commit murder for

25  hire as charged in Count One, you are advised that the

1   elements of the offense of murder for hire are:  One, that a

2   person at or about the time charged in the indictment used or

3   caused another to use any facility of interstate commerce; and

4   Two, that the use of any interstate facility was done with the

5   intent that a murder be committed in violation of the laws of

6   the State of Missouri; and Three, that anything of pecuniary

7   value was received or promised or agreed to be paid as

8   consideration for the murder; and Four, the death of Melvin B.

9   Griesbauer resulted.  Count One of the indictment charges each

10  defendant with the charge of conspiracy to commit murder for

11  hire.  Earlier in these instructions, I defined the elements

12  of the offense.  You may use these definitions in considering

13  whether each defendant conspired to commit murder for hire.

14          Instruction 30, It is not necessary that the act done

15  in furtherance of the conspiracy be in itself unlawful.  It

16  may be perfectly innocent in itself.  It is not necessary that

17  each defendant have personally committed the act, known about

18  it, or witnessed it.  It makes no difference which of the

19  conspirators did the act.  This is because a conspiracy is a

20  kind of partnership so that under the law, each member is an

21  agent or partner of every other member, and each member is

22  bound by or responsible for the acts of every other member

23  done to further that scheme.  It is not necessary that the

24  Government prove beyond a reasonable doubt that more than one

25  act was done in furtherance of the conspiracy.  It is

42

1  sufficient if the Government proves beyond a reasonable doubt

2  one such act, but in that event, in order to return a verdict

3  of guilty, you must unanimously agree upon which act was done.

4         Instruction number 31, It is not necessary for the

5  Government to prove that the conspirators actually succeeded

6  in accomplishing their unlawful plan.

7         Instruction number 32, You may consider acts

8  knowingly done and statements knowingly made by a defendant's

9  coconspirators during the existence of the conspiracy and in

10 furtherance of it as evidence pertaining to each defendant

11 even though they were done or made in the absence of and

12 without the knowledge of each defendant.  This includes acts

13 done or statements made before each defendant has joined the

14 conspiracy, for a person who knowingly, voluntarily, and

15 intentionally joins an existing conspiracy is responsible for

16 all of the conduct of the coconspirators from the beginning of

17 the conspiracy.  Acts and statements which are made before the

18 conspiracy began or after it ended are admissible only against

19 the person making them and should not be considered by you

20 against each defendant.

21        Instruction number 33, The crime of murder for hire

22 as charged in Count Two of the indictment has four elements

23 which are:  One, that a person at or about the time charged in

24 the indictment used or caused another to use any facility of

25 interstate commerce; and Two, that the use of any interstate

1   facility was done with the intent that a murder be committed

2   in violation of the laws of the State of Missouri; and Three,

3   that anything of pecuniary value was received or promised or

4   agreed to be paid as consideration for the murder; and Four,

5   the death of Melvin B. Griesbauer resulted.  If all of these

6   elements have been proved beyond a reasonable doubt as to each

7   defendant, then you must find each defendant guilty of the

8   crime charged.  Otherwise, you must find each defendant not

9   guilty of this crime.

10          Instruction number 34, A person may be found guilty

11  of murder for hire even if he personally did not do every act

12  constituting the offense charged if he aided and abetted the

13  commission of murder for hire.  In order to have aided and

14  abetted the commission of murder for hire, one, a person must

15  before or at the time the crime was committed have known

16  murder for hire was going to be committed, and two, a person

17  must before or at the time the crime was committed have

18  knowingly acted in some way for the purpose of causing,

19  encouraging, or aiding murder for hire, and three, a person

20  must before or at the time the crime was committed have

21  intended that a facility of interstate commerce be used for

22  the commission of a murder, and four, the death of Melvin B.

23  Griesbauer resulted.  For you to find a defendant guilty of

24  murder for hire by reason of aiding and abetting, the

25  Government must prove beyond a reasonable doubt all the

44

1    elements of murder for hire were committed by some person or

2    persons that the defendant aided and abetted that crime;

3    otherwise, you must find that particular defendant not guilty

4    of this crime under Count Two.

5         You should understand that merely being present at

6    the scene of an event or merely acting in the same way as

7    others or merely associating with others does not prove that a

8    person has become an aider or abettor.  A person who has no

9    knowledge of the crime that is being committed or about to be

10   committed but who happens to act in a way which advances some

11   offense does not thereby become an aider or abettor.

12        Instruction number 35, You are instructed that the

13   law of the State of Missouri, Section 565.020 of the Missouri

14   Revised Statutes, provides that a person commits the crime of

15   murder in the first degree if he knowingly causes the death of

16   another person after deliberation upon the matter.  The law of

17   the State of Missouri further provides that deliberation means

18   cool reflection for any length of time no matter how brief.

19        Instruction number 36, Under the statute upon which

20   Counts One and Two of the indictment are based, the term

21   "anything of pecuniary value" means anything of value in the

22   form of money, a negotiable instrument, a commercial interest,

23   or anything else, the primary significance of which is

24   economic advantage.

25        Instruction number 37, Under the statute upon which

1   Counts One and Two of the indictment are based, the term

2   "facility of interstate commerce" includes means of

3   transportation and communication.

4        Instruction number 38, Under the statute upon which

5   Counts One and Two of the indictment are based, the term "as

6   consideration for" means consideration in the traditional

7   sense of bargained-for exchange.  The term "consideration"

8   includes payment or the promise to pay later.

9        Instruction number 39, Intent or knowledge may be

10  proved like anything else.  You may consider any statements

11  made and acts done by each defendant and all the facts and

12  circumstances in evidence which may aid in the determination

13  of each defendant's knowledge or intent.  You may but are not

14  required to infer that a person intends the natural and

15  probable consequences of acts knowingly done or knowingly

16  omitted.

17       Instruction number 40, The law does not require the

18  prosecution to call as witnesses all persons who may have been

19  present at any time or place involved in the case or who may

20  appear to have some knowledge of the matters in issue at this

21  trial, nor does the law require the prosecution to produce as

22  exhibits all papers and things mentioned in evidence.  The

23  jury will always bear in mind that the law never imposes upon

24  a defendant in a criminal case the burden or duty of calling

25  any witnesses or producing any evidence, and no adverse

1   inferences may be drawn from her failure to do so.

2          Instruction number 41, In conducting your

3   deliberations and returning your verdict, there are certain

4   rules you must follow.  I will list those rules for you now.

5   First, when you go to the jury room, you must select one of

6   your members as your foreperson.  That person will preside

7   over your discussions and speak for you here in court.

8   Secondly, it is your duty as jurors to discuss this case with

9   one another in the jury room.  You should try to reach

10  agreement if you can do so without violence to individual

11  judgment because a verdict, whether guilty or not guilty, must

12  be unanimous.  Each of you must make your own conscientious

13  decision but only after you have considered all the evidence,

14  discussed it fully with your fellow jurors, and listened to

15  the views of your fellow jurors.  Do not be afraid to change

16  your opinions if the discussion persuades you that you should,

17  but do not come to a decision simply because other jurors

18  think it is right or simply to reach a verdict.

19          Third, if the defendant is found guilty, the sentence

20  to be imposed is my responsibility.  You may not consider

21  punishment in any way in deciding whether the Government has

22  proved its case beyond a reasonable doubt.  Fourth, if you

23  need to communicate with me during your deliberations, you may

24  send a note to me through the marshal or bailiff signed by one

25  or more jurors.  I will respond as soon as possible either in

1  writing or orally in open court.  Remember that you should not

2  tell anyone, including me, how your votes stand numerically.

3  Fifth, your verdict must be based solely on the evidence and

4  on the law which I have given to you in my instructions.  The

5  verdict, whether guilty or not guilty, must be unanimous.

6  Nothing I have said or done is intended to suggest what your

7  verdict should be.  That is entirely for you to decide.

8          Finally, the verdict form is simply the written

9  notice of the decision that you reach in this case.  The form

10  reads as follows:  In The United States District Court for the

11  Eastern District of Missouri, Eastern Division, United States

12  of America, plaintiff, versus Katherine A. Mock and Elain Kay

13  Young, defendants, case S1-4:09-CR-679 HEA.  Verdict, Count

14  One, we, the jury, find the defendant, Katherine A. Mock,

15  guilty or not guilty of the crime charged in Count One of the

16  indictment.  Count Two, we, the jury, find the defendant,

17  Katherine A. Mock, guilty or not guilty of the crime charged

18  in Count Two of the indictment.  A signature line for the

19  foreperson and a signature line for the date.

20          In the United States District Court for the Eastern

21  District of Missouri, Eastern Division, United States of

22  America, plaintiff, versus Katherine A. Mock and Elain K.

23  Young, defendants, case number S1-4:09-CR-679 HEA.  Verdict,

24  Count One, we, the jury, find the defendant, Elain Kay Young,

25  guilty or not guilty of the crime charged in Count One of the

1    indictment.  Count Two, we, the jury, find the defendant,

2    Elain Kay Young, guilty or not guilty of the crime charged in

3    Count Two of the indictment.  A signature block for the

4    foreperson as well as a block for the date.

5           You will take these forms to the jury room, and when

6    each of you has agreed on the verdict, the foreperson will

7    fill in the form, sign and date it, and advise the marshal or

8    bailiff that you are ready to return to the courtroom.

9           Mr. Dittmeier, counsel for the Government, you may

10   proceed with your closing argument.  And, Counsel, if you want

11   to use the instructions during your arguments, they will be

12   with the court clerk.

13          MR. DITTMEIER:  May it please the Court, attorneys.

14   Ladies and gentlemen of the jury, as the judge just told you,

15   this part of the case is called closing argument, and what it

16   does, it gives the attorneys an opportunity to review the

17   evidence with you and tell you what they feel the evidence has

18   proven and shown.  I want to remind you though, a closing

19   argument is not evidence, so if any attorney gets up here and

20   they refer to a piece of evidence or misstate a piece of

21   evidence, it is the way you remember the evidence.  You are

22   the triers of fact, and you have all listened to this case

23   carefully.  You know what evidence has been presented up

24   there, and you can review it.

25          Now before we review the evidence, there is a few

1    instructions I want to go through.  You listened to all the

2    instructions, and you will have them back in the room, but

3    just a couple of them.  If you recall the elements of the

4    crime, and the Government has to prove these beyond a

5    reasonable doubt, element one, "that a person at or about the

6    time charged in the indictment used or caused another to use

7    any facility of interstate commerce," well, if you recall that

8    phone call from Kay Young to Kathy Mock when she made the

9    offer to Keri Ponder about killing for $6,000, that's an

10   interstate facility.  That phone call was an interstate

11   facility.  When Jean Ballard is called by Kathy Mock and says,

12   I am going to the hospital, when, in fact, she was going up to

13   Novinger to effect the murder, that is the use of an

14   interstate facility.  When Kathy Mock is on the way up to

15   Novinger and she stops and uses her ATM card and buys that

16   mask and then that ATM card is communicated through the air

17   waves to the banks, that is interstate.  So clearly interstate

18   facilities have been used in furthering this crime.  Also,

19   every mail, every phone call to the insurance companies, that

20   is all using interstate facilities.  So obviously Count One

21   has been satisfied.

22           Count Two is that any interstate facility was done

23   with the intent that a murder be committed.  Well clearly that

24   is what this is all about.  What they were doing for that

25   period of time, those several weeks, everything was geared to

1  this murder being committed, from buying the mask to trying to

2  collect what the true crime is, to get the insurance, the life

3  insurance money.  So that element has been met.

4      The third element is that anything of pecuniary value

5  was received or promised or agreed to be paid as

6  consideration.  Well, there is over a million dollars of

7  insurance that they are trying to collect.  There's been 6,000

8  offered to Keri Ponder.  There's been 10,000 offered to Thomas

9  Ponder.  And when you look at the financial situation of both

10  defendants, you know that money was coming from that loan Kay

11  Young was trying to get and eventually the rest of it would

12  come from the insurance.  So, of course, they were talking

13  about money.  They were offering money, and Kathy Mock clearly

14  when she tells Jean Ballard I'm going to be coming into some

15  money soon, I will pay you back the money I owe you plus some,

16  there is money promised.  That is the third element.

17      And the fourth element, "resulted in the death of

18  Melvin Griesbauer," obviously, that has been met.  There is no

19  dispute he was murdered.  He was murdered in cold blood.  He

20  was executed up there at that barn.  So that fourth element

21  has been met.

22      The next instruction I want to mention to you and the

23  judge just read it to you, it involves the conspiracy, and

24  also really you have got an aiding and abetting which tells

25  you if two people are doing something and one aids and abets

1    the other one, they are a principal.  The acts of one are

2    attributed to the acts of another one as long as they are

3    moving in the same direction to accomplish the same purpose.

4    This instruction says it is not necessary that each defendant

5    have personally committed the act, known about it, or

6    witnessed it.  It makes no difference which of the

7    conspirators did the act.  This is because a conspiracy is a

8    kind of partnership so that under the law, each member is an

9    agent or partner of every other member, and each member is

10   bound by or responsible for the acts of every other member

11   done to further their scheme.  So, for instance, when Kathy

12   Mock is in Republic, Missouri buying that mask, it's just as

13   if Kay Young was down there buying that mask.  They are

14   conspiring.  They are acting together.

15          The other instruction, and we talked about it in voir

16   dire, and that is hold the Government to proving each element

17   beyond a reasonable doubt.  The Government expects you to hold

18   them to that burden, and I would submit that we have met that

19   burden.  And when you read this instruction, it indicates --

20   and I am just going to read parts of it -- "a reasonable doubt

21   is a doubt based upon reason and common sense and not the mere

22   possibility of innocence.  A reasonable doubt is a kind of

23   doubt that would make a reasonable person hesitate to act.

24   Proof beyond a reasonable doubt, therefore, must be proof of

25   such a convincing character that a reasonable person would not

1   hesitate to rely and act upon it.  However, proof beyond a

2   reasonable doubt does not mean proof beyond all possible

3   doubt."  And if you think about it, I probably couldn't prove

4   beyond all possible doubt that I am the same attorney that's

5   been in front of you the last five days.  So I think you

6   understand that instruction.

7         But when it talks about a reasonable person acting,

8   you might relate to James Goodwin when he found that chatter

9   and he saw krisfarmstore and saw the chatter on there and it

10  clearly related to sex, and he says, I've been quiet, now you

11  can do what I want, and he knows that Kay Young's husband was

12  murdered, and he sees that she leaves her house at night

13  reluctantly when she don't want to and goes right over there

14  when he tells her to get her ass over there.  He put that

15  together.  That was a reasonable man.  He knew that had

16  something to do with this murder, and he took that chat and he

17  mailed it in to the prosecuting attorney's office.  So it's

18  not that sophisticated.  It's just hold the Government to its

19  proof beyond a reasonable doubt.

20        Now let's take a look at the evidence, and let's

21  start going through it right at the beginning.  Do you recall

22  that Elain Young was married four times.  Her third husband

23  was David Crawford, and she divorced David Crawford on

24  March 23rd of 2003.  And if you recall, Kay Young's friend,

25  Gayle Craigg, testified, and she said she started dating

53

1   Melvin Griesbauer in the fall of 2003.  Well, by March 23rd of

2   2004, that is about six months, she was on his life insurance

3   policy as the major beneficiary, and I believe that was that

4   policy that was $250,000 that moved up to $400,000, but it was

5   a significant policy that after six months, they are not

6   married yet, she gets on his insurance policy as a

7   beneficiary.  Does that sound familiar?

8         Think back again to James Goodwin.  Melvin Griesbauer

9   is killed on March 23rd, and by the end of April, she is

10  already hooked up with James Goodwin.  Remember, the first

11  part of May then, she goes and stays at his house for three

12  days.  Well, within six months, October 23rd of 2006, just

13  about six months, she's on James Goodwin's insurance as a

14  beneficiary.  And what does James Goodwin say?  She asked him

15  to put her on as a beneficiary.  It's not hard to infer that

16  that is the same thing that happened to Melvin Griesbauer

17  except it was a much, much larger amount of money involved

18  there.

19        Now here's something else.  As you look through this

20  evidence and think about it, she is on Melvin Griesbauer's

21  insurance.  As they move on through '04, she marries him.

22  September 5, 2004 she marries Mel Griesbauer.  And you recall

23  in the stipulation that was made, he was deployed to go to

24  Iraq.  That was October 15, 2004.  Once they were married,

25  they lived together 40 days and he was gone.  He didn't come

1   back until September the 20th of 2005.  There was a short

2   period around Christmas in 2004 he was there, but other than

3   that, when you are reviewing this evidence, keep in mind, she

4   married him, he was gone October 15th, 40 days.

5           Now let's take a look and move into the summer of

6   '05.  She has only lived with him 40 days after they are

7   married.  We move to the summer of '05.  What is she doing?

8   She is having an affair already with Kris Robins.  And what

9   did he say?  She really, really disliked her husband.  How

10  could she dislike him that much in that short period of time?

11  He said she repeatedly said "I wish he was dead.  I would like

12  to kill the sonofabitch."  And he said she said it over and

13  over during that summer while he was with her.  Now how do you

14  know that is true?  Well, here's how you know.  When you take

15  a look at that chat that James Goodwin came up with, in that

16  first paragraph -- and this is in May of 2007, and it's from

17  krisfarmstore, but Goodwin puts it together because she told

18  him she was having an affair with a guy.  He thought it was

19  Chris Roberts, but her husband was in Iraq, and Chris

20  Roberts's wife was in the penitentiary.  Well, Robins told you

21  his wife was in the penitentiary, so we're talking about the

22  same person.

23          When he sees that, him talking about thinking about

24  her cervix and then goes into the business about "I have kept

25  quiet, the least you can do is what I say," and then he gets

1   real assertive and says get over here and then she shows up

2   over there, Goodwin knows what that is, and he knows that "I

3   have stayed quiet," what's he staying quiet for?  Well, Robins

4   explained that to you, the same thing that Goodwin inferred.

5   He stayed quiet because she said I would like to kill the

6   sonofabitch.  I want him dead.  And why did she tell him she

7   wanted him dead?  "Because he was going to try and take my dog

8   business."  They were only together 40 days and he is over in

9   a war zone.  Do you think he was worried about her dog

10  business?  The reason is made up, but it's hard to say I'm

11  looking to get his insurance money, his life insurance money,

12  so that is the excuse she gives to Robins.

13          Now what else is going on during that same period of

14  time?  Well, she gets her profile, and she's got it on the

15  dating service, Adult Friend Finder, and that runs from July

16  to November of '05.  And what's she got on that profile?  Now

17  obviously in that profile, she is looking for sex.  She's got

18  interested in one-on-one sex.  She is looking for a

19  well-endowed male, somebody that knows how to make love to a

20  woman.  But the sex isn't the important thing.  When you read

21  that, there are phrases in there as to what she is looking

22  for, and she is looking for somebody on a more permanent

23  basis.  She is looking for a partner.  She is looking for a

24  companion.  She wants somebody of a similar IQ because clearly

25  Melvin Griesbauer is beneath her, and she wants a commitment.

1    She wants a man who really knows how to be the man of the

2    house.  Does that sound like Melvin Griesbauer is in her plans

3    at all?  Once he gets back from Iraq, he is not going to be in

4    her plans for very long.  You know that.  You don't do this

5    after being married to somebody for 40 days.  She's looking

6    for another man already, and she hooks up with Eschmann, Tim

7    Eschmann.

8           Now his profile, he is looking for one-on-one sex,

9    but pretty much he is a businessman.  He is cutting back.

10   He's got a farm.  He owns an airplane.  From what you have

11   heard in this case, does that sound like somebody Kay Young

12   would be geared to?  Somebody with money.  And he takes her

13   flying for the first time on September the 12th -- or

14   September the 14th of 2005.  Her poor husband, Melvin

15   Griesbauer, is coming back September the 20th.  She is out

16   with this other guy six days before he comes home.  And then

17   they see each other throughout the fall.  Melvin Griesbauer is

18   there, but he is working nights.  He is working up in this

19   meat packing company every night, and Eschmann never sees him.

20   She tells Eschmann we are going to be separated in the spring,

21   which Eschmann justifies that he can see her then.  Well, they

22   were going to be separated, just not in the way Melvin

23   Griesbauer or Eschmann would have preferred.  But she tells

24   him we will be separated.  He takes her on another airplane

25   trip February the 25th of 2006, and that is when Eschmann and

1   Young fly down to Springfield for this dog and trade show, and

2   he meets Kathy Mock down there.  Mock and Young are like this.

3   They are incredibly close.  He flies her to Springfield, and

4   he meets Mock, and they spend the day together.  That is only

5   a month before Melvin Griesbauer is going to get murdered.

6   Think about that.  She is down there in Springfield with Mock

7   and she has her boyfriend flying her down there.

8           Now let's move into after the first of the year.  We

9   start moving into March, and you have got some critical days

10  here, and almost every day in March is leading up to something

11  that tells you what the end result is going to be.  March

12  the 13th of 2006 -- and keep in mind, Kay Young is obsessed

13  with keeping this farm.  She needs the farm.  She doesn't have

14  money.  She is desperate.  She's already since 2003 -- and

15  it's in the records that were put in trial -- has had two

16  different loans on this farm, and now she is trying to

17  renegotiate and redo another loan on the farm, and she needs

18  that loan.  And there is that e-mail, and it's in Exhibit 27E,

19  she sends it to Nick Lessing, and she says that she can give

20  him another $100 for the appraisal, but she says "my paycheck

21  is stretched very thin.  I simply cannot stretch myself any

22  further and survive the month" -- she can't survive the month

23  of March -- "and I do not sell puppies for four weeks."  So

24  any dogs she's got, if she can even sell them, is not going to

25  be until April.  She is desperate.  "I need the money, I can't

1    survive the month."  That loan is important, extremely

2    important to her.

3         Now that is on March the 13th.  We move into March

4    the 14th, and March 14th, if you recall, Keri Ponder told you

5    that is the day that Rita got bonded out, Rita Ponder got

6    bonded out of jail by Kathy Mock.  Early that evening, she is

7    driving back from Jean Ballard's house with Kathy Mock, and

8    Kathy Mock gets a call from Kay Young, and when she hangs up,

9    Keri Ponder says what was that about, and Kathy Mock says Kay

10   says that her husband took out $300,000 in life insurance on

11   her and told her she won't be around to enjoy it with him.

12   Well, where does that come from?  Well, what it comes from is

13   Mock and Young were obsessed with the life insurance, and that

14   is what they had to throw out now this time.  They had to

15   attribute that to Melvin Griesbauer.  There is no evidence

16   here that he took out any life insurance on her, but that is

17   related to Keri Ponder because it's easier when you are going

18   to ask somebody to kill somebody to try and make it look like

19   that they are at least killing a bad guy rather than just some

20   poor guy who happens to have life insurance that you want.

21        So right after that phone call, Kathy Mock says to

22   Keri Ponder, Do you know of anybody that will kill Kay's

23   husband, and Keri Ponder says no.  Well then she says to Keri

24   Ponder, Will you kill him.  They would be willing to pay

25   $6,000.  Well, Kathy Mock is in the verge of having her car

1  possessed.  She is behind on her house payments.  They might

2  take her house.  She don't have 6,000.  We know from the

3  March 13th e-mail to Lessing that Young don't have 6,000, at

4  least she is not going to have it until she gets the loan on

5  March the 22nd and then later down the road when she collects

6  the life insurance.  But she asked Keri Ponder will you do

7  this for $6,000, and here is something that is really

8  significant.  If you recall, Keri Ponder says, Why doesn't she

9  just divorce him.  Logical question.  And we know that Kay

10  Young's been divorced three other times.  She knows the

11  process.  She knows how to do it.  And what does Kathy Mock

12  say?  It's not that simple.  It's not that easy.  Well, why

13  isn't it that simple and why not that easy?  Every one of you

14  could give me the answer right now.  It's not that simple and

15  not that easy because she can't get this loan without Melvin

16  Griesbauer.  He has to be put on the deed to the farm.  You

17  heard Lessing testify to that.  His salary, they both made

18  between 25 and 30,000 a year, and they needed both those

19  salaries in order to be able to get this loan.  And as a

20  practical matter, even after she got the loan, if she

21  separated from Mel Griesbauer and he walked away with his part

22  of the salary, she still couldn't handle the bills.  She

23  couldn't save that farm.  So that is why it wasn't so simple

24  and it wasn't so easy.  She couldn't leave him or divorce him.

25  She needed him on that deed, and she needed the insurance

 1   money.

 2          And when you take a look and evaluate the credibility

 3   of the witnesses -- and listen, every witness the Government

 4   puts on there, be critical of them.  Analyze them, be critical

 5   of the witnesses, but be fair.  And if you are, you are going

 6   to find right down the line they were telling the truth.  Did

 7   you see Keri Ponder's reaction when she said that she offered

 8   her the 6,000?  Do you recall when she started crying on the

 9   stand?  She was looking over at Kathy Mock.  Well, that was a

10   significant moment because they both know that is true.  That

11   is why she broke down.  That conversation took place.  And she

12   didn't want to be up here saying it, but she did.  And you are

13   told with Keri Ponder when you take a look at her, consider

14   she's got a criminal record.  She's got a felony conviction

15   for assault.  But isn't somebody with a felony conviction

16   somebody you would approach to see if they would do a murder?

17   Obviously.

18          Now that is on the 14th.  The offer's been made, and

19   it is made right after a phone call from Kay Young.  But let's

20   move on.  Wednesday was the 15th.  The next day is March

21   the 16th of '06, and that's the day that Keri Ponder has to go

22   over to Jean Ballard's to spend the night so Ballard can take

23   her to the bus stop in Joplin on March the 17th.  And what

24   happens there?  That night over there, Keri Ponder said, Well,

25   she asked me to kill him, but I just thought it was talk.

1    Well truthfully, ladies and gentlemen, she thought it was a

2    little bit more than that because the night of March 16th --

3    now this is a week before the murder on the 23rd -- she tells

4    Jean Ballard, so it's not like just another conversation.  She

5    tells Jean Ballard that Mock had asked her to kill Kay's

6    husband.  That is not after the fact.  That is not made up.

7    That was told on March the 16th.

8              Now the reason Mock wasn't there to take her to the

9    bus is Kathy Mock and her other daughter-in-law, Rita Ponder,

10   went up to Novinger, Missouri the 16th and the 17th to spend

11   with Kay Young.  And then she comes back on the 17th, and what

12   occurs then?  The first time with Keri Ponder, it's a

13   telephone call.  Now it's a face-to-face meeting with Kay

14   Young up in Novinger.  She comes back, and she approaches her

15   son, Thomas Ponder, and says, Do you know anybody that will

16   kill Kay's husband.  We'll pay $10,000 for it, and he says no.

17   But she tells him that Melvin Griesbauer is abusive and

18   ex-military.  So now we have got he's going to take the dog

19   business, he took out 300 in life insurance, and now the next

20   story is he is abusive and ex-military.  It depends on who you

21   are talking to.  You appeal to whatever you think will

22   motivate them and get them to do it.  But it is significant

23   because she comes back from Novinger and approaches her son.

24   Once again, Thomas Ponder, he's got two felony convictions.

25   He is addicted to meth.  Who else do you go to to get a murder

1    done.

2         Now after the 17th, you move on through that weekend,

3    and on March the 20th, she goes to Thomas Ponder again and

4    says I am going up to Kay's house on March the 22nd after

5    Jason is sentenced that morning.  She wants Thomas Ponder to

6    go up there with her, and he has got enough sense not to do

7    that.  He is not going up with her.  But then we get to the

8    morning of March the 22nd, and what happens that day?  Well,

9    Kathy Mock and Rita Ponder go to the sentencing of Jason that

10   morning, and on the way back from the sentencing, Kathy Mock

11   tells Rita Ponder I'm going to the hospital in Joplin for my

12   stress for awhile, so I am not going to be here.  Rita Ponder

13   goes and cleans the kennels.  She comes back to the house at

14   1:30, and Kathy Mock is gone.  I mean, the murder now is --

15   it's in motion.  It's moving right now.  She is on her way to

16   Novinger, but she told Rita that she was going to the

17   hospital.  And after she leaves her at some point, she makes a

18   telephone call, another interstate facility, to Jean Ballard

19   to tell Jean Ballard I am going to the hospital and I will be

20   there about three days.  But she is not.

21        She stops in Republic, Missouri 2:25 p.m. and buys

22   that ski mask.  The plan is coming together, and now she is

23   heading up to Novinger.  What's happening that morning?  Kay

24   Young is re-doing the loan with Lessing, and they get their

25   loan.  And remember, she hired Arbitronix.  It is a place to

1  negotiate your bills down with your debtors, and they

2  consolidate them, and she gets her loan.  And this is

3  significant.  What did Lessing say she kept saying?  She

4  wanted to get the loan, get the bills paid.  Do you recall

5  what she said?  And he said she was adamant.  She had to walk

6  away from this with $10,000.  You think that's the $10,000

7  they were talking about giving to Thomas?  That is not a

8  coincidence that Kathy Mock says we'll pay $10,000 and all the

9  way up in the northwest part of the state Kay Young is telling

10  the guy she is getting the loan from, "I have to walk away

11  from this with $10,000."  They needed that $10,000 for any

12  initial payment on that murder.  And she gets her loan, and

13  Melvin Griesbauer that day is put on the deed to that farm,

14  and when that happens, he's got about 15 hours to live.

15          Now what else is happening on the 22nd?  On March

16  the 22nd, Rita Ponder, who is back in Cassville, calls Thomas

17  Ponder to come over and fix her car, and I think he gets over

18  there about 7:30 p.m. that night, and she said, Well, your

19  mother went into the hospital for stress, and Thomas Ponder

20  goes, She didn't go to the hospital.  She is up with Kay Young

21  in Novinger, Missouri, and she came to me and offered me

22  $10,000 or wanted me to find somebody for $10,000 to kill

23  Kay's husband.  That is hours before the murder ever happened.

24  That is not made up.  Now you may think Thomas Ponder knew a

25  little bit more about it because if you recall when Ms.

 1   Herndon was cross-examining Jean Ballard, Jean Ballard said

 2   that Thomas Ponder told her I was offered $10,000 to kill him,

 3   I declined it, but I told her if you do it, make sure you wear

 4   a mask and gloves so you don't get blow-back from the gun.

 5   Does that sound familiar with the gloves and the gun -- or the

 6   mask up there?  Of course it does.

 7           Now we move on from March the 22nd, and we are

 8   getting down to the critical time now.  And Kay Young told

 9   Sheriff Leonard Clark that she got a call at 1:04 a.m. from

10   her husband to come into Kirksville and pick him up, he was

11   coming home from work.  And she said it took her about 20

12   minutes to get in there.  So let's say she picked him up at

13   1:25.  They are going to be back between 1:40 and 1:45.

14   2:01 a.m. a 911 call comes out that there has been a shooting

15   at the farm.  2:03 a.m. Officer Salsberry is dispatched to go

16   to the farm, and he goes over there and he goes up -- comes

17   up, he sees them waving the flashlight.  He goes up there.

18   Young and Mock are the only two there, and they're huddled in

19   front of the kennel.  Melvin Griesbauer is over by the barn,

20   and he is dead.

21           And you listen to that 911 call.  Here's both of

22   them, they are up there, and on that call, they are just so

23   upset.  They are on the verge of hysteria.  If you hear Mock,

24   she is doing most of the talking, but in between if there is

25   silence, she is moaning into the phone, and then Kay Young

1   comes on the phone, and she is upset, and she says "I can't do

2   this".  Now this is the same Kay Young that said "I would like

3   to kill the sonofabitch" just the summer before, okay?  She is

4   the one that is sending Mock out to hire these people to come

5   up to help do the murder.  Mock knows she talked to Keri

6   Ponder.  That was all an act, ladies and gentlemen.  And on

7   that phone call if she says it once, she says it several

8   times.  I'm not going to quantify how many times she says it,

9   but Kathy Mock goes, Kay came home, he went out to take care

10  of the horses or whatever, and Kay heard a shot, came up and

11  got me up out of bed, and I got dressed and I went up to the

12  barn.  She repeats that several times on the 911 call.  And

13  then later when Salsberry talks to her at the back of the

14  ambulance, Kathy Mock again tells him what happened, that Kay

15  heard a shot, and I was up in bed, she came up and woke me up

16  and took me up to the barn.  But the glitch here is that when

17  Salsberry was there and Burns came up when they checked Melvin

18  Griesbauer, they are familiar with weapons, and they noted

19  that that gun was cocked because they were thinking an

20  accident or a suicide.  He told you that.  They see that gun

21  cocked, and they see a live round in there.  That had to be

22  done after the murder.  And if you recall, Salsberry says at

23  that point, we thought it was a homicide.  They pulled their

24  weapons, took their flashlights and started -- went into the

25  barn.  They found that shell casing and looked around.  They

66

1   still weren't focused on the two women.  They are looking for

2   somebody else.  And I specifically asked Salsberry, I said,

3   Did you ever say in front of the women that that gun was

4   cocked with a round in there.  He said no, we kept that to

5   ourselves.  We didn't convey that to them.

6          So now what happens?  They go back down to the house,

7   and Sheriff Leonard Clark shows up.  He was a friend of Kay

8   Young's mother.  He knew the mother and he knew the Young

9   family.  He says he goes in the house, gives his condolences

10  to Kay Young, and when Corporal Wilhoit shows up, they sit

11  down and talk to her.  And what story does she give them?  She

12  tells them in detail how she went in and she picked him up.

13  She brought him back to the house.  He went in and got a coat

14  and went up to the barn to check his babies, the dogs, and he

15  was going to check his traps, and she is working in the house

16  and she hears this gunshot, and she hollers out the back door,

17  but he don't answer, but he is hard of hearing, but she is

18  extremely concerned.  Now keep in mind, in that same

19  statement, she says he is shooting up around the barn all the

20  time.  So why this intense concern that night, we don't know.

21  But she is concerned, so she goes upstairs, wakes up Kathy

22  Mock.  Kathy Mock gets dressed.  The stories are in lock-step.

23  Kathy Mock comes down.  They go up to the barn, and they find

24  him dead.

25          Now what else does she tell Sheriff Clark?  She tells

1    Clark that he was in a really good mood when he came home that

2    day because they got that loan, and he was excited about going

3    out and buying lumber.  Now he just signed a 30-year loan, and

4    they were having trouble making it, and he is going to be

5    excited about going out and getting lumber?  But he signed

6    this 30-year loan.  He is going to go get lumber.  He doesn't

7    know that he is not going to be around.  He is not privy to

8    the separation talk with Eschmann.  He doesn't know this is

9    going to happen.  He thinks they are okay because he wasn't

10   part of the murder plot.  He didn't know what's been going on

11   for the last six months.

12           What else does she emphasize, really emphasize, to

13   Sheriff Clark?  He was so careless with the gun.  He walked

14   around with the gun cocked all the time.  It was so dangerous.

15   He kept that gun cocked.  Just a knock, that hammer would fall

16   and it would fire.  Now this guy is a war vet.  He's handled

17   rifles over there.  Do you really think that he walked around

18   all the time with the hammer back on that gun?  But she had to

19   tell them that because they were so intent on trying to make

20   this look like an accident.  She knew that gun was cocked up

21   there, and she is trying to touch every base and answer it

22   all.  But here's what happens.  When Leonard Clark gets

23   finished interviewing them, and there's nothing -- they don't

24   ask her about that gun being up there cocked, she just tells

25   her story.  She is allowed to leave, and they go over to her

 1    son, Jared's, which is about three miles from there.  The

 2    police get a search warrant, and they continue their

 3    investigation.  Well, when they go over -- Leonard Clark goes

 4    over about 4 that afternoon to take the buccal swabs.  They

 5    have Mock and Young sit down, and they take that swab on the

 6    inside of their cheek to check for the DNA.  Mock and Young

 7    clearly now know this isn't being looked at like an accident

 8    anymore.  There is somebody that suspects a murder.  The

 9    wheels are starting to come off this plan.

10          So he leaves at 5.  At some point, they go back to

11    the house that night because Kathy Mock's truck is sitting

12    back there.  And if you recall, Lieutenant Hall said they

13    searched Mock's truck and didn't find any pills in it, and he

14    searched her purse and didn't find any pills, and Kathy Mock

15    had just travelled up there.  But they go back, she has to get

16    her vehicle.  But what else did Lieutenant Hall tell you?

17    When you do a search warrant, you leave an inventory, and you

18    list everything that you took off the premises is on that

19    inventory.  What was on that inventory?  That they had found

20    the mask and the gloves that had been pitched on that far side

21    of the house.  So now they have got buccal swabs.  They found

22    the mask and the gloves that were part of the murder.  The

23    wheels are really coming off.

24          Mock leaves there and heads back to Southwest

25    Missouri in her car.  And whatever time she left there, we

```
 1   know she got back to Jean Ballard's house in Exeter, which is
 2   right by Cassville, about 2:30 a.m. because she calls Ballard.
 3   Ballard comes home from -- she is up north in Clinton,
 4   Missouri.  She comes home, gets home about 6:30.  And what
 5   happens?  Well, the phones are used again.  Kay Young calls
 6   Ballard and says, How is Kat, and she says she's been
 7   sleeping.  Kay Young says, Well, don't upset her, don't upset
 8   Kat, and when she wakes, tell her I love her.  She is trying
 9   to stay connected to that part.  She is trying to stay
10   connected and keep her finger on the pulse of what Mock is
11   doing down there.  And you will also recall when asked to
12   describe their relationship by Sheriff Clark, Young said "we
13   cherish the time we spend together."  Her and Kathy Mock
14   "cherish the time we spend together."  But when she calls
15   Ballard and says tell Kat I love her, what is missing out of
16   that conversation?  Don't upset Kat?  Wouldn't you think you
17   might tell her what Kat might be upset about, that my husband
18   was killed up here and that she saw it?  That is a glaring
19   omission.  That would be the first thing you would say.  She
20   is under a lot of stress, this happened, so just take care of
21   her.  She doesn't tell her what the problem is.  Then Mock
22   wakes up and gets sick, and Ballard says have you taken some
23   pills, and she pulls this -- you saw that, what did they say,
24   108 pills were in there -- and said she took some handfuls of
25   these.  And Ballard then takes her to the hospital, and they
```

1  get -- and if you recall, Ballard said that Young called

2  several times that morning checking on her but wasn't saying

3  that her husband was dead.  Just tell Kat I love her and how

4  is she.

5           They get to the hospital, and Ballard says where did

6  these pills come from, and she says Kay gave them to me.  She

7  told me to get to your house and take the pills and that you

8  would take me to the hospital and then I could get time in a

9  psych ward and not go to the penitentiary.  Well, ladies and

10 gentlemen, doesn't that -- remember Amanda Bax testifying, and

11 she says Kay Young told her that she had Mock looking to get

12 people to do the murder for them, but that Mock was going to

13 be the fall guy.  Well, once they knew the police was onto it,

14 Mock was the one who was going to take the pills and try and

15 get into the psych ward for a period of time so she wouldn't

16 get charged with it, but Young now is trying to put her

17 distance with her.  She is still manipulating and trying to

18 work the pieces on this thing.  Kathy Mock that morning calls

19 her daughter-in-law, Rita, and says I'm going to the

20 penitentiary.

21          So what else happens on the 24th of March, that's a

22 Friday?  Well, that night with everything that is going on,

23 Rita Ponder has this knowledge.  She knows about this murder

24 that was committed up in Novinger, Missouri.  She calls her

25 mother.  She is frightened, and she calls Chris Buchholz, a

1   Cassville policeman, who comes out about 11:00 p.m. on Friday

2   night, and she tells him about these offers of money to kill

3   Beau Griesbauer and tells about this murder.  He doesn't know

4   anything about this murder.  He hasn't heard anything about

5   it.  So it is in the early morning hours of March the 25th, he

6   calls up to Kirksville to get the Adair County Sheriff to see

7   what is going on, tells them what he knows, and they know that

8   this information is significant.  We do have a murder like

9   that.  It is related up here.  We are on our way down, and the

10   Highway Patrol investigators are down there that Saturday.

11   You know, it's a six, six and a half hour drive, but they get

12   down there on Saturday, and they interview Thomas Ponder, they

13   interview Rita Ponder, and they interview Jean Ballard.  But

14   they are down there on the 25th, and that is when Thomas

15   Ponder gives them that bag of pills.  And you know that Kay

16   Young, she was a nurse.  She's got access to those pills, just

17   like she had access to the pills she gave James Goodwin.

18   Remember when he couldn't get an erection, and who has the

19   pills?  Kay Young provides them.  And you remember what Mock

20   told Ballard when they got her to the hospital and said Kay

21   told me to take them, "Kay is a nurse.  She knows what she's

22   talking about."  Kay Young was running the show here.  It's

23   that simple.

24          Then you have got that on Saturday and we move

25   through to the 26th, and here is something else now that is

1  significant.  On the 27th -- they don't interview Thomas

2  Ponder until Saturday night, March the 25th.  We move into

3  Monday, March the 27th, and who goes to the Highway Patrol?

4  Normane Newlin.  And when I tell you to be critical of the

5  witnesses but be fair, Newlin is one of them you want to be

6  critical of.  They brought in the mayor of Novinger to say

7  that he didn't have a good reputation for truthfulness.  You

8  shouldn't doubt that for a second.  That is probably true, but

9  what does Newlin come in and tell them?  He says that David

10  Crawford, her third husband, Newlin was working on the farm

11  out there, and the two of them were in the hot tub together,

12  Newlin and Kay Young, and she says -- and he was having

13  trouble with his wife.  She says, I will kill your wife if

14  you'll kill David Crawford.  Why did she want Crawford -- now

15  here is another reason.  Why did she want Crawford killed?

16  Because he was on the deed to the farm, and the two of them,

17  they got divorced March 23rd of 2003, so she was afraid she

18  would either lose the farm or lose part of it in a divorce,

19  the fact that Crawford's name had been put on that farm.  Does

20  that sound familiar?  Does that sound familiar of what was

21  going on with Melvin Griesbauer?  And that is why she is

22  asking that.

23        How would Normane Newlin know whose names were on the

24  deed to the farm if Kay Young didn't tell him?  And what does

25  he say?  She offered to kill my wife, take her horseback

1   riding and hit her in the head and make it look like an

2   accident.  Well, what have we got up at the barn with Melvin

3   Griesbauer?  The gun is cocked, we are laying the ground work

4   about how careless he is.  That is supposed to look like an

5   accident.  Are you seeing the parallels here with what Normane

6   Newlin said?  What else has Normane Newlin said?  She said she

7   would not only kill my wife, but she would give me $10,000.

8   There is no way he knew that on March the 25th, Thomas Ponder

9   said that there was $10,000 being offered to kill Melvin

10  Griesbauer.  Newlin couldn't have known that on Monday.  You

11  look at those factors to look at how reasonable the testimony

12  it is and how believable it is.  She tells Lessing I have got

13  to come away from this loan, I have to walk out of here with

14  10,000.  She walked out with $10,800.  She offered -- or

15  Thomas Ponder is offered 10,000 to do the murder.  Newlin,

16  10,000 was going to be thrown into his deal back in 2003.

17          Ladies and gentlemen, right down the line it's

18  consistent.  What else does Newlin tell you, talking about his

19  credibility?  He said, Well, she was a heck of a shot.  I saw

20  her standing in the garden and shoot a dog up by the barn and

21  kill it.  Their witness, Gayle Craigg, said, oh, she shot

22  stray dogs all the time.  He was telling the truth about that,

23  wasn't he?  Normane Newlin said she always had a stun gun in

24  her car.  Nick Berry pulls her over at the time of the arrest

25  on the murder, what's she got in the car?  A stun gun.  Newlin

1  was telling the truth on that.

2        And what happens now?  He's killed March 23rd, and by

3  the end of April, she hooks up with Jim Goodwin, the old man,

4  who is just elated to have a woman that's younger than him.

5  Then by June, she's still got her financial problems.  She

6  borrowed money from Goodwin.  They have some sexual contact.

7  They go through the summer.  They are getting closer.  By

8  September, she borrows $1,500 to pay a lawyer in Columbia

9  still trying to get her death certificate because obviously

10  with the circumstances here, she was having problems doing

11  that.  Goodwin drives her to Columbia for that, and then she

12  asked Goodwin to get on his life insurance, and October 23rd

13  he puts her on the life insurance.  It's a pattern, ladies and

14  gentlemen, all the way through.

15        And then you have Amanda Bax.  Now that is a woman

16  who has six felony convictions.  She is doing time right now,

17  so you have to be very critical of her, but what did she

18  testify to?  She said that Kay Young said I shot my husband.

19  Did she give you anymore details about what happened there at

20  the barn?  No.  But what does she get into?  She got into

21  talking about her farm with Amanda Bax, and she said the farm,

22  my family's had the farm for years and years.  Amanda Bax

23  couldn't know how long her family had that farm.  And what

24  else did she tell her?  She told her that she was having

25  financial problems, that her husband had a million-dollar life

1    insurance, million dollars in life insurance, and she had to

2    have that to pay the farm off.  And what did she say to Amanda

3    Bax that just tells everything?  It's not losing her dog

4    business.  It's not because somebody's taking insurance money

5    out on her.  It's not because her husband is abusive.  What

6    does she tell Amanda Bax?  "I would rather lose a husband than

7    lose the farm."  She was willing to lose David Crawford rather

8    than lose the farm.  And, in fact, she did kill her husband,

9    Melvin Griesbauer, in order to keep the farm.

10          And all you have to do is look at that initial story

11   that Kathy Mock told there that night, the initial story that

12   Kay Young told there that night, they were right in lock-step.

13   They talked about that story before the murder ever happened

14   and before the wheels started coming off of this thing.  And

15   based on this evidence, ladies and gentlemen, you put it

16   together.  You follow it through.  You can't reach any other

17   conclusion except both these defendants are guilty of both

18   counts they are charged with.  Thank you.

19          THE COURT:  Mr. McGraugh.

20          MR. MCGRAUGH:  Thank you, Your Honor.  May I have a

21   moment.  I want to get some exhibits from the Government.

22          THE COURT:  Sure.

23          MR. MCGRAUGH:  May it please the Court, attorneys for

24   the Government, attorneys for Ms. Young.  May it please you,

25   ladies and gentlemen of the jury.  First I would like to just

1    tell you how much we appreciate your willingness to serve as

2    jurors in this case, and we understand what a case like this

3    does, and we understand the patience you had to expend to sit

4    here.  I know there was a lot of interruptions and I know a

5    lot of things are occurring in this case, and I understand

6    that and realize it is difficult.  Serving as a juror is not

7    only a duty in our democracy, but it is probably next to

8    serving your country in times of war the highest duty we do

9    here.  The courts cannot function without you, so we

10   appreciate it.

11        At voir dire, I painstakingly went through it.  I

12   know that my voir dire, my jury selection, was very difficult

13   because it took a long time, and we constantly went over these

14   concepts, these concepts of presumption of innocence, these

15   concepts of burden of proof.  And in order for you to be

16   selected as a juror in this case, you had to commit, you had

17   to swear, you had to take an oath that you could follow those

18   principles of law, that you would hold the Government to its

19   burden of proof, making them prove each element of the case

20   beyond a reasonable doubt and that you would presume Kathy

21   Mock innocent.  That's the only reason you were selected as

22   jurors.  There were a number of jurors that couldn't do that,

23   and they were excused, but you said you could do it, and you

24   took an oath that you would follow that instruction.

25        Now I spent that much time on that because I realized

1   what kind of case this was.  I realized how difficult a case

2   this would be to hear from a juror's perspective because our

3   natural inclination, our human nature, would dictate that

4   realizing Melvin Griesbauer was murdered, that you would want

5   to have someone take responsibility for that murder and be

6   punished for it.  I understood that.  I knew that.  But that

7   is not enough.  And in order for you to follow the law in this

8   case, in order for you to follow the law in this case, I knew

9   that if you followed the law, that Kathy Mock would not be

10  found guilty, should not be found guilty of this case if you

11  follow the law.

12        Now Kathy Mock did not enter into any agreement to

13  kill Melvin Griesbauer, and Kathy Mock did not kill Melvin

14  Griesbauer, not for money, not for any reason.  Now you are

15  going to have a lot of questions about her when you go back to

16  that jury room.  There is a lot of questions.  And as I said

17  in opening statement, there was missing pages of this book.

18  There is unanswered questions, and questions you probably need

19  in order to deliberate in this case.  But those questions are

20  not resolved against Kathy Mock.  Those are resolved against

21  the Government.  That affects your burden of proof.  If you

22  don't have an answer to a question that you need, that has to

23  be assessed against the Government as to whether they maintain

24  their burden of proof.

25        Now let's talk about what we do know as it relates to

1    these instructions.  Now the Court will give you these

2    instructions, and I will use my instructions because I have

3    highlighted them, but instruction number 27 is the element for

4    conspiracy to commit murder for hire, and the first element is

5    that two or more people have to reach an agreement with the

6    intent that a murder for hire be committed and death resulted.

7    Now I submit to you, ladies and gentlemen, that there is no

8    evidence of that.  As it relates to this agreement or alleged

9    agreement, the evidence is sort of all over the place, and it

10   comes from, you know, Thomas Ponder and Keri Ponder and Rita

11   Ponder and Jean Ballard, and that testimony all sort of

12   conflicted.  You know, if you were to believe them, you

13   couldn't believe one and believe another because their

14   testimony conflicted.  But Thomas Ponder testified that Kathy

15   had asked him to kill somebody or kill someone, and then at

16   one time I think he said to kill Beau.  It kind of went back

17   and forth one way or the other, but even if you were to

18   believe that conversation occurred or the context of that

19   conversation, the one thing you have to walk away from that is

20   what Thomas Ponder said, "I didn't take it seriously," and the

21   answer is no, no agreement.  There was no agreement.

22        Now Thomas Ponder's testimony as I said conflicted

23   with Rita Ponder and it conflicted with Jean Ballard, and they

24   conflicted about the details, but one thing was consistent.

25   The one thing that was consistent was the answer was no.  The

1   answer was there was no agreement.  And you need that

2   agreement.  You need someone to agree to commit a murder for

3   you to have a murder for hire, a conspiracy to commit murder

4   for hire, and the answer was no, and that was their proof for

5   that.  So there was no agreement.  Likewise, Keri Ponder

6   testified, you know, consistently that she was asked by Kathy

7   about killing someone or killing Beau.  Again, she said I

8   didn't take it seriously, and the answer was no.  Again, no

9   agreement.  There was no agreement formed to kill Beau

10  Griesbauer for money from Thomas Ponder or Keri Ponder.

11          The one consistent fact amongst all those

12  witnesses -- what was interesting was the consistent factor

13  amongst all those witnesses, you know, had to do with not only

14  that the answer was no, but the fact is who Kathy Mock was at

15  that time, her emotional state at that time, kind of her

16  vulnerability, her being near collapse.  All those witnesses

17  testified consistently about that.  They all testified that

18  same way.  And they also testified about another thing.  They

19  testified that Kay Young was pressing Kathy Mock, was filling

20  her head with, you know, Melvin is abusing me.  I mean, that

21  is what Thomas Ponder said, that Melvin Griesbauer was abusing

22  Kay.  Where does that information come from?  That comes from

23  Kay, and it's come to press that into Kathy's head because she

24  knew Kathy was vulnerable and that she was in danger of it.  I

25  mean, we even know that from Rita Ponder when they are up in

1    Novinger.  When they are up in Novinger, Kay is openly saying

2    this to Kathy, how she's in fear of her life.  Jean Ballard

3    talks about it when she is blogging, blogging about this case.

4    She talks about going to dinner with them and that Kay was

5    openly talking about how abusive Melvin was.

6         But even more importantly is what Keri Ponder said.

7    Keri Ponder -- I found that testimony very interesting.  When

8    she receives that phone call from Kay, Keri describes that as

9    there is a physical manifestation from Kathy.  She is like --

10   you know, it affects her.  She believes it.  It's not what Mr.

11   Dittmeier says, that this is just they are coming up with

12   little schemes that they are trying to get out there.  This is

13   Kay Young scheming.  This is Kay Young manipulating Kathy, and

14   we know that to be true by Kathy's reaction to that phone

15   call, how she has reacted to it.  Knowing Kathy, she sees that

16   she is slumped, she sees that she is upset.  This is Kay Young

17   manipulating Kathy, putting into Kathy's head that Kay is in

18   jeopardy.

19        I submit to you, ladies and gentlemen, and we know

20   this from -- the other thing I will mention about this as well

21   is the testimony of Jean Ballard, that when asked about how

22   Kathy Mock was around Kay, Jean Ballard said she was helpless

23   when she was around Kay.  Now I submit to you, ladies and

24   gentlemen, that that's just what happened, and I think -- and

25   what we know before these conversations take place in March of

1  '06, we know that Kay Young has that intention well before

2  that, well before Kathy Mock is ever in the picture, and we

3  know that from Mr. Robins.  Robins says in like '04, '05 she

4  is talking about it.  We know that that's what Kay's intention

5  is.  Unfortunately for Kathy, she had no idea.  All she knew

6  was what Kay was telling her, that Kay was in jeopardy.

7          Now you heard from that testimony that Kay Young

8  knows how to move pieces around the chess board.  I mean, you

9  know that from the testimony of Mr. Goodwin.  I mean, she had

10  Mr. Goodwin put her on his life insurance.  We heard this from

11  the testimony of Newlin, how she would try to manipulate a

12  situation even to kill David Crawford and how she was going to

13  help him.  We know that.  We know that from other witnesses

14  that this is part of who she is, part of what she does.  So

15  it's not a great leap, ladies and gentlemen, to believe that's

16  what she was doing to Kathy Mock.  And we know that from the

17  testimony of Keri Ponder.  We know from the testimony of Keri

18  Ponder how Kathy reacted to that information.

19          Now the other interesting thing about Keri Ponder was

20  this.  Keri Ponder had come back to this area in order to move

21  back here with her kids.  And I asked her were you moving back

22  here to find a stable place for your kids.  Yes.  A secure

23  place for your kids.  Yes.  A safe place for your kids.  Yes,

24  that is what I was planning on doing.  And even after she has

25  this conversation with Kathy -- and this would make sense.

1    This is why she said I didn't take it seriously, you know, I

2    didn't give it any credit, this conversation about killing

3    someone, I didn't take it serious.  Well, you know why that is

4    true that Keri is telling the truth that she didn't take it

5    seriously was that even after that conversation and even after

6    Kathy was arrested, Keri Ponder was planning on moving her

7    kids down here, a safe, secure environment for the kids.

8    Would she be doing that, would that be her plan if she thought

9    that Kathy was really serious, that Kathy was part of some

10   plan like this?  No.

11        Let me talk about Count Two, and you have two

12   instructions for Count Two.  That is instructions 33 and 34,

13   and again this sets out the elements that you are required to

14   have in order to find anyone guilty in this case, and they

15   have to prove these elements beyond a reasonable doubt.  Now

16   instruction number 33 says that "anything of pecuniary value

17   was received or promised or agreed to be paid as consideration

18   for the murder."  Instruction 34 is an aiding and abetting,

19   and it says in order to be guilty of this, this element has to

20   be proved beyond a reasonable doubt, that they acted in a way

21   and purpose of causing or encouraging or aiding a murder for

22   hire for pecuniary gain.  It refers back to this instruction

23   33, that there has to be something of pecuniary value received

24   or promised or agreed to.

25        I submit to you, ladies and gentlemen, that there is

1   no evidence of that.  There is no evidence -- you know, even

2   if you take the Government's case at its best, there is no

3   evidence that Kathy Mock was offered any money or was given

4   any money or agreed to receive any money for the death of

5   Melvin Griesbauer.  There is no evidence of that.  Now I

6   understand because there is huge evidentiary gaps here, Mr.

7   Dittmeier has to make big jumps, and he has to ask you to take

8   big jumps and to speculate and to try to fill in these gaps in

9   the evidence because there is no evidence of that.  But

10  neither here nor there, Kathy Mock did not commit this murder.

11        And this evidence is sort of uncontroverted, and

12  particularly the evidence uncontroverted was from Amanda Bax.

13  Amanda Bax just by circumstances was sharing a cell with Kay

14  Young.  Amanda Bax tells us from Kay's own mouth who shot

15  Melvin Griesbauer.  She shot Melvin Griesbauer.  Remember she

16  is wearing that -- she sees Ms. Young wearing this bracelet,

17  and she realized she is a federal prisoner.  She says, What

18  are you in here for.  Murder.  Federal murder?  What, did you

19  kill the president?  No, I shot my husband.  And she also says

20  why.  "I'd rather lose a husband than lose a farm."  The third

21  thing she says is Kathy Mock is the fall guy.  Now there is

22  nothing I can do for Amanda Bax.  Amanda Bax is telling the

23  truth.  She just happened to be in the same spot, you know, as

24  Kay Young in that jail.  But you know what, Amanda Bax's

25  testimony is corroborated by the only piece of evidence I

1   introduced, and that is this exhibit, this note that was found

2   in Kay Young's truck at the time she was arrested.  It says

3   "use her drugged state to convince her she shot him."  Well,

4   that surely tells you, ladies and gentlemen, that if they've

5   got to try to convince Kathy that she shot him, the real

6   person that shot Melvin Griesbauer was Kay Young.

7           Now let's talk about some of the evidence that was

8   collected there at the scene and particularly the ski mask and

9   the gloves.  One of the interesting things about the testimony

10  of the ski mask -- well first, this evidence was introduced by

11  the Government as to the farm, and this is the overhead of

12  this farm.  Now one of the interesting things about this ski

13  mask and gloves is where it's found.  And I said this in

14  opening statements.  Of all the places that you can hide a ski

15  mask and gloves, to place it right by the house, that mask and

16  gloves was intended to be found, ladies and gentlemen.  Each

17  of these buildings would have been anyplace you could hide

18  this ski mask and gloves.  This is the inside of Kay Young's

19  house.  You could hide that ski mask and gloves just about

20  anywhere on this farm, which would be a lot more difficult to

21  find.  You know what was so interesting -- and again,

22  sometimes from time to time you hear a witness say something

23  that you don't anticipate.  You know, generally I know

24  generally what everybody is going to say, but Lieutenant Hall

25  said it was so unusual to find this sitting out like this,

1    find a ski mask and gloves.  Now it really never really made

2    much sense about the ski mask and gloves, and, in fact, it's

3    Jean Ballard who three years after this homicide, three years

4    after she is talked to by police, comes up with this Thomas

5    Ponder, you know, told her to wear gloves and a hat.  That's

6    three years, three years that she's been blogging on this case

7    that she comes up with this.

8         But the ski mask I think is sort of interesting

9    because of everything that is sort of incidental to it.

10   Exhibit 31 was this receipt of how the ski mask was purchased.

11   And I have to tell you, I think what's sort of strange about

12   the ski mask -- I'm sorry, the interesting thing about the

13   purchase of the ski mask -- now get this.  This is the

14   Government's theory.  Again, there is no evidence of this, but

15   this is their theory that on her way up to commit the murder,

16   she buys a ski mask in order to commit the murder.  Now there

17   is no evidence of that, but that is their theory.  And what's

18   on this receipt?  Again does this make sense that if you are

19   going to go up, you are going to plan on committing a murder,

20   well, I am going to stop at a Wal-Mart and I am going to buy a

21   couple CDs, some T-shirts, and a short sleeve shirt while I'm

22   there and buy a ski mask to commit a murder?  That doesn't

23   make any sense.

24        Now the other thing about this receipt that doesn't

25   make any sense to me, if given that's the theory, is she keeps

1   it.  You remember Lieutenant Hall does a search of her purse

2   on the 23rd.  Weeks later or the following week when they do a

3   search warrant of Kathy Mock's home, they look in the purse

4   and they find the receipt.  If you are going to buy a ski mask

5   in order to commit a murder, do you think you are going to

6   keep the receipt from it?  I suspect, ladies and gentlemen,

7   what the evidence was was that Kay Young told her to buy a ski

8   mask on the way up, and that's why she bought it, and while

9   she was at Wal-Mart, she bought other stuff.

10          The evidence doesn't make any sense.  Now the other

11   evidence as it relates to the ski mask is this DNA.  All we

12   really know about the DNA is it was handled by Kathy Mock.

13   Well, if she purchased it, she probably handled it.  That is

14   all there is to that DNA.  The other interesting thing about

15   the DNA on the ski mask as well as on the gloves is there is

16   other people's DNA on it.  And we don't know what's inside and

17   what's outside of either the gloves or the mask, but there is

18   other sources.  There were other people's DNA on both the mask

19   and the gloves.

20          Now the gloves also had what they call gunshot

21   residue on it.  Now Will Randle from the crime lab testified

22   about the gun residue.  He said there was a minimal amount of

23   gun residue, but all the conclusions you can draw from that is

24   that you are either in proximity to where the gun was shot,

25   that you handled the weapon, or that someone who handled the

1    weapon touched the gloves.  Those are the only conclusions

2    that you can make from that.  You also remember the exhibit --

3    I was looking for this exhibit of the cartridge where they

4    separated the cartridge and they put, you know, the gunpowder

5    separate from the casing and the shell.  Well, did you see how

6    much gunpowder was in there?  There was one flake of unburnt

7    particle.  That was all that was on there.  And again, what

8    Will Randle testified to was that there is no way to know

9    where it came from, what gun it came from, how long it had

10   been there, and again it can be transferred.  It doesn't mean

11   that you shot a gun.  It just means that you maybe were around

12   where a gun was fired or it could have been that it was

13   transferred from the person who actually shot the gun onto the

14   glove.  That is all that means.  But what's sort of head

15   scratching about -- this is the exhibit I was referring to.

16   Look at all that gunpowder there, and we are talking about one

17   little flake.  That is all that was found.

18          Now what's sort of a head scratcher about the gloves

19   is what you have to look at in this regard.  Exhibit 34, which

20   is a stipulation about fingerprints, now the gun was tested

21   for fingerprints, right, and no fingerprints were found on the

22   gun.  Now remember the testimony about the gun.  The gun was

23   carried around by Kay Young and Melvin Griesbauer all the

24   time.  I think Gayle Craigg said it was a traveler.  It went

25   everywhere with them.  Now are you telling me that not one

1    print was found on it?  No prints?  I think it's a reasonable

2    conclusion, ladies and gentlemen, is that gun was wiped down.

3    That is why there is no prints on it.  Now if Kathy Mock was

4    wearing gloves and did this, why would the gun be wiped down?

5            Here's what we know about the shooting, what little

6    we know about the shooting, and it comes from Dr. Adelstein.

7    Dr. Adelstein can't tell us anything about the person that

8    actually shot the weapon, can't tell us how tall, how short,

9    what hand they are, what position they were in.  They can't

10   tell us what position Melvin Griesbauer was in at the time he

11   was shot.  He doesn't know anything about that.  Now what he

12   did say is that he would estimate that the gun was anywhere

13   from 6 to 30 inches away based on the stippling, the tattooing

14   from the gunpowder.  But he even said, you know, that is just

15   an estimate.  We could really find out if we test fired the

16   weapon ourselves and figured out how far you'd get stippling

17   if we really want to know that, and he just threw that out as

18   an estimate.  That is about all he said about the actual

19   shooting incident except for one other thing.  He said who

20   used this gun is someone who knew how to use it.  That is what

21   he said.  He said the person who shot this gun in this

22   shooting incident had to know how to use it.  That is an

23   important piece of information because it was clear that Kathy

24   Mock did not have any proficiency in weapons.  We know that.

25   We know she had no proficiency in weapons.  But Kay Young did.

1    She could shoot that dog from 200 yards away.  I tell you,

2    ladies and gentlemen, instinctively what happened, what

3    probably happened, is Kay Young shot Melvin Griesbauer and

4    cocked it again, and that's why there was another round in

5    there.

6        Now I'm going to start -- I'm going to end here where

7    I started, and that is talking about oaths and commitments and

8    promises, and I realize what's difficult in this case in

9    looking at these instructions is there is a murder, but a

10   murder isn't enough.  They have to prove more than there was

11   just a murder.  They have to prove those elements that we

12   talked about, and that is going to be difficult for you

13   because of what I said earlier, because Melvin Griesbauer was

14   murdered and you are going to want to have somebody pay for

15   that.  But you have to live by your oath as a juror in this

16   case.  And considering this evidence, the other important

17   piece of evidence is the pills.  The pills are important, and

18   why are the pills important?  Well, they are probably for two

19   reasons.  Either she is trying to kill Kathy off or she is

20   doing just what this note says, this note that's in her car

21   two years after the homicide.  There is a reason why it's

22   there.  Now it's important for you to look at all the evidence

23   in this case but particularly those pieces of evidence.

24       Now, ladies and gentlemen, I'm going to say it again,

25   oath, promise, commitments, these are things that we rely on.

1    Everyone in this courthouse that works in this courtroom, we

2    work on a word, your word.  If you don't keep your word, then

3    anyone coming into this courthouse can't rely on our justice

4    system.  You make a promise, you've got to keep it.  You've

5    got to find Ms. Kathy Mock not guilty.  I tell you, ladies and

6    gentlemen, all this, all of what we function in this

7    courthouse day in and day out is based on an oath that I take,

8    that Mr. Dittmeier takes, that the Court takes, witnesses

9    take, and you take.  You've got to live up to your oath.  When

10   I got married, I got a ring, and it said this represents the

11   love and fidelity to your wife.  If I'm not faithful to my

12   wife, this ring means nothing, as this courtroom and all these

13   proceedings mean nothing if we don't keep our word.  Keep your

14   word, ladies and gentlemen.  Scrutinize this evidence, look at

15   these instructions, look at these elements.  There is no

16   evidence to support these accusations.  Find Kathy Mock not

17   guilty.  Thank you.

18           THE COURT:  Ms. Herndon.

19           MS. HERNDON:  Can we take a little break?  It's been

20   two hours.

21           THE COURT:  We will take a brief recess during the

22   arguments at this time, ladies and gentlemen.  Again, do not

23   discuss the case amongst yourselves or with anyone else.  Do

24   not allow anyone to discuss it within your hearing or

25   presence.  Do not form or express any opinions about the case

1   until it is given to you to decide.

2          **(Court Recessed from 12:10 p.m. until 12:25 p.m.)**

3          MS. HERNDON:  Thank you, Judge.  May it please the

4   Court.  Ladies and gentlemen of the jury, first thing I want

5   to ask you to do when you go back into the jury room to make

6   your decision in this case is to remember the rules.  It's not

7   enough that Kay Young could have killed her husband.  It's not

8   enough that she might have killed her husband.  What you have

9   promised to do is to hold the Government to a burden of

10  proving to you beyond a reasonable doubt that Kay Young was

11  involved in a conspiracy to kill her husband, that she was

12  involved in a murder for hire.  And the judge read the

13  instructions to you.  You will have them to take back there

14  with you and to look at, which this is what you will do as a

15  jury, you will go back there and you will all talk about it.

16  You will all talk about the evidence that you heard last week,

17  every bit of evidence that you heard.  So let's go through the

18  evidence and see where reasonable doubt exists.  Remember what

19  reasonable doubt is, a doubt, something that you would

20  hesitate to act upon as a reasonable person.  Is there

21  evidence in this case that you would hesitate to act upon to

22  find Kay Young guilty of murdering her husband, of conspiring

23  to commit murder for hire?  Well, let's look at what the

24  evidence is.  Let's go through all of it.

25          Let's first talk about the physical evidence in this

1  case.  What does the physical evidence in this case show you?

2  What does it tell you?  It tells you that every single test

3  that was performed on every single piece of evidence that was

4  taken to the crime lab came back with Kay Young being

5  excluded.  No matter what there was on the mask or the gloves

6  or the gun or anything else, the bag of pills, anything else

7  they took, if they found something, Kay Young was excluded as

8  a contributor.  So what do we have?  We have a ski mask that

9  has Kathy Mock's DNA on the inside of it and DNA contributed

10  from Mel Griesbauer on the outside of it.  And how does that

11  fit with what happened here?  It fits exactly with what you

12  have heard, that Kathy Mock who had the shoes that we see the

13  similar shoe print in the exact position, 6 to 30 inches away

14  from Mr. Griesbauer as the medical examiner testified,

15  shooting that gun with blood splatter coming back onto the

16  mask.

17        MR. MCGRAUGH:  I will object, Your Honor.  There is

18  no evidence that there was blood splattering on the mask.

19        THE COURT:  Closing argument, let's proceed.

20        MS. HERNDON:  What do we know about what that mask

21  had on it?  A mixture of DNA.  And so you as reasonable people

22  can draw reasonable inferences as to why Kathy Mock's DNA is

23  on the inside of that mask and Melvin Griesbauer's is on the

24  outside.

25        Now let's move on to the gloves.  What do we see on

1   the gloves?  On the inside, again the inside of the glove, we

2   see Kathy Mock, and on the outside of that glove, even if it

3   is just a little bit, we see something that came from the gun.

4   Does it mean that she fired the gun?  No.  As the expert

5   testified, it doesn't mean that she did.  It means she could

6   have.  But again, what is excluded?  Kay Young.  Yes, Mr.

7   McGraugh says there is a mixture on that glove, too, but don't

8   forget that in that mixture is not Kay Young.  Excluded.  The

9   physical evidence fits in line with just what I told you about

10  how this homicide happened.  And we heard testimony about the

11  cartridge that was behind to the right.  Most likely that's

12  how it would have ejected, completely consistent with where

13  Kathy Mock's shoe print was who had on the mask and the

14  gloves.  And what happens to that mask and those gloves?  It

15  ends up on the side of Kay Young's house.  Why?  Why does it

16  end up on the side of Kay Young's house?  Because as Kathy

17  Mock is coming back to the house, that's where she throws it.

18  Mr. McGraugh wants to give some implication that she would

19  have hidden it somewhere else, but really let's think about

20  what happened here.  After that shot is fired, she comes back

21  to the house.  We know that because we know that is where she

22  is when Kay goes to get her.  Who could have discarded that

23  there?  Kathy Mock.

24          So let's move on and look at some more of the

25  evidence.  Let's go from the physical evidence and look at the

1   statements that we have in the case.  We've already talked a

2   lot about, and I won't go into detail, about the statements.

3   Let's start with Keri Ponder.  What does Keri Ponder say?  She

4   talks about some "they".  "They are willing to pay 10,000."

5   She doesn't know who "they" are who are willing to pay

6   $10,000.  Not only does she say I did not take this seriously

7   at all, Kathy was always talking about hurting people, the

8   Government brings this into you as this huge monumental

9   evidence of a murder for hire, but there is a lot of problems

10  with this.  There is a lot of problems with these statements.

11  Nobody takes them seriously.  Keri Ponder told you she didn't

12  take it seriously, and even more problematic for their case

13  against Kay Young is there is no evidence at all that Kay

14  Young said this to Kathy Mock.  No evidence.  You have Keri

15  Ponder saying that Kathy Mock said this to her, but Keri

16  didn't hear Kay, and the Government didn't bring you anything

17  to even suggest that Kay knew Kathy made that statement.  So

18  there is no evidence from Keri Ponder that Kay Young was

19  involved in a conspiracy to kill her husband for money.  None

20  at all.  Even if Kathy Mock was serious when she asked Keri

21  Ponder -- and that's an "even if" -- the Government has the

22  burden of proving to you that Kay Young was involved in this

23  conspiracy, and they have given you no evidence that Kay ever

24  knew Kathy made that statement and no evidence that that's

25  actually what Kay said to Kathy on the phone.

1      And the same goes with Thomas Ponder's statements,

2   and his statements are even more problematic because Thomas

3   Ponder is all over the place, perhaps because he was more

4   involved in this than he wants to admit as suggested by a

5   statement he may have made.  I don't know, Jean Ballard says

6   he made it, and I don't know why Jean would lie about it.  She

7   says he talks about telling his mom to wear a mask and gloves,

8   but we don't really know what Kathy Mock said to Thomas Ponder

9   because he told you -- he gave four different statements.  He

10  is a meth addict.  He really doesn't remember anything that

11  happened.  In one of his statements, he kept insisting to the

12  officers that she asked me if I knew someone who would kill

13  someone, and I said no, and that was the end of it.  So maybe

14  that is all that ever happened or maybe Kathy said to him it's

15  probably worth about $10,000 or maybe Kathy said to him -- the

16  very worst case scenario for Kay Young -- Kathy said to him

17  Kay is willing to pay $10,000.  But what if Kathy did say that

18  to him?  Again has the Government brought you any evidence

19  that Kay knows Kathy said that?  Is there any connection

20  between those statements that are made to either Keri or

21  Thomas Ponder and Kay Young?  None at all.  None at all.  We

22  have to rely on the Ponders saying what Kathy said saying what

23  Kay said, and that is certainly not evidence beyond a

24  reasonable doubt or any evidence at all that Kay Young was

25  involved in a conspiracy to murder her husband and to pay

 1   someone to do it.  And again, what does Thomas Ponder say?

 2   Well, I said no, so no conspiracy has been developed there

 3   after he said no.

 4        Let's talk about Jean Ballard.  What did Jean Ballard

 5   say?  More statements from Kathy Mock.  Jean Ballard said that

 6   when she is in the car with Kathy, she says to Kathy, Did Kay

 7   kill her husband, and Kathy shook her head no, and she said,

 8   Did you kill him, and Kathy said, I think so, but I don't

 9   remember.  Right out of Kathy Mock's own mouth, Did Kay kill

10   her husband.  No.  No.  Now let's talk about the statements

11   that we heard out of Kay Young's -- that people directly heard

12   Kay Young say without Kathy being the middle man or the middle

13   woman in it all.  Rita Ponder, what did Rita Ponder tell you?

14   When Mr. Dittmeier is going through his time line of how this

15   murder is evolving, remember that he left out Rita Ponder's

16   statements.  What did Rita Ponder say when she went up to that

17   farm to sell dogs with Kathy?  She said I heard Kathy and Kay

18   discussing the marriage was bad.  She wanted to leave him, and

19   Kathy was talking about offering to help her move out.  That

20   is what Rita Ponder said.  So here when we finally have the

21   two people together, we can finally hear Kay and Kathy talking

22   without it coming through Keri or Thomas Ponder.  What does

23   Rita Ponder hear?  She hears I want to move out, I want to

24   leave him.  That is what Kay is telling Kathy, and Kathy is

25   saying I will help you move out.  Drastically different from

 1   "I would like to hire someone to kill him and pay that person

 2   money."

 3          Tim Eschmann, what does Tim Eschmann say?  He says,

 4   you know, we were friends, we dated, we went out, not a maybe

 5   typical relationship that you're thinking of.  It wasn't a

 6   physical relationship.  I don't make a habit of dating married

 7   women, but she told me that she was leaving her husband.  She

 8   told me that they had agreed to divorce.  Right out of Kay

 9   Young's mouth.  So when we hear words coming -- that witnesses

10   heard out of Kay Young's mouth, we are hearing talking about

11   divorce, we have agreed to divorce, and I am leaving him, I

12   want away from him.  Until, of course, we come to Amanda Bax.

13          Now let's talk a minute about Amanda Bax.  Remember

14   Amanda Bax with her six felony convictions and her five

15   aliases?  And why is that important to you?  Because remember

16   what she said about her convictions.  They all involved

17   deceit, fraud, representing something that is not true.  That

18   is what she's been doing all of her life apparently with her

19   six felony convictions and her 12 years that she's racked up

20   for doing bad checks.  She has set out to convince people she

21   is someone that she is not and to defraud people, and that is

22   what she came up and did here.  Now how do you know that?  How

23   do we know that Amanda Bax is not telling the truth?  Well,

24   her story doesn't make any sense first of all.  She talks

25   about Kay saying that Kathy and Mel were having some kind of

 1  an affair.  Where did that come from?  Whoever suggested or

 2  said that?  Does it fit in with anything else that you have

 3  ever heard in this case?  Not at all.  And then she talks

 4  about how Kay would rather lose a husband than lose the farm.

 5  Well, she wasn't losing the farm.  Where did that come from?

 6  She had just refinanced.  She is not in danger of losing the

 7  farm.  She just closed on a new loan for the farm.  It is not

 8  an option between they are moving in for foreclosure if she

 9  doesn't get rid of her husband.  It doesn't at all fit with

10  the facts of what are happening here.

11          And the last thing about Amanda Bax I want you to

12  remember is what she said when she was being asked about what

13  she might get out of this.  She wants you to think that from

14  the goodness of my heart, I am coming in here and I am telling

15  you what I heard.  But what do we know?  We know she is not at

16  all acting out of the goodness of her heart because she

17  said -- well, when she was asked about if this is going to

18  help her get early parole, "Well, I have to do 40 percent of

19  my time by statute."  Well now that certainly wasn't an answer

20  to the question at all because she wanted to avoid the

21  question, and she wanted to say to you, Well, I don't really

22  know, my attorney is going to be up with me at the parole

23  board, and I don't really know what he is going to say.  So

24  she wants you to believe that she is going to come in here and

25  testify to try to put someone in prison for murder and she is

 1     not going to bring that up to the parole board.  That doesn't

 2     even make sense.  It would have been much more credible and

 3     believable for her to say, yes, it will be great if I can get

 4     some time off my sentence.  It will be great if they let me

 5     out after 40 percent and not 60 or 80 or 100, and I am going

 6     to tell the parole board that I did a good thing here, but I

 7     am still telling the truth.  But she didn't take that

 8     approach.  She tried to avoid it and circle around it and not

 9     answer it because she is not a truthful person.  You can't

10     believe what she says based on what she said, what her record

11     is, what her convictions are for, and the fact that her story

12     made no sense.

13          Now the other person that you heard talk about what

14     Kay Young had said to him is Kris Robins.  Kris Robins says,

15     yeah, every time we went to Columbia on these trips together

16     to Columbia, she would say to me how she would like to see him

17     dead.  And then what did he say just voluntarily, just not me

18     trying to squeeze it out of him or get him to do anything

19     other than what was in his head, "Well, you hear that all the

20     time."  You hear that all the time.  He didn't take it

21     serious.  He didn't call the police.  He didn't do anything

22     about it.  He didn't do anything about it until the police,

23     law enforcement, come to him and say, Hey, we have got this

24     little chat transcript here from you talking with Kay Young.

25     And what did he say to me?  He said, You know, I didn't even

1    remember that.  I don't know if there was conversation before

2    this, probably, or after this, I don't know, probably.  I

3    didn't even remember what was on the paper until they brought

4    it -- until they showed me what was on the paper.

5            And so the Government wants to come in here and show

6    this to you, and this "I have kept quiet" all of a sudden

7    means Kris Robins has kept quiet about the fact that Elain

8    Young was saying I wish he was dead.  But if you look at that,

9    which is in evidence, if you look at that conversation, after

10   he says "I have kept quiet", what does she say?  Kay Young's

11   response to him is "you have lost me," and then they go on to

12   just continue talking about hooking up.  What's going on?  Use

13   your reasonable common sense here to think about what is going

14   on.  What does "I have kept quiet" mean?  Kris Robins and Kay

15   Young are having an affair outside of her relationship with

16   Jim Goodwin.  Remember that?  Remember how Jim Goodwin found

17   that chat and it ruined his world basically?  He broke up with

18   Kay Young after that.  So reasonably don't you think Kris

19   Robins is saying I have kept quiet meaning I haven't let your

20   boyfriend know we are seeing each other?  In the context of

21   what is happening and what Kris Robins told you and the

22   conversation in that chat, it makes a lot more sense than what

23   the Government wants to bring in to you as this Kay Young

24   saying I wish he was dead that Kris Robins took so seriously

25   because he hears it all the time.

1      The statements that have been brought to you in this

2  case are either statements that Elain Young had no knowledge

3  of, the Government has no evidence that she has knowledge of

4  them, or are statements of her real intent, which was to leave

5  him, divorce him, or statements that cannot be trusted, that

6  cannot be believed, and the testimony of Amanda Bax can't be

7  believed, and the testimony of Kris Robins "I have kept quiet"

8  is not what the Government wants you to think it is, and you

9  as reasonable people can figure that out.

10      So let's move on down to talking about what was going

11  on in Kay Young's life at the time that this homicide happened

12  because that is the Government's whole theory about what the

13  motive behind this was.  The insurance, the insurance, the

14  insurance.  We have heard all about the insurance, but look at

15  those insurance policies and remember what you have heard

16  about those insurance policies.  That is not Kay Young running

17  out and taking more life insurance than she could ever need

18  out on her husband.  He is in the military.  He is being

19  deployed.  He is going to Iraq.  There was absolutely no

20  evidence that there was anything improper about those

21  insurance policies.  Gayle Craigg told you on the one policy

22  that she was present when he got it.  Everybody was there.  It

23  was a little insurance affair before they were deployed.  He

24  is going to Iraq, a better than even chance that he won't come

25  back as compared to just driving down to Cargill and doing

 1   some work, and the Government hasn't given you any evidence

 2   that there was anything unusual about those insurance

 3   policies, that Kay in any way influenced her husband to take

 4   those out.  The only one she took out was the little one that

 5   she got at school, that she got through work, and that was an

 6   accidental death policy.

 7           And if you think for a minute that Kay Young was

 8   trying to make what happened to her husband look like an

 9   accident when she really did it, then think again about what

10   the evidence is because everybody wants to get up and shout

11   and holler about how much she knew about guns and she could

12   use a gun and she used it to take care of those varmints and

13   all other kinds of things around the farm and she was good at

14   it.  So is the woman who wants to collect on her accidental

15   death policy going to go and shoot the guy and then cock the

16   gun again?  It doesn't even make sense.  This woman who

17   carries a gun all around and knows about the gun is going to

18   set him up for an accident by cocking the gun after he is shot

19   and instantly killed?  It doesn't even make sense.  Throwing

20   up insurance and saying, yeah, this is the stuff that the

21   movies are made of, woman kills her husband for the insurance,

22   the problem in this case is the Government has given you no

23   tie at all between this insurance and the murder.  None at

24   all.  Now they have said to you, well, she needs the insurance

25   money to pay for the murder.  That's what they say sometimes

1  anyway.  She is going to collect on the insurance and pay for

2  the murder, but sometimes they tell you that she needs the

3  loan to pay for the murder because we have got that

4  10,000-dollar figure floating around there sometimes.  Keri

5  Ponder said 6,000; Thomas Ponder said 10,000.  Of course, we

6  know the problem with that is there is no evidence that Kay

7  Young even knew Kathy Mock was throwing out this 10,000-dollar

8  number.

9          So, yeah, was it a coincidence that Kathy Mock threw

10  out a 10,000-dollar number and Kay Young wanted to come out of

11  her loan with $10,000?  Now if the figure had been $6,587,

12  then maybe you couldn't call that a coincidence, but $10,000

13  is a pretty round number, and since there is no connection

14  between the $10,800 that Kay Young ended up with and the

15  $10,000 that Kathy supposedly mentioned to Thomas Ponder

16  maybe, if that discussion even occurred, then we are left with

17  way more than reasonable doubt here.

18          Well, the Government says Kay Young was broke.  She

19  was desperate.  She had to have this insurance money.  But the

20  evidence shows you otherwise.  What does this whole loan thing

21  show you?  She had this debt resolution thing with Arbitronix.

22  The restructuring of the loan was redoing the farm loan,

23  paying off all the debt from Arbitronix, and leaving her with

24  $10,800.  She was far from desperate.  This was wiping out her

25  debt and leaving her some money after that.  And what did

1    Gayle Craigg tell you about the dogs she had?  She was a dog

2    breeder.  You saw the kennel.  This isn't somebody who's got a

3    couple dogs in their kitchen that they're hoping to sell.

4    She's got a huge kennel out there, and depending on what the

5    dogs sold for, she had between 20,000 and $91,000 worth of

6    dogs out there plus, as Gayle Craigg told you, two male dogs

7    who she could breed -- who are valuable to breed more litters

8    with.  So this whole motive of she was desperate for money and

9    had to kill him to get the life insurance is simply not

10   supported by the Government's own evidence.

11        Now let's move on to talk about what Kathy Mock and

12   Kay Young did on the evening of the homicide because you can

13   take a lot from -- the Government is telling you that within

14   40 days of being married -- now remember, that is not 40 days

15   of knowing each other, but within 40 days of being married,

16   Kay Young is on her husband's life insurance policy.  And what

17   does that mean?  That means that she is setting him up to kill

18   him already then.  But what happens after he dies, what does

19   she do?  During the 911 call, she can't even talk.  She is

20   over by the side of the fence vomiting.  The police come and

21   Salsberry tells you she couldn't talk, I was talking to Kathy

22   Mock.  Kathy is on the 911 call.  Kathy is talking to the

23   police when they get there because Kay can't even speak.  And

24   what does Gayle Craigg tell you?  For months after that when

25   she first saw her, she was like a walking zombie, and for

1    months after that, she was so affected by her husband's death

2    that she couldn't spend the night alone.  And this is the same

3    woman that from almost the beginning of their marriage was

4    plotting his death?  It just doesn't add up.  And that is

5    contrasted to Kathy Mock who is the one who is doing the

6    talking, who is the one who is throwing the mask and gloves on

7    the side of the house.  It just doesn't add up if you look at

8    what Kay Young was by all reports her demeanor and her actions

9    that night and the months after that.

10            Now let's talk just briefly about this other -- the

11    Government knows they can't prove this case to you, and so

12    they are going put on these other people.  They are going to

13    put on Normane Newlin.  They're going to put on Jim Goodwin.

14    Now you saw Normane Newlin up here.  You saw his credibility

15    as he came up.  And remember, the thing to remember about

16    Normane Newlin is he has a grudge.  He has an ax to grind.

17    Remember how Kay Young testified against him in a proceeding

18    that meant a lot to him.  And he is going to come up here and

19    tell you a story that, really, this thing about the man with

20    the insurance papers and then he lost the insurance papers and

21    oh, no, he really tore them up.  Mr. Dittmeier and I agree

22    about one thing, judge Normane Newlin's credibility.  Remember

23    what Jeff Dodson said, reputation for being untruthful.  And

24    also remember this, remember this when it comes to Normane

25    Newlin and to Jim Goodwin.  Did anyone else ever end up dead?

1    Normane Newlin said no, I am not going to do this.  David

2    Crawford, does she go try to find somebody else to kill him?

3    Does anyone ever try to kill him?  Does he ever end up dead?

4    Jim Goodwin, is there any evidence at all that Kay Young tried

5    to do anything to him?  This whole thing about the pills she

6    gave him when he wanted an erection is a complete red herring.

7    They were given to him before she was put on his insurance

8    policy.  Is there any evidence that after she was put on his

9    insurance policy she tried to kill him or do anything to him?

10         The only thing the Government is trying to do by

11   bringing these witnesses to you is to say Kay Young has bad

12   character.  She cheats on her husbands.  She messes around.

13   But remember the Adult Friend Finder thing.  Look at that

14   exhibit.  What's going on there?  She is paying Adult Friend

15   Finder every month out of her and her husband's joint bank

16   account.  Just like Tim Eschmann told you, there is no hiding

17   here.  There is nothing -- it's a marriage of convenience, for

18   her to stay on his insurance until they get past that and the

19   marriage ends.

20         The Government has made some fatal assumptions here,

21   ladies and gentlemen.  They have assumed that Kay Young knew

22   about the statements Kathy Mock made.  They have assumed that

23   Kay Young gave Kathy these pills because she is a nurse and

24   she would have access to them.  Where was the evidence of

25   that?  You have to make huge leaps, huge leaps.  They have

 1   assumed that Kay Young at some point promised Kathy Mock money

 2   or something if she would kill her husband.  Where is the

 3   evidence of that?  It simply doesn't exist.  It doesn't add

 4   up.  There is reasonable doubt written all over this case.

 5   Don't let all the things the Government has thrown in here to

 6   you take your eye off what the jury instructions say because

 7   none of these things prove the elements that the Government

 8   has to prove in the jury instructions.  The fact is, Kay Young

 9   was a victim in this case, and the Government has not shown to

10   you beyond a reasonable doubt anything different, and for that

11   reason we ask you to find Kay Young not guilty on both counts

12   when you go back to the jury room.  Thank you.

13          THE COURT:  Mr. Dittmeier, you have 15 minutes for

14   rebuttal.

15          MR. DITTMEIER:  Kay Young is a victim in this case?

16   She is sitting right over there.  She doesn't look like Mel

17   Griesbauer did on the morning of March 23rd, does she?  I

18   don't call that a victim.  And, ladies and gentlemen, when Ms.

19   Herndon just finished up and said, Well, the Government put in

20   just a lot of stuff here, you know what that stuff is called?

21   It's called evidence.  Evidence.  It don't come in if it's not

22   evidence, and every bit of it goes to Kay Young's guilt, every

23   bit of it goes to Mock's guilt.

24          Now do you remember me telling you do you remember

25   the evidence if I say something different than what you

1   remember or whatever?  Let me show you what lawyers do, and

2   you saw a good example of it up here with both of them.  Ms.

3   Herndon just told you about these dogs.  She didn't have any

4   financial problems.  She had all these dogs in the kennel.  No

5   financial problems, okay?  Well, it sounds pretty good except

6   on March the 13th, and you saw this, she sends an e-mail to

7   Lessing saying "my paycheck is stretched very thin, I simply

8   cannot stretch myself any further and survive the month."  Why

9   didn't she sell a dog if it's that easy.  She may have still

10  owed money on those dogs or on the kennel, we don't know.  But

11  on paper, her e-mail, pnurse_kate, "I am stretched so thin I

12  can't survive the month."  But Ms. Herndon gets up here and

13  tries to say, well, she was financially okay, she didn't need

14  that.

15          Here is another thing when she says Elain Young "you

16  have me lost" like she doesn't understand when he was saying I

17  was thinking about your cervix, and I have kept my mouth shut,

18  you better come over here.  Take a look at this.  "Just

19  thinking about that cervix", okay.  "Expect you to be here

20  when I tell you, too."  He is giving her an order.  And then

21  "how soon can you be here."  She goes, "You have me lost.  Are

22  you drinking.  Oh, there you are.  Do you have a minute."

23  What do you think, ladies and gentlemen?  Something happened

24  on the chatter coming through, "oh, there you are."  She

25  wasn't saying I am lost, I don't know what you are saying.

1   And if for a second she didn't know what he was saying, do you

2   think she would have left her home after 9:00 at night and

3   went to his house, then knocking on the door, taking orders

4   from Robins?  You saw him there.  Going over there to give him

5   sex because he kept his mouth shut.

6          And here is another thing.  Every witness says, well,

7   I didn't take them serious.  I didn't take them serious.

8   Well, Keri Ponder on the 16th took it serious enough to tell

9   Jean Ballard, didn't she?  Thomas Ponder took it serious

10  enough when he told Rita Ponder she went up to Novinger and

11  she was asking me to kill somebody for $10,000.  They all

12  thought it was significant.  And Kris Robins thought it was

13  significant to hold it over her head to say "I have kept my

14  mouth shut."  And we can say they didn't take it serious, but

15  they all took it serious to that point.

16         Now the other thing both attorneys did, Kathy Mock

17  went to Thomas Ponder and offered him $10,000, went to Keri

18  Ponder, that is no conspiracy.  Ladies and gentlemen, under

19  the instructions, the conspiracy we are talking about is

20  between Kathy Mock and Young.  That's the conspiracy we are

21  talking about.  When Young tells Amanda Bax that Mock was

22  trying to find somebody to kill him for her, that's your

23  conspiracy, ladies and gentlemen, and that's exactly what Mock

24  was doing, and she confirms to Bax that she knew she was doing

25  it.  And sure, of course, you have to be careful with Bax, but

1   Bax didn't make that up.  How would Bax know she had a farm?

2   How would Bax know she had the farm in her family for a long

3   time?  How would Bax know that Young's husband had a million

4   dollars of insurance on him if Young hadn't told her?  Do any

5   of you know how much insurance I've got on myself or any of

6   you know how much insurance the one next to you has got?  No.

7   Young told her she had a million dollars of insurance, and it

8   was in the context of talking why she was in the penitentiary.

9   Bax said she said that she had Kathy Mock trying to find

10  somebody to kill him.  Well, Mock went to Keri Ponder and

11  Thomas Ponder.  How would Bax know that if Young didn't tell

12  her?  She would have no way.  We are talking about several

13  years after the crime.  So right down the line it fits.  They

14  were in this together.  They planned it together.  It's that

15  simple.

16          And both of them are actors.  You heard the 911 call

17  and the wailing and whatever on it.  That was an act, ladies

18  and gentlemen.  Do you recall when Trooper Berry pulled Young

19  over when he arrested her for murder, and he walked up and

20  said, You are under arrest for murder.  What did Young say?

21  "Murder, who"?  And she's got a note in her purse relating to

22  her husband's murder.  But if you would have seen that in a

23  vacuum and not knowing the rest of this evidence, you would

24  have thought that poor lady is baffled.  She was so cool,

25  "murder, who".  Well, that is the same thing that's gone

1    through this whole thing.

2            And they were acting in lock-step.  You can just see

3    that.  Ms. Herndon has implied that Kathy Mock came up there

4    and did this murder by herself.  Well, think about it.  Young

5    tells Leonard Clark that she heard the shot, went upstairs,

6    and got Kathy Mock out of bed.  Well, if Mock did this murder

7    by herself, she couldn't have gone up the steps and got her

8    out of bed.  She would have been up by the barn.  She heard

9    the shot and then she went right up there.  That's her story.

10   And they have got the same story.  They are covering for one

11   another.  That is what a conspiracy is all about.  So we can

12   twist the words, we can do what we want.  For instance,

13   Ms. Herndon gets up here and says the Government is acting

14   like she took every piece of insurance out for the murder.

15   The insurance is a motive.  We have never presented that she

16   took any of that insurance out herself.  And incidentally, Ms.

17   Herndon got up here and said, you know, they got married on

18   September 5th and she took this insurance out.  Well, that is

19   true she took more insurance out, but you remember the

20   evidence.  She'd already had insurance before that.  She had

21   insurance on him, was a beneficiary, six months after they

22   met.  It wasn't after they were married.  She was on there

23   before that.

24           So, ladies and gentlemen, you have heard the evidence

25   in this case.  And, you know, Mr. McGraugh says that Kathy

1    Mock, there is no evidence.  Well, what did she do?  She went

2    to two people on behalf of Kay Young to solicit them to commit

3    this murder.  She drove up there for the murder.  Do you think

4    it's just a coincidence that out of all the Wednesdays in the

5    world, she happened to drive up to Novinger and Melvin

6    Griesbauer is going to get killed at 2:00 that morning?  She

7    specifically went up there for the murder, and she went up

8    there to do the murder with Kay Young.  She bought the mask.

9    The mask is wrapped around the gloves.  And, you know, we

10   talked about you see CSI and all the shows, and you have to

11   realize those are movie shows, but do you realize what Mr.

12   McGraugh was saying.  There was only one particle of gunpowder

13   on there.  That would be like saying we found one hair and it

14   belongs to somebody, but they have got a whole head of hair,

15   so they weren't here.  There was one particle on there, but

16   it's outside, and it's wrapped up in a mask that was bought

17   that afternoon.  It's all contemporaneous.  It happened at the

18   same time.

19        But here is another thing.  There is no question

20   Kathy Mock went up there to participate in this murder.  She

21   bought the ski mask.  Her DNA is on the mask.  Her DNA are on

22   the gloves.  The gunshot particle is there.  But she wasn't

23   going to go up there without a weapon.  How would she know --

24   you are going to go up there and do this murder and you have

25   no weapon?  What was he killed with?  He was killed with Kay

1 Young's rifle, which was kept in the barn sometimes.  Wouldn't

2 that be something for Mock to go up there to do the murder by

3 herself and she go, I have put all this effort into it and now

4 I don't know where the gun is?  It was Kay Young's gun.  And

5 as far as Mock's footsteps around the body, you know Kay

6 Young's footprints were there, too, because she told Leonard

7 Clark she checked his pulse.  They were up there by the body.

8 There is just no question about that.

9         And this business about the gun being cocked, there

10 is two explanations.  They shoot him, and just like a pump gun

11 or a lever action, you shoot and just reflexively you cock it

12 and it hammers back, that is the one explanation, and then

13 they just set it down, and with their adrenaline pumping

14 because nobody said they kill people every day, their

15 adrenaline was going to be pumping, it was a glitch that they

16 missed.  The other explanation is that they planned this out.

17 They are so focused on killing him, they are so focused on

18 their stories about going up and getting Mock out of bed and

19 then would say he'd run around with the hammer back all the

20 time, that they just missed the forest for the trees and it

21 never registered that somebody would take a look at that and

22 go how.  They just got too close to it, okay?  But the fact

23 is, they are both there.  They are both standing by the body.

24 They both tell the same story about Mock up in bed.  They

25 can't tell that same story if they are not in it together.

1          So, ladies and gentlemen, use your common sense.

2     Mock's got her DNA on the mask and the powder.  It's Young's

3     gun that is used.  Young has said that she would like to kill

4     the sonofabitch to Kris Robins.  She's had affairs from the

5     day they meet.  She is going to inherit a million dollars.

6     Mock is telling Jean Ballard I am going to come into some

7     money pretty soon, and I will pay you, and I will have extra

8     money left.  It is just right down the line, ladies and

9     gentlemen.  They just they killed this poor man.  He came home

10    from work that day and just didn't have a clue what was going

11    to happen up there.  Mock could have been waiting up in the

12    barn for him, and Young could have drove him up there.

13    Remember when we selected the jury, I said you might not know

14    exactly who pulled the trigger, there is certain things, but

15    when we went through the essential elements that the

16    Government has to prove beyond a reasonable doubt, we have

17    proved every one of them.

18          And don't forget Melvin Griesbauer in this case

19    because he is the victim.  Mock's not a victim.  Young's not a

20    victim.  And they talk about Mock being so drug induced.  When

21    she was on that phone and when she was talking to Salsberry,

22    nobody said she was drug induced then.  That was part of the

23    game.  Once the wheels came off, she got back to Jean

24    Ballard's house and took those pills because they knew they

25    were going to have to change their game plan because it was

1   closing in on them.  That mask and gloves should have never

2   been found because it should have been taken as an accident

3   and it stayed up at the barn and that would have been the end

4   of it.  You have a traffic accident on a corner, you don't

5   have the police looking around back in the alleys and whatever

6   for a gun.  So it's just the wheels came off of it.  They made

7   some mistakes.  But you have got Mock asking people when she

8   has no money, but she'll get money if you kill Mel Griesbauer.

9   She has no motive to kill Griesbauer except what she is going

10  to gain from Young.  Remember, they cherish their time

11  together.  They are tight.  Well, Mock knows she is going to

12  get some money because she told Jean Ballard she is going to

13  be coming into some money.

14          So, ladies and gentlemen, use your common sense in

15  this case.  Follow the evidence to its logical conclusion, and

16  you can only conclude one thing, that they conspired and that

17  they killed him.  And, you know, this 10,000 she talks about

18  being a round number.  Well, it is interesting that she says

19  Normane Newlin says Kay Young told him $10,000 on top of

20  killing his wife, and he says that on the Monday after the

21  murder.  He had no idea that she was adamant about getting

22  10,000 left over after the loan.  He had no idea that Thomas

23  Ponder was offered 10,000.  At some point, it quits becoming a

24  coincidence and it's fact.  And if you follow this logically,

25  ladies and gentlemen, you can't reach any conclusion other

1    than they cold bloodedly executed this Melvin Griesbauer.

2    When he walked up to that barn, he was a dead man walking, and

3    he was dead like that when they shot him, and then they went

4    into their staged act.  And as early as March the 29th after

5    her husband is killed in her backyard, she is on the telephone

6    with the insurance company trying to collect that insurance.

7    And within a month, she is hooked up with another guy, and she

8    is bleeding him for money.  And she's the victim?  I don't

9    think so.

10            Ladies and gentlemen, you have heard this evidence.

11   You have taken an oath, and you know what you have to do.

12   Thank you.

13            THE COURT:  Will you swear in the CSO, madam clerk.

14                        (CSO sworn)

15            THE COURT:  Ladies and gentlemen, if you will go back

16   with the CSO and Carrie.  Ms. Cosgrove and Mr. Curry, you can

17   get your personal effects and your lunches, but then you have

18   to leave the jury room and bring those with you, all right?

19   We will be in recess.

20               **(JURY OUT AT 1:08 P.M.)**

21   **(A Bench Conference Was Held On the Record and Outside of the**

22        **Hearing and Presence of the Jury As Follows:)**

23            MR. REILLY:  Judge, the Government just wants to

24   supplement a record on the composition of the jury.  This is

25   related to the Batson challenge that we probably should have

1    asked the Court to note at the time, but as to the actual

2    composition of the jury that was seated, based on my

3    observations, there are five juror panel members who appear to

4    be African American.  That would be number one, Johnson,

5    number 5, Ransom, number 8, Mr. Hamer, number 10, Ms. Cobbs,

6    and number 11, Ms. Perry.  We didn't make that record at the

7    time of the Batson challenge, but just so there is something

8    to preserve the composition of the jury.  In addition to that,

9    the defense between the two of them, I think according to my

10   recollection, struck three venire panel members who appear to

11   be African American males, number 10, Mr. Jackson, number 14,

12   Mr. Wince, and number 24, Mr. Martin.  Just for the record I

13   note that.

14            THE COURT:  Very well.  Okay.  Thank you, fellas.

15            **(Court Recessed from 1:10 p.m. until 4:00 p.m.)**

16            THE COURT:  All right.  We have received several

17   questions from the jury around 3:35.  The first of which is,

18   Can we see a bank statement on Young and Mock.  Second, Can we

19   see the note found in Young's car.  Three, The coroner's

20   report as to what caused the zipper mark on the victim's face.

21   So as to question number one?

22            MR. MCGRAUGH:  I don't think there are bank

23   statements.  There were never any bank statements entered into

24   evidence, were there?

25            MR. REILLY:  Yeah, there actually was.

1    Government's 31C is Mock's bank statement as long as your

2    records reflected that they were admitted and then the bank

3    records of Kay Young came in as business records.

4              THE COURT:  Was that the loan stuff or the...

5              MR. REILLY:  Mock was Security Bank.

6              MR. GORLA:  Mock's came in for the mask to show that

7    the mask was paid out of the account.

8              THE COURT:  Right, right, yeah.

9              MR. REILLY:  We didn't go through the entire bank

10   statement, but we touched on the withdrawal.  That's all we

11   touched on.  And then on Young's --

12             THE COURT:  Because it was a debit card at the

13   Wal-Mart purchase.

14             MR. CURRAN:  Yeah, they linked it to the purchase.

15             MR. GORLA:  And Young, they linked it to the Adult

16   Friend Finder bill.

17             THE COURT:  Right, but that's it?

18             MR. GORLA:  That's it.

19             MR. DITTMEIER:  They are not complete bank

20   statements.

21             THE COURT:  See and I interpret the question as

22   looking for something else other than that because -- but

23   maybe I'm wrong -- because those don't really say anything one

24   way or another.  Those aren't really disputed as to what

25   happened with those transactions or whether they happened or

1  not.  So if that's all the bank records we've got, that's all

2  the bank records they get for what it's worth.  So it was 31C

3  and what was the number on the other one, Michael?

4          MR. REILLY:  Judge, the other one was 32B, Judge.

5          THE COURT:  All right.  So 31C and 32B?

6          MR. GORLA:  Is 32B for the Adult Friend Finder?

7          MR. MCGRAUGH:  32B was related to the Adult Friend

8  Finder.  Now there was a big stack of records.  It was like

9  600 pages of bank records, but the only thing that we talked

10 about were the Friend Finder withdrawals.  Just like with 31C

11 is, you know, 116 pages of bank records, but the only thing we

12 touched on was her debit card agreement and the debit card

13 statement from April -- from the March 22nd purchase of the

14 ski mask.

15         MR. GORLA:  That's all that they get.

16         THE COURT:  Yep.

17         MR. REILLY:  I'm going to go get the Bank of America

18 records -- or the U.S. Bank records.  That's 32C -- or 32B.  I

19 left that in the office, so I will go get that.

20         MR. CURRAN:  That note is in my office, the note that

21 they are talking that was seized.

22         THE COURT:  Oh, the note found in Young's car with

23 the book.  Okay.

24         MR. CURRAN:  I will be quicker than I was the first

25 time getting over here.  I will run over and get it if that's

1    all right.

2         THE COURT:  Before you go do that, what about the

3    coroner's report as to what caused the zipper mark on the

4    victim's face?

5         MR. GORLA:  It's not in evidence.

6         THE COURT:  It's not in evidence, yeah, so...

7         MR. CURRAN:  So you are free to speculate.

8         MR. MCGRAUGH:  I think what he did was he said I was

9    wrong about the -- but that was the only reference to the mark

10   on his face.  There was no report ever put into evidence.

11        MR. GORLA:  Say it was caused by the zipper.

12        MR. DITTMEIER:  You know, Judge, for the record, I

13   think I'd object to any bank records going back there because

14   they are so disjointed.  I mean, I don't know what the jury is

15   looking for.  Unless they are more pointed of what they want

16   out of bank records, if they get this, it is going to make no

17   sense.  You put them in for the record, but as far as what the

18   jury would be looking for, I don't see anything coming out of

19   them, and I would object to them going back there unless they

20   are specific in what they want.

21        THE COURT:  Yeah, and I don't know what specific

22   records they are looking for.  You know, as you indicated, all

23   the records were admitted, but the only thing that anybody

24   ever talked about was, you know, the debit card and the

25   transaction with respect to the mask and the transaction or

1    payment for the Friend Finder thing.

2           MR. DITTMEIER:  There is no time frames.  There is

3    nothing.

4           THE COURT:  Do you object to those going back, those

5    two or three pieces from those exhibits?

6           MR. DITTMEIER:  No, if there are two or three pieces,

7    I have no objection to that.

8           MR. GORLA:  Yeah, that's all.  That's what we talked

9    about.

10          MR. MCGRAUGH:  I think that probably should go back,

11   Judge.

12          THE COURT:  Okay.  And then as to -- and Kevin Curran

13   has gone to retrieve the copy of the copy of the note that is

14   referred in number two.  And then as to the coroner's report,

15   standard stock response "be governed by the evidence as you

16   recall it and the instructions of law given to you."

17          MR. MCGRAUGH:  Will you respond specifically to each

18   question, Judge, so they will know?

19          THE COURT:  No, only to three.  And then the response

20   to 1 and 2 is the actual -- is the response of giving it to

21   them.  And for the record, the note from the jury is signed by

22   Maurice Johnson.

23          MR. DITTMEIER:  Judge, my suggestion would be "you

24   are to be guided by the evidence."  I don't see that they are

25   going to find that there is anything that is going to help

1    either side in those bank records other than... .

2             THE COURT:  Other than?

3             MR. DITTMEIER:  Nothing.

4             MS. HERNDON:  Well, let me look and see.  What will

5    they get?

6             MR. REILLY:  If we just go with the pages we touched

7    on, those are the two pages that we touched on with Mock, and

8    then these are the pages that they alluded to with the Friend

9    Finder withdrawals from July through November.

10            MS. HERNDON:  Yeah, I mean, I don't have any problem

11   with them not going back.  We decided that they don't get

12   them.

13            THE COURT:  Okay.  So they don't get those bank

14   records.  What about the note, are we sending the note back?

15            MR. CURRAN:  Well, it's in evidence.  We used it at

16   closing.  Judge, it was the whole defense case.

17            MS. HERNDON:  It's the only thing they introduced.

18            MR. CURRAN:  Is that not much to ask, Judge?

19            **(Court Recessed from 4:20 p.m. until 5:50 p.m.)**

20            THE COURT:  You may be seated.  I think as of 5:14, I

21   received a note indicating signed by Mr. Johnson whom I am

22   going to assume is the foreperson that they reached a verdict,

23   okay?  So unless anybody has any questions or concerns, I'm

24   going to have Carrie bring them out and see where we are, all

25   right?  In that regard, for those that are sitting in the

123

1  gallery, please no outbursts of any kind one way or another.

2                    **(JURY IN AT 5:50 P.M.)**

3        THE COURT:  Will the foreperson please rise.

4  Mr. Johnson, has the jury reached verdicts in this case?

5        JUROR:  We have, Your Honor.

6        THE COURT:  Would you hand the paperwork to the

7  clerk.  Will the defendants please rise.  Will the jury please

8  rise.  Madam clerk, will you read the verdicts.

9        THE CLERK:  In the case of the United States of

10 America versus Katherine Mock and Elain Kay Young, Count One,

11 we, the jury, find the defendant, Elain Kay Young, guilty of

12 the crime charged in Count One of the indictment.  Count Two,

13 we, the jury, find the defendant, Elain Kay Young, guilty of

14 the crime charged in Count Two of the indictment.  Count One,

15 we, the jury, find the defendant, Katherine Mock, guilty of

16 the crime charged in Count One of the indictment.  We, the

17 jury, find the defendant, Katherine Mock, guilty of the crime

18 charged in Count Two of the indictment.

19        THE COURT:  Ladies and gentlemen of the jury, you may

20 be seated.  The defendants may be seated.  Counsel, do you

21 wish to have the jury polled?

22        MR. CURRAN:  Yes, Your Honor.

23        THE COURT:  Madam clerk, will you poll the jury.

24                    (Jury polled)

25        THE CLERK:  The verdict is unanimous.

1          THE COURT:  Thank you, madam clerk.  Ladies and

2    gentlemen of the jury, the verdicts that you have returned

3    will be accepted by the Court in this matter, and those

4    verdicts will act as the closure, the judgment, that will

5    close these matters that is the dispute between the United

6    States of America and the defendants, Mock and Young.  Having

7    accepted your verdicts in this case, you will be released from

8    the admonitions that I gave you regarding the trial over the

9    last week or so, and you are free to discuss it or not discuss

10   it.  It's entirely up to you.  I do recommend, however, that

11   with regard to the thing that I told you about websites, that

12   it would be a wise course not to utilize any social sites that

13   you might have to make posts regarding the trial or your

14   conclusions or statements or experiences regarding the trial.

15   My recommendation to you.

16          Having discharged you from any further service in

17   this case and relieved you of any admonition, I also want to

18   take this opportunity to personally thank you as a member of

19   the Eastern District Court here in Missouri, the federal

20   district court, and to thank you also on behalf of my

21   colleagues, the other federal district court judges and

22   magistrates here in the Eastern District of Missouri, for your

23   service as well as thank you on behalf of the lawyers

24   representing the Government and the defendants in this case

25   and the defendants also.  We know from our experiences in the

1  justice system that participating in jury duty sometimes is a

2  difficult experience for citizens.  Sometimes you don't want

3  to participate.  Sometimes it takes you away from your jobs,

4  from your families, from your homes, from the things in life

5  that you might just consider just fun.  It's an awesome duty.

6  It's an awesome experience, but we hope that you understand

7  and appreciate the fact that without you, each and every one

8  of you, our system of justice would fail.

9          The Constitution, the founders of the Constitution,

10  designed it so that citizens would make decisions just as they

11  designed it so that citizens would make the decisions

12  regarding government regarding their governance.  The justice

13  system, courts, are an integral part of our system, our

14  uniquely American system, and without your participation in

15  it, we wouldn't be unique, we wouldn't have justice, and it

16  would fail.  So if we inconvenienced you, we apologize, but

17  hope that you understand its importance.  If it was a

18  difficult decision for you to participate in jury duty, we

19  apologize for that, too, but we know you understand that it

20  was important.  If it caused you to wrack your minds, your

21  consciences, and your souls, well, we can't apologize for that

22  because that is what it is supposed to do.  That is what makes

23  it work.  That is what makes it fair.  Thank you again.  And

24  when you go back home to work and to your families and your

25  children, your grandchildren, your neighbors, hopefully you

1    will be able to tell them that it was tough work, but it was

2    important work, and urge them to participate fully every time

3    that they are called for jury duty because if you don't

4    participate, then you're really opting out of the system.

5            Thank you very much.  You are free to go.  Counsel, I

6    also want to say while the jury is here before they exit

7    through that door this one last time, that it was a personal

8    pleasure for me as a judge of this court to have each and

9    every one of you before me and representing your clients

10   vigorously, aggressively, and professionally representing your

11   respective clients.  I can say that as long as I've been doing

12   this as a judge, there is nothing more fulfilling and more

13   assuring than when lawyers do their jobs ethically and

14   professionally.  That makes it a good experience for me.

15   Thank you very much.  Thank you, ladies and gentlemen.  You

16   are free to go.

17   **(The Following Proceedings Were Held Outside the Hearing and**

18   **Presence of the Jury.)**

19           THE COURT:  All right.  Defendants will be remanded

20   to the custody of the marshals pending sentencing.  Counsel, I

21   will get a memo out to you within the next day or so letting

22   you know when the sentencing date will be.  I will order a

23   presentence investigation report so that it can go with the

24   defendants upon their sentencing, all right?  Thank you.  We

25   will be in recess.

Volume 6

127

1          (PROCEEDINGS CONCLUDED AT 6:00 P.M.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                             CERTIFICATE

2

3       I, Angela K. Daley, Registered Merit Reporter and

4   Certified Realtime Reporter, hereby certify that I am a duly

5   appointed Official Court Reporter of the United States

6   District Court for the Eastern District of Missouri.

7       I further certify that the foregoing is a true and

8   accurate transcript of the proceedings held in the

9   above-entitled case and that said transcript is a true and

10  correct transcription of my stenographic notes.

11      I further certify that this transcript contains

12  pages 1 through 127 inclusive and that this reporter takes no

13  responsibility for missing or damaged pages of this transcript

14  when same transcript is copied by any party other than this

15  reporter.

16      Dated at St. Louis, Missouri, this 30th day of May, 2012.

17

18

19      _____

        /S/Angela K. Daley
20      Angela K. Daley, CSR, RMR, FCRR, CRR
        Official Court Reporter
21

22

23

24

25