UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:09-CR-679-HEA |
| | ) |
| KATHERINE A. MOCK, | ) |
| ELAIN KAY YOUNG, | ) |
| | ) |
| Defendants. | ) |

JURY TRIAL
VOLUME 4

BEFORE THE HONORABLE HENRY E. AUTREY
UNITED STATES DISTRICT JUDGE

MARCH 15, 2012

APPEARANCES:

| | |
|---|---|
| For Plaintiff | Michael A. Reilly, AUSA |
| | Patrick T. Judge, Sr., AUSA |
| | Thomas E. Dittmeier, AUSA |
| | OFFICE OF U.S. ATTORNEY |
| | |
| For Defendant | Christopher E. McGraugh, Esq. |
| Katherine A. Mock | LERITZ PLUNKERT & BRUNING P.C. |
| | |
| | Kevin Curran, AFPD |
| | OFFICE OF U.S. PUBLIC DEFENDER |
| | |
| For Defendant | Jennifer Herndon, Esq. |
| Elain Kay Young | |
| | Michael J. Gorla, Esq. |

REPORTED BY:        Gayle D. Madden, CSR, RDR, CRR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7987

2

## INDEX

*Witnesses:*

**JASON WYCKOFF**
    Direct Examination by Mr. Reilly . . . . . . . . Page   3
    Cross-examination by Mr. Curran  . . . . . . . Page  27
    Cross-examination by Mr. Gorla . . . . . . . . Page  55
    Redirect Examination by Mr. Reilly . . . . . . Page  56
    Recross-examination by Mr. Curran  . . . . . . Page  58

**AMANDA BAX**
    Direct Examination by Mr. Dittmeier . . . . . . Page  62
    Cross-examination by Mr. McGraugh . . . . . . . Page  70
    Cross-examination by Mr. Gorla . . . . . . . . Page  72
    Redirect Examination by Mr. Dittmeier . . . . . Page  83
    Recross-examination by Mr. McGraugh . . . . . . Page  84

**EDWARD ADELSTEIN**
    Direct Examination by Mr. Judge . . . . . . . Page  86
    Cross-examination by Mr. McGraugh . . . . . . . Page  93

Stipulations Read . . . . . . . . . . . . . . Page 102

**NORMAN LANE NEWLIN**
    Direct Examination by Mr. Dittmeier . . . . . . Page 108
    Cross-examination by Mr. McGraugh . . . . . . . Page 116
    Cross-examination by Mr. Gorla . . . . . . . . Page 119
    Redirect Examination by Mr. Dittmeier . . . . . Page 124

Stipulations Read . . . . . . . . . . . . . . Page 125

**TIM ESCHMANN**
    Direct Examination by Mr. Reilly . . . . . . . Page 131
    Cross-examination by Mr. McGraugh . . . . . . . Page 143
    Cross-examination by Ms. Herndon . . . . . . . Page 144
    Redirect Examination by Mr. Reilly . . . . . . Page 148
    Recross-examination by Ms. Herndon . . . . . . Page 151

**JAMES R. GOODWIN**
    Direct Examination by Mr. Dittmeier . . . . . . Page 157
    Cross-examination by Ms. Herndon . . . . . . . Page 170
    Redirect Examination by Mr. Dittmeier . . . . . Page 174
    Recross-examination by Mr. McGraugh . . . . . . Page 175

**JEAN BALLARD**
    Direct Examination by Mr. Dittmeier . . . . . . Page 178
    Cross-examination by Mr. Curran . . . . . . . . Page 190
    Cross-examination by Ms. Herndon . . . . . . . Page 203
    Recross-examination by Mr. Curran . . . . . . . Page 219

1      (Proceedings started at 9:37 a.m.)

2      (The following proceedings were held in open court and

3  with the Defendants present.)

4      (The following proceedings were held within the hearing

5  and presence of the Jury.)

6           THE COURT:  Morning.  Ready to proceed?

7           MR. REILLY:  Yes, Your Honor.  At this time, the

8  Government would call Jason Wyckoff.

9           Sir, would you please step up and be sworn?

10           THE COURT:  Right here, sir.

11           Proceed.

12           MR. REILLY:  Thank you, Judge.

13                       **JASON WYCKOFF**,

14  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15  FOLLOWS:

16                       DIRECT EXAMINATION

17  BY MR. REILLY:

18  Q    Will you state your name for the record?

19  A    My name is Jason Wyckoff.

20  Q    What is your current business, occupation, or profession?

21  A    I am a DNA criminalist supervisor with the Missouri State

22  Highway Patrol Crime Laboratory in Springfield.

23  Q    How long have you been a DNA criminalist, and how long

24  have you been a DNA criminalist supervisor?

25  A    I have been a DNA criminalist for over 15 years, and I've

4

1    been a DNA criminalist supervisor since 2009.

2    Q    And starting with your original duties as a DNA

3    criminalist, would you please tell us, what are the duties of

4    a DNA criminalist with the Missouri State Highway Patrol Crime

5    Laboratory?

6    A    I initially began in the Offenders Profiling Unit, where

7    I was responsible for profiling convicted defenders per the

8    Missouri state law for inclusion into the COmbined DNA Index

9    System, otherwise known as CODIS, the CODIS DNA database.

10   After that -- I was in that section for about five and a half

11   years -- I transferred to the DNA Caseworking Unit where my

12   duties were to locate and genetically type biological

13   substances on evidence and make comparisons to reference

14   standards.

15   Q    What are the duties and responsibilities that you

16   currently hold as a supervisor?

17   A    As a supervisor, on a limited basis, I still perform some

18   casework analysis, but my main duties involve overseeing the

19   day-to-day operations of the DNA Caseworking Unit of the

20   subordinates that I supervise.

21   Q    And do you still perform some work with the CODIS

22   database?  You referred to something as the CODIS database.

23   Do you have duties related to the CODIS database in the

24   Missouri State Crime Laboratory?

25   A    Yes.  I am the local DNA database administrator or the

5

1   local CODIS database administrator for the Springfield lab.

2   Q     What is your educational background?

3   A     I have a Bachelor of Science degree in biology from

4   Southwest Missouri State University in Springfield, and I have

5   a chemistry minor.

6   Q     What is -- would you relate your training, your formal

7   training, your on-the-job training?

8   A     Excuse me?

9   Q     Would you please tell us about your training, formal

10  training and on-the-job training to be a DNA criminalist?

11  A     Sure.  I had the training program for the Convicted

12  Offender Unit where I first began.  It was a six-month program

13  where I was required to demonstrate competency and proficiency

14  in profiling and developing profiles for convicted offenders

15  and use of the CODIS database.  In the Caseworking Section, I

16  had to demonstrate competency and proficiency in performing

17  DNA analysis as it pertains to samples that I would encounter

18  in casework -- crime scene evidence, blood, semen, touch type

19  samples -- and making comparisons to reference standards from

20  known individuals and generating reports.

21  Q     And did your training include training in the application

22  of statistics to DNA results?

23  A     Yes.

24  Q     Have you presented in the area of DNA analysis?

25  A     Yes.

1    Q     On more than 10 occasions?

2    A     Yes.

3    Q     How many times have you had the opportunity to perform

4    DNA analysis on evidence?

5    A     Hundreds of times.

6    Q     Have you been previously qualified in court as an expert

7    on DNA analysis?

8    A     Yes.

9    Q     And did that testimony, expert testimony, include

10   testimony on applying statistics to DNA findings?

11   A     Yes.

12   Q     I want to move into more the substance of the matter.

13   What is DNA?

14   A     DNA is a molecule that we have in the cells of our body.

15   It's often referred to as the blueprint to life.  It contains

16   the genetic information that programs us to be who and what we

17   are.  It programs us to have two arms and two legs, so it

18   makes us the same, yet it can make us different -- the fact

19   that you see different hair colors and different eye colors.

20   It's been estimated that 99.9 percent of a person's DNA is the

21   same from one person to the next.  It's the .1 percent that's

22   different between people that the crime lab focuses on because

23   we want to know what the differences are among people's

24   profiles, so we can either include them as being a contributor

25   to a crime scene stain or exclude them as being the source of

1    a crime scene stain.

2    Q    You've used a term "profile" several times now.  Would

3    you define that, sir?

4    A    A profile is just merely a visual representation of a

5    person's DNA at the locations that we test.  At the Highway

6    Patrol Laboratory, we are looking at 16 locations.

7    Q    And, again, these are the unique locations that bear

8    distinctions in the DNA profiles, correct?

9    A    Yes.

10   Q    Now, would you expect everyone's profile to be unique

11   except for identical twins?

12   A    Yes.

13   Q    Would you explain that?

14   A    Identical twins would come from the same egg, so they

15   would have the same DNA profile as the egg splits.  Fraternal

16   twins come from separate eggs, separate sperm, separate

17   fertilizations, so they would have separate DNA profiles or

18   distinct DNA profiles.  The DNA profiling chemistry that we

19   use and the number of locations that we use has the ability to

20   differentiate between even members of a family.

21   Q    Would you expect DNA to be the same no matter what cell

22   type it's coming from in a person's body?

23   A    Barring certain issues such as bone marrow transplants or

24   something like that, yes.

25   Q    Is DNA analysis widely used and accepted in both forensic

1   and nonforensic science?

2   A     Yes.

3   Q     Would you give us some examples of nonforensic uses of

4   DNA?

5   A     DNA can be used for disease identification.  It can be

6   used for identification of individuals of mass disasters, and

7   it can be used in paternity testing.

8   Q     And in terms of disease recognition, is that information

9   that medical personnel rely on in making decisions to treat --

10  diagnose and treat patients?

11  A     Yes.

12  Q     And can you give us some examples of DNA, how it's been

13  used to identify victims in mass disasters?

14  A     Well, one of the most recent ones that I've actually been

15  involved with was the Joplin tornado disaster that occurred

16  last May.  We were taking reference standards from remaining

17  family members and comparing them to the DNA from the bodies

18  in the morgue and trying to make identifications through the

19  use of DNA.

20  Q     And then you alluded to paternity testing as well?

21  A     That's correct.

22  Q     How is DNA used forensically in a criminal investigation?

23  A     In a forensic setting, DNA can be recovered from a

24  multitude of sources, being blood, semen, hair roots, skin

25  cells, and so forth, and the goal is to attempt to develop a

1    DNA profile from those substances on crime scene evidence.

2    When a profile is developed, then we can either enter it into

3    a database, if it's eligible, the CODIS database, and search

4    for any offenders that it may hit with, or we also have the

5    possibility if reference standards are submitted with the

6    case, we can do a direct comparison, one-on-one, with the

7    profile from the reference standard to the profile from the

8    crime scene evidence to see if a match exists or not, to see

9    if an association can be established between an individual and

10   the crime scene or between two individuals or so forth.

11   Q    So, in other words, can you compare the profile of an

12   unknown sample, for instance, seized at a crime scene or

13   recovered at a crime scene, with the profile of a known sample

14   to determine whether the person who gave the known sample is

15   consistent with the unknown sample that was seized at the

16   crime scene?

17   A    Yes.

18   Q    And can this be used to associate or exclude a person

19   from being associated with a particular piece of evidence?

20   A    Yes.

21   Q    And the extent of what it tells us is whether or not

22   their biological materials in one way or another have come

23   into contact with a piece of evidence?

24   A    Yes.

25   Q    Before we move into -- just a couple more general

1    questions before we move on.  Does DNA -- at a crime scene,

2    would you expect DNA to morph or change the characteristics of

3    the DNA?  Would you explain what you expect in terms of DNA at

4    crime scenes?  Does its composition change?

5    A    I wouldn't expect it to change.  DNA does not morph over

6    time from one profile into a next.  As DNA degrades over time,

7    meaning that it undergoes changes and becomes no longer

8    usable, it simply goes away on the profile.  It does not

9    change into one -- from one type into the next.  It just

10   simply degrades and goes away.

11   Q    So based on your training and experience, you wouldn't

12   expect one profile to turn into a different profile with

13   different characteristics?

14   A    That's correct.

15   Q    It may change or go away -- it may degrade or go away,

16   but it won't morph into a different profile?

17   A    That's correct.

18   Q    Thank you.  And based on your -- your training and

19   experience, how -- what are some of the scenarios by which DNA

20   may be left behind on evidence?

21   A    Depending on what the situation and the circumstances of

22   the crime are, if we're dealing with somebody who is bleeding,

23   blood can be deposited on items; blood can be deposited on

24   people; blood can be transferred that way.  If we're dealing

25   with a sexual assault situation, semen can be left or

1   deposited on somebody or it can be deposited on items or

2   clothing or bedding or automobiles or so forth.  In the realm

3   of touch DNA, DNA can be deposited through skin cells being

4   left behind on items, such as a shirt collar, if a shirt was

5   left at the scene, or a hat that was left at the scene.

6   Q     Thank you.  And you referred to something called touch

7   DNA.  What is it that actually causes DNA to be present in a

8   touch DNA scenario?

9   A     Touch DNA is a term that has been applied to samples

10  where we wouldn't expect a high level of DNA such as would be

11  present with blood or semen.  These are types of cases where

12  we would expect skin cells and a lower amount of DNA to be

13  recovered.

14  Q     If you don't find DNA on a sample, does that mean that no

15  person ever touched a particular object?

16  A     I wouldn't expect that to be the case.

17  Q     Okay.  What are some of the explanations?

18  A     If I can't find DNA, it meant I either didn't test the

19  right area or maybe the DNA that was there was below my

20  threshold of detection.

21  Q     And is it possible for somebody to touch something yet

22  not shed skin cells or leave a detectable amount of DNA to

23  develop a profile?

24  A     I would say that it's probably the case that if I don't

25  receive a profile on a touch item, such as a pen or a doorknob

1    or a cabinet knob or something like that, that it's

2    probably -- knowing that somebody did touch it, it's probably

3    below my level of detection.  I have a certain threshold limit

4    that I must meet in order to proceed in generating a DNA

5    profile.

6    Q    I'm going to hand you what's already been marked for

7    identification purposes as Government's Exhibits 24D, 24D1,

8    24E, and 24F.

9    A    May I open this exhibit?

10   Q    Yes, sir.  Do you recognize the items presented to you?

11   A    Yes.

12   Q    Touching on 24D and 24D1, would you please tell the

13   ladies and gentlemen of the Jury what those items are and how

14   you recognize them?

15   A    24D is a ski mask.  I recognize it by my green tag, which

16   was stapled to the item.  It has the lab number, date,

17   initials, and my ID, or my initials are my ID.

18        24D1 is the container that contained this mask.  I

19   recognize it by my initials and date.

20   Q    When you receive -- well, and please tell us what the

21   other items are as well, sir.

22   A    24E was the container that contained these gloves as well

23   as some GSR materials.  I recognize it by my initials and

24   date.

25   Q    When you refer to GSR materials, did Mr. Randle from the

1   crime laboratory have the opportunity to inspect the gloves

2   before you conducted DNA analysis?

3   A    Yes.

4   Q    So any GSR materials would have been placed in there

5   by -- by Mr. Randle; is that fair to say?

6   A    Yes, I noted in my notes that they were placed in there

7   prior to my opening.

8   Q    All the items that are in front of you, were they

9   properly marked, packaged, and sealed when you retrieved them

10  from evidence and had occasion to begin to conduct your

11  analysis?

12  A    Yes.

13  Q    Would you tell the ladies and gentlemen of the Jury

14  what -- what you did in the initial steps of your analysis to

15  determine whether there were DNA materials present on these

16  items?

17  A    To backtrack, do you want me to recognize these first,

18  the gloves?

19  Q    Yes.  What is Government's 2F?

20  A    Okay.  24F are the gloves that were in here.

21  Q    Thank you.

22  A    And I recognize them by my date and initials on both

23  gloves.

24  Q    Thank you.  And would you tell us what -- what your

25  initial steps were in terms of beginning DNA analysis on the

1   materials that you received that are before you?

2   A    I began by examining the ski mask.  I attempted to swab

3   three locations off of the ski mask, and by swabbing, I mean

4   simply putting a drop of water on the tip of a cotton swab,

5   the type of swab that you may encounter at a physician's

6   office, a long wood applicator stick type swab.  I placed a

7   drop of water on the tip of that swab, and I rubbed it against

8   the surface that I wished to test, and the goal was to

9   transfer any skin cells that may be on those areas that I

10  tested to that swab.  Once in that swab form, I can take that

11  swab and cut it, place it in a tube, and begin the DNA

12  profiling steps.

13  Q    Thank you.  And would you relate the specific areas you

14  swabbed on the mask and why you chose those areas?

15  A    I attempted three different areas on the mask.  The first

16  area was the inside apparent face area of the mask.  The

17  second was a general swabbing of the general inside surface

18  that would have been away from the face area.  The third area

19  was the general outside surface.  I sometimes don't know how

20  the mask was actually worn and/or items of clothing are

21  actually worn.  People can wear things inside out, and so in

22  the interest of seeing if I couldn't develop something in this

23  case, I swabbed the inside and the outside, two samples from

24  the inside and one from the outside.

25  Q    Thank you.  In terms of the analysis, what is the next

1   step in the analysis with regard to this particular piece of

2   evidence?

3   A     The next step would be to see if I couldn't develop

4   profiles from those areas.

5   Q     And would you tell the ladies and gentlemen of the Jury

6   if you were able to develop profiles on the ski mask or in the

7   three areas that you described?

8   A     I was able to develop profiles from two of the three

9   areas.

10   Q     What were those two areas?

11   A     The inside face area, a profile was developed from that,

12   and the general outside surface, a DNA profile was developed

13   from that.

14   Q     Now, with regard to the gloves -- well, strike that.

15   We'll walk through with one piece of evidence to describe the

16   procedure unless you prefer to discuss the gloves before we

17   move on to reference standards.  We can carry one piece of

18   evidence through.  Did you have profiles or did you receive

19   known profiles for which to conduct known samples for which to

20   attempt to develop profiles for comparison purposes to the

21   profiles that you developed on the ski mask?

22   A     Yes.

23   Q     I'm going to hand you what's been marked as Government's

24   Exhibits 10B, 11B, and 28H.  Do you recognize those?

25   A     Yes.

1    Q     What are they?

2    A     10B is a known reference standard from Elain Kay Young.

3    I recognize it by my initials and date.  11B is a known

4    reference standard from Kathy Mock.  I recognize that by my

5    initials and date.  24H is a known reference standard from

6    Melvin Griesbauer, and I recognize that by my initials and

7    date.

8    Q     And when you say a reference standard, were those all --

9    were those all buccal swabs?

10   A     May I check my case notes?

11   Q     Yes, sir.

12   A     Yes.

13   Q     And are buccal swabs submitted on a regular basis to the

14   crime laboratory to attempt to develop a known -- known

15   reference sample?

16   A     Yes.

17   Q     And in this case, were they properly marked, packaged,

18   and sealed when they were received by the crime laboratory as

19   to each individual that you've identified associated with

20   Government's 10B, 11B -- 10B being Young, Elain Kay Young, 11B

21   being Katherine Mock, and 28H being Melvin Griesbauer?

22   A     Yes.

23   Q     And with the intended reference samples, were you able to

24   develop profiles to develop -- from which to develop known

25   samples?

1   A     Yes.

2   Q     Would you please tell the ladies and gentlemen of the

3   Jury what you developed in terms of profiles for the known

4   samples?  What did that leave you with?  Did you have a known

5   reference standard for Elain Kay Young, Melvin Griesbauer, and

6   Katherine Mock?

7   A     Yes.

8   Q     And based on that, just to walk through one piece of

9   evidence before we move on to some of the other items you

10  tested, what were the results or what did you do next in terms

11  of -- not necessarily what you did next, but what were the

12  results of the comparison of the unknown samples from the ski

13  mask, the unknown profiles, to the known reference standards

14  that were submitted?

15  A     The profile from the inside surface area of the ski mask

16  was consistent with the profile from Kathy Mock.  The DNA

17  profile from the general inside surface area could not be

18  developed.  The DNA profile from the general outside surface

19  area of the ski mask was characteristic of a mixture.  The

20  major component of that mixture was consistent with Kathy

21  Mock.  Melvin Griesbauer could not be eliminated as being a

22  contributor to that mixture.

23  Q     So there was a -- on the inside face area, it was

24  consistent with Katherine Mock's DNA; that's the inside face

25  area of the ski mask, correct?

1    A    That's correct.

2    Q    The general -- the inside general surface area, general

3    inside surface area, not the face area, you were not able to

4    develop a profile?

5    A    That's correct.

6    Q    And then on exterior, it was consistent with -- with the

7    DNA profile of Ms. Mock and something you referred to as a

8    mixture?

9    A    The profile from the outside, the general outside surface

10   was characteristic of a mixture.  The major component of that

11   mixture or the person who can be associated as contributing

12   the most DNA to that mixture was consistent with Kathy Mock.

13   Q    Would you -- you used a term called mixture that I don't

14   think we've heard before.  Would you tell the ladies and

15   gentlemen of the Jury what a mixture is?

16   A    A mixture is DNA coming from more than one person in a

17   profile.

18   Q    And then you said the -- the other person or contributor

19   in the mixture was -- could not -- was consistent with Melvin

20   Griesbauer; he could not be excluded.  I'm sorry.  Would you

21   tell us about those findings?

22   A    Melvin Griesbauer could not be eliminated as being a

23   contributor to the minor component of that mixture.

24   Q    And what's the distinction between a major and minor

25   contributor when you define the term "mixture"?

1   A    When dealing with mixtures, if we have certain

2   characteristics of the profile where it is demonstrated that

3   more DNA is coming from one person over another person,

4   sometimes we can assign what we call a major component.  It's

5   also known as the major contributor, who contributed the more

6   or most DNA to a sample, or if we're dealing with a minor

7   component, who contributed lesser DNA to that mixture.

8   Sometimes we have mixtures where we have equal contribution

9   from both, generally referred to as a one-to-one mixture, and

10  we can't assign a major and minor, but whenever more DNA is

11  present, sometimes we can assign a major component, and that

12  was done in this case.

13  Q    Now, moving on to the next, next items you examined, was

14  that the gloves in Government's Exhibit 24F?

15  A    Yes.

16  Q    Would you tell the ladies and gentlemen of the Jury what

17  you did to attempt to develop a DNA profile on the -- on the

18  rubber gloves, Government's 24F?

19  A    There were two gloves in this case.  I attempted two DNA

20  samples per glove.  I attempted on what was considered to be

21  the apparent inside surface of the gloves for DNA.  Glove #1,

22  I chose the inside and outside palm areas for one sample and

23  then the apparent inside finger surface area, and then I did

24  the same for Glove #2.

25  Q    Thank you.  And what were the results of your attempt to

1    develop profiles on the gloves?

2    A     With both gloves, on the inside and outside palm areas, I

3    did not receive enough DNA to attempt profiling, so there was

4    an insufficient amount of DNA recovered from those areas on

5    both gloves.

6    Q     And then were there areas on the gloves where you were

7    able to develop any DNA profile?

8    A     Yes.

9    Q     Would you tell us about that?

10   A     The apparent inside finger areas of both gloves yielded

11   profiles that I could use for comparison purposes.

12   Q     And in terms of -- of -- let's talk about what we'll

13   refer to as Glove 1 and Glove 2.  In terms of Glove 1, what,

14   if anything, were the results of your analysis?

15   A     I was able to develop a DNA profile.  Would you like me

16   to go ahead and talk about --

17   Q     Please.

18   A     -- comparisons?

19   Q     Yes, sir.

20   A     The profile is consistent with the profile from Kathy

21   Mock.  There is additional DNA showing up at one of the 16

22   locations that I tested for, and that is not enough

23   information for me to go any further with.  It's just too

24   insufficient for me to ever be able to include or exclude

25   somebody from being a contributor to, and I'm not even sure

1    that it could be DNA.  It could very well be an artifact of

2    the profiling process.  The DNA that I'm receiving is in

3    certain positions on -- at that location where it could be an

4    artifact or it could be additional DNA.  Either way, it's

5    insufficient for me to do anything with.

6    Q    What does the term "artifact" mean?

7    A    An artifact in the instance that I'm describing could be

8    DNA that is being developed as part of the typing process.

9    It's not actually generated from the -- it's not actually part

10   of the DNA profile.  It's a phenomenon of the process that

11   occurs.  It's recognized, and we deal with it in the

12   laboratory, and in this instance, it's falling into positions

13   where it could actually be an artifact rather than DNA.

14   Either way, it's insufficient.

15   Q    Thank you.  How would you characterize the strength of

16   the amount of DNA for which you could develop the profile that

17   matched Katherine Mock's profile on the inside of Glove 1,

18   inside finger area of Glove 1?

19   A    I had enough DNA to meet the minimum criteria to develop

20   a DNA profile.

21   Q    Thank you.  Now, with regard to -- go up to what were the

22   results of your attempts to develop a profile on the inside

23   finger area of Glove 2.

24   A    I was able to also develop a DNA profile from that area

25   as well.

1   Q    Okay.  What type of profile was that, and what were the

2   results of your comparisons?

3   A    The profile is characteristic of a mixture.  The major

4   component of that mixture is consistent with Kathy Mock.

5   There is still DNA that is unaccounted for in that mixture.

6   Q    And is that -- in terms of the mixture and the DNA, was

7   Ms. Mock the major contributor?  Was hers the major

8   contributor in the profiles?

9   A    The major component was consistent with Kathy Mock.

10  Q    Thank you.  And other terms -- how would you define the

11  other amount of DNA that you were unable to identify?

12  A    The other amount is consistent with being minor and

13  partial.

14  Q    Thank you.  Now, did you have an opportunity to analyze a

15  third piece of evidence that I have not put before you?

16  A    Yes.

17  Q    And what were the -- what was that third piece of

18  evidence?

19  A    Are you talking about another glove?

20  Q    Yes, sir.

21  A    It was a glove.

22  Q    Okay.  And that was seized from -- seized from a separate

23  location.  Were you able to develop -- a separate location at

24  17631 Penny Royal.  Were you able to develop a profile on that

25  glove?

1    A    The glove that I tested, I was not able to develop a DNA

2    profile from either of the locations that I tested, and the

3    locations were the same that I tested on these two other

4    gloves.

5    Q    Okay.  And there, there's just an insufficient amount of

6    DNA material to develop any profile at all?

7    A    There was an insufficient amount of starting material for

8    developing a profile.

9    Q    Okay.  Now, in terms of the reference standards, you also

10   had a reference standard from a store clerk and from Jared

11   Young, is that correct?

12   A    Yes.

13   Q    Okay.  Now, did you have occasion to perform a

14   statistical analysis relative to your DNA findings?

15   A    Yes.

16   Q    Why do you do a statistical analysis?

17   A    Statistical analyses in DNA can be performed to provide

18   an indication for the meaning to a match or how much weight

19   can be added to the meaning of a match.  It is such as if you

20   have, say, a one-to-three, one out of every three people could

21   be consistent with being in that profile, that's not a very

22   significant number.  One out of three is not very rare.  One

23   in quintillion might be considered pretty rare.  So it just is

24   a way for us to describe and give a weight to the meaning

25   whenever we make an association between an individual and a

1    crime scene sample.

2    Q    And does that assist you to determine the probability

3    that someone else randomly selected would have the same, the

4    same profile as your sample, your known sample, and the

5    profile developed from the crime scene evidence?

6    A    It would be the number of people I would expect in the

7    population to have that profile if everyone were tested.

8    Q    And what were the results of your statistical analysis in

9    this case?

10   A    For the -- what I considered to be the single source

11   profile or coming from one contributor only on the inside face

12   mask area, the profile from that is -- has an approximate

13   frequency of one in 107.3 quadrillion people tested in the

14   Caucasian population and one in 480.8 quadrillion people

15   tested in the black population.

16   Q    So I'm sorry.  The profile developed from Ms. Mock

17   developed on which areas of the ski mask?

18   A    The inside face area of the ski mask.  That can also be

19   applied to the major component from the outside general

20   surface of the ski mask as well as the profile from the inside

21   of Glove 1 as well as the major component from the profile

22   from the inside of Glove 2.

23   Q    And what was that number?

24   A    Approximately one in 107.3 quadrillion in the Caucasian

25   population and one in 480.8 quadrillion in the black

1    population.

2    Q     How many zeros is that on the end of 1.07.3 or 107.3?

3    A     Fourteen.

4    Q     In terms of the mixtures, were you surprised or are you

5    surprised when you develop mixtures on materials that you

6    test?

7    A     Particularly not when dealing with touch DNA type

8    samples, where skin cells are the target for our profiles.

9    Q     And why is that?

10   A     Due to the transient nature of DNA and how DNA can be

11   transferred from one person to the next, receiving DNA in

12   low-level components is not uncommon, especially when dealing

13   with clothing items, knowing that people can share clothes,

14   other people can touch people's clothing, or in the case of

15   gloves or something like that, somebody could shake hands with

16   somebody and then put on a pair of gloves.  It's just random.

17   Q     It's possible for somebody to touch another item that

18   somebody has touched yet -- yet -- or touch an item that

19   another person has touched and have that person's DNA or the

20   second person's DNA on their hands?

21   A     And it's not uncommon for that to show up in a low-level

22   capacity, such as in a minor component where it's partial and

23   minor.  It's not uncommon for that to happen in a mixture.

24   Q     Thank you.  Now, in terms of evidence developed on the

25   ski mask, you said Melvin Griesbauer's profile could not be

1    eliminated as being the minor contributor on the exterior of

2    the ski mask, is that correct?

3    A    He cannot be eliminated as a contributor to the minor

4    component.

5    Q    Okay.  As a contributor to the minor component.  And

6    based on your training and experience, are you aware of

7    certain scenarios in which blood -- blood can splatter when

8    somebody is shot?

9    A    Sure.

10   Q    Is that something that is at least a factor in analyses

11   conducted in crime laboratories?

12   A    It could be, yes.

13        MR. REILLY:  Thank you.

14        If I may have just a moment, Your Honor?

15        THE COURT:  Sure.

16   Q    (By Mr. Reilly) One thing I should have asked you -- on

17   the items you tested, I know Mr. Griesbauer could not be

18   excluded from -- from the exterior -- as being a contributor

19   to the minor -- a contributor to the minor mixture on the

20   exterior of the ski mask.  Ms. Young was excluded from -- from

21   all these items, is that correct?

22   A    That's correct.

23   Q    Okay.  As was the store clerk, Francis Woods, and Jared

24   Young?

25   A    That's correct.

1       MR. REILLY:  Thank you.  No further questions.

2       THE COURT:  Mr. Curran.

3       MR. CURRAN:  Thank you, Judge.

4                     CROSS-EXAMINATION

5    BY MR. CURRAN:

6    Q    I'm going to have some specific questions about the

7    results.  Let me know if you need to refer to your notes.

8    You'll probably do that anyway.

9    A    Sure.

10   Q    Let me start with something the Government just asked

11   you.  He posed a hypothetical that the DNA on the ski mask

12   could have potentially come from blood; that's what he just

13   asked you, right?

14   A    Potentially.

15   Q    Yeah.  Did you do any serology tests to see if there was

16   blood?

17   A    Blood detection was not performed.

18   Q    Pardon?

19   A    Blood detection was not performed.

20   Q    All right.  So you knew the ski mask was related to a

21   homicide, right?

22   A    Yes.

23   Q    And you -- you've already said a couple of times that

24   some of the DNA -- well, you said that the victim couldn't be

25   excluded as a contributor to some of the DNA you found on what

1    you called the outside of the mask, right?

2    A    That's correct.

3    Q    All right.  But then nobody did any -- and that's

4    possible; there are tests to determine whether blood is on the

5    surface of a material, is that right?

6    A    That's correct.

7    Q    That's called serology, I think?

8    A    It's called stain identification in today's language.

9    Q    All right.  You know how to do it?

10   A    I know how to do that.

11   Q    Okay.  But nobody asked you to do that?

12   A    I decided not to perform stain identification in this

13   case.

14   Q    Okay.  Now --

15   A    Or on this item.

16   Q    Pardon?

17   A    I decided not to perform it on this particular item.

18   Q    Now, next -- I'm going to ask you more about that minor

19   profile in a couple minutes, but I want to ask you a couple

20   other things first.  Let me ask you about DNA evidence in

21   general.  If you do not -- if you check an item for DNA and

22   don't find anything, that doesn't mean it wasn't touched by

23   someone or came in contact with somebody, is that right?

24   A    That's correct.

25   Q    Okay.  Every time we touch something, you know, we don't

1  always get a result, I guess, if you're checking for DNA,

2  correct?

3  A    Whenever somebody touches something, the potential to

4  leave skin cells behind is there, but it may not be at a level

5  where I can detect it with my threshold limit.

6  Q    And also, to be sure I'm clear, we are talking about

7  touching, like my putting my hand on the podium, I could

8  potentially be leaving cells, and if there's enough there,

9  you'd be able to type it, is that right?

10  A    Yes.

11  Q    All right.  And then when we talk about mixtures, if

12  somebody else in the courtroom were to put their hand where I

13  put my hand, they could potentially be leaving cells, and then

14  we'd have two people's DNA potentially?

15  A    Yes.

16  Q    All right.  Now, I think you said sometimes, if there's

17  more -- I'm going to use -- if I don't use the right word,

18  tell me.  When you type it, if you see a certain profile more

19  quantity, you can link the higher quantity profile to one

20  individual; is that fair to say?

21  A    It's usually where we assign what we refer to as a major

22  contributor or a major component.

23  Q    Okay.  Because that's because you're -- when you say

24  major, you're getting a higher read?

25  A    That's correct.

1    Q    There's more DNA there, is that right?

2    A    That's correct.

3    Q    Okay.  Because, normally, if you have a mixture, there's

4    nothing about the profile itself that -- that -- I mean, my

5    DNA profile doesn't have my name on it, right?

6    A    No.

7    Q    Okay.  So you have to look at the mixture and determine

8    if there's a major contributor, and if that fits the profile,

9    then -- then -- then you'll do the numbers to see what the

10   likelihood is it's that person, is that right?

11   A    Once I assign a major component after I make the

12   comparison and if it happens to be consistent with somebody,

13   then I can do statistical analysis, yes.

14   Q    Okay.  And the other thing -- you can't put a time on

15   this -- I'm going to use an analogy -- like cause of death, or

16   sometimes a pathologist will give an estimate as to when the

17   person died, you know, based on their observations or

18   training.  With DNA, there's no such observation; you cannot

19   say when DNA was -- by your testing, you can't say when DNA

20   was placed on a surface; is that fair to say?

21   A    That's correct.

22   Q    All right.  And also, if the conditions are right, DNA

23   can last on the surface for quite a while, is that right?

24   A    Yes.

25   Q    Okay.  And you also mentioned something about the

1   challenges of -- well, let me ask you this; is there sometimes

2   a challenge with forensic samples because they're not found in

3   optimum conditions?

4   A    Yes.

5   Q    Okay.  You talked about degradation, which I understand

6   to mean over time, I think, heat and maybe the elements can

7   degrade a sample where you don't get an appropriate reading,

8   is that right?

9   A    Yes.

10  Q    Okay.  And then you also have a problem with --

11  contamination is a potential problem -- that somebody else's

12  DNA can actually get mixed up with the sample that you're

13  trying to --

14  A    That's correct.

15  Q    Okay.  And I think that's why people take precautions

16  when they're gathering it; they put on latex gloves so their

17  DNA doesn't get mixed up with the sample they're trying to

18  take, is that right?

19  A    That's one reason as well as to protect themselves from

20  the evidence.

21  Q    Okay.  So what I take that to mean is we're, you know,

22  cells; if I'm doing this, am I shedding cells right now?

23  A    Yes.

24  Q    Okay.  So I'm potentially dropping DNA, right?

25  A    Yes.

1  Q    But it doesn't mean you're going to get a result if you

2  swab this?

3  A    If I were to swab that, I wouldn't expect a result.

4  Q    Okay.  All right.  Now I'm going to talk to you about --

5  let's talk about the gloves for a second.  You referred

6  that -- you said that you got a result and that you found DNA,

7  Glove 1, on the inside finger; does that sound right?

8  A    Yes.

9  Q    Now, how did -- you referred to it as the inside finger.

10  How did you determine that that was the inside finger?

11  A    I referred to it as the apparent inside finger, and the

12  trace analyst had already previously determined what he

13  considered to be the exterior surface of that glove, and I

14  swabbed the side opposite of his labeling as well as where I

15  labeled.

16  Q    All right.  Now, the trace analyst determined the outside

17  of the glove; I think that's because he said he found some

18  gunshot residue?

19  A    That's correct.

20  Q    All right.  So since he found gunshot residue on one side

21  of the glove, he made the assumption that's the outside of the

22  glove, right?

23  A    I don't know how he made that assumption.

24  Q    Well, you said -- you just said you referred to the

25  inside finger of the glove and one of the reasons was the

1    trace analyst just, you know, let you know what he thought the

2    inside and the outside of the glove were.

3    A    That's what the trace analyst let me know.

4    Q    Okay.

5    A    I do not know how he made that distinction.

6    Q    Oh, you don't know how he made the determination?

7    A    No.

8    Q    You didn't ask him?

9    A    I just know that it was noted in his notes, and I went

10   from that point forward.

11   Q    All right.  So there was nothing intrinsic about the

12   glove -- and these are latex gloves, right?  They look the

13   same on either side?

14   A    Yes.

15   Q    Yeah, you wear -- I assume you're well familiar with

16   latex gloves would be my guess?

17   A    Yes.

18   Q    All right.  Okay.  And they can be worn either way?  I

19   mean it's not like a glove we buy at Kmart or something like

20   that or, you know, the outside and inside may be different

21   fabric or different material, is that right?

22   A    They can be worn either way.

23   Q    Okay.  All right.  So on Glove 1, the inside finger, you

24   said that there was a -- you developed Ms. Mock's profile, is

25   that right?

1    A    On the apparent inside finger, the profile was consistent

2    with Kathy Mock.

3    Q    All right.  And then at one site -- now, when we're

4    talking about the DNA typing, I think you already covered this

5    with the Government; you're not getting a profile of the whole

6    DNA; you're working off of 16 sites, is that right?

7    A    That's correct.

8    Q    Okay.  And at one site, in addition to the major

9    contributor, which was similar to Ms. Mock's, you also said

10   there was some other activity?

11   A    At one site, there was additional allelic activity or

12   additional DNA showing up.

13   Q    Okay.  So that's -- so that -- let me ask you.  If that

14   is -- if that was DNA -- and I realize you had an explanation

15   it's possibly what you call an artifact, but if it was DNA,

16   there's no way that came from Ms. Mock, right?

17   A    If it's additional DNA, Ms. Mock had already been

18   accounted for as being consistent with the major component.

19   Q    Okay.  So if that is DNA, that came -- it had to have

20   come from somebody else?

21   A    If it is DNA, it had to have come from somebody else.

22   Q    All right.

23   A    It was not consistent with her.

24   Q    Okay.  But as you said, since it only shows up at one

25   site -- well, strike that.  All right.  And that's what you

1    referred to as the inside finger?

2    A    The apparent inside finger, yes.

3    Q    All right.  And then in the apparent inside finger on

4    Glove 2, besides the major contributor -- that profile was the

5    same as Ms. Mock's profile; we had that, right?

6    A    The major component was consistent with Kathy Mock.

7    Q    And then what you had -- what you referred to as minor

8    components -- first of all, let's say that that -- the minor

9    components are not related to Ms. -- to the Mock profile, is

10   that right?

11   A    Yes.

12   Q    Okay.

13   A    Ms. Mock had already -- if that was her DNA -- had

14   already been accounted for as the major component.  There's

15   additional DNA still present.

16   Q    And I count that you found -- I'm going to use the word

17   "activity".  I'm trying to be broad enough that I don't -- but

18   it looks to me one, two, three, four, five, six, seven, eight,

19   nine, 10 sites, there was other evidence of DNA; is that fair

20   to say?

21   A    Yes.

22   Q    All right.  Now, also, if you look at -- you have that in

23   front of you?

24   A    Yes.

25   Q    Okay.  If you look at D13S317 -- do you have that site?

1   A    Yes.

2   Q    Now, what I referred to, for lack of a better word,

3   that's the name of that site; that identifies where on the --

4   which chromosome and where on the chromosome you're looking;

5   is that fair to say?

6   A    Yes.

7   Q    All right.  Now, and it's also -- you describe -- when

8   you get the profile, the profile, you assign numbers?

9   A    Yes.

10  Q    Okay.  So I'm going to get into numbers.  I want to make

11  it more easy.  Under Glove 2, at that site we just talked

12  about, that D13, Ms. Mock is a 12, 13, right?

13  A    Yes.

14  Q    Okay.  And then you found evidence of also an 8, a 9, and

15  11, is that right?

16  A    Yes.

17  Q    Now, the way I understand it is, at those sites, the most

18  you're going to get is two numbers, is that right, one for

19  each allele?

20  A    That's not the most.  The minimum would be one.  The

21  maximum could be several.

22  Q    Well, so if you have an 8 and a 9 and an 11, based on

23  your experience, how many potential contributors is that?

24  A    At that particular location --

25  Q    Yeah.

1    A    -- with your specific scenario --

2    Q    Yeah.

3    A    -- it's characteristic of at least three.

4    Q    Okay.  So in addition to Ms. Mock's profile, there's a

5    potential profile with two others or three others?  Oh,

6    because you only get one, so it could be three; it could be

7    one 8, one 9, one 11?

8    A    That's why I said it's at least -- that whole locus taken

9    into account with the scenario that you just gave is

10   characteristic of at least three.

11   Q    Okay.  All right.  Now, we don't know if it's three or

12   not because you don't have enough information basically,

13   right?

14   A    I have information at other loci.  When taking the

15   profile into context as a whole, I would say that it's

16   characteristic of at least two.

17   Q    Okay.  For the -- for the -- those 8, 9, and 11 that we

18   just talked about, right?

19   A    I'm referring to the profile as a whole.

20   Q    Okay.

21   A    If you pull out just that one segment and don't allow me

22   to look at the others, then I would have to say that just that

23   one segment is characteristic of at least three.

24   Q    Okay.

25   A    But whenever I take the whole profile as a whole, using

1    the context of every piece of information that I'm given, it's

2    characteristic of at least two.

3    Q    All right.

4    A    I like to make my decisions based on more than just one

5    location.  I like to make my decisions based on what's

6    happening to the profile as a whole.

7    Q    All right.  That -- so what we're saying is you have

8    Ms. Mock as a major contributor; there's other DNA; the other

9    DNA, you know, activity that you found had to come from others

10   and not her, is that right?

11   A    That's correct.

12   Q    Okay.  Now, looking at the whole profile, maybe you can

13   determine whether it was one or two others, but frankly, you

14   don't have enough information to do that, is that right,

15   because you didn't --

16   A    Do I have enough information?

17   Q    Well, you didn't get a reading at every site?

18   A    There's a reading at every site, and I think you may be

19   referring to a minor component reading at every site.

20   Q    Okay.  All right.

21   A    And I have the major contributor present at every site,

22   all of the 16.

23   Q    I didn't ask that --

24   A    The minor component is what's partial.

25   Q    I didn't ask that appropriately.  I was talking about the

1    minor contributors.  You don't have a read -- we already

2    talked about that; you don't have a reading; you didn't get

3    DNA activity at every site for the minor component?

4    A    It doesn't appear that way.  If there is a reading, it

5    could actually be the exact same type as the major

6    contributor, and it may be being masked by the major

7    contributor.

8    Q    Okay.  All right.  So you're saying at these sites where

9    you don't have a minor component, it's possible that the other

10   contributors were the same, so it was all absorbed into one

11   reading?

12   A    Either that or --

13   Q    Okay.

14   A    -- the other contributor dropped out.

15   Q    All right.  Just so I've got it, at this site, inside

16   finger, Glove 2, there is more DNA than -- DNA of more than

17   one person?

18   A    Yes.

19   Q    Okay.  And at most, it's potentially two more people?

20   A    All I can say is that it is at least two.

21   Q    All right.

22   A    No.  Let me rephrase that.

23   Q    Well, I guess --

24   A    The profile is characteristic of at least two people --

25   Q    All right.

1    A     -- as a whole, not the major contributor plus two others.

2    It's characteristic of being at least two people for this

3    whole entire profile.

4    Q     Okay.  Counting the major and the minor?

5    A     Yes.

6    Q     Okay.  All right.  Now, you also said that -- oh, now,

7    with regard -- I want to move into the ski mask.  With regard

8    to the ski mask, you -- you talked about inside face, and you

9    also referred to outer surface.  How did you make that

10   determination as to what the inside part of the mask is as

11   opposed to the outside?

12   A     Ski masks are a little bit easier than gloves.  Ski masks

13   actually have a stitching on the inside surface to where you

14   know what the inside versus the outside should be.

15   Q     Should be, is that right?

16   A     Should be.

17   Q     I mean you don't necessarily -- you can wear it either

18   way, is that right?

19   A     Sure.

20   Q     Okay.  And in this case, you didn't have any

21   information -- all right.  You solely based inside/outside

22   based on the stitching?

23   A     Yes.

24   Q     Okay.  But it could have been worn inside out for all

25   that you know?

1   A    Yes.

2   Q    Okay.  Now, you said that on the outer surface, again,

3   there was a major contributor and that was -- the profile was

4   the same as Ms. Mock's, right?

5   A    The profile from the major contributor is consistent with

6   Kathy Mock.

7   Q    All right.  Then this is another situation where we have

8   some other activity in terms of, at certain sites, we call

9   minor contributors?

10  A    Yes.

11  Q    All right.  So it's the same situation where more than

12  one person contributed to this sample?

13  A    Yes.

14  Q    All right.  And you also said that you can't exclude

15  Mr. Griesbauer?

16  A    That's correct.

17  Q    And that's because that his profile at the sites where

18  you have received activity is the same?

19  A    There were genetic markers in common between the minor

20  component and Mr. Griesbauer's reference standard where I

21  would expect them to be if he were in that mixture.

22  Q    Now, you didn't get a reading at every site with regard

23  to minor contributors on the outer surface, is that right?

24  A    Again, I don't know.  I have a reading at every site.

25  Where there is not a minor contributor present, it could very

1    well be masked by the major -- the major contributor of the

2    major component.

3    Q    All right.  So you're saying that -- let's take one of

4    those sites.  Let's take Penta E, and, again, that's a name

5    just for the location you're looking on the chromosome,

6    correct?

7    A    Yes.

8    Q    Okay.  All right.  Now, with Penta E, ski mask outer

9    surface, you have a 7, is that right?

10   A    That's correct.

11   Q    And you have that as a major contributor --

12   A    Yes.

13   Q    -- correct?  And that's also the same as what Ms. Mock is

14   at that site; she's a 7?

15   A    She contains a 7.

16   Q    Yeah.  Now, at that same site, Mr. Griesbauer is a 12,

17   15, two numbers, right?

18   A    Yes.

19   Q    All right.  So he's not a 7?

20   A    No.

21   Q    Okay.  So when you say that -- that -- that there could

22   have been a minor contributor of 7 but since she's a 7, it

23   shows up 7, that could potentially exclude Mr. Griesbauer

24   because if someone's a 7 at that site and he's not, he's

25   excluded, right?

1   A    When taking that one locus without looking at the rest of

2   the profile, taking that one without the rest of the context,

3   yes, he would be excluded from that locus.

4   Q    Well, let me make sure I have this right.  You're looking

5   at 16 sites, right?

6   A    Yes.

7   Q    If there's one difference, if my profile at one site is

8   different than the sample, I'm excluded, is that right?

9   A    Not necessarily.

10  Q    Well, if it's -- if you just get one reading -- okay,

11  let's just say all we have here is the major contributor

12  profile, right, for the sake of this question --

13  A    Okay.

14  Q    -- all right, and at one site I'm different than your

15  major contributor profile; you can't include me?

16  A    I wouldn't say that that's the case.  In this case --

17  Q    Well, I'm not -- let me start with the question, and then

18  we can work into this case.  I mean at this site we're talking

19  about, if you get a 7 and at that site I'm a 14, 16, I mean

20  that's not the same, right?

21  A    That's not the same.

22  Q    Okay.  So then I would be excluded?

23  A    Potentially.

24  Q    Potentially?

25  A    I said potentially.

44

1   Q    Okay.  So you're saying if the numbers are different you

2   can still include me?

3   A    Potentially.

4   Q    All right.  Now I want to stay on the outer surface of

5   the ski mask.  Let's talk about the first, the D3S1358.  Now,

6   I show that you have for the 14, 16, that's the major

7   contributor and that's what Ms. Mock is at that site, is that

8   right?

9   A    That's correct.

10  Q    And then you have minor contributors; you have 15, 17,

11  and 18, is that right?

12  A    Potentially.  It looks like the 14 could also be included

13  in that as well.

14  Q    Okay.  So, again, is this a situation where if that is

15  DNA, if that major -- well, we know the major, you're saying,

16  is DNA.  If these minor readings are DNA, they came from

17  others other than Ms. Mock most likely?

18  A    Yes.

19  Q    All right.  And also, the fact that we have three numbers

20  there, you said, that could potentially be at that site shows

21  a profile of more than one person?

22  A    There's potentially four numbers there, and, yes, you are

23  correct.

24  Q    Okay.  All right.  And then if we -- and then

25  Mr. Griesbauer at that site is a 15, 17, right?

1    A    Yes.

2    Q    So -- but we have 15, 17, 18, is that correct?

3    A    Potentially, 14, 15, 17, 18.

4    Q    Okay.  Now, let me ask you, you can't tell which two of

5    these numbers go with each other, right?

6    A    Sometimes we can.  Sometimes we can't.  In this instance,

7    looking at that one locus, I would not want to make that

8    distinction.

9    Q    Okay.  All right.  So when you say you can't exclude

10   Mr. Griesbauer, what I understand you to mean is you see a 15

11   and 17 in there, he is a 15 and 17, but we don't know whether

12   the contributor was actually a 15, 18, right?

13   A    That's one possibility for one contributor.

14   Q    Okay.  All right.  And then maybe another contributor was

15   just a 17 at that point?

16   A    That's another possibility for another contributor.

17   Q    Okay.  All right.  So he has a couple of numbers in

18   common, and that's why you say you can't exclude him?

19   A    That's correct.

20   Q    All right.  Now, if we move over to the next one, TH01,

21   you have a 7 and a 9, is that right?

22   A    As the minor component?

23   Q    I'm sorry.  I'm sorry.  I'm looking -- yes, as a minor

24   contributor, 7 and 9.

25   A    It actually could potentially be 7, 9, 9.3.

1    Q    Okay.  Well, Ms. Mock is a 9.3, right?

2    A    Yes.

3    Q    Okay.  So the minor contributor, what do you have -- a 7,

4    and then what's the other?

5    A    9 and potentially a 9.3.

6    Q    Okay.  Now, why do you say potentially?  You have the 9.3

7    as a major contributor and also a 9.3 as a minor contributor?

8    A    Correct.

9    Q    Okay.  And that's just based -- I'm going to say amounts,

10   but that's based on quantity or amount of --

11   A    It's based on the fact that the 8 and 9.3 appear to go

12   together, and whenever you put those together using relative

13   peak heights, there's a little bit of the 9.3 that's taller

14   than the 8.

15   Q    Okay.  All right.

16   A    So it leads me to believe that there is potentially a 9.3

17   also still remaining there.

18   Q    All right.  And that's based on your reading it?

19   A    That's correct.

20   Q    Okay.  If I say eyeballing it, is that fair to say?

21   A    And running the numbers with it, too.

22   Q    Okay.  All right.  Now, next, if we move over one more to

23   the D21S11, Ms. Mock, the major contributor, is a 31, 31.2,

24   fair to say?  That's her profile at that site?

25   A    Yes.

1  Q    And I'm looking for -- again, I have that the minor

2  contributors are a 27, a 28, and a 29, is that right?

3  A    And potentially a 31.

4  Q    And potentially a 31.  All right.  Minor of 31.  Now, I'm

5  guessing you know what my question is going to be by now.   In

6  terms of the minor contributors, we're talking about -- well,

7  first of all, if we're assuming Ms. Mock is the major

8  contributor, she's certainly not the contributor to these, to

9  the numbers we just read, right, although she has a 31?

10 A    In the minor component, yes.

11 Q    Yeah, okay.  And then, again, Mr. Griesbauer is a 27 and

12 a 29 at that site, right?

13 A    That's correct.

14 Q    But then you also have another number there; you have a

15 28, is that right?

16 A    And potentially a 31.

17 Q    And potentially a 31.  So, again, he's included because

18 he has numbers in common, but we can't tell -- there's no way

19 to tell by your testing as to which of those two numbers go

20 together?

21 A    No.

22 Q    Okay.

23 A    I wouldn't want to.

24 Q    Okay.  That makes sense.  And, again, I think we've

25 already said this.  It's most likely more than one person; if

1  this is DNA, it came from more than one person?

2  A    In my opinion, this is DNA and it is coming from more

3  than one person.

4  Q    Okay.  All right.  Now, with -- I'm going to move over to

5  D18.  You know what we're talking about?

6  A    Yes.

7  Q    Okay.  All right.  Now, you have the major contributor is

8  a 17, 18, which is the same as Ms. Mock's profile, correct?

9  A    Yes.

10  Q    And then beneath that -- and correct me if my notes are

11  wrong here -- you have a minor of a 16, is that right?

12  A    And potentially a 17.

13  Q    Potentially a 17.  Now, why do you say potentially?  Is

14  that because you're not comfortable with the reading that you

15  got where you could call it that?

16  A    I see the 17 slightly elevated more than the 18, and the

17  17, 18 look like sister alleles, and whenever you take into

18  account a 70 percent heterozygosity, just me eyeballing this

19  right here, it appears that there would be a little bit of a

20  17 left over.

21  Q    Okay.  Now, if that's two -- well, again, we sort of have

22  the same -- I guess it's the same issue.  If you get two

23  numbers, that could be one person that contributed both

24  numbers, is that right?

25  A    Yes.

1    Q    Okay.  But then it could also be -- you can have one

2    number at that site, right?

3    A    For each person in a sample, I would expect one or two

4    peaks from each person.

5    Q    Okay.  So where we say it's -- you just said it's a 17,

6    18 based on your experience.  That could have been two

7    separate contributors, a 17 contributed and a person with an

8    18 at that site contributed?

9    A    Taking that into context, that one locus alone,

10   potentially.

11   Q    Okay.  All right.  I'm going to move -- and so I'm going

12   to move -- I'm going to move it along here.  D -- at the D5S,

13   again, that's a situation where I see three numbers, 12, 12.2,

14   and 13; is that fair to say?

15   A    Say again.

16   Q    12, 12.2, and 13.

17   A    There's four numbers there -- 11, 12, 12.2, and 13.

18   Q    Okay.  All right.

19   A    With the major being consistent with being an 11.

20   Q    Okay.  Yeah, the major -- at that site, that's a

21   situation where at that site Ms. Mock is the same number;

22   she's an 11, 11?

23   A    Yes.

24   Q    Okay.  All right.  And then you found other DNA minor

25   contributors, correct?

1    A    Yes.

2    Q    All right.  And same question -- that can be more than

3    one person contributed to -- to that, to the minor sample that

4    you found?

5    A    At that location, I'm not sure whether it's more than one

6    person in the minor or not.

7    Q    Okay.  But it could be at least one -- it's got to be at

8    least one person, right?

9    A    At that location --

10   Q    Yes.

11   A    -- taking everything into account at that one location,

12   it's characteristic of at least two.

13   Q    Okay.  All right.  And then let's -- with regard to the

14   next site, D13, we have a major of 12 and 13, correct?

15   A    Yes.

16   Q    And then we have 8, 9, and 11?

17   A    Yes.

18   Q    As a minor?

19   A    And a potential 12 with that.

20   Q    And a potential 12.  All right.  The 12 is also in common

21   with the major --

22   A    That's correct.

23   Q    -- contributor?  All right.  So you probably know my

24   question by now.  Looking at that site, it could be more than

25   one contributor?

1   A    Yes.

2   Q    All right.  And, again, with regard to Mr. Griesbauer, he

3   has two of the numbers in common; he has an 8 and a 12, right?

4   A    That's correct.

5   Q    And that's another reason why you say you can't exclude

6   him?

7   A    That's correct.

8   Q    Isn't it fair to say that you just don't have enough

9   information to exclude him?  I mean if he's different in a

10  couple sites, because you don't have results from minors at a

11  couple of these sites, he could be excluded, right?

12  A    There -- as I stated earlier, there are genetic markers

13  in common between his profile and the minor component here

14  where I would expect them to be if he were in this mixture,

15  taking this entire profile in context, not locus-by-locus, not

16  one locus by itself, taking the entire profile as a whole.

17  Q    Okay.  But when you analyze it, you look at it

18  locus-by-locus, right?  I mean that's how you develop the

19  profiles at each locus, right?

20  A    At some point, I look locus-by-locus --

21  Q    Okay.

22  A    -- but I have to base my decision based on the profile as

23  a whole, not what's going on at one locus and simply ignore

24  the rest of the profile.

25  Q    Yeah.  Well, I'm not asking you to ignore anything.  I'm

1    just asking you for your results.  Okay.  Now let's talk

2    about -- let's move down to D8S1179.  A major contributor, the

3    profiles 9, 10, is that correct?

4    A    Yes.

5    Q    And, again, that's the same as Ms. Mock at that site, is

6    that right?

7    A    Yes.

8    Q    Okay.  And then minors, I show 11, 12, and 13?

9    A    And a potential 9.

10   Q    And a potential 9.  Okay.  Once again -- okay.  Now, at

11   that point, Mr. Griesbauer is a 12 and a 13, is that right?

12   A    Yes.

13   Q    Okay.  But as we've just said, your minor contributors,

14   we have -- you have an 11, and Mr. Griesbauer isn't an 11 at

15   that site, is that right?

16   A    That's correct.

17   Q    Okay.  All right.  So when you say -- and I think you've

18   already said this; you can't tell by looking at this which two

19   of these numbers are supposed to go together?

20   A    I wouldn't want to in the minor component.  The major

21   component, I can.

22   Q    All right.  Okay.  That makes -- okay.  I understand.

23   All right.  Now I just want to make sure what -- what -- all

24   the reference standards you used, well, all the people's DNA

25   who you typed.  Now, I'm not sure my list is complete, so let

53

1    me know.  You had -- you certainly had Kathy Mock.  You had

2    the buccal swabs from Kathy Mock, and that's how you developed

3    the reference standard for her, is that right?

4    A    Yes.

5    Q    Okay.  Let me ask you, taking the buccal swabs, is there

6    a prescribed way to do it?  I mean does somebody have -- is

7    that something that if somebody is not doing it right it can

8    affect your results?

9    A    Potentially.

10   Q    Okay.  What's the proper way to do it, to take a buccal

11   swab?

12   A    I educate people to put on a pair of gloves and take the

13   swab and swab the inside of the cheek.

14   Q    All right.

15   A    And package it properly after that.

16   Q    Now, that only took you like a couple seconds to say

17   that.  Is that all anyone needs to know; you don't need any

18   more training than that?

19   A    If I were to receive a phone call in the laboratory,

20   that's what I would tell an officer over the phone.

21   Q    Okay.  And you're comfortable with collecting this

22   evidence that way?

23   A    As long as he follows that general procedure and wears

24   gloves, yes.

25   Q    All right.  If I cough -- if one coughs or sneezes, will

1   that expel -- will DNA come out?

2   A    I would expect that to, yes.

3   Q    All right.  So I assume the officer should be also

4   instructed, "If you've got to cough or sneeze or anything like

5   that, don't do it while you're taking a sample"?

6   A    That -- yes.

7   Q    Okay.  But it doesn't sound like you tell them that?

8   A    At this day and age, with the amount of education that's

9   out there, I would expect an officer to know not to sneeze on

10  the evidence whenever it pertains to DNA.

11  Q    All right.  Now, so you've got a reference standard from

12  Ms. Mock.  There's a reference standard from Mr. Griesbauer?

13  A    Yes.

14  Q    All right.  A reference for Jared Young?

15  A    Yes.

16  Q    Okay.  Elain Young?

17  A    Yes.

18  Q    And Ms. Wood, is that --

19  A    Ms. Woods, yes.

20  Q    Okay.  Anybody else?

21  A    No.

22  Q    Okay.  I think I may -- oh, a couple more questions.  You

23  mentioned something; you referred to the transient nature of

24  DNA?

25  A    Yes.

1  Q    All right.  And is that you meant that DNA can be

2  transferred sometimes, like if I shake your hand, I can get

3  some of your DNA on my hand?

4  A    Potentially.

5  Q    Okay.  All right.  And it can -- it can move from surface

6  to surface potentially?

7  A    Potentially.

8  Q    Okay.  Because once it lands, it's not glued there or

9  anything like that, not --

10  A    Depends on whether the stain was wet whenever it's being

11  transferred or dry.  With a multitude of scenarios, it can --

12  it can be transferred.

13  Q    All right.  And we talked about the mask, as to whether

14  you did any tests for the presence of blood.  Did you -- did

15  you test the gloves for that, if there were any blood present?

16  A    I tested one glove.

17  Q    All right.  And what did you find?

18  A    Blood was not detected.

19        MR. CURRAN:  All right.  I have nothing further.

20  Thank you.

21        THE COURT:  Mr. Gorla.

22        MR. GORLA:  Thank you, Judge.

23                    CROSS-EXAMINATION

24  BY MR. GORLA:

25  Q    Good morning, Mr. Wyckoff.

1   A     Good morning.

2   Q     I'll be very brief.  As I understand it, you compared the

3   known DNA sample that you had from Elain Kay Young to the

4   profiles that you developed from the ski mask, is that

5   correct?

6   A     That's correct.

7   Q     And you were able to eliminate Ms. Young as a contributor

8   to those profiles on the ski mask, is that correct?

9   A     That's correct.

10  Q     And you also compared her DNA profile to the DNA that you

11  found on the gloves, is that correct?

12  A     That's correct.

13  Q     And you also were able to eliminate her as a contributor

14  to those sources as well, is that correct?

15  A     Yes.

16          MR. GORLA:  That's all I have, Judge.  Thank you.

17          THE COURT:  Redirect.

18                      REDIRECT EXAMINATION

19  BY MR. REILLY:

20  Q     In terms of the manner in which the buccal swabs were

21  taken, you received the reference standards we've discussed,

22  correct?

23  A     Yes.

24  Q     Were you able to develop a DNA profile off of each buccal

25  swab?

1    A    Yes.

2    Q    So, apparently, they were taken in a manner in which --

3    by which a DNA sample was properly extracted; is that fair to

4    say?

5    A    There was a sufficient amount of DNA on each buccal swab.

6    Q    You said it was possible to test for stain identification

7    on the ski mask but you didn't do that.  Why was that?

8    A    In this instance, with the ski mask already having been

9    associated with the crime scene, I was not interested in

10   locating victim's blood at the crime scene.  I understood the

11   victim to be bleeding, and finding his blood at the crime

12   scene was not important to me.  It was finding an association

13   between somebody unrelated to the scene is where I wanted to

14   focus.

15   Q    Mr. Curran mentioned contamination, and just because the

16   word came up, in terms of what happened with your analysis,

17   are there built-in standards for you to detect contamination

18   in the analysis?

19   A    In the laboratory, yes.

20   Q    Okay.  And that's not a concern here, is it?  Did you

21   detect --

22   A    As far as the laboratory is concerned, I did not detect

23   contamination.

24   Q    And who was -- was it Mr. Randle who identified the

25   inside of what he determined to be the inside of the gloves?

58

1    A    He determined what was the exterior, and we assumed -- I

2    assumed the interior from that reference point.

3    Q    And had you worked with Mr. Randle for many years?

4    A    Yes.

5    Q    And you determined what was the inside and the outside of

6    the ski mask based on the stitching, is that correct?

7    A    Based on, yes, the stitching.

8    Q    And Mr. Curran asked you if the mask could have been

9    inside out or been worn inside out?

10   A    Yes.

11   Q    And in either event, the DNA profile consistent with

12   Ms. Mock's DNA is on both sides of the mask, is it not?

13   A    She is consistent with being the profile from the inside

14   face area and the major component on the general outside

15   surface area.

16            MR. REILLY:  Thank you.  No further questions.

17            MR. CURRAN:  Judge, I just have a couple questions.

18            THE COURT:  Uh-huh.

19                      RECROSS-EXAMINATION

20   BY MR. CURRAN:

21   Q    With regard to whether you typed for blood or not, on

22   direct, the Government gave you a hypothetical that, you know,

23   during -- there's a shooting, that potentially blood could

24   splatter, correct?  Do you remember that question?

25   A    Yes.

1   Q     Okay.  But at the time you answered that question, that

2   it was a potential that could happen, the blood could splatter

3   at a shooting, you were aware that you hadn't typed any of

4   this evidence for the presence of blood, correct?  I mean you

5   knew you hadn't checked the ski mask or the gloves for blood,

6   correct?

7   A     Yes.

8   Q     Okay.  So at the time you answered the hypothetical yes,

9   you knew you didn't have any evidence whether there was blood

10  on -- you know, any trace amounts of blood on any of these

11  objects, is that correct?

12  A     I do not know whether the outside surface was blood or

13  not.

14  Q     And let me ask you about -- with regard to the DNA found

15  on this ski mask, I believe you stated both when you were

16  talking to the Government and me that we can leave DNA by

17  touching something, is that correct?

18  A     Potentially.

19  Q     Okay.  So when we talk about wearing the ski mask, you

20  can't say for sure how the DNA was deposited on the ski mask,

21  is that correct?

22  A     That's correct.

23  Q     Somebody could have had it in their hand?

24  A     Potentially.

25  Q     Yeah.  I guess somebody could have wiped a surface --

60

1   potentially, I realize -- could have wiped a surface that had

2   somebody else's DNA on it already, is that right?

3   A    Potentially.

4   Q    Because it can be transferred?

5   A    Potentially.

6   Q    Okay.  So when we talk about wearing, we don't know if

7   the DNA was transferred by somebody wearing it or not, right?

8   A    I do not know.

9              MR. CURRAN:  Okay.  Thank you.

10             THE COURT:  All right.  Is this witness excused?

11             MR. GORLA:  Yes.

12             MR. REILLY:  Yes, Judge.

13             THE COURT:  Thank you, sir.  You're free to go.

14             MR. DITTMEIER:  Judge, may we approach just briefly?

15             THE COURT:  Certainly.

16       (A bench conference was held on the record and outside of

17   the hearing of the Jury as follows:)

18             MR. DITTMEIER:  Judge, our next witness is an

19   incarcerated person.  Now, I think she's outside the door

20   there.  They'll -- she's dressed in regular clothes.  They're

21   going to bring her in without handcuffs, and an agent is going

22   to escort her in, but I wanted the Court to know that, so I

23   didn't know if you wanted to take a little recess now.  I

24   don't have any quarrel with her coming inside the door with

25   the guards, so it don't make any difference to me.

1          THE COURT:  Okay.

2          MR. DITTMEIER:  And Mr. Gorla wanted to make a

3    record, I think.

4          MR. GORLA:  Yeah, Judge.  There are some -- there are

5    some problem areas.

6      (The Deputy Clerk conferred with the Court.)

7          MR. GORLA:  You want to just take a recess?

8          THE COURT:  It doesn't matter to me, I mean, but

9    anyway --

10          MR. GORLA:  Anyway, there are some problem areas.

11    This woman who is going to come in and testify, on her 302,

12    when she was talk -- when she spoke with the FBI, she

13    indicated that Kay Young said something to her about murdering

14    her mother.

15          THE COURT:  Uh-huh.

16          MR. GORLA:  She also mentioned something about

17    telling -- Amanda Bax says that -- according to the report --

18    that Kay Young told her that she had -- apparently, Amanda Bax

19    had a disabled boyfriend and Kay Young is telling her how to

20    give her an overdose of morphine.  Now, obviously, those are

21    areas that we cannot go into because, obviously, you know,

22    under Rule 403, the prejudicial value really exceeds the

23    probative effect.  Mr. Dittmeier indicated to me he's not

24    going to go into that area.

25          MR. DITTMEIER:  And I've instructed the witness.

62

1        MR. GORLA:  And Mr. McGraugh, I'm sure, is looking to

2   get something out of this witness, too, and I assume that he's

3   not going to go into those areas as well.

4        MR. MCGRAUGH:  I'm somewhat insulted by that, but,

5   no, I'm not planning on going into either of those areas.

6        THE COURT:  All right.

7        MR. GORLA:  That's all I have.

8        THE COURT:  All right.  So you want to take a recess?

9        MR. DITTMEIER:  We don't have to.  It's whatever fits

10  into the Court's schedule.

11        MR. GORLA:  Whatever you want to do, Judge.

12    (The Court conferred with the Deputy Clerk and the Deputy

13  Marshal.)

14        THE COURT:  So we won't take a recess.

15        MR. GORLA:  Thanks, Judge.

16        THE COURT:  All right.

17    (The following proceedings were held within the hearing

18  of the Jury.)

19        THE COURT:  Proceed.

20                    **AMANDA BAX,**

21  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

22  FOLLOWS:

23                    DIRECT EXAMINATION

24  BY MR. DITTMEIER:

25  Q    Would you state your name for the Jury, please?

1   A     Amanda Bax.

2   Q     Ms. Bax, are you presently incarcerated?

3   A     Yes, sir.

4   Q     And what are you incarcerated for right now?

5   A     Bad check charges.

6   Q     And have you previously been convicted of felonies?

7   A     Yes.

8   Q     And would you tell the Jury how many felony convictions

9   you have?

10  A     Six.

11  Q     Now, do you know the Defendant Kay Young?

12  A     Yes, sir.

13  Q     Okay.  And how did you come to meet Kay Young?

14  A     I was a roommate with her in St. Charles County Jail.

15  Q     So the two of you were incarcerated together?

16  A     Yes, sir.

17  Q     Was that back in June of 2010?

18  A     Yes, sir.

19  Q     Okay.  And you said you were cellmates.  Who was in the

20  cell first?

21  A     She was.

22  Q     And then you were brought in as a cellmate to her?

23  A     Yes, sir.

24  Q     Okay.  And when you first came into the cell, did you

25  start arranging the cell for yourself or do anything of that

1    nature?

2    A    Yes, sir.  I hung pictures of bulldogs up beside my bed.

3    Q    Okay.  And did that strike up a conversation between you

4    and Mrs. Young?

5    A    Yes, sir.

6    Q    And what did Ms. Young tell you?

7    A    That she had a farm that she raised bulldogs on.

8    Q    Okay.  And did she give you anything?

9    A    A business card that had an aerial view of the farm on

10   it.

11   Q    Of the farm?

12   A    Yes.

13   Q    Okay.  Now, once you had struck up your conversation with

14   her and started talking to her, was there anything about her

15   that made you take notice?

16   A    She had on a black bracelet, which in St. Charles County

17   means you're a federal inmate.

18   Q    Okay.  And did you make inquiry about that?

19   A    Yes.

20   Q    And what'd you ask her?

21   A    What the charge was, what she was charged with.

22   Q    And what did she tell you she was charged with?

23   A    A federal murder.

24   Q    Okay.  Did you have any response to that?

25   A    Yeah.  I said, "What'd you do -- kill the President?"

1  Q    And what'd she say?

2  A    She said, "No.  I shot my husband."

3  Q    Okay.  Now, did she give you any more details than that

4  about the specific homicide?

5  A    No.

6  Q    Did you at any time discuss with her why she shot her

7  husband?

8  A    Yes.

9  Q    Okay.  And what did she tell you the reason she shot him

10  was?

11  A    Well, because she was getting ready to lose her farm --

12  Q    Okay.

13  A    -- and she had a -- around a million-dollar life

14  insurance policy against her husband.

15  Q    Okay.  And the million-dollar life insurance would go to

16  paying off the mortgage on the farm?

17  A    Yes, sir.

18  Q    Okay.  Did she talk to you at all about how long she'd

19  had the farm or anything of that nature?

20  A    She said it'd been in her family for years and years.

21  Q    Okay.  Did she say anything specific to impress on you

22  how important the farm was to her?

23  A    She said she'd rather lose her husband than lose that

24  farm.

25  Q    Did you have any conversation concerning any other person

1   who may have been involved with her?

2   A    Kathy Mock.

3   Q    What did she tell you about Kathy Mock?

4   A    She said that she was trying to get her to find somebody

5   to commit the murder for her and that she was going to end up

6   being the fall guy for her.

7   Q    Now, Kay Young said that?

8   A    Yes.

9   Q    Kay Young said she had Kathy Mock trying to find

10  somebody?

11  A    Yes, sir.

12  Q    To do what?

13  A    To commit the murder for her.

14  Q    Okay.  And then she said that Mock would be the fall guy?

15  A    Yes, sir.

16  Q    Did she give you any idea or say anything about Mock

17  having any kind of involvement with her husband?

18  A    She said that she was having an affair with her husband.

19  Q    Did she mention any other man around either during the

20  time of the murder or shortly after that she was having any

21  kind of relation with?

22  A    Yes.  She had --

23       MR. GORLA:  Judge, I'm going to --

24  A    Yes.

25       MR. GORLA:  -- object to this, Your Honor, on the

1    basis that I don't believe it's relevant.  Can we approach the

2    sidebar?

3              THE COURT:  Okay.

4       (A bench conference was held on the record and outside of

5    the hearing of the Jury as follows:)

6              THE COURT:  Can you hear me, Gayle?

7              COURT REPORTER:  Yes.

8              MR. GORLA:  Okay.  Judge, I would object to this.

9    I've got an idea that wherever Mr. Dittmeier is going, he's

10   going to ask her, I believe, if Kay Young told her about a

11   relationship that she developed with someone after the murder,

12   and I mean I don't see how that has anything to do with the

13   homicide other than, basically, again, it's going to go to her

14   bad character and they're going to sully up her bad character

15   and then basically put it out there to argue that she's a bad

16   person and, therefore, you know, she did this.  It's

17   propensity evidence, and it shouldn't -- it shouldn't come in,

18   and he shouldn't be allowed to go into that at this point

19   because there's certainly been no testimony from anybody as to

20   what this is about.  You know, if somehow this person has

21   already appeared and then they've already tied it up, it's

22   different, but we don't know if they're going to be able to

23   tie it up, and we don't think that they can, and if you let

24   the cat out of the bag now, it's too late later on if you

25   decide that this particular person's testimony isn't relevant.

1     It shouldn't come in.

2            MR. DITTMEIER:  The person he's talking about is

3     going to testify in the case.  He'll be two or three witnesses

4     down the road, and basically what this testimony is going to

5     be is that he was an older gentleman from Iowa or Illinois,

6     and at the time of the murder or shortly after, she took up

7     with him, and she thought she could get some money from him,

8     and she subsequently had him put her on his life insurance

9     policy.  It will go to the immediacy that she took up with

10    somebody else.  It goes to her financial problems at the time,

11    which were motive for the murder, and she got on this

12    gentleman's life insurance policy, which is going to indicate

13    how close she was to him.  He's going to testify to all of

14    that, including some more, but it gives this witness

15    credibility that she in fact talked to Young, it gives him

16    credibility that Young is relating the same thing because I'm

17    sure this gentleman is going to be cross-examined as to

18    whether that's true or not, and this is coming from Young.  So

19    it's intrinsic evidence.  It goes right to her financial

20    problems and her need for the money and the lack of mourning

21    and how quickly she took up with somebody else.

22           MR. GORLA:  Judge, the definition of intrinsic

23    evidence is it's evidence that goes to prove the actual crime

24    that the person is charged with.  The crime is already done.

25    The crime has already occurred.  You know, you're talking

1   about something that happened after the fact.  It just doesn't

2   have anything to do -- to prove what happened on March 23rd of

3   2006.  It's totally unrelated.  The fact that after

4   Mr. Griesbauer's death that she develops a relationship with

5   someone else doesn't have anything to do with whether or not

6   she had anything to do with killing him.

7            THE COURT:  You got a fight in this?

8            MR. MCGRAUGH:  I really don't have a dog in this

9   fight.

10           THE COURT:  This is a thin line, Mr. Dittmeier.  This

11  is a thin line under the circumstances.  This is a thin line

12  under the circumstances.  I -- I think if you're going to get

13  into this with this witness -- Bax is her name?

14           MR. DITTMEIER:  Yes, sir.

15           THE COURT:  It will need to be developed a little

16  more, so as of now I'm going to sustain the objection.

17           MR. DITTMEIER:  Okay.  That's fine.

18      (The following proceedings were held within the hearing

19  of the Jury.)

20           THE COURT:  Proceed.

21           MR. DITTMEIER:  Okay.  I have no further questions of

22  this witness, Judge.

23           THE COURT:  Cross.

24

25

CROSS-EXAMINATION

BY MR. MCGRAUGH:

Q    Good morning, Ms. Bax.

A    Good morning.

Q    My name is Chris McGraugh.  We've actually met before --

A    Yes.

Q    -- and it was when you were at the St. Louis County Jail?

A    Yes.

Q    And you met with myself and my investigator, Ronald
Davis.  Do you remember that?

A    Yes.

Q    And it was like around June of 2011; does that sound
about right?

A    Yeah.

Q    And we discussed most of what you just testified to, is
that correct?

A    Yes.

Q    Yeah.  You had -- you had told us that the conversation
with -- with -- well, first, you said that you were sort of a
likeable inmate and people talked to you all the time, is that
right?

A    They do.

Q    Okay.  And warm up to you?

A    Yes.

Q    Okay.  And you told me that -- that -- we asked you what

1    Kay Young had told you, and Kay had told you that -- you had

2    asked, "What makes it a federal murder?"  I guess that was

3    right, and you were sort of kidding, "Did you kill the

4    President?" or something like that, is that right?

5    A    Yeah.

6    Q    And that prompted her response that "I shot her -- shot

7    my husband"?

8    A    Yes.

9    Q    Okay.  And she told you why she shot her husband was

10   to -- to collect insurance to -- so she could get out of debt

11   with her farm?

12   A    Yes, sir.

13   Q    And then we -- we talked about, well, what did she say

14   about Kathy Mock --

15   A    Uh-huh.

16   Q    -- because that's really what we were interested in --

17   A    Yes.

18   Q    -- because we represented Kathy, and you told us that --

19   that Kay told you that Kathy Mock was the fall guy?

20   A    Yes.

21   Q    Okay.  Now, this is something I don't think we talked

22   about but I know that you talked to the Government about.  She

23   also told you that on the -- let me make sure I get this

24   right.

25   A    Okay.

1    Q    She told you that Jared, her son, was at the scene of the

2    homicide on that night?

3    A    She talked about her son.

4    Q    All right.  And did she tell you that -- that her son

5    Jared was at the scene on the night of the murder?

6    A    I don't think that was a specific.  She said that he --

7    it might have been the night.

8    Q    Okay.  And when we asked you about -- this will be my

9    last question.  We asked you was that everything that Kay

10   Young had talked about with -- with you about Kathy Mock, and

11   you said, yeah, it was just that she was supposed to be the

12   fall guy, is that right, when you and I talked?

13   A    Yes, whenever you and I talked.

14           MR. MCGRAUGH:  All right.  That's all I have.  Thank

15   you.

16           THE WITNESS:  Thank you.

17           MR. GORLA:  Thank you, Judge.

18           THE COURT:  Mr. Gorla.

19                    CROSS-EXAMINATION

20   BY MR. GORLA:

21   Q    Good morning, Ms. Bax.

22   A    Good morning.

23   Q    Ms. Bax, you've -- you're known by other names as well,

24   is that correct?

25   A    Yes.

1    Q    Okay.  You've -- you're also known as Amanda D. Bowers,

2    is that true?

3    A    Bowers, yes.

4    Q    Okay.  Amanda Dawn Bowers, is that right?

5    A    Yes.

6    Q    Amanda D. Bax-Bowers?  Did you use that name?

7    A    Yeah.

8    Q    And Amanda Dawn Bay, is that correct?

9    A    That -- yeah --

10   Q    Did you use that name?

11   A    -- that was an alias, yes.

12   Q    Okay.  You're currently serving, if I understand this

13   right, four sentences for four different felonies in the

14   Missouri Department of Corrections, is that true?

15   A    Yes.

16   Q    Okay.  And two of these sentences arose out of cases in

17   St. Charles County, is that true?

18   A    Yes, sir.

19   Q    Okay.  And both of those were bad check cases, right?

20   A    Yes, sir.

21   Q    Felony bad check cases, is that true?

22   A    Yes, sir.

23   Q    That involved passing bad checks in excess of $500, is

24   that correct?

25   A    No.  They were written on a closed account.  They were

1    under 500.

2    Q    Okay.  But they were written on a closed account?

3    A    Yes.

4    Q    Okay.  Okay.  And you pled guilty to both of those cases,

5    is that true?

6    A    Yes, I did.

7    Q    And kind of -- and worked out a joint deal on both of

8    those cases, is that true?

9    A    I don't understand what you mean.

10   Q    Oh, okay.  Well, here, in one of the -- in one of the

11   cases, you were sentenced to six years, but the sentence was

12   suspended, and you were placed on five years' probation, is

13   that true?

14   A    Yes, I was, yes.

15   Q    Okay.  And then in the other case, I guess which was

16   pending at the same time in St. Charles --

17   A    Uh-huh.

18   Q    -- you were sentenced to six years consecutive to the

19   first case, is that correct?

20   A    Yes, sir.

21   Q    And then you were -- you served a period of shock

22   probation on that case, is that correct?

23   A    I went to treatment, yes.

24   Q    You went to treatment, so you went to 120-day treatment

25   program?

1    A    Yes, sir.

2    Q    Okay.  And after that, you were put on probation, is that

3    correct?

4    A    Yes, sir.

5    Q    Okay.  And -- and then there was conditions of probation

6    that were imposed upon you, is that correct?

7    A    Yes.

8    Q    Okay.  And, obviously, some of those conditions were that

9    you -- you know, you obey the law, is that correct?

10   A    Yes.

11   Q    Okay.  All right.  And that probation was eventually

12   revoked, is that correct?

13   A    Yes, it was.

14   Q    Okay.  And it was revoked because you picked up some new

15   cases, is that true?

16   A    No, I didn't have any new cases.

17   Q    Okay.  Well, you had a case in St. Louis County, didn't

18   you, and that was another passing a bad check case, is that

19   correct?

20   A    That was -- yeah, but that was previous to even getting

21   sentenced on the St. Charles County cases.

22   Q    Okay, but you pled guilty to that case on May 25th of

23   2010, is that correct?  Does that sound right?

24   A    Yeah.  Right after I got out of treatment, I pled out on

25   it.

1    Q    Okay.  Okay.  And then you were put on probation on that

2    case, correct?

3    A    Yes.

4    Q    And you asked for probation, correct?

5    A    My attorney asked, yes.

6    Q    Okay.  Well, you wanted it, too, right?

7    A    Well, sure.

8    Q    Sure.

9    A    Absolutely.

10   Q    And, you know, in the course of asking for probation, you

11   know, you're telling the judge, "I want probation; I'm going

12   to do well," is that correct?

13   A    Yes.

14   Q    And "I'm going to obey the law," is that correct?

15   A    Yes.

16   Q    And "I'm going to do everything I'm supposed to," is that

17   correct?

18             MR. DITTMEIER:  Judge --

19   A    Yeah.

20             MR. DITTMEIER:  -- I'm going to object to this.  He's

21   entitled to go into her convictions, but I don't know that you

22   can go through the entire history and cross-examine her in

23   detail on the cases.

24             THE COURT:  I'm kind of at a loss where we're going

25   here, Mr. Gorla.

1          MR. GORLA:  Well, Judge, what I'm trying to do is I'm

2     just trying to --

3          THE COURT:  Sidebar.

4      (A bench conference was held on the record and outside of

5     the hearing of the Jury as follows:)

6          THE COURT:  You lost me.

7          MR. GORLA:  Well, I can tell you, I can explain.

8          THE COURT:  Okay.

9          MR. GORLA:  Judge, what I'm doing is I had -- I am

10    entitled to cross-examine her and show that her probation has

11    been revoked and go through the sequence, and I'm not going

12    into the -- into the facts of the case, and I'm not going to

13    sit here and say, "Tell me what you did," and "This is what

14    you did."  All I'm doing is -- and I'm being very quick -- I'm

15    just tracing the fact to show that, you know, she's -- she

16    gets put on probation, or, no, she goes to the penitentiary;

17    she does 120 days; she gets back out.  Now she's got another

18    case pending; she gets put on probation in that case; then her

19    probation in that case eventually gets revoked.  She pleads to

20    another case, and now she goes back to the penitentiary, and I

21    am entitled to show, okay, that -- not only her prior

22    convictions but that she kept being placed on probation and

23    her probation kept being revoked, and that's what I'm doing,

24    so . . .

25          MR. DITTMEIER:  Judge, I just think it was going

1   beyond that as to what she was telling people and that sort of

2   thing and what her lawyer was telling her.  I mean she's got

3   six felony convictions.  She's under a sentence now of 12

4   years.  She's got two of them running consecutive.  I just --

5   and, clearly, she said initially that her probation was

6   revoked, so I mean I -- I think it's there.

7            MR. GORLA:  I still think, Judge, I'm able to go

8   through the sequence at least, and again, I'm not going to go

9   into anymore about, you know, "You asked the judge for

10  probation, you got probation," but I think I'm still entitled

11  to go through the sequence and to show the number of cases

12  that she pled to and that she kept getting probation and she

13  kept coming back and doing the same stuff.

14           THE COURT:  Which is relevant to what?

15           MR. GORLA:  Which is relevant to her credibility

16  because she's under oath when she -- when she -- when she gets

17  sentenced, when she pleads guilty to the court.  You know

18  that.

19           THE COURT:  Yeah.  Okay.

20           MR. GORLA:  Okay.

21           THE COURT:  So we already know that she's got six

22  prior convictions.

23           MR. GORLA:  Right.

24           THE COURT:  She either pleaded guilty or was

25  convicted, okay.

1          MR. GORLA:  Right.

2          THE COURT:  Some of them, she got probation on, which

3   means what?  The issue on her credibility is whether or not

4   she has convictions and the number of convictions that she may

5   have and to what extent a jury might tend to believe or

6   disbelieve her testimony in light of her previous convictions.

7   Whether she's been on -- whether she's been on probation two,

8   three, four, or five times is not an issue going to

9   credibility, I don't think.  It's an issue going to ability to

10  adhere to the rules of probation.  Clearly --

11         MR. GORLA:  Which means -- there's the answer.

12         THE COURT:  But clearly, since she has difficulty

13  adhering to the general concept of being a law abiding citizen

14  to begin with, i.e., she has six convictions, then it's not

15  beyond the realm to believe that she may have some difficulty

16  adhering to the conditions of probation, which are the same

17  conditions that exist prior to picking up the charge.

18         Don't commit crimes.  Don't hang around people that

19  are committing crimes.  Don't do drugs.  Keep your nose clean.

20  Get a job.

21         You know --

22         MR. GORLA:  I think *Davis versus Alaska* lets me win

23  in this, Judge, and again, it'd be different if I'm going to

24  hammer it, and I'm not going to hammer it.  I'm close to the

25  end, and here's what I'm going to do.  I'm not going to bring

1    up anything else about, "You know, you asked the judge," but

2    I'm just going to go into her last prior conviction, and I can

3    ask her about that, what it was for and when it was.

4            THE COURT:  Go ahead.

5            MR. GORLA:  And that's pretty much the extent.

6            THE COURT:  And you're not going to ask her what her

7    lawyer asked the judge or what she wanted the judge to do?

8            MR. GORLA:  I'm not going to do that.

9            THE COURT:  And you're just going to -- okay.

10           MR. GORLA:  I'm just going to go through and say,

11   "You plead guilty to this, and you got -- and you were on

12   probation.  You pled guilty to this, and you eventually got

13   revoked, and you're in the penitentiary," period.

14           THE COURT:  Okay.  We can do that.

15           MR. GORLA:  Okay.  That's all I want to do.  Thank

16   you.

17           MS. HERNDON:  We've got to make sure we follow the

18   law here, Judge.

19           THE COURT:  You're correct.

20       (The following proceedings were held within the hearing

21   of the Jury.)

22           THE COURT:  Proceed.

23           MR. GORLA:  Okay.  Thank you, Judge.  Let me find my

24   place here.

25   Q    (By Mr. Gorla) Okay.  Ms. Bax, one of the other cases

1   that you're currently serving a sentence for is a felony case

2   that came out of Jefferson County, is that correct?

3   A    Yes, it was.

4   Q    Okay.  And that was a -- that was a stealing case, is

5   that correct?

6   A    Stealing by deceit.

7   Q    Stealing by deceit?

8   A    Uh-huh.

9   Q    Okay.  And you were sentenced to five years in the

10  Department of Corrections on that case, is that correct?

11  A    Yes.

12  Q    Okay.  All right.  So what you're doing now is you're

13  doing a total of what -- 12 years, is that correct?

14  A    Yes, it is.

15  Q    Okay.  So you're doing six and six on the St. Charles,

16  but one of those sentences runs consecutive, is that correct?

17  A    The sixes run consecutive to each other, yes.

18  Q    Okay.  And then the other -- the other two sentences, the

19  seven-year sentence out of St. Louis County and the five-year

20  sentence out of Jeff County, they're running concurrent?

21  A    Yes, sir.

22  Q    Okay.  Do you currently have an out date?

23  A    No, I do not.

24  Q    Okay.  And, obviously, at one point, at some point,

25  you're going to come in front of the Parole Board, is that

1   correct?

2   A    Yes, sir.

3   Q    Okay.  And I assume you want to be released as soon as

4   you can, is that true?

5   A    For sure, yes.

6   Q    Okay.  And do you plan on informing the Parole Board of

7   your testimony in this case?

8   A    I'm not sure if they'll be informed or not.  It depends

9   on what my attorney -- how he -- he will be there with me.

10  Q    Your attorney.  And your attorney knows that you're here

11  today testifying?

12  A    Yes.

13  Q    Okay.  And I guess your hope is that, you know, you're

14  going to get some benefit from testifying, is that correct?

15  A    I don't know that I can get benefited because I'm on a

16  percent by law; I have to serve a certain amount of time.

17  Q    You have to serve how much?

18  A    Forty percent.

19  Q    Forty percent?

20  A    Uh-huh.

21  Q    Not 85?  Forty percent?

22  A    Forty-five -- forty percent.

23  Q    Forty percent?

24  A    Yes.

25  Q    Okay.  Now, if I understand your testimony correctly, you

1    were Ms. Young's cellmate --

2    A    Yes, I was.

3    Q    -- in St. Charles County?

4    A    Yes.

5    Q    Okay.  And Ms. Young kept her paperwork in that cell, is

6    that correct?

7    A    I'm sure she did.

8    Q    Okay.  And there's no secured area inside that cell in

9    which to lock any belongings up, is there?

10   A    No.

11             MR. GORLA:  Okay.  That's all I have, Judge.

12             THE COURT:  Redirect.

13                       REDIRECT EXAMINATION

14   BY MR. DITTMEIER:

15   Q    Just briefly, Ms. Bax, Mr. McGraugh asked you about Kay

16   Young telling you that Kathy Mock was going to be the fall

17   guy --

18   A    Yes, sir.

19   Q    -- right?  But -- and that's what he asked you, but she

20   also said that Kathy Mock did more than just be there; what

21   did she say that she asked Kathy Mock to do?

22   A    To find somebody to commit the murder for her.

23             MR. DITTMEIER:  Okay.  All right.  I have no further

24   questions.

25             THE COURT:  Mr. McGraugh.

84

1          MR. MCGRAUGH:  Just a couple questions.

2          THE COURT:  Sure.

3                    RECROSS-EXAMINATION

4    BY MR. MCGRAUGH:

5    Q    Ms. Bax, this wasn't the only thing you talked about with

6    Kay Young, is that right?  What you testified here, you talked

7    about bulldogs and --

8    A    Absolutely.

9    Q    Yeah, talked about -- did you talk about your case as

10   well or what you were being locked up on?

11   A    I -- she probably knew.  I just got out of treatment.

12   Q    Okay.

13   A    Yeah.

14   Q    And nothing about this was particularly uncommon for

15   people to talk about their cases in jail, was it?

16   A    Some do.  Some don't.

17   Q    All right.

18   A    It just depends.

19   Q    But she was pretty free with that information, wasn't

20   she?

21   A    What she talked to me about?

22   Q    Yes, ma'am.

23   A    Yes, we -- yes.

24   Q    And as to the questions that -- whether you receive any

25   benefit from this, when you and I and Mr. Davis talked, I

1   pretty much told you there's nothing I could ever do for

2   you --

3   A    Nope.

4   Q    -- is that right?

5   A    That's right.

6         MR. MCGRAUGH:  Okay.  That's all the questions I

7   have.

8         THE WITNESS:  Yep.

9         MR. GORLA:  I have none, Judge.

10        MR. DITTMEIER:  No further.

11        THE COURT:  Thank you.

12        THE WITNESS:  Thank you.

13        THE COURT:  Brief recess?

14        MR. DITTMEIER:  Yes.

15        THE COURT:  All right.  Ladies and gentlemen, we'll

16   take this as our morning recess.  Again, do not discuss the

17   case amongst yourselves or with anyone else.  Do not allow

18   anyone to discuss it within your hearing or presence.  Do not

19   form or express any opinions about the case until it is given

20   to you to decide, and do not utilize any social networking

21   sites for any purpose during the course of the recess.

22        Fifteen-minute recess, Carrie.

23      (Court recessed from 11:29 a.m. until 11:58 a.m.)

24      (The following proceedings were held within the hearing

25   and presence of the Jury.)

1          THE COURT:  Call your next witness.

2          MR. JUDGE:  Dr. Adelstein.

3          THE COURT:  Step up, sir, and be sworn in by the

4    clerk.

5          Proceed.

6                    **EDWARD ADELSTEIN,**

7    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

8    FOLLOWS:

9                     DIRECT EXAMINATION

10   BY MR. JUDGE:

11   Q    Doctor, tell the jurors who you are.

12   A    My name is Edward Adelstein.  I'm a pathologist, Chief of

13   the Harry S. Truman VA Hospital, and I am also a Medical

14   Examiner of Boone and Callaway County.  In order to achieve

15   this position, I went to medical school.  I have a degree of

16   veterinary medicine.  I've completed a pathology residency and

17   am Board Certified in clinical and anatomical pathology.

18         Anatomical pathology is the study of tissues.  It's doing

19   autopsies.  It's determining the cause of death.  Clinical

20   pathology involves the other aspects of medicine, such as

21   laboratory tests, such as blood banking and microbiology.

22         I'm here primarily today as a medical examiner.  In the

23   world of medical examining, you can reach one other higher

24   degree of, I would say, training, and that is I could have

25   spent an additional year and do a fellowship in forensic

87

1   pathology, but I am not a forensic pathologist.  I'm simply a

2   pathologist with a lot of experience in medical examining.

3   I've probably done over 2,000 autopsies and have been doing

4   this for the last 20 years as a medical examiner.  In the

5   medical examiner world, one of the things that we most are

6   asked to do is really review causes of death that are not

7   natural.  So if people die from anything other than natural

8   causes, they're referred to us.  So if they die of things like

9   suicide or homicide or accidents, then we're asked to review

10  those cases and we're asked as to examine the bodies, carry

11  out an autopsy, and really determine two things, the cause and

12  the manner of death, and that's really the job that we do.  We

13  have special training and skills because we see those

14  particular cases more than most, say, ordinary pathologists.

15  Q    And you've, obviously, testified in court before?

16  A    Yes, I have.

17  Q    Many times?  All right.  Did you conduct an autopsy of a

18  Melvin Griesbauer on March 24th, 2006?

19  A    I did.

20  Q    All right.  And in conjunction -- in conjunction with

21  that, did you arrive within a reasonable degree of medical

22  certainty as to the cause of death of Melvin Griesbauer?

23  A    I did.  The cause of death was a gunshot wound to his

24  face with -- with enormous destruction of his tissues of his

25  brain, the kind of an injury that actually separated his

1    spinal cord from the rest of his brain.  So, in his case,

2    death was pretty much instantaneously.  He would have probably

3    not been able to move, and on the most positive side, he

4    probably felt no pain at the time of his death.

5    Q    All right.  And because of the massive destruction caused

6    by that gunshot wound, he had truly no physical capabilities

7    at the instant that he was shot?

8    A    That's correct.

9    Q    All right.  And so, therefore, he would not have been

10   able to cock a gun, aim a gun, anything like that after his --

11   after he was shot in the face?

12   A    It is unlikely that he could have carried out any

13   function after he was struck by this bullet.

14   Q    All right.  And in conducting your autopsy, were there

15   photographs taken?

16   A    Yes, there were extensive photographs taken.

17   Q    I'm going to show you three photographs, and they are

18   Government's Exhibits 28, 28A, and 28B.  Are those three

19   exhibits that I just mentioned -- were those photographs taken

20   during the course of the -- the autopsy?

21   A    That's correct, yes, sir.

22   Q    All right.  Do they accurately reflect the condition of

23   Melvin Griesbauer's body at the time those photographs were

24   taken and at the time you conducted the autopsy?

25   A    They do.

1        MR. JUDGE:  All right.  And, Judge, I would seek to

2   admit Government's Exhibits 28, 28A, and 28B into evidence.

3        MR. MCGRAUGH:  No objection, Your Honor.

4        MR. GORLA:  No objection.

5        THE COURT:  Admitted.

6   Q    (By Mr. Judge) I'm showing you Government's Exhibit 28.

7   Can you tell us what the purpose of that photograph is and

8   what it tells us as it relates to your conclusion that Melvin

9   Griesbauer was shot to death?

10  A    Yes.  We -- we make an examination of someone almost if

11  they were a patient; that is, we -- we look at their clothes;

12  we look at them externally to see if they have any injuries on

13  them, and in this case, so this is how he was really brought

14  to us, with a -- with a zipper leather jacket and some clothes

15  on, and you can see on the left side of his face that there's

16  a very large stellate wound.  This wound is surrounded by some

17  little burnt areas because as a gun goes off, sometimes there

18  are large particles of semi-burnt material that come off and

19  burn the skin.  This was a large -- a large gun, a .30-30 with

20  a big bullet, and -- and we also have some abrasions on his

21  face.  This is the kind of bullet that when it enters into

22  your body causes excessive damage pretty much and can destroy

23  bones, and even at this point on -- this is on the left side

24  of his face, and just to have the perfect day, revealing that

25  I'm not perfect, at one point in this description, I list this

1    on the right side of his face, but in our drawings and

2    everywhere else, I describe it as the left.

3    Q    Okay.

4    A    So you can see this wound, and you can see there are no

5    other injuries that you can see.  You can see that behind him

6    there's a fair amount of blood because this wound exited from

7    behind, and there was a great deal of blood and actually brain

8    material that was coming from that wound.

9    Q    You raised a point.  There is an exit wound --

10   A    Yes.

11   Q    -- to the back of the head; is that fair to say?

12   A    Right, right, there's an exit wound.

13   Q    All right.  That the bullet exited out of, correct?

14   A    That's correct, yes, sir.

15   Q    I'm going to show you Government's Exhibit 28A.

16   A    This is a little higher power of the wound, and a couple

17   things, you can see; you can see that there are some -- the

18   actual wound itself, the stellate wound, which is four by

19   seven centimeters, that's where the bullet entered.  You can

20   see some abrasions under it.  One of the abrasions actually

21   has a pattern, which I described it, perhaps, as coming from a

22   lag screw, but it probably was from a zipper.  There's also

23   some very fine punctate material, which we can see better on

24   the next slide, that's -- you can probably -- can I touch the

25   screen?  Can they see?

1    Q    Yeah, I think you can.  Go ahead.

2         THE COURT:  Yeah.

3    A    There's these little tiny punctate marks.  Oh, wow, this

4    is pretty amazing.  And that's what we call stippling, and

5    when we show it on the next slide, stippling is important

6    because one of the things we're asked to do -- we know why he

7    died.  We're asked to make some observations as to how close

8    the gun was to him, and the way we look at guns is that if

9    they're pressed tight against your skin, sometimes they just

10   make a little tiny hole and they tear your skin a little bit,

11   and we call those contact or tight contact.  If they're back a

12   little further, we call them loose contact and we see soot

13   from the gunpowder itself, but when they're back greater than

14   six to 30 inches, we see this unburnt gunpowder, which looks

15   like little black dots, which we call stippling.  So in this

16   gentleman's case, we see stippling.  We don't really know

17   without test-firing the gun, but we know probably this gun was

18   held anywhere from six to 30 inches away before he was shot.

19   So this is important to us because the position of the gun

20   sometimes gives us some clues as to what the events were that

21   took place.

22   Q    All right.  And I'm going to show you Government's

23   Exhibit 28B that may show the stippling a little bit more.

24   A    And I think you can see them in these little areas like

25   this.  This is really unburnt gunpowder.  If you would hold a

1    match to this, it would actually sparkle.  So this gives us

2    some idea that this was not a close contact; it was not a

3    tight contact; it was a gun that was held anywhere from six to

4    30 inches away from him when it was fired.  Again, they're a

5    little subtle, and in my early days, I used to miss this all

6    the time.

7    Q    Could you describe the wound that was to the back of his

8    head, what you described earlier as the exit wound?

9    A    Yeah.  The exit wound is -- is -- is somewhat linear, and

10   it's -- the path of the bullet, we described as being from

11   front to back, slightly downward, but once the bullet hits the

12   bone, the trajectory is no longer necessarily accurate.  That

13   is the bullet can do -- so it went backwards, it veered a

14   little bit toward the middle, and during that process, it

15   actually did enormous destruction to the inferior parts of all

16   the brain on that side, but because this is a large bullet, it

17   actually generates a huge force field, and we really didn't

18   want to show you and it wouldn't be helpful to see that the

19   brain essentially had become macerated and that it was

20   separated from the spinal cord at the cerebellum, the back

21   part of the brain.  So at the instant this bullet was fired,

22   he would be unable to move any extremities.  He should be

23   unconscious because of the damage to the frontal lobes of his

24   brain, and so he would simply be as he was in the original

25   picture; he would have fallen over and -- and would not be

1   able to move his extremities or move.

2            MR. JUDGE:  Doctor, thank you very much.

3            No further questions, Judge.

4            THE COURT:  Cross.

5                      CROSS-EXAMINATION

6   BY MR. MCGRAUGH:

7   Q    Good afternoon, Dr. Adelstein.

8   A    Afternoon.

9   Q    My name is Chris McGraugh; we know each other?

10  A    Right.

11  Q    The -- and I represent Kathy Mock.  I just have a very

12  brief set of questions for you.  From your examination and the

13  autopsy you performed, there are some things that would be

14  difficult to know, and let me confirm those with you.  You

15  have no opinion as to where the person that shot the weapon

16  would be at the time the bullet was fired; would that be fair

17  to say?

18  A    That's true.

19  Q    Okay.  And you would have no conclusions or testimony

20  based on your examination of the position of Mr. Griesbauer at

21  the time that he was shot?

22  A    That's true.  I cannot tell whether he was lying down or

23  standing up.

24  Q    Or sitting for that matter, correct?

25  A    That's generally true, correct.

1   Q    You can't tell whether the person that shot the weapon

2   was right-handed or left-handed?

3   A    That's correct I cannot.

4   Q    Can't tell how tall that person was?

5   A    I cannot.

6   Q    Let me just ask you some questions about the stippling,

7   okay?

8   A    Yes, sir.

9   Q    It's the unburnt tattooing around the wound?

10  A    Yes, sir.

11  Q    And -- now, the -- I believe you said six to 30 inches?

12  A    There's a variation of that, but I think the classic

13  textbooks give it from six to 30 inches.

14  Q    And that's just sort of a -- that's not something based

15  on your own studies; that's just sort of been passed down as

16  an accepted distance?

17  A    It's in the literature with the concept that to be

18  actually sure you would have to test-fire the gun because

19  every gun and every bullet produces a slightly different fire

20  pattern.

21  Q    Okay.  So as to this, as to this weapon and this wound,

22  we can't really be sure of the exact distance; would that be

23  fair to say?

24  A    That is correct.

25  Q    But you could have -- if you have the weapon and the type

1   of ammunition that was used, you could test-fire it and you

2   could give a pretty accurate determination of the distance?

3   A    That's correct.

4   Q    Okay.  One last question for you.  Is -- we had talked,

5   you know, some time ago about this case over the phone.  Do

6   you recall that?

7   A    I do not actually.

8   Q    Okay.

9   A    Sorry.

10  Q    The -- and I had sort of asked you these same questions

11  as to whether you had any opinions on these, on these things.

12  One opinion you did express to me and I had written down was

13  that the person that fired the weapon would have some

14  familiarity with the gun and how they could load another shell

15  into the chamber, is that right?

16  A    And that would be reasonable because it's a kind of a gun

17  that you actually have a lever action, so you would need to

18  know something about guns to fire this gun.

19        MR. MCGRAUGH:  Okay.  That's all I have, Doctor.

20        THE WITNESS:  Thank you.

21        MR. GORLA:  No questions.

22        THE COURT:  Okay.  Thank you.  Any redirect?

23        MR. JUDGE:  No, Judge.  Thank you.

24        THE COURT:  Thank you, sir.  You're free to go.

25        THE WITNESS:  Thank you very much.

1          THE COURT:  Call your next witness.

2          MR. DITTMEIER:  Judge, could we approach just

3    briefly?

4          THE COURT:  Uh-huh.

5      (A bench conference was held on the record and outside of

6    the hearing of the Jury as follows:)

7          MR. DITTMEIER:  The next witness is going to take

8    some time, okay?

9          THE COURT:  All right.

10         MR. DITTMEIER:  And he's one of our -- he's our

11   404(b), so we're going to have to read some instructions or

12   whatever to the Jury ahead of time, so I don't know what the

13   Court wants to do, if you want to break now and we can do the

14   instructions and come back or whatever.

15         THE COURT:  Yeah.  Why don't we go ahead and break

16   for lunch now.

17         MR. GORLA:  Okay.

18         THE COURT:  And we'll come back and be ready to go.

19   Is this the stuff you're talking about?

20         MS. HERNDON:  Is this our copy?

21         MR. REILLY:  Yes, Judge, that's your copy.  There's a

22   copy for the Court, and there's a proposed limiting

23   instruction on the use of 404(b) limited only to Ms. Young,

24   and then there's the 404(b) instruction itself, and there's an

25   instruction to be given before and then at the close of the

 1  evidence.

 2          THE COURT:  Okay.  All right.  Yes, sir.

 3          MR. DITTMEIER:  We're down to about our last six or

 4  seven witnesses, so I'd anticipate we will shut down probably

 5  tomorrow.

 6          THE COURT:  Okay.

 7          MR. DITTMEIER:  If we go good this afternoon, it

 8  could be maybe two witnesses tomorrow.

 9          THE COURT:  Okay.  All right.  Good enough.  All

10  right.  Good deal.  1:15?

11          MR. DITTMEIER:  That's fine.

12          MR. REILLY:  Thank you, Judge.

13      (The following proceedings were held within the hearing

14  of the Jury.)

15          THE COURT:  Now, ladies and gentlemen, we'll take our

16  luncheon recess at this time.  We'll reconvene from lunch at

17  1:15.  During the course of the luncheon recess, do not

18  discuss the case amongst yourselves or with anyone else.  Do

19  not allow anyone to discuss it within your hearing or

20  presence, and do not form or express any opinions about the

21  case until it is given to you to decide, and as always, do not

22  utilize any social networking sites over the luncheon recess,

23  and we'll see you back at 1:15.

24      (Court recessed for lunch from 12:14 p.m. until 1:29p.m.)

25      (The following proceedings were held outside the hearing

 1   and presence of the Jury.)

 2            THE COURT:  Mr. G.

 3            MR. GORLA:  Okay.  The first thing, Judge, I'd just

 4   like to do is -- from what I understand, they're going to put

 5   Norman Newlin on the stand, and he's a 404(b) witness.

 6            THE COURT:  Uh-huh.

 7            MR. GORLA:  So the first thing I'd like to do is

 8   renew our objection to him, argue that this prior act evidence

 9   is irrelevant to any issue in the case other than Ms. Young's

10   character and it's inadmissible as propensity, that the act

11   that he would testify to was neither similar in kind nor

12   reasonably close in time to this charged offense, that the

13   potential unfair prejudice substantially outweighs the

14   probative value of the evidence, and I would argue that it's

15   excludable not only as 404(b) evidence, but it's also

16   excludable under Rule 403 because its probative value is

17   substantially outweighed by unfair prejudice, confusing the

18   issues, misleading the Jury.  That's basically it.  It's what

19   we talked about before.

20            THE COURT:  All right.  Mr. Reilly.

21            MR. REILLY:  Judge, I'd stand on the Court's previous

22   record, and I would note for the record that I know there were

23   multiple 404(b) witnesses the Government proffered on multiple

24   solicitations and sets of events.  One thing with Mr. Newlin,

25   the witness who will -- the Government proposes to present --

1  the evidence he's going to adduce relates to events that were

2  within three or four years of the present offense, so they're

3  very close in time.  The Government's pared down in its

4  case-in-chief the amount of 404(b) it intends to present and

5  will present Mr. Newlin's testimony, and other than that, I'd

6  stand on the record previously created.

7        THE COURT:  All right.  Anything further, Mr. Gorla?

8        MR. GORLA:  Yes, Judge.  The only other thing -- and

9  I've talked to Mr. Dittmeier about this -- there's certain

10  areas of Mr. Newlin's testimony that would be extremely

11  prejudicial if they came out, and the Court is aware of those

12  areas, and Mr. Dittmeier has indicated to me he's not going to

13  go there, which is fine.

14        THE COURT:  That's my understanding as part of our

15  discussion immediately prior to recess for lunch or right

16  after the recess for lunch.

17        MR. GORLA:  Correct.

18        THE COURT:  Okay.  Got anything in this one,

19  Mr. McGraugh?

20        MR. MCGRAUGH:  Just -- just as a minor procedural

21  note, Judge.

22        THE COURT:  Uh-huh.

23        MR. MCGRAUGH:  The Government tendered an instruction

24  before the lunch hour.

25        THE COURT:  Yeah.

1      MR. MCGRAUGH:  We reviewed it, and we believe that's

2  appropriate, and we would ask the Court to give that

3  instruction prior to the -- prior to the 404(b) evidence being

4  elicited.

5      THE COURT:  All right.

6      MR. GORLA:  And then, Judge, while we're on

7  instructions --

8      THE COURT:  Yes.

9      MR. GORLA:  -- the limiting instruction is fine with

10  us.  The 404(b) instruction -- at the bottom, Judge, it's a

11  catchall.  It says, "You may consider prior acts only on the

12  issue of motive, intent, knowledge, plan, absence of mistake

13  or accident," and all they do is they're just parroting the

14  statute.  The law in the Eighth Circuit in *United States*

15  *versus Mothershead* basically says, you know, that you have to

16  use care in framing the language; you have to specify the

17  specific purpose for which it's used; you can't just kind of

18  shotgun the statute, which they did here, and throw everything

19  in the kitchen sink.  So the instruction should be given, but

20  the instruction has got to be limited to the specific purpose

21  that the Government is trying to introduce the evidence.

22      THE COURT:  Mr. Reilly?  Mr. Dittmeier?

23      MR. REILLY:  Judge, again, I'd propose that in this

24  case, it's relevant to all those factors.  It does -- the

25  evidence that we intend to offer goes to her motive, intent,

1    knowledge, plan, and absence of mistake or accident.  If --

2    if -- I'll concede this.  We can -- we can take -- right now,

3    we don't know of evidence of absence of mistake or accident.

4    Should -- should the defense start arguing mistake or

5    accident, then, perhaps, perhaps, it could come in, but

6    we'll -- we'll concede the last point, but other than that,

7    Judge, it's relevant to all those factors -- motive, intent,

8    knowledge, plan.

9               THE COURT:  Okay.  Anything else?

10              MR. REILLY:  No, Judge.

11              THE COURT:  All right.  Consistent with our earlier

12   discussions and the rulings thereon, the objection will be

13   overruled.  The evidence will be allowed subject to these

14   instructions being read as cautionary and limiting.  Now --

15   yeah.  Is this the next witness then that's going to be

16   called?

17              MR. DITTMEIER:  Yes, Your Honor.

18              THE COURT:  All right.

19              MR. GORLA:  I think you're going to read stips first,

20   right?

21              MR. REILLY:  I have two stipulations to read.  Then

22   we'd call the witness.

23              THE COURT:  And then you'll call him.  Okay.  So I

24   propose then to read these two instructions after you've

25   called the witness, and then after the instructions are read,

 1    you can begin your inquiry.

 2            MR. DITTMEIER:  Okay.

 3            THE COURT:  All right.

 4            MR. GORLA:  Thank you, Judge.

 5            THE COURT:  All right.  Ready?

 6            MR. REILLY:  Yes, Judge.

 7            THE COURT:  All right.  Bring them out.  Oh.

 8        (The following proceedings were held within the hearing

 9    and presence of the Jury.)

10            THE COURT:  Good afternoon, ladies and gentlemen.

11            JURORS IN UNISON:  Good afternoon.

12            THE COURT:  Mr. Reilly.

13            MR. REILLY:  Thank you, Your Honor.  Before the

14    Government calls its next witness, we'd move to introduce two

15    stipulations.  The first one is Government's Exhibit #42.

16            THE COURT:  Very well.

17            MR. REILLY:  Ladies and gentlemen, this stipulation

18    is consistent with the other stipulations you've seen in that

19    it's in the same form.  This is a stipulation of facts

20    entitled, "Elain Kay Young, Marriage Dates," and it is

21    Government's Exhibit 42.

22            This stipulation provides as follows:

23            The United States of America and Defendants Katherine

24    A. Mock and Elain Kay Young accept the following facts in this

25    case to be proven.

1          Elain Kay Young was married to Danny Young from

2    February 4th, 1972 to July 7th, 1978.

3          Elain Kay Young was married to Frank Niece from

4    October 31st, 1986 to May 21st, 1996.

5          Elain Kay Young was married to David Crawford from

6    July 4th, 1996 to March 21st, 2003.

7          Elain Kay Young was married to Melvin Griesbauer from

8    September 5th, 2004 to the time of -- to the time of his

9    death.

10          Now, that's Government's Exhibit 42, signed by all

11   the parties.

12          The next stipulation is Government's Exhibits 37,

13   37A, and 37B.  Judge, I'd move for the introduction of

14   Government's Exhibit #37.

15          THE COURT:  Very well.

16          MR. REILLY:  This is a stipulation related to the

17   title history for real estate 17631 Penny Royal Road.

18          The United States of America and Defendants Katherine

19   A. Mock and Elain Kay Young agree and accept the following

20   facts in this case to be proven.

21          One, on January 11th, 1999, Celia Hammons -- well,

22   I'm going to move back for just a moment.

23          The following pertains to information maintained by

24   the Adair County Recorder of Deeds in relation to the property

25   at 17631 Penny Royal Road and/or information related to the

1  refinancing of the property on March 22nd, 2006.  Kay

2  Crawford, E. Kay Crawford, E. Kay Young all refer to the same

3  person, Elain Kay Young.

4         Number one, on January 11th, 1999, Celia Hammons, the

5  mother of Keith Hammons, Karen Watt, and Kay Crawford,

6  executed a beneficiary deed to convey the property to Keith

7  Hammons, Karen Watt, and Kay Crawford as tenants in common

8  upon her death.

9         Number two, on March 31st, 2000, Celia Hammons

10  executed a beneficiary deed to convey the property upon her

11  death to Elain Kay Crawford and David Barton Crawford as joint

12  tenants.

13         Number three, on April 6th, 2000, Celia Hammons

14  executed a warranty deed which revoked the beneficiary deed of

15  March 31st, 2000 and conveyed the property to David B.

16  Crawford and Kay Crawford as joint tenants.

17         Number four, Celia Hammons died on or about

18  August 15th, 2000.

19         Sorry.

20         Number five, on March 20th, 2003, David B. Crawford

21  executed a quitclaim deed, releasing any potential interest he

22  may have had in the property entitled to E. Kay Young.

23         On March 21st, 2003, E. Kay Young executed a warranty

24  deed granting the property to Elain Kay Young and Jared L.

25  Young as joint tenants.

1          On May 12th -- number seven, on May 12th, 2003, Elain

2     Kay Young -- Elain Crawford, Elain Kay Young executed a deed

3     of trust granting National City Mortgage Company a deed of

4     trust to secure a $30,000 loan.

5          On or about June 9th, 2004, Elain Kay Young and Jared

6     Young executed a real estate deed of trust granting Northeast

7     Missouri Bank a security interest in the property not to

8     exceed $53,000.  Thereafter, on June 22nd, 2004, National

9     Mortgage Company executed a release of mortgage releasing its

10    mortgage previously referred to in paragraph seven.

11         Number nine, on March 22nd, 2006, Elain Kay Young and

12    Jared Young, as set forth in Government's Exhibit 37A,

13    executed a quitclaim deed granting Elain Kay Young and Melvin

14    Griesbauer -- Elain Kay Young, Melvin Griesbauer, and Jared

15    Young ownership of the property as joint tenants with the

16    right of survivorship and not as tenants in common.

17         Number ten, on March 22nd, 2006, Elain Kay Young,

18    Melvin Griesbauer, and Jared Young, as set forth in

19    Government's Exhibit 37B, executed a deed of trust granting

20    Home Funds Direct a security interest of $75,650 to secure a

21    loan of $75,650.  At or near this time, proceeds of

22    approximately $52,715.77 from this loan were transferred to

23    Northeast Missouri Bank to release the remaining balance from

24    the original $53,000 mortgage referred to in paragraph eight.

25         And attached to this stipulation that is signed by

1    the parties are Government's Exhibit 37A, which is simply the

2    quitclaim deed of March 22nd of 2006 that is referred to in

3    Government's paragraph nine.

4         Also attached are documents related to the deed of

5    trust referred to in paragraph ten, and this is Government's

6    Exhibit 37B, and it relates to the deed of trust for Home

7    Funds Direct, securing their interest in the property at 17631

8    Penny Royal Road in Novinger, Missouri, in relation to the

9    loan executed on March 22nd, 2006.

10        Thank you, Your Honor.

11        THE COURT:  That concludes the stipulations?

12        MR. REILLY:  Yes, Judge.

13        THE COURT:  Call your next witness.

14        MR. DITTMEIER:  Norman Newlin.

15     (Witness sworn.)

16        THE COURT:  Ladies and gentlemen, Instruction #A:  As

17   you know, there are two Defendants on trial here, Katherine A.

18   Mock and Elain Kay Young.  Each Defendant is entitled to have

19   her case decided solely on the evidence which applies to her.

20   Some of the evidence in this case is limited under the Rules

21   of Evidence to one of the Defendants and cannot be considered

22   against the other.  You are about to hear evidence in relation

23   to Elain Kay Young's previous offer of United States currency

24   or other things of value for the agreement to murder David

25   Crawford.  You must not consider that evidence when you are

1    deciding if the Government has proved beyond a reasonable

2    doubt its case against Defendant Katherine A. Mock.

3         Instruction #B:  You are about to hear evidence that

4    the Defendant Elain Kay Young previously offered another

5    person United States currency and other things of value as

6    consideration for the agreement to murder one of her previous

7    husbands, David Crawford.  You may consider this evidence only

8    if you unanimously find it is more likely true than not true.

9    This is a lower standard than proof beyond a reasonable doubt.

10   If you find that this evidence is more likely true than not

11   true, you may consider it to help you decide motive, intent,

12   knowledge, or plan.  You should give it the weight and value

13   you believe it is entitled to receive.  If you find that it is

14   not more likely true than not true, then you shall disregard

15   it.  Remember, even if you find that the Defendant may have

16   committed a similar act in the past, this is not evidence that

17   she committed such an act in this case.  You may not convict a

18   person simply because you believe she may have committed

19   similar acts in the past.  The Defendant is on trial only for

20   the crimes charged, and you may consider the evidence of prior

21   acts only on the issue of motive, intent, knowledge, or plan.

22        Mr. Dittmeier.

23

24

25

1    **NORMAN LANE NEWLIN,**

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                    DIRECT EXAMINATION

5    BY MR. DITTMEIER:

6    Q    Would you state your name for the Jury, please?

7    A    Norman Lane Newlin.

8    Q    Okay.  And where do you live at, Mr. Newlin?

9    A    Novinger, Missouri.

10   Q    Do you know the Defendant in this case, Kay Young?

11   A    Yes, I do.

12   Q    And when did you first meet her?

13   A    It would have been back in 2000 or so.

14   Q    And how did you meet her?

15   A    She was the Superintendent at the Callao School where my

16   kids went to school.

17   Q    Now let me direct your attention to 2002.  Shortly before

18   the start of the school year, were you looking for a place to

19   live in Novinger?

20   A    Yes, I was.

21   Q    And did you discuss that with the Defendant Kay Young?

22   A    Yes, I did.

23   Q    And did she suggest anything to you?

24   A    Yes, she did.

25   Q    And tell the Jury what she suggested.

1    A    She suggested I move on the farm and help with the farm

2    for the rent, so I moved to a mobile home there.

3    Q    So she suggested you move on the farm and you'd pay the

4    rent off by working on the farm?

5    A    Yes.

6    Q    And did you do that?

7    A    Yes, I did.

8    Q    Okay.  And who did you move on the farm with?

9    A    Me and my four kids.

10   Q    Okay.  Were you separated from your wife at that time?

11   A    Yes, we were separated.

12   Q    Now, when you first were going to move on the farm, did

13   you have your trailer on the farm yet?

14   A    Not at the very beginning but soon.

15   Q    Okay.  And where did you stay then?

16   A    I stayed approximately a week in the house with Kay.

17   Q    Okay.  And your children were there also?

18   A    Yes.

19   Q    Okay.  And then you moved the trailer onto the farm?

20   A    Yes.

21   Q    Okay.  I want to show you what's been marked and

22   previously admitted into evidence, which is Government's

23   Exhibit 3.  Can you see that --

24   A    Yes, I can.

25   Q    -- photograph there?  Can you see where your -- where you

1   moved your trailer, where it was parked at?

2   A    Yes.

3   Q    And could you touch the screen and show the Jury?

4   A    Sure.   It was right here, right in this area.

5   Q    And there's a concrete pad that's there?

6   A    Yes.

7   Q    Okay.   Now, after you moved on the farm -- you said you

8   were separated from your -- your wife.   Do you know whether or

9   not Mrs. Young was having marital problems with her husband?

10  A    Yes, she was.

11  Q    And she was married at the time?

12  A    Yes, she was.

13  Q    And tell the Jury, what was his name?

14  A    David Crawford.

15  Q    And did the two of you discuss your problems?

16  A    Yes, we did.

17  Q    Okay.   Did you discuss her getting a divorce?

18  A    Yes.

19  Q    Did she discuss with you what one of her primary concerns

20  were as far as getting a divorce?

21  A    Yes.   She was worried that she would lose her farm

22  because his name was on the farm as well.

23  Q    Okay.   So David Crawford's name was on her farm?

24  A    Yes, that's what she had told me.

25  Q    And she was concerned of losing the farm?

1    A    Yes.

2    Q    Okay.  Did she ever discuss with you about having

3    anything done to David Crawford?

4    A    Yes.

5    Q    Did there ever come a point in time when you took that

6    discussion seriously?

7    A    Yes, there was.

8    Q    And do you recall when and where that took place?

9    A    Yes.  It was in the hot tub directly behind the house,

10   and it was the first time that she was very serious about it.

11   Q    Okay.  And what did she ask you to do to David Crawford?

12   A    She had asked me to kill David Crawford; in return, she

13   would kill my ex-wife or soon-to-be --

14   Q    Did she tell you how -- okay.  Excuse me.  Did she tell

15   you how she would kill your ex-wife?

16   A    Yes.  She said that she would take her horseback riding

17   and hit her in the back of the head with a rock or a club and

18   claim that it was a horseback accident.

19   Q    At that time you were in the hot tub and with this

20   conversation, was there ever any money discussed?

21   A    Yes, there was.

22   Q    And what was that?

23   A    Of $10,000 on top of that.

24   Q    So she would kill your wife and give you 10,000?

25   A    Yes.

1   Q     If you'd kill David Crawford?

2   A     Yes.

3   Q     Okay.  During that discussion, did you ever talk about

4   insurance at all?

5   A     Yes.  She wanted me to take out insurance on my ex-wife.

6   Q     Did she discuss any insurance in connection with David

7   Crawford?

8   A     She'd had some insurance on him, but --

9   Q     She didn't discuss it with you?

10  A     She didn't discuss how much or anything of the sort.

11  Q     Now, after that discussion -- and let me direct your

12  attention back to Government's Exhibit 3.  On that photograph,

13  can you see where the hot tub is at?

14  A     Yes.

15  Q     You said you were in a hot tub?

16  A     Yes.  It was -- well, right there.

17  Q     Okay.  Right behind the house?

18  A     Yes, it was.

19  Q     Okay.  Now, was there another conversation with her?

20  A     Yes, there was.

21  Q     And do you know about how long it was after that?

22  A     Approximately a week or less.

23  Q     Okay.  And where did that conversation take place?

24  A     That took place in her truck, and it was sitting next to

25  the summer kitchen, which was right there.  I'm sorry.  I'm

1   unable to touch it in the right spot.

2   Q    In the driveway, by this building here?

3   A    Yes, it is, right in there.

4   Q    Okay.  And did that conversation cover the same ground?

5   A    Yes, it was, and she was very serious in that

6   conversation.

7   Q    And did she say again she'd give the $10,000?

8   A    Yes.

9   Q    With pretty much the same terms?

10   A    Yes.

11   Q    And what did you tell her?

12   A    I told her, no, I did not want that in any way, shape, or

13   form.

14   Q    Okay.  Now, do you know whether or not Elain Young had a

15   stun gun?

16   A    Yes.

17   Q    Okay.  And where did she keep that at?

18   A    Most of the time, it was in her truck.

19   Q    Okay.  And did you ever have occasion to use it?

20   A    Yes.

21   Q    Now, do you know whether or not she had a rifle?

22   A    Yes, she did.

23   Q    And do you know what kind of rifle it was?

24   A    Yes.  It was a Model 94 Winchester.  It set at the back

25   door.

1    Q    Okay.  And that was a lever action?

2    A    Yes, it is.

3    Q    Okay.  Do you know whether or not she knew how to handle

4    that rifle?

5    A    Yes.

6    Q    Okay.  Did you ever see her use the rifle?

7    A    Yes, I did.

8    Q    And could you tell the Jury about a specific instance?

9    A    One afternoon, I was down at the house, and there was

10   some -- a stray dog up in the barn lot, and she was standing

11   at the back of the -- near the yard or garden, and she shot a

12   dog -- one shot -- and killed him.

13   Q    Okay.  And where do you describe the garden at?

14   A    The garden is right here.  The dog would have been

15   somewhere right along in this area in there.

16   Q    Now, after she asked you about killing David Crawford, at

17   some point shortly after that, did you have occasion to move

18   from there?

19   A    Oh, yes.

20   Q    And about when did you move; do you recall?

21   A    I moved in the spring of 2003.

22   Q    Okay.  And were you aware that she in fact divorced David

23   Crawford --

24   A    Yes.

25   Q    -- in March of 2003?

1   A    I knew she divorced, yes.

2   Q    And nothing happened to David Crawford?

3   A    No.

4   Q    And Elain Young kept the farm, to your knowledge?

5   A    As far as I know, yes.

6   Q    As far as you know?

7   A    Yes.

8   Q    Okay.  All right.  Now, when did you first hear that

9   Melvin Griesbauer had been killed?

10  A    Umm, I'd heard that Friday morning, at the local gas

11  station.

12  Q    So that was after the murder?

13  A    Yes.

14  Q    So that would have been the Friday morning?

15  A    Yes, it would have been approximately 9:00.

16  Q    Okay.  And did you then go in the following Monday and

17  report this knowledge to the Highway Patrol?

18  A    Yes, I did.

19  Q    And where did you go to talk to the Highway Patrol?

20  A    Troop B is in Macon County.

21  Q    In Macon?

22  A    Yes.

23  Q    So you heard about it on Friday morning, and you went in

24  and told the FB -- or the Highway Patrol what you knew on

25  Monday?

1    A    Yes.

2         MR. DITTMEIER:  Okay.  I have no further questions of

3    this witness.

4         THE COURT:  Cross, Mr. McGraugh?

5         MR. MCGRAUGH:  Briefly, Your Honor.

6                      CROSS-EXAMINATION

7    BY MR. MCGRAUGH:

8    Q    Mr. Newlin, my name's Chris McGraugh.  I represent Kathy

9    Mock.  You don't know Kathy Mock nor ever met her?

10   A    No, I do not know Mock, Kathy Mock.

11   Q    I want to ask you about this incident where the stray dog

12   was shot.  Is it your testimony that Kay Young was at the rear

13   of her residence?

14   A    Yes.  She was near the garden.

15   Q    And the animal was somewhere up towards the barn?

16   A    Yes, in the barn lot area.

17   Q    And would you estimate that to be in excess of 200 yards?

18   A    Oh, I would say yes.

19   Q    And one shot?

20   A    Yes.

21   Q    Pretty good with a rifle then?

22   A    Yes.

23        MR. MCGRAUGH:  Okay.  Thank you.

24        THE COURT:  Mr. Gorla?  Ms. Herndon?

25        MR. GORLA:  Judge, may we approach?

1          THE COURT:  Sure.

2      (A bench conference was held on the record and outside of

3  the hearing of the Jury as follows:)

4          MR. GORLA:  Judge, what I would like to do is -- we

5  talked about this before, so I'm making my offer of proof.  I

6  propose to ask him, okay, that in late 2003 through 2004 that

7  he was charged in a criminal case in Macon County Circuit

8  Court, okay, and that he was charged -- it was a felony, okay,

9  and that because it was a felony, there's a range of

10  punishment that's possible -- that goes -- possibility -- to

11  the penitentiary and that Kay Young was a witness against him

12  in that case.

13          As of right now, what you indicated that I could ask

14  him is that he's a -- you know, that -- that he was involved

15  in a court proceeding but I can't say it's a felony, and the

16  reason why I think -- without going into it, exactly what it

17  is, even though I'd like to do that and I know you're not

18  going to let me, but I think the reason why it's important

19  that I'm able to say it's a felony or a criminal case is

20  because that would show how his bias would cause him to

21  testify unfavorably against Ms. Young because it is a felony

22  and because there's so much at stake because if I just say

23  court proceeding, it could be small claims court, it could be,

24  you know, a misdemeanor.  Who knows what it could be?  It

25  could be a civil case, and then in that case, you know, I'm

1  not -- I'm hamstrung and I can't show that he's biased against

2  Kay Young.

3          So I think in the very least I should be able to ask,

4  you know, that he was charged in a criminal case in Macon

5  County and without going into what the charges were, to say

6  that it was a felony and that it carried a possible range of

7  punishment in the penitentiary and that Kay Young was a

8  witness against you in that case, and then I'll leave it.

9          MR. DITTMEIER:  Judge, I still stand on my previous

10  argument that if she testified against him in a court

11  proceeding, that establishes the bias.  The fact that the

12  felony never went anywhere -- I mean I just -- I don't think

13  that that's relevant.

14          THE COURT:  Anything else, Mr. Gorla?

15          MR. GORLA:  Well, my answer, Judge, is I'm able to

16  show that he's biased and it's important that I show what he's

17  looking at and what the consequences are of the court

18  proceeding and that the consequences are direct to him, which

19  would cause him to slant his testimony against Ms. Young.

20          THE COURT:  All right.  My ruling is still the same,

21  consistent with our earlier discussion and in our discussion

22  at sidebar now on this issue.  I don't see that anything has

23  changed materially to cause me to modify or change my ruling.

24      (The following proceedings were held within the hearing

25  of the Jury.)

1                         CROSS-EXAMINATION

2    BY MR. GORLA:

3    Q    Good afternoon, Mr. Newlin.  When did this conversation

4    take place that you told us about with the hot tub?

5    A    It would have been in the spring of 2003.

6    Q    Spring of 2003?

7    A    Well, I shouldn't say spring.  January, sometime in the

8    first part of the year.

9    Q    In January?  So in January, it's normally cold in

10   January, is that correct?

11   A    Yes.

12   Q    You went in the hot tub in January?

13   A    Yes.

14   Q    Okay.  Now, if I understand this correctly, you went to

15   the police on March 27th, is that correct?

16   A    Yes.

17   Q    Okay.  And you initiated the contact, is that correct?

18   A    Yes, I did.

19   Q    Okay.  And talked to a Sergeant Wilhoit, is that correct?

20   A    Yes, I did.

21   Q    At Adair County Justice Center, is that correct?

22   A    Yes.

23   Q    Okay.  How long did you live on Ms. Young's property?

24   A    Umm, moved in there in the fall -- it would have been

25   just before school started -- and moved out early spring,

1    which March, April, somewhere right along in there.

2    Q    You were supposed to stay there for a year, is that

3    correct?

4    A    Yes, we had a lease for up to a year.

5    Q    But you left early, is that right?

6    A    Yes, I did.

7    Q    And you were asked to leave early, is that true?

8    A    It was a mutual agreement, yes.

9    Q    Because you and Ms. Young weren't getting along at that

10   point; is that a fair statement?

11   A    Right.

12   Q    Now, you testified in front of the Grand Jury, is that

13   correct?

14   A    Yes, I did.

15   Q    Okay.  And you told them that, you know, at the time that

16   you were living there you were separated from your wife, is

17   that true?

18   A    Yes.

19   Q    And Ms. Young was going through a divorce with David

20   Crawford, is that correct?

21   A    Yes.

22   Q    And you told the grand jurors, at least for a while, that

23   it was kind of a standing joke, wasn't it, that you would joke

24   about killing each other's spouses?

25   A    She talked about it a lot, and I took it as a joke, yes.

121

1   Q    And, basically, you used the words "standing joke" in

2   front of the grand jury, is that true?

3   A    Possibility, yes.

4   Q    Okay.  You were involved in a court proceeding in Macon

5   County Circuit Court late 2003 through 2004, is that true?

6   A    Yes.

7   Q    Okay.  There was a lot at stake in that proceeding, is

8   that true?

9   A    Pardon?

10  Q    There was a lot at stake in that proceeding, is that

11  true?

12  A    Yes, I guess there is, yes.

13  Q    Yeah.  And it was hotly contested, is that correct, a

14  fair statement?

15  A    Possibly, yes.

16  Q    Kay Young was a witness against you in that case, is that

17  true?

18  A    Yes, she was.

19  Q    Now, when you testified in front of the Grand Jury, did

20  you tell them something about at one time coming down from the

21  trailer and that Kay Young had an insurance man at her house?

22  Is that true?

23  A    Yes, it is true.

24  Q    So -- so tell us about that.

25  A    She wanted me to take out a life insurance policy on my

1   ex, and I wanted no part of it.

2   Q    So she had a -- if I understand this, she's had -- she

3   has an insurance man there, some guy who works for an

4   insurance company, is that true?

5   A    Yes.

6   Q    So he's sitting in her house, is that true?

7   A    Yes.

8   Q    And he's got papers all prepared for you to sign, is that

9   true?

10  A    There was some paperwork, yes.

11  Q    Okay.  What company was the man from?

12  A    I have no idea.

13  Q    What did the guy look like?

14  A    Older gentleman.

15  Q    When did this happen?

16  A    It was of the evening.  It was after dark.  I don't know

17  exactly the date.

18  Q    Okay.  And what did you do?

19  A    Umm, I wanted no part of it, absolutely no part of it,

20  did not agree to it in any way, shape, or form.

21  Q    Well, what did you do with the -- with the paperwork?

22  A    Umm, she handed -- they handed me the paperwork.  I did

23  rip it in half.  Other than that, I believe I carried it out,

24  but I'm not for sure on that.

25  Q    Well, let me ask you this.  Do you remember when you

1  talked to Sergeant Wilhoit on March 27th of '06?

2  A    Yes.

3  Q    And you told him about this completed life insurance

4  application; do you remember that?

5  A    I did tell them about --

6  Q    Yeah, and, actually, you told them that you still had the

7  application in your possession, is that true?

8  A    I thought I had, but I do not have it at this time.

9  Q    Well, but my question was you told them that you still

10 had the application, is that correct?

11 A    That could very well have been, yes.

12 Q    Okay.  And then later on, on October 22nd, you also

13 talked to FBI Agent Keith Kohne, is that correct?

14 A    Yes.

15 Q    And you talked to him, I guess, right before your Grand

16 Jury testimony, is that true?

17 A    Yes.

18 Q    In St. Louis?

19 A    Yes.

20 Q    And he asked you initially, right before you started,

21 if -- he asked you about that form, is that correct?

22 A    Umm, possibly, yes.

23 Q    And you told him you couldn't find it, is that correct?

24 A    Yes.

25 Q    And that's the same form that now you're saying you

1   ripped up, is that true?

2   A    I tore it in half, yes.

3   Q    You tore it in half.

4        MR. GORLA:  Could you give me a minute, Judge?

5        THE COURT:  Sure.

6        MR. GORLA:  Judge, I have no further questions.

7        THE COURT:  Redirect?

8        MR. DITTMEIER:  Yeah, just one question, Judge.

9        THE COURT:  All right.

10                       REDIRECT EXAMINATION

11  BY MR. DITTMEIER:

12  Q    Mr. Newlin, you just testified that when you went in --

13  after Melvin Griesbauer was killed, you went in on that Monday

14  and told them about being asked to kill David Crawford?

15  A    Yes.

16  Q    And you told Sergeant Wilhoit about the situation where

17  the insurance papers had been made out?

18  A    Yes.

19  Q    Okay.  Did you indicate that you would look for those

20  insurance papers?

21  A    Yes, I believe so.

22  Q    And did you look for them?

23  A    Yes, I did.

24  Q    Did you find them?

25  A    No, I have not.  We've had a house fire since then, so I

1   have no --

2   Q    But you -- but you told him you had them?

3   A    I thought I'd had them, yes.

4           MR. DITTMEIER:  Okay.  All right.  I have no further

5   questions.

6           THE COURT:  Anything else?

7           MR. MCGRAUGH:  No questions, Your Honor.

8           MR. GORLA:  No, Your Honor.

9           THE COURT:  All right.  Thank you, sir.  You're free

10  to go.

11          THE WITNESS:  Thank you.

12          THE COURT:  Call your next witness.

13          MR. REILLY:  Judge, we have two stipulations before

14  we call the next witness.

15          THE COURT:  Okeydoke.

16          MR. REILLY:  Ladies and gentlemen, this is

17  Government's Exhibit #43, Stipulation of Facts, Missouri Army

18  National Guard.

19          United States of America and Defendants Katherine A.

20  Mock and Elain Kay Young agree and accept the following facts

21  in this case to be proven.

22          At the time of his death in March 2006, in addition

23  to his employment at Cargill Meat Solutions, Incorporated,

24  Melvin Griesbauer was a soldier in the Missouri Army National

25  Guard.  In his capacity as a soldier of the Missouri Army

1    National Guard, Melvin Griesbauer was deployed to serve in

2    Operation Iraqi Freedom from October 15th, 2004 to

3    September 20th, 2005.  During this period, Melvin Griesbauer

4    was home on leave from December 24th, 2004 to January 14th,

5    2005.

6              And that stipulation is signed by the parties.

7              Judge, I'll also move at this time for the

8    introduction of Government's 44, 44A, and 44B.  It's a

9    stipulation of facts regarding Melvin Griesbauer's employment

10   at Cargill and the hours that he worked.  The record should

11   reflect that 44 is the agreement signed between the Government

12   and Elain Kay Young and her attorney, one of her attorneys;

13   44A is the exact same stipulation, but that is signed by the

14   Government and Ms. Mock and her attorneys, and at this time,

15   I'd ask for leave to publish Government's 44.

16             THE COURT:  Very well.

17             MR. REILLY:  United States of America and Defendants

18   Katherine A. Mock and Elain Kay Young agree and accept the

19   following facts in this case to be proven.

20             On April 19th, 2004, Melvin Griesbauer was hired by

21   Cargill Meat Solutions, Incorporated.  Melvin Griesbauer was

22   on military leave from approximately mid July until his return

23   from being deployed in October of 2005, at which time he

24   resumed his employment at Cargill.  Melvin Griesbauer worked

25   for Cargill at the plant located at or near 600 South Iowa

1   Avenue, Ottumwa, Iowa.  This plant is located approximately 70

2   miles from the property at 17631 Penny Royal Lane, Novinger,

3   Missouri.  It takes approximately one hour and 20 minutes each

4   way to drive from 17631 Penny Royal Lane -- Penny Royal Road

5   to the plant.  During the week of March 20th, 2006, as set

6   forth in Government's Exhibit 44B, Melvin Griesbauer worked

7   the following hours:

8           Monday, March 20th, 1:16 p.m. to 11:58 p.m.

9           Tuesday, March 21st, 1:52 p.m. to 11:42 p.m.

10          Wednesday, March 22nd, 1:47 p.m. to 11:47 p.m.

11          44B is simply a Cargill business record that says

12   "Time Detail" and reflects the hours described in the

13   stipulation from March 20th through March 22nd.

14          At this time, Your Honor, the Government moves to

15   call Tim Eschmann.

16          THE COURT:  Step right here, sir, and be sworn in by

17   the clerk.

18       (Witness sworn.)

19          MS. HERNDON:  Judge, may we approach before we start?

20          THE COURT:  Uh-huh.

21       (A bench conference was held on the record and outside of

22   the hearing of the Jury as follows:)

23          MS. HERNDON:  Judge, I just wanted to re -- oh,

24   sorry.  Sorry.  I just wanted to renew our earlier objection

25   to this testimony.  Whatever theory the Government is

 1    proceeding under, whether this is 404(b) evidence or intrinsic

 2    evidence of the crime, it's neither one.  This man is somebody

 3    who -- the person that she met under the Adult Friend Finder.

 4    Actually, she knew him before that, but they connected through

 5    the Adult Friend Finder service, and their relationship --

 6    well, there isn't anything about this relationship that is

 7    either intrinsic to the crime, goes to prove the crime, or is

 8    404(b) evidence because there's no bad acts or anything

 9    alleged here, so it's really just character evidence to

10    show -- to attempt to show that she was having an affair with

11    this guy while she was still married to her husband, which

12    just shows that she's a bad character, that she has propensity

13    to commit crimes because she's having affairs with her

14    husband.  It doesn't go to show anything else that's relevant

15    at all to the case.

16          MR. REILLY:  Judge, perhaps if Ms. Young was charged

17    with fraud that didn't relate to her husband, that might be

18    true, but what she's charged with is a murder-for-hire of her

19    husband, and her intent and disposition for her husband is

20    entirely relevant.  The Friend Finder profile is relevant.  As

21    I specified earlier, we'll be presenting a somewhat redacted

22    or less damaging version of the records.  It doesn't contain

23    references to bra cup or bra size, but in terms of why it's

24    relevant, it shows her intent toward her husband.  It is

25    intrinsic, and it is probative of her -- a fact in the case,

1   and that's her disposition and intent toward her husband.  She

2   specifies that she's looking for a companion, and she was

3   actively seeking and dating other men, and she had a date with

4   Mr. Eschmann on March 21st in the evening hours to celebrate

5   his birthday on March 22nd, just about the same day

6   Mr. Griesbauer was killed, and she gave him a gift.  This is

7   entirely relevant, and he will testify to a series of contacts

8   with her, a series of dates.  They did meet on Adult Friend

9   Finder, and this was all during the course of her relationship

10  with Mr. Griesbauer, and aside from the Friend Finder profile,

11  it would be relevant on its own separate and apart from

12  Mr. Eschmann's testimony for all the reasons I specified when

13  we had this conversation during Detective or Lieutenant Hall's

14  testimony.  Thank you.

15          MS. HERNDON:  Well, Judge, I think that might be true

16  if there was some evidence that she killed her husband so that

17  she could be with another man.  There's absolutely no evidence

18  of that.  If there was some kind of insinuation or even a

19  little tiny speck of evidence that she wanted Mel dead so that

20  she could be with Tim Eschmann, then, yeah, it would be

21  relevant, but there's not even a suggestion of that.  So we're

22  going to renew the previous objection and renew the objection

23  to the -- to Mr. Reilly referring to any content of the Adult

24  Friend Finder exhibit.  What's the exhibit number?

25          MR. REILLY:  32 and 32A.

1          MS. HERNDON:   Exhibit 32 -- 32 and 32A that's already

2    been admitted.

3          MR. REILLY:   And if I may, just one other thing for

4    the record, Judge.

5          THE COURT:   Sure.

6          MR. REILLY:   The facts will speak for themselves in

7    terms of her disdain for Mr. Griesbauer that's reflected in

8    this when she's looking for somebody with a similar IQ, you

9    know, and this man is probably, by his profile that's in his

10   records, more sophisticated than Mr. Griesbauer, and the fact

11   that she had a date with him and gave him a gift within hours

12   of when her husband was murdered is entirely relevant of the

13   fact that she was looking for a companion, someone other than

14   her husband.

15          And aside from that, in September of 2007, she met

16   with him and they discussed life insurance.  She said she was

17   going to collect on life insurance policies and sought his

18   advice on investment proceeds or how to invest the proceeds.

19   So this is intrinsic to the case, and it's probative of her

20   intent.

21          THE COURT:   The objection is overruled.

22      (The following proceedings were held within the hearing

23   of the Jury.)

24          THE COURT:   Proceed.

25          MR. REILLY:   Thank you.

1                      **TIM ESCHMANN,**

2 HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3 FOLLOWS:

4                    DIRECT EXAMINATION

5 BY MR. REILLY:

6 Q    I'm sorry.  Would you state your name again, sir?

7 A    Tim Eschmann.

8 Q    Mr. Eschmann, what's your current occupation?

9 A    I was in retail most of my life, but now I'm a partner

10 and business manager for a state agency contractor there in

11 Kirksville.

12 Q    Thank you.  Do you own an airplane?

13 A    Yes, sir.

14 Q    Are you a pilot?

15 A    Yes, sir.

16 Q    Do you also own a farm?

17 A    Yes, uh-huh.  I live on the family farm, which is 1,240

18 acres there in western Adair County, uh-huh.

19 Q    1,240 acres, did you say?

20 A    Yes, sir, uh-huh.

21 Q    And what do you do with the farm now?

22 A    I -- since working in town, I lease the pasture out and

23 have CRP, which is government set-aside land, for part of it.

24 Q    Did you have occasion to meet Elain Kay Young or make

25 contact with her in August or September of 2005?

1    A    Yes.

2    Q    What was the medium by which you initially contacted

3    Ms. Young?

4    A    We dated for a few months beginning in that time, and we

5    actually met up on a dating website called Adult Friend

6    Finder.

7    Q    And on Adult Friend Finder, do you have to be a member to

8    participate in Adult Friend --

9    A    Yes.  It's like a lot of them.  You subscribe and you

10   post general information about yourself on a profile that

11   other members can look at, and then there's an internal system

12   to contact by email, you know, without knowing who it is to --

13   Q    And is that what happened in this case?  Did you have the

14   opportunity for -- to view Ms. Young's profile?

15   A    Yes, that's correct, uh-huh.

16   Q    And would she have had the opportunity to review your

17   profile?

18   A    Yes, uh-huh.

19   Q    And is this service something that's free?

20   A    No.  That's what I say.  You subscribe, and when you're a

21   member -- I think people that don't subscribe can view them,

22   but you're not allowed to contact people unless you pay the

23   subscription and are a member.

24   Q    And in the profiles, do people generally post some

25   information about themselves?

 1   A     Generally, yeah.

 2            MR. REILLY:  Okay.  And now I'm going to show you --

 3   I'm going to show you what's been marked as Government's

 4   Exhibits 32 and 32A, and for the record, 32A is nine -- nine

 5   records of -- nine pages of records with a business affidavit

 6   related to Mr. Eschmann's account with Adult Friend Finder,

 7   also known as Various, Inc.  So I'll move for the introduction

 8   of Government's 32A at this time, Judge.

 9            THE COURT:  Any objection?

10            MS. HERNDON:  Our previous objection, Judge.

11            THE COURT:  All right.  32A, was it?

12            MR. REILLY:  32A, Your Honor.

13            THE COURT:  32A will be admitted.

14   Q     (By Mr. Reilly) Do you recognize Government's 32A, sir?

15   A     Yes, uh-huh.

16   Q     And I'm going to direct your -- your attention to the

17   profile section in 32A.  Do you recall that profile?

18   A     Yes.  That was mine, uh-huh.

19   Q     Okay.  And I'm going to also direct your attention to

20   Government's 32, which are Ms. Young's records on the Friend

21   Finder website, and I'm going to direct your attention to the

22   profile section of that.  Would you please take a moment to

23   peruse that profile?

24   A     Okay.

25   Q     Do you recognize that profile, sir?

```
 1   A     Yes, yes, uh-huh.

 2   Q     Is that the profile Ms. Young had posted?

 3   A     Yes, that's correct, uh-huh.

 4   Q     Thank you.  Now I'm going to ask you, if you would, read

 5   your profile to the ladies and gentlemen of the Jury.

 6   A     Okay.  It's real short.

 7         "I'm a well-educated businessman and have decided to

 8   start working less.  I'm six foot, one inch tall, 175 pounds,

 9   blue-eyed, and thinning brown hair.  I am a pilot and have my

10   own airplane and could come to see you.  Let's connect.

11   Q     Thank you.  So in the information you posted, you

12   represented yourself to be a well-educated businessman,

13   correct?

14   A     Correct, uh-huh.

15   Q     And you also held out that you own your own airplane,

16   correct?

17   A     That's correct, uh-huh.

18   Q     And you're a pilot?

19   A     That's correct, uh-huh.

20   Q     I'm going to, for the record, publish the profile on the

21   records on Government's 32, and with the -- the profile,

22   individuals can also post additional information that's called

23   "Profile Want," correct?

24   A     They're like preferences that people have for somebody

25   they're looking for, yeah.  I mean none of that is really even
```

1  required, but most everybody at least puts something in that

2  text, you know, to give some idea about themselves.

3  Q     Thank you.  And the record should reflect this is date

4  registered 7-27 of '05, pnurse_kate@hotmail.com, "Looking for

5  men for one-on-one sex," and the profile is as follows:

6       "I enjoy life to its fullest, am a workaholic but take

7  time for play, not mind games.  I own a farm, raise champion

8  bulldogs, and also work in the education field.  My love life

9  is very important to me, so if you are the man who can take me

10  away from the stressors of my life, please send me a message.

11  I love to spoil my men.  I am looking for a partner.  I do not

12  need to be raised.  I want a companion who is capable of

13  fulfilling my sexual and emotional needs, who has a similar

14  IQ, so we can connect on deeper levels.  Things I enjoy in

15  life are riding horses, camping, fishing, hunting, riding

16  motorcycles, reading, and sex."

17       "Profile Want:  A compassionate, sensual, well-endowed

18  male who actually knows how to make love.  I am not into rough

19  or cruel sex.  I want passion and fireworks, not scars and

20  bruises.  So leave me a message, and we can see where this

21  leads.  I do not want mind games or bullshit manipulation.  If

22  you make a commitment to me and don't follow through, then you

23  are wasting my time.  I am looking for a man who really knows

24  how to be the man of the house.  Life is too short to waste a

25  moment of it."

1       And then the billing records indicate that this "Profile

2   Want" in the third page of the records is associated with

3   Elain Kay Young, and there's a credit card number specified

4   and address and other information.

5       Now, after -- after reviewing the profile, did you have

6   occasion to make contact with Ms. Young initially through the

7   Adult Friend Finder site?

8   A    Yes, uh-huh.

9   Q    And thereafter, did you communicate with her and she

10  communicate with you via cell phone or email?

11  A    It was email, yes, uh-huh.

12  Q    Thank you.  Now, did you have occasion to take Ms. Young

13  flying sometime around September 14th of 2005?

14  A    Yes, uh-huh, we --

15  Q    Was that, if not your first date, right around the time

16  of your first date?

17  A    Yeah, that was it, uh-huh.

18  Q    And so that date was September 14th, 2005?

19  A    That's correct, uh-huh.

20  Q    And you -- have you had occasion to review your flight

21  logs to --

22  A    Yes.

23  Q    -- to verify the dates?

24  A    Yeah, I keep a log book of all flights and who was with

25  me and what I was doing, and yeah, that's -- that's -- that

1    date is correct for that, yes.

2    Q    Did you continue to see Ms. Young after that initial date

3    where you took her flying on September 14th, 2005?

4    A    Periodically, yeah, uh-huh.

5    Q    At some point, did you have occasion during the fall,

6    perhaps, to fly her to -- to another airport to eat dinner?

7    A    Yeah.  We went one evening to Quincy, Illinois, and ate

8    there at the cafe at the airport, uh-huh.

9    Q    During your contact with Ms. Young, did you have occasion

10   to discuss her marital status with her?

11   A    Yes.  She, fairly early on, told me that she was

12   currently married and was -- the marriage was over, they were

13   going to get divorced, but they weren't going to do it until

14   in the spring.

15   Q    Did she say why she was staying with her -- why she

16   didn't just get divorced in the fall?

17   A    What I got -- it was a health insurance issue.  It was to

18   stay on his health insurance for that period of time, yes.

19   Q    That's what she represented to you?

20   A    Uh-huh.

21   Q    Did you have occasion to visit the farm where -- where

22   Ms. Young resides at 17631 Penny Royal Road?

23   A    Yes.  I was there a few times, uh-huh.

24   Q    And what time of day were you normally at the farm?

25   A    Umm, you know, we went into Kirksville and went out to

138

1  dinner a few times, and that was primarily when I was there,

2  and that would be in the evenings.

3  Q    Did you ever meet her husband?

4  A    No, I did not, huh-uh.

5  Q    Did you ever have occasion to meet a woman named Kathy

6  Mock?

7  A    Yes, I did, uh-huh.

8  Q    And what were the circumstances under which you met

9  Ms. Mock?

10  A    Well, Kay raises these bulldogs, and there was a trade

11  show for vendors that sell to producers in Springfield,

12  Missouri, that she was wanting to go to, and I agreed to fly,

13  fly her down there, and of course, when we got there, we

14  wouldn't have any transportation, so she said she had a friend

15  who would drive us around, and that turned out to be Kathy

16  Mock, yeah.

17  Q    And -- and did you make this trip sometime around

18  February 25th of 2006?

19  A    Yes, that's correct, uh-huh.

20  Q    Did anybody accompany you and Ms. Young to Springfield?

21  A    Umm, she had a young female friend in Brookfield that we

22  stopped and picked and also dropped her off on the way back.

23  Felicia.

24  Q    And was that at Ms. Young's request that you stopped and

25  picked up Felicia?

1    A    Yes, yes, uh-huh.

2    Q    Felicia -- is her last name Lambert?

3    A    I'm not certain.  That's probably right.  I don't know if

4    I even knew for sure.

5    Q    Okay.  That's okay.  And would you tell us what happened

6    when you arrived in Springfield, just generally the day's

7    activities?

8    A    Well, we went to this trade show through most of the

9    morning, and I took everybody out for lunch, and we went over

10   to Bass Pro Shop in the afternoon and came back essentially.

11   Q    I'm going to direct your attention -- would you tell the

12   ladies and gentlemen of the Jury when your birthday is?

13   A    My birthday is March 22nd.

14   Q    Thank you.  I'm going to direct your attention to

15   March 21st of 2006.  Did you have occasion to have contact

16   with Ms. Young during the evening hours of March 21st?

17   A    Yes.  She called me and wanted to take me out for my

18   birthday, and we went out and ate dinner that night, uh-huh.

19   Q    Where did you go to eat dinner?

20   A    It was Kirksville, the Wooden Nickel, I'm pretty certain.

21   It's a restaurant there in Kirksville.

22   Q    And Ms. Young wanted to take you out?

23   A    Uh-huh.

24   Q    This was during the evening hours of March 21st?

25   A    That's correct, uh-huh.

1    Q    And did she give you anything?

2    A    She gave me an engraved money clip for a birthday

3    present, yes.

4    Q    I'm going to hand you what's been marked as Government's

5    Exhibit #33.  Do you recognize that?

6    A    Yeah, that's it.  Yeah, that's it, uh-huh.

7          MR. REILLY:  Thank you.  Judge, I'll move for the

8    introduction of Government's Exhibit 33.

9          MR. MCGRAUGH:  No objection, Your Honor.

10         MS. HERNDON:  Judge, we'd object based on the

11   previous grounds.

12         THE COURT:  Very well.  Noted.  Overruled.  Admitted.

13   Q    (By Mr. Reilly) Is that the money clip?

14   A    That's it, yeah.

15   Q    I want to show you the -- you said there's an engraving.

16   Are those your initials at the top?

17   A    Yes, uh-huh.

18   Q    "TE, Happy Birthday 2006"?

19   A    Yeah, that's correct.

20   Q    Thank you.  And that was what she -- she gave you on

21   March 21st, during the evening hours?

22   A    That's correct, uh-huh.

23   Q    And during this time frame, did she call you

24   occasionally?

25   A    Yes, uh-huh.

1    Q    And just for the record, what -- what was the cell phone

2    number you were using at the time?

3    A    Mine?

4    Q    Yes, sir.

5    A    Same one I have now, which is 660-626-7210.

6    Q    660-626-7120?

7    A    7210.  I'm sorry.

8    Q    I'm sorry.  Thank you.  After -- did you eventually find

9    out that Ms. Young's husband was murdered?

10   A    Yeah.  It was in the media there in Kirksville, uh-huh.

11   Q    After the murder, did you have some contact with her or

12   did she have contact with you?

13   A    She called me several times, uh-huh.

14   Q    Thank you.  I'm going to direct your attention sometime

15   around Labor Day or September of 2007.  Did you have any

16   further contact with Ms. Young?

17   A    Not long before Labor Day, she had called me, and the

18   little town close to where we live has a Labor Day celebration

19   where they have a little parade, and she asked me if I would

20   come by and talk to her there -- she was going to be watching

21   the parade -- which I did.

22   Q    And just to step back for a minute, were you -- were you

23   in the process of -- while you were -- before the murder of

24   Mr. Griesbauer, were you in the process of building a new

25   house?

1    A    Yes, uh-huh.  I built a new house there on the farm, and

2    it was just right during that same time period.  We actually

3    started on it in the fall of '05, uh-huh.

4    Q    And on your farm, the 1,240-acre farm?

5    A    Uh-huh.

6    Q    And was Ms. Young ever present, to your knowledge, when

7    the house was being built?

8    A    At least one time, I remember her being out there,

9    uh-huh, when it was under construction, yes.

10   Q    Did she talk to you or discuss anything with you that you

11   recall when she was out there?

12   A    Well, I just -- I specifically remember because I was in

13   the process of setting a base cabinet and she had a suggestion

14   of where it should go, yes.

15   Q    Okay.  And -- thank you.

16   A    You know, nothing else substantial that I can think of,

17   but that kind of sticks in my mind.  It's been awhile now.

18   Q    All right.  And just moving back to this Labor Day event,

19   did you -- did you have occasion -- did you actually go meet

20   her at the Labor Day Parade?

21   A    Yes, uh-huh, I did, uh-huh.

22   Q    And did she bring up anything to ask your advice?

23   A    That -- as far as what -- the only thing I really

24   remember specifically about the conversation was it had been

25   an issue about a death certificate being issued, and she was

```
 1   feeling that one was going to be and that she would have some

 2   life insurance benefits, and my background is in finance.

 3   Asked me what I thought she should do with the money, how she

 4   should invest it, yeah.

 5   Q    And at some point prior to that, had she made you aware

 6   that there was life insurance on her husband?

 7   A    I don't remember exactly when, but there had been a

 8   mention of a couple of policies on him, yes.

 9              MR. REILLY:  Thank you.  I have no further questions

10   for this witness, Your Honor.

11              THE COURT:  Cross-examination, Mr. McGraugh.

12                          CROSS-EXAMINATION

13   BY MR. MCGRAUGH:

14   Q    Good afternoon, Mr. Eschmann.

15   A    Good afternoon.

16   Q    My name is Chris McGraugh.  I'm Kathy Mock's attorney.  I

17   just have one or two questions for you.

18   A    Okay.

19   Q    This travel to Springfield to the trade show --

20   A    Uh-huh.

21   Q    -- I want to ask you about that.  That was the first time

22   you met Kathy Mock?

23   A    Yes, uh-huh.

24   Q    And --

25   A    Only time as far as that goes, yeah.
```

1   Q    The only time you met Kathy Mock.  And Ms. Young talked

2   about -- talked to you about Mock; would that be fair to say?

3   A    A little bit, yeah, of course, you know.

4   Q    Did she tell you that -- that her impression of Kathy was

5   she was suicidal because her -- she had recently caught her

6   husband in a homosexual relationship?

7   A    Just before we left, she basically said, "I hope I see

8   her again because I'm concerned about her being suicidal."

9   Yes, just what you just said pretty much, yeah.

10        MR. MCGRAUGH:  Okay.  Thank you, sir.  That's all I

11   have.

12        THE COURT:  Ms. Herndon.

13        MS. HERNDON:  Thank you, Judge.

14                 CROSS-EXAMINATION

15   BY MS. HERNDON:

16   Q   Mr. Eschmann, I want to ask you a little bit about your

17   relationship with Ms. Young.  You said the first time that you

18   ever went anywhere with her was September 14th of 2005,

19   correct?

20   A    Correct, uh-huh.

21   Q    And you were aware from the outset that she was married,

22   correct?

23   A    Yes.  Well, as of that meeting, and this was also the

24   time that she informed me that her and her husband weren't

25   going to stay together; that's correct.

1    Q    Okay.  So it was the very initial time you guys --

2    A    It was pretty early on.  I believe it was the first --

3    the first meeting, yes, because I'm not in the habit of dating

4    married women, no.

5    Q    Okay.  So when you say you're not in the habit of dating

6    married women, she told you probably on the September 14th,

7    2005 meeting that she was married, correct?

8    A    I believe that's correct, uh-huh.

9    Q    But you continued to see her up until her -- well, and

10   even past when her husband died in March of 2006, correct?

11   A    After that, the only time that I saw her was at that

12   Labor Day celebration, yeah.

13   Q    Okay.  So between September 14th of 2005 and March of

14   2006, you saw her -- what -- approximately how many times?

15   A    I don't know exactly.  Not a lot.  Maybe eight or 10

16   times.

17   Q    Okay.  Eight or 10 times.  Now, you say you're not in the

18   habit of dating married women, so would you consider these

19   outings that you had with her more of like a casual

20   relationship?

21   A    It was very casual, yes, uh-huh.

22   Q    You never -- I'm sorry to ask you this, but you never had

23   a sexual relationship with her?

24   A    No, I did not, no.

25   Q    So you knew that Ms. Young and her husband were -- they

1    had agreed to separate, correct?

2    A     That was what she told me anyway, yes.

3    Q     Okay.  You knew that they had planned to divorce in

4    spring of 2006?

5    A     Well, again, did I know?  This is what she told me, yes.

6    Q     Okay.  Right.  I'm sorry.  Well, did she make you aware

7    that she had a back injury?

8    A     Yes, uh-huh.

9    Q     And I think what you've testified to is that she said

10   that she needed to stay on her husband's health insurance to

11   take care of a surgery for that back injury?

12   A     That was what I understood.  That's what she told me,

13   yes, uh-huh.

14   Q     Okay.  Thank you.  Now, you never hid your relationship

15   from Ms. Young's husband, correct?

16   A     No, and I did not ever meet him.  I never knew him at

17   all.

18   Q     Okay.

19   A     Yeah.

20   Q     You told us -- okay.  Well, let me ask you this.

21   Ms. Young never asked you anything about what your finances

22   were like, did she?

23   A     Umm, I don't remember her specifically asking me.  I'm

24   sure I probably discussed it some, but I don't -- you know,

25   this has been six years ago.  I don't remember exactly.

1   Q     You don't remember her ever asking you about your

2   finances, what your finances were like?

3   A     I don't remember her specifically asking me, no.

4   Q     You don't remember her ever asking you about any

5   insurance policies you might have had?

6   A     No, I don't remember.  I don't really remember on that

7   one way or the other to tell you the truth.  I mean that's

8   been six years ago, you know.

9   Q     Okay.  Well, let me ask you --

10  A     But I can't say, yes, I definitely remember her ever

11  asking me because I don't.

12  Q     Okay.  Let me ask you this.  You have been interviewed by

13  the Missouri State Highway Patrol and the FBI about this whole

14  thing, correct?

15  A     That's correct, uh-huh.

16  Q     Do you recall being interviewed by Corporal Wilhoit from

17  the Missouri State Highway Patrol on April 24th of 2008?

18  A     Yeah, that sounds right, uh-huh.

19  Q     Okay.  And if I told you that he represents that you said

20  she did not ask about your finances or insurance policies,

21  would you have any quarrel with that?

22  A     No, I don't.  Like I say, I don't specifically remember

23  her ever asking me about it, yeah.

24  Q     Okay.  Thank you.

25  A     Again, I'm sure I probably mentioned some details about

1  my finances, but I don't recall now what.

2  Q    Okay.  Thank you.  The evening of -- that the two of you

3  went out for dinner for your birthday, that was the evening of

4  March 21st, correct?

5  A    Yes, uh-huh.

6  Q    And would you describe Kay Young on that evening as being

7  her normal self?

8  A    Yeah.  Yeah.

9         MS. HERNDON:  I don't have any other questions for

10  you.  Thank you, sir.

11         THE WITNESS:  Okay.

12                  REDIRECT EXAMINATION

13  BY MR. REILLY:

14  Q    Did you tell Ms. Herndon -- I think you said you had

15  approximately eight or 10 dates, somewhere in that

16  neighborhood, with Ms. Young?

17  A    Yeah.  I don't know exactly.  We went out to dinner

18  several times and a couple of social functions, yeah.

19  Q    And did some of those -- and, of course, you took her

20  flying at least the three times that we talked about?

21  A    Right, right.

22  Q    And the airplane fuel, that's not dirt cheap necessarily,

23  is it?

24  A    Unlike all other fuel.  No, that's true.

25  Q    And a little more expensive even than gas these days,

1    right?

2    A    Definitely.

3    Q    Now, one of those dates was a wedding reception at the

4    Comfort Inn in Macon, correct?

5    A    That's correct, uh-huh.

6    Q    And then there was an occasion when you went horseback

7    riding at a friend of Ms. Young's in a town called Green --

8    A    Well, it was a church function.  I think she went a

9    little bit.  She'd had this back injury and hadn't been able

10   to be on a horse, and I want to say these friends maybe had

11   one of her horses there or something, but yeah.

12   Q    And then there were some other activities, and you went

13   to dinner with her, you said, on several occasions?

14   A    A handful of times, yeah.  That would be mainly the other

15   times that we went out, uh-huh.

16   Q    And, now, in terms of that -- during that time, she also

17   had occasion to -- you said she didn't -- Ms. Herndon asked

18   you if she hid the relationship or if you hid your

19   relationship from Melvin Griesbauer -- your relationship with

20   Ms. Young, correct?  She asked you that question, right?

21   A    Yeah, yeah.  I mean there was no hiding on my part;

22   however, I never did ever meet the man or ever talk to him, so

23   you know.

24   Q    So over that five- or six-month period, you never met

25   him?

1    A    That's correct.  That's correct.

2    Q    And whenever you were at the farm, he was not there,

3    correct?

4    A    That's correct, uh-huh.

5    Q    And you would eat dinner at nighttime with Ms. Young?

6    A    Right, right.

7    Q    Now, she also asked if you ever discussed finances.

8    She'd been on your airplane three times, correct?

9    A    Uh-huh.

10   Q    And your 1,240-acre farm, is that an attractive property,

11   a nice property physically?

12   A    Oh, yeah, yeah.

13   Q    And you were building a new house on that property?

14   A    That's correct, uh-huh.

15   Q    And she had been to the area where you were building a

16   new house?

17   A    Uh-huh.

18   Q    Thank you.  I have no further questions.

19   A    I might also have just sold my business right then, too,

20   yeah.

21   Q    And what was the business that you had sold?

22   A    I had a fairly large retail flooring store there in

23   Kirksville, uh-huh.

24        MR. REILLY:  Thank you.  I have no further questions.

25        THE COURT:  Anything else?

1         MR. MCGRAUGH:  Nothing, Your Honor.

2                    RECROSS-EXAMINATION

3  BY MS. HERNDON:

4  Q    Mr. Eschmann, I know it's been a long time, but I just

5  want to briefly take you back again and ask you about your

6  April 24th, 2008 interview with Corporal Wilhoit.  Do you

7  recall telling him, when he was interviewing you about your

8  relationship with Kay Young, that you all did not try to hide

9  your relationship from Mr. Griesbauer?

10 A    I don't recall that, but I did not try to.  Yeah, I

11 don't -- you know, he very well may have asked me that and I

12 may have said that, but I don't recall it specifically.

13         MS. HERNDON:  Okay.  Thank you, sir.

14         THE COURT:  All right.  You may step down.

15         Call your next witness.

16         Step right over here, sir, right here, and be sworn

17 in by the clerk.

18     (Witness sworn.)

19         MS. HERNDON:  Can we come up before we start?

20         THE COURT:  Sure.

21     (A bench conference was held on the record and outside of

22 the hearing of the Jury as follows:)

23         THE COURT:  Yes, ma'am.

24         MS. HERNDON:  Again, I just want to renew our

25 objection under whatever theory the Government is offering

1    this evidence, 404(b) or as extrinsic evidence of the crime,

2    because it's not either one.  This is someone that she met and

3    had a relationship with after Mr. Griesbauer died, and there's

4    no insinuation or suggestion that she ever tried to kill him.

5    Well, I guess there could be, but there's certainly no

6    evidence that she ever tried to kill him.  It's completely

7    irrelevant to the charges.  It's definitely more prejudicial

8    than probative.  Again, it just goes to show her bad

9    character.  Yeah, I guess that's it.

10           MR. REILLY:  It's intrinsic to the crime, Your Honor.

11   It shows she developed a close relationship with him within

12   five weeks of the homicide, and over the course of their

13   relationship, she requested money, borrowed money from

14   Mr. Goodwin here to get the life insurance or the death

15   certificate, so she could collect on the life insurance.  In

16   that respect, it's very intrinsic to the crime.  Aside from

17   that, it's also relevant because Mr. Goodwin discovered the

18   chat, Government's Exhibit #12, when Ms. Young was having the

19   relationship with Mr. Robins, and he's the one who would

20   forward the chat on to the police, and then he had a falling

21   out with Ms. Young after discovering the chat.  It all goes to

22   show the circumstances under which Robins was made a part of

23   the case as well, and that, of course, is incriminating in and

24   of itself because --

25           THE COURT:  This is the Yahoo! chat?

1    MR. REILLY:  No.  This is the chat where he says,

2  "I've kept quiet."

3    THE COURT:  Yeah.

4    MR. REILLY:  It's the chat that was seized on or at

5  least created -- it appears to have been created on May 3rd of

6  2007, and that's relevant because it goes to show that Mr. --

7  Mr. Robins certainly has knowledge of the case, and it tends

8  to corroborate him when he says that there was -- there was

9  statements by Ms. Young, "I'd like to kill the son of a bitch.

10  I wish the son of a bitch was dead," and it relates the whole

11  circumstances, (a) that it occurred and then (b) how it

12  came -- how Robins came to the attention of the authorities,

13  and that all relates to Robins' credibility as well.

14    MR. DITTMEIER:  Yeah, and she also specifically

15  asked -- can you hear me?  She also specifically asked this

16  gentleman if he would put her on his life insurance, which

17  shows her fixation on life insurance, her knowledge of life

18  insurance, and he in fact put her on as beneficiary with his

19  life insurance and listed her as a friend.  Melvin

20  Griesbauer's initial life insurance before he was ever married

21  to her -- and she was on there as a friend.  Both of them to

22  the exclusion of family members.

23    MS. HERNDON:  Well, he also had his daughter on his

24  life insurance policy, so it's not correct to say it was

25  exclusion of family members, but it still is the -- it

1    still -- this happened after the fact.  There is nothing,

2    nothing that makes having life insurance on your spouse

3    something illegal or suspicious.  I mean all of this goes --

4    this is -- this is not going to show anything other than her

5    propensity to do something that's wrong and that she's a bad

6    character.

7           MR. REILLY:  And, Judge, that's simply not the case.

8    The life insurance is also relevant to show the close

9    association.  It shows that she asked him to be the -- be a

10   beneficiary on -- she asked to be a beneficiary on his life

11   insurance, and it shows that it's more likely than not that

12   she -- she was close enough to him to ask for the money to pay

13   for the attorney so she could collect on her life insurance.

14   Also, it's intrinsic to the case as well, so it's relevant to

15   show association.

16          MS. HERNDON:  Well, there's nothing illegal about

17   collecting on life insurance that you have on your spouse.  I

18   mean that's just not inappropriate.  So borrowing money from

19   him to collect on life insurance that was rightfully hers is

20   not -- there's nothing wrong with that.

21          MR. REILLY:  And, Judge, that would seem to be an

22   argument -- I'm sorry.

23          THE COURT:  In light of our earlier discussions on

24   this issue and inclusive of our discussions here at sidebar,

25   the objection is overruled, and I would just caution you that

1  with respect to the examination of this witness, Mr. -- what's

2  his name -- Goodwin?

3          MS. HERNDON:  Goodwin, yeah.

4          THE COURT:  Let's just keep it narrowed to those

5  things that we discussed.

6          MS. HERNDON:  Can I, while we're up here, object to

7  Government's Exhibit 38A, which I guess is a -- well, are you

8  going to play it?

9          MR. REILLY:  Yes.  We intend to play two phone calls,

10 Judge.  After Mr. Goodwin found the chat between Mr. Robins

11 and Ms. Young, their relationship had a falling out

12 sometime --

13         THE COURT:  Goodwin and Young?

14         MR. REILLY:  Goodwin and Young.  Once Goodwin found

15 out that Young was apparently still continuing to have a

16 relationship with Robins, there was a falling out between

17 Goodwin and Young because Goodwin wanted to -- wanted to

18 separate himself from Young, and she continued to pursue him,

19 and these -- these two voicemails -- there were many

20 voicemails, but we've narrowed it down to two voicemails that

21 just reflect the tenor of their relationship that she was --

22 she was pursuing him, and it's relevant because it

23 corroborates his -- it shows -- (a) it shows the course of

24 their relationship; it corroborates that he did get the chat,

25 and then it shows that she was close to him, pursuing him.  It

1    corroborates his testimony related to the other things we've

2    discussed.

3           MS. HERNDON:  Well, no, it doesn't.  I mean this is

4    not *One Life to Live*.  I mean, seriously, that was canceled.

5    The fact that they had a falling out over some third guy has

6    nothing to do with anything.  I mean, so what?

7           MR. REILLY:  Well, the third guy just happened to be

8    the guy who was telling her he kept quiet because she was

9    threatening to kill the -- kill the -- or she wanted the --

10   the, as she referred to it, son of a bitch dead, and so,

11   again, if this was a fraud case or something not related to

12   Melvin Griesbauer, then Ms. Herndon would be right.

13          MS. HERNDON:  Well, it doesn't matter who the --

14   sorry.

15          THE COURT:  Do we really need to get into this,

16   Michael?

17          MR. REILLY:  Okay, Judge, we'll withdraw it.

18          THE COURT:  All right.  Oh, I said, do we really need

19   to get into this, Michael?

20          MR. REILLY:  We think so, but I understand your

21   ruling.  We'll withdraw it.  We may hold him back.

22          THE COURT:  All right.

23          MR. REILLY:  Thank you.

24       (The following proceedings were held within the hearing

25   of the Jury.)

1          THE COURT:  Proceed.

2          MR. DITTMEIER:  Thank you.

3                    **JAMES R. GOODWIN,**

4    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5    FOLLOWS:

6                      DIRECT EXAMINATION

7    BY MR. DITTMEIER:

8    Q    Would you state your name for the Jury, please?

9    A    James R. Goodwin.

10   Q    And where do you live at, Mr. Goodwin?

11   A    Denmark, Iowa.

12   Q    And are you presently retired?

13   A    Yes, I am.

14   Q    And what was your occupation?

15   A    Welding instructor, Southeastern Community College, West

16   Burlington, Iowa.

17   Q    And how long were you a welding instructor?

18   A    Twenty-eight years.

19   Q    And how far is Denmark, Iowa, from Kirksville

20   approximately?

21   A    Approximately 120 miles.

22   Q    Now, do you know the Defendant in this case, Kay Young?

23   A    Yes, I do.

24   Q    And do you recall when you first met her?

25   A    April of 2006.

1    Q     And did you purchase a pony from her?

2    A     Yes.  The reason that I met her was I was looking for a

3    pony for my grandson and she had one for sale.  I bought the

4    pony.

5    Q     And were you going to give that pony to your grandson

6    back in Iowa?

7    A     Yes, I was.

8    Q     Did Ms. Young have any conversation as to when you were

9    going to give the pony to your grandson?

10   A     Yes.  She mentioned that she'd like to see his reaction

11   to the pony, and I said it would probably be the middle of the

12   week, the following week.

13   Q     And this was like early May?

14   A     Yes, it would have been.

15   Q     Okay.  And did she come up to Iowa to see you give the

16   pony to your grandson?

17   A     Yes, she did.

18   Q     And after traveling up there and seeing you give the pony

19   to your grandson, did Mrs. Young stay up there at all?

20   A     Yes, she did.

21   Q     And how long did she stay there?

22   A     She stayed from Wednesday evening through Saturday

23   morning.

24   Q     And where did she stay at?

25   A     At my residence.

1   Q     And while she was up there and as you got to know each

2   other, did you -- were you aware that -- what her occupation

3   was?

4   A     She had mentioned that she was working for a doctor as a

5   nurse and she also had a teaching certificate.

6   Q     Do you have any health problems?

7   A     Yes, I do.

8   Q     Did you ever discuss those health problems with

9   Ms. Young?

10  A     Yes, I did.

11  Q     Okay.  And what are your health problems?

12  A     Brittle diabetic.  I've had some heart attacks, mild

13  strokes.  I have five stents.

14  Q     Did she suggest anything or anybody you might see with

15  your condition?

16  A     She said that the doctor she worked for was really in

17  good on knowledge on diabetes.

18  Q     And what was that doctor's name?

19  A     Dr. Alt.

20  Q     And where was she located at?

21  A     Kirksville, Missouri.

22  Q     And did you eventually go see Dr. Alt?

23  A     Yes, I did.

24  Q     Now, did you and Ms. Young keep continuing to see each

25  other?

1   A    Yes, we did.

2   Q    And did you have any common interests?

3   A    Yes.  We had horses and the education.

4   Q    Did the two of you ride horses occasionally?

5   A    Yes, we did.

6   Q    At some point, would you stay weekends together?

7   A    Yes, we would.

8   Q    And was there any sexual contact at all?

9   A    Yes.

10  Q    Now let me direct your attention to, perhaps, early June.

11  I believe you said you met her at the end of April?

12  A    Yes, I did.

13  Q    Okay.  In early June, did she ever have occasion to

14  borrow any money from you?

15  A    Yes, she did.  In June, she borrowed $1,000 from me.

16  Q    Did you ever have occasion, after she borrowed the money,

17  to discuss with her any financial difficulties she was having?

18  A    We didn't go into great depths, but money was hard to

19  come by.

20  Q    Did she ever discuss the mortgage on her farm?

21  A    Yes, she did.

22  Q    And what did she tell you about that?

23  A    That just a short time before her husband was deceased

24  that they had taken a loan out on the farm.

25  Q    Now, did you continue seeing each other through the

1    summer through 2006?

2    A    Yes, we did.

3    Q    And towards the end of the summer, perhaps, September of

4    '06, did she ever have occasion to borrow any more money from

5    you?

6    A    Yes, she did.  She borrowed $1,500 in September.

7    Q    Okay.  And did she tell you what she needed that money

8    for?

9    A    She needed to pay lawyer fees for a death certificate, I

10   believe, was what -- for her husband.

11   Q    She was trying to get a death certificate on her husband?

12   A    Yes.

13   Q    Okay.  Do you know whether she went and saw the lawyer?

14   A    Yes, she did.  I drove her down to Columbia, Missouri, to

15   see the attorney.

16   Q    Did you go in with her?

17   A    No, I did not.

18   Q    But she borrowed that money, trying to get the death

19   certificate to get her insurance?

20   A    That's what I understood.

21   Q    Now, did Ms. Young ever discuss whether or not you had

22   any life insurance on you?

23   A    Yes.

24   Q    Did she ever make any request of you concerning your life

25   insurance?

1   A    Yes, I would say there was a request.

2   Q    And what did she ask you?

3   A    That we were getting to be good friends and if she could

4   be put on as beneficiary.

5   Q    Of your life insurance?

6   A    Of my life insurance.

7   Q    And did you in fact put her on?

8   A    Yes, I did.

9   Q    Okay.  And would you recognize the beneficiary

10  designation on your group insurance if you were to see it

11  again?

12  A    Yes, I would.

13  Q    Let me show you what's been marked as Government's

14  Exhibit 38B1.  Do you recognize that?

15  A    Yes, yes, I do.

16  Q    And does your signature appear on it?

17  A    Yes, it does.

18       MR. DITTMEIER:  At this time, Your Honor, I would

19  offer Exhibit 38B1 into evidence.

20       MR. MCGRAUGH:  No objection.

21       MS. HERNDON:  Just object based on our previous

22  grounds, Judge.

23       THE COURT:  The objection is noted, overruled.  The

24  exhibit is admitted.

25  Q    (By Mr. Dittmeier) Mr. Goodwin, I'm showing the

1    beneficiary designation on this group insurance plan of yours.

2    Do you see your signature as the owner on there?

3    A    Yes, I do.

4    Q    And did you sign that?

5    A    Yes, I did.

6    Q    Okay.  And does it show the date you signed it?

7    A    Yes.  October 23rd, '06.

8    Q    Okay.  And was Elain Kay Young put on this insurance

9    policy by you?

10   A    Yes.

11   Q    Had somebody else been on the insurance policy before?

12   A    Yes.  My daughter Tammy Lynn Dingman.

13   Q    Okay.  And when Ms. Young was put on, was she put on as

14   the sole beneficiary or a joint beneficiary?

15   A    Joint.

16   Q    So they would split the money if something happened to

17   you?

18   A    Split the money.

19   Q    Do you know approximately how much this insurance policy

20   was for?

21   A    60,000.

22   Q    60,000.  Okay.  Now, that was October 23rd, '06.  In the

23   month of October of that year, did Ms. Young have occasion to

24   give you any pills?

25   A    Yes.

1    Q    And what did she give you the pills for?

2    A    So I could get an erection.

3    Q    But she gave you the pills?

4    A    Yes.

5    Q    Now, moving on into December of 2006, did you -- did you

6    quit teaching at that point?

7    A    Yes.  I went on medical leave.

8    Q    And after that, in January of '07 and after that, did you

9    see -- have occasion to see Ms. Young anymore?

10   A    Yes.

11   Q    Were you staying more frequently at her place?

12   A    Yes.

13   Q    And that was where -- in Novinger?

14   A    In Novinger, Missouri.

15   Q    And did you bring any of your property down to her house?

16   A    Yes, I did.  I brought a couple of horses.

17   Q    And they grazed down there?

18   A    Yes.

19   Q    And the two of you would occasionally ride?

20   A    Yes.

21   Q    Did Ms. Young ever indicate to you that she was seeing

22   anybody else while her deceased husband was in Iraq?

23   A    I don't know how the conversation got brought up, but,

24   yes, she did mention a name.

25   Q    And what name did she tell you?

1  A    Kris Roberts, I believe, was his name.

2  Q    And did she tell you why she was seeing him, anything

3  about his wife?

4  A    She evidently was in the penitentiary.

5  Q    Ms. Young told you that about this Kris Roberts?

6  A    Yes, yes.

7  Q    Okay.  Now I want to direct your attention more into the

8  spring of 2007.  Was there ever a time that you were at

9  Ms. Young's house in Kirksville and asked her if she could

10 give you some directions as to the best route to take to a

11 place in Kentucky?

12 A    Yes, there was.

13 Q    And what were you going down to Kentucky for?

14 A    I had an old van that I drive the Amish with that broke

15 down in Kentucky.  I had rented a van and had brought it back

16 and was going back to return the rented van and pick up my

17 broke-down van.

18 Q    Okay.  And you stopped in Kirksville?

19 A    Yes, I did.

20 Q    Did you have anybody with you?

21 A    Yes, I did.  I had a former student with me.

22 Q    Okay.  And what did you ask Ms. Young?

23 A    For the quickest route to get down to where the van was

24 located.

25 Q    And what did you receive?

1    A    I received a MapQuest or whatever came off the computer,

2    directions to get there, and a couple of other papers with

3    that.

4    Q    But the map was to show you the fastest route down there?

5    A    Yes.

6    Q    Okay.  And after you left and started down the road, at

7    some point, you said you discovered there were other papers?

8    A    I handed the map and the papers to my friend, the

9    student.

10   Q    Yeah.

11   A    And, all of a sudden, he said, "Oh, wow, what is this?"

12   Q    Let me show you what's previously been marked as

13   Government's Exhibit 12.  I'm going to show you Government's

14   Exhibit 12A and see if you recognize these.

15   A    Yes.  This was what was along with the map.

16   Q    Okay.  And I'll just show you this envelope and ask if

17   you recognize it -- Exhibit 12A.

18   A    Yes.  This is where I mailed a copy of that to the

19   attorney.

20   Q    Okay.  Now, Mr. Goodwin, when you discovered that this

21   had been turned over with the MapQuest, when you looked at it,

22   was there anything there that came to your attention?

23   A    Several of the actions that they were taking and the name

24   of Kris at the farm store.

25   Q    Kris, farm store?

```
 1   A     Yes.

 2   Q     And who did you associate that with?

 3   A     With Mr. Roberts.

 4   Q     Okay.  And this was while you were still seeing Elain

 5   Young?

 6   A     Yes.

 7   Q     Okay.  Was there any phrase that gave you some concern in

 8   there?

 9   A     What they were wanting to do and that he would keep his

10   mouth shut.

11   Q     Okay.  That he'd kept quiet?

12   A     He'd keep quiet, yes.

13   Q     Did you feel that might be significant?

14   A     Yes, I did.

15   Q     And you said with what they were going to do or what they

16   were talking about doing --

17   A     Uh-huh.

18   Q     -- that gave you some concern?

19   A     Yes.

20   Q     And at that time, you were fond of Ms. Young?

21   A     Yes.

22   Q     Now, you identified Government's Exhibit 12A.  Did you

23   mail that somewhere?

24   A     Yes.  I dropped it in a Kirksville post office.

25   Q     And you mailed it to who?
```

1   A    To the district attorney.

2            MR. DITTMEIER:  Okay.  Judge, I'd offer Government's

3   Exhibit 12A into evidence.

4            THE COURT:  All right.

5            MR. MCGRAUGH:  No objection, Your Honor.

6            MS. HERNDON:  Well, I would object based on my

7   previous objections related to Mr. Robins.

8            THE COURT:  All right.  The objection is noted,

9   overruled.  12A will be admitted.

10  Q    (By Mr. Dittmeier) And is that your handwriting on 12A?

11  A    Yes, it is.

12  Q    And that exhibit is sent to the Adair County Prosecuting

13  Attorney?

14  A    Yes.

15  Q    And you mailed that because you thought that chat had

16  something to do with --

17  A    This.

18  Q    This case?

19  A    With her husband's death.

20           MS. HERNDON:  Judge, I would object to him

21  speculating about anything that that chat had to do with.  He

22  wasn't a party to it.

23           THE COURT:  Sustained as to form.

24  Q    (By Mr. Dittmeier) Okay.  Now, after you found this chat,

25  did you begin putting some distance between yourself and

1    Mrs. Young?

2    A    Yes, I did.

3    Q    Did you quit seeing her?

4    A    Yes.

5    Q    After you quit seeing her, did she try and make contact

6    with you?

7    A    Yes, she did.

8    Q    And how was she trying to do that?

9    A    Numerous calls on my answering machine.

10   Q    Were you --

11   A    Several.

12   Q    Were you picking up on those calls?

13   A    I did not pick them up.  They were recorded, though, on

14   my answering machine.

15   Q    Was there ever a time when she indicated she was out in

16   your driveway calling you?

17   A    Yes, I believe there was.

18   Q    Okay.  And that was recorded on your answering machine?

19   A    Yes, it was.

20   Q    And you've heard those recordings?

21   A    Yes, I have.

22   Q    And you've turned them over to the Government?

23   A    Yes, I did.

24   Q    And in those recordings, was she talking about needing

25   you?

1          MS. HERNDON:  Judge, I would object to him -- based

2     on our previous conversation, I don't think he can sit here

3     and say what the content of the recordings were.

4          THE COURT:  Yeah, let's stay away from that,

5     Mr. Dittmeier.

6          MR. DITTMEIER:  Okay.  Judge, I'd like to ask leave,

7     though, to perhaps qualify those later.

8          THE COURT:  All right.

9          MR. DITTMEIER:  I have no further questions of this

10    witness.

11         THE COURT:  Very well.

12         MR. MCGRAUGH:  I have no questions, Your Honor.

13         THE COURT:  Ms. Herndon.

14         MS. HERNDON:  Thanks, Judge.

15                    CROSS-EXAMINATION

16    BY MS. HERNDON:

17    Q    Mr. Goodwin, you've told us already that you have several

18    health issues, is that correct?

19    A    Yes.

20    Q    One of those issues is that you are a brittle diabetic?

21    A    Yes.

22    Q    And you've been taking insulin for, oh, at least 20 years

23    for that?

24    A    Approximately 20 years, yes.

25    Q    And you've also had heart attacks and strokes, is that

1   correct?

2   A     Yes.

3   Q     Do you take heart-related medication?

4   A     Yes, I do.

5   Q     You also have bipolar disorder, is that correct?

6   A     Been diagnosed it, yes.

7   Q     You take lithium to control that disorder?

8   A     Yes.

9   Q     Now, you told Mr. Dittmeier that at some point in October

10  Ms. Young gave you two blue pills, is that correct?

11  A     Yes.

12  Q     And that happened on two separate occasions, correct?

13  A     Yes.

14  Q     And the two occasions that she gave you those pills were

15  October 17th and October 18th, according to your testimony,

16  correct?

17  A     Yes.

18  Q     But she never told you what those were?

19  A     No.

20  Q     And right around this time, October 17th, October 18th,

21  you ended up in the emergency room, correct?

22  A     Yes, I did.

23  Q     And you were diagnosed as having dizziness, heart

24  problems, and hyperglycemia, correct?

25  A     Yes.

1  Q    You also told us about going to see Dr. Alt.  Dr. Alt --

2  in fact, you're constantly seeking someone who can help you

3  with your diabetes, correct?

4  A    Yes, I am.

5  Q    And Dr. Alt knew about a specialist in Columbia, a

6  diabetes specialist in Columbia, correct?

7  A    Yes.

8  Q    And that was a doctor that you were interested in seeing,

9  right?

10 A    Yes.

11 Q    And so Ms. Young hooking you up with Dr. Alt who could

12 then hook you up with the specialist in Columbia was to your

13 advantage, correct?

14 A    Yes.

15 Q    Now let's talk about this chat conversation that you just

16 finished discussing with the prosecutor.  You inadvertently

17 ended up with that in with the MapQuest papers, correct?

18 A    I ended up with the -- yes, the chat on the computer,

19 yes.

20 Q    I mean, it wasn't intended for you?

21 A    I'm sure it was not.

22 Q    Okay.  And at the time, you were under the understanding

23 that you and Ms. Young were having an exclusive relationship?

24 A    Yes.

25 Q    And so you were hurt by what you saw there?

1    A    Yes.

2    Q    And you were in fact so hurt by it that you broke off the

3    relationship?

4    A    Pretty much so, yes.

5         MS. HERNDON:  Do you have, Tom, the life insurance?

6    Do you have the life insurance?

7         MR. DITTMEIER:  Pardon?

8         MS. HERNDON:  Do you have the life insurance exhibit

9    that you used?

10        MR. DITTMEIER:  Yes.

11        MS. HERNDON:  Excuse me just a minute, Mr. Goodwin.

12   Q    (By Ms. Herndon) I want to ask you for just a minute

13   about Government's Exhibit 38B1, and this is the same document

14   that Mr. Dittmeier showed you a few minutes ago, correct?

15   A    Yes, it is.

16   Q    Was this document filled out by you?

17   A    Yes.

18   Q    And you're the one that wrote in your name and the name

19   of the beneficiaries on the policy?

20   A    Yes.

21   Q    And then you signed it?

22   A    Yes.

23   Q    And that happened -- you added Ms. Young to your life

24   insurance policy on October 23rd of 2006, correct?

25   A    Yes.

1  Q    And then after your relationship ended, at some point,

2  you removed her from your policy, correct?

3  A    Yes.

4         MS. HERNDON:  I don't have any other questions.

5  Thank you, sir.

6         THE COURT:  Redirect?

7         MR. DITTMEIER:  I just have one question, Judge.

8                   REDIRECT EXAMINATION

9  BY MR. DITTMEIER:

10  Q    Ms. Herndon asked you about when you took those little

11  blue pills --

12  A    Yes.

13  Q    -- that she gave you?  And then she asked you about

14  having a reaction and going into the hospital?

15  A    Yes.

16  Q    Did you have the reaction after you took the pills?

17  A    Yes.

18  Q    And you took them twice?

19  A    Yes.

20  Q    And both times, there was a reaction?

21  A    Yes.

22  Q    Okay.  But that's -- that's all; you just had a reaction

23  and went to the hospital and you were okay?

24  A    I don't recall anything that happened during that time,

25  but, yes.

1          MR. DITTMEIER:  Okay.  All right.

2          THE COURT:  Mr. McGraugh.

3          MR. MCGRAUGH:  I just thought of a question.

4                    RECROSS-EXAMINATION

5   BY MR. MCGRAUGH:

6   Q    Mr. Goodwin, I'm Chris McGraugh.  I represent Kathy Mock.

7   You didn't have a prescription for these pills, did you?

8   A    No.

9   Q    Ms. Young just gave them to you?

10  A    Yes.

11  Q    Do you know where she got them from?

12  A    No idea.

13         MR. MCGRAUGH:  Okay.  That's all I have.  Thank you,

14  sir.

15         MS. HERNDON:  No other questions.  Thank you, Judge.

16         THE COURT:  All right.  Thank you, sir.  You're free

17  to go.

18         THE WITNESS:  Thank you, Judge.

19         THE COURT:  Call your next witness.

20         MR. CURRAN:  Judge, may we approach for a second?

21         THE COURT:  Uh-huh.

22     (A bench conference was held on the record and outside of

23  the hearing of the Jury as follows:)

24         MR. CURRAN:  This relates to the next witness.  I

25  have some materials I may need to -- may use on cross.  I

1    assume the Government has it, but just in case.

2         THE COURT:  All right.  What is that?

3         MR. CURRAN:  Kirksville has -- I think it's a

4    newspaper -- their home page where they have comments on --

5    where they have comments on issues of the day.  Okay.  With

6    relation -- with relation to this charge, there's an Internet

7    chat that goes on for -- actually, it goes on for 800

8    comments, but one of the people involved in the chat is

9    someone named Jean Ballard, and it's either under "Jean" or

10   under "Jean Ballard."  Based on the contents, I'm sure it's

11   her.  I may want to use some of this as fuel for cross, not a

12   lot of it, but what I did is I prepared copies of the chat

13   that I'll give to the Government, and then I also did a page.

14   These -- the comments are numbered.  Okay.  You'll see there's

15   a number there, and it says one, and these are the comments on

16   this murder that was reported.  Okay.  I've listed the numbers

17   of the ones that I believe are attributable to Jean Ballard.

18   I'll give you an example.  Number 14.  I'm sorry, Judge.  I've

19   also circled.  Here's one that says, "Jean Ballard:  I was

20   Kathy's so-called best friend at the time.  She came to my

21   house after.  Jean Ballard."  All right.  I counted a total of

22   about 17 comments.  I don't plan on getting into all of them.

23   What I did was I'll give you a copy, and then I highlighted --

24   these are the numbers of the comments I believe that are

25   attributable to her, and then I have highlighted in yellow the

```
 1    ones I want to refer to, okay, and I can give you the general
 2    areas.  One of the general areas is there's another guy in
 3    here, BJS, that says he's writing a book, and she agrees to
 4    cooperate with him and give him information regarding the
 5    book, and then there's a comment that she could also provide
 6    information about Kay Young's -- not Kay Young -- Kathy Mock's
 7    family for the book, and then there's also -- I think we
 8    already have this in other discovery.  She relates in the chat
 9    when she first meets Kay Young, and there's a conversation at
10    Golden Corral where she claims Kay tells her that her husband
11    is trying to kill her.  That may already be in evidence.  So
12    I'm trying to make it easy.  Okay.  And I've got copies for
13    everyone.  Those are the areas I'm thinking about.  I know it
14    seems like a lot, but I'm not going to hit on all of them.
15              THE COURT:  Okay.  Are you guys good?
16              MR. DITTMEIER:  Judge, I don't believe we are going
17    to have -- I don't believe we're going to have any objection
18    to this because I feel pretty certain she was on Topix.  I
19    wouldn't want to waive any relevancy objection or -- and I
20    think if there's one that's questionable, whether it's her or
21    not, Kevin would bring it to our attention, but she was on
22    there.  I don't know how often, but I don't -- we concede she
23    was on Topix, so if he's identified her --
24              THE COURT:  Okay.
25              MR. CURRAN:  I only have about three or four points I
```

1   want to make on it, so I'm not going to take her through all

2   the chat which --

3           THE COURT:  All right.

4           MR. CURRAN:  Okay.

5           THE COURT:  Good.

6       (The following proceedings were held within the hearing

7   of the Jury.)

8           THE COURT:  Call your next witness.

9           Proceed.

10                          **JEAN BALLARD,**

11  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

12  FOLLOWS:

13                       DIRECT EXAMINATION

14  BY MR. DITTMEIER:

15  Q    Would you state your name for the Jury, please?

16  A    Jean Ballard.

17  Q    And where do you live at, Ms. Ballard?

18  A    Clinton, Missouri.

19  Q    And do you know the Defendant Kathy Mock?

20  A    Yes.

21  Q    And were you friends with her?

22  A    Yes.

23  Q    And would you describe yourself as close friends?

24  A    Very.

25  Q    Let me direct your attention back to March of 2006.  Do

1    you know where Kathy Mock was living at that time?

2    A    In Cassville, Missouri.

3    Q    And where were you living at?

4    A    In Exeter, Missouri.

5    Q    How far away from Cassville is Exeter?

6    A    It was the next town over.

7    Q    Okay.  Are you talking about -- how many miles?

8    A    Two or three.

9    Q    A few miles?

10   A    Yes.

11   Q    Now, have you ever had occasion to meet Kay Young?

12   A    Yes.

13   Q    And how often did you meet Ms. Young?

14   A    Two times.

15   Q    And do you recall where you met her at?

16   A    Once at a dog show and once at Golden Corral in Clinton,

17   Missouri.

18   Q    Golden Corral is like an eating place?

19   A    Yes.

20   Q    Now, you said you were close friends with Kathy Mock.

21   Back in March of 2006, do you know what her financial

22   situation was?

23   A    Very poor.

24   Q    Okay.  Did she owe you any money at that time?

25   A    Yes.

1    Q    And what did she owe you?

2    A    Approximately $2,800.

3    Q    Now, do you recall hearing when Melvin Griesbauer was

4    killed?

5    A    Yes.

6    Q    At some time shortly before that, did Kathy Mock discuss

7    with you or bring up the money she owed you?

8    A    Yes.

9    Q    And what did she tell you?

10   A    She told me she was going to pay me back everything she

11   owed me plus give me extra.

12   Q    Did she indicate she was coming into some money?

13   A    Yes.

14   Q    Did you know a lady by the name of Keri Ponder?

15   A    Yes.

16   Q    And how did you know Keri Ponder?

17   A    She was Kathy's ex-daughter-in-law.

18   Q    Do you recall whether or not in March of 2006 she was

19   visiting Kathy in Cassville?

20   A    Yes.

21   Q    She was?

22   A    Yes.

23   Q    Did she ever have occasion to stay overnight at your

24   house during that period?

25   A    Yes.

1    Q    And do you recall, would that have been March 16th?

2    A    Yes.

3    Q    And what did she stay there March 16th for?

4    A    I was taking her to the bus station the next day so she

5    could go home.

6    Q    And where'd she live?

7    A    In Boston.

8    Q    So the evening of March 16th, she stayed at your house?

9    A    Yes.

10   Q    And that night she stayed at your house, did she relate a

11   conversation or anything that Kathy Mock had asked her to do?

12   A    Yes.

13        MR. CURRAN:  Judge, I'm going to object.  It's

14   hearsay.

15        MS. HERNDON:  Same objection, Judge.

16        THE COURT:  Mr. Dittmeier.

17        MR. DITTMEIER:  Judge, I -- I don't have to get into

18   the details of it.

19        THE COURT:  All right.

20   Q    (By Mr. Dittmeier) Okay.  I believe you already answered

21   that she had a conversation with you about something Kathy

22   Mock had asked her to do?

23   A    Yes.

24   Q    And then the following day, did you in fact take Keri

25   Ponder to the bus stop?

Volume 4

182

1   A    Yes.

2   Q    Now let me direct your attention into the next week,

3   which would be March the 22nd of 2006.  Do you recall when

4   Kathy Mock -- did you know her son Jason?

5   A    Yes.

6   Q    Okay.  And do you recall what was happening to him that

7   week?

8   A    Yes.

9   Q    And what was that?

10  A    He was going to court.

11  Q    Okay.  And that was on March the 22nd?

12  A    Yes.

13  Q    Did you, at any point that day, happen to get a call or

14  have a conversation with Kathy Mock?

15  A    Yes.

16  Q    And what did she tell you, or where'd she tell you she

17  was going?

18  A    She told me she was headed to Joplin to the stress unit

19  at the hospital.

20  Q    And that was on March 22nd she called you?

21  A    Yes.

22  Q    Did she tell you how long she'd be there?

23  A    She told me she wouldn't be able to talk to me for two or

24  three days unless she needed me.

25  Q    Now I want to direct your attention to the next day,

183

1    March the 23rd.  Did you have occasion to be up in Clinton,

2    Missouri?

3    A    Yes.

4    Q    And tell the Jury, what were you up there for?

5    A    To pay my taxes.

6    Q    And did you come home that evening, or did you stay?

7    A    I stayed the night at a hotel.

8    Q    And at some point in the early morning hours, did you

9    receive a call from Kathy Mock?

10   A    Yes.

11   Q    Do you know about what time that was?

12   A    Approximately 2:30 in the morning.

13   Q    And when she called you, what was her condition?

14   A    She was upset, very upset.

15   Q    Did she tell you where she was at?

16   A    She was in my driveway.

17   Q    Back in Exeter, Missouri?

18   A    Back in Exeter, yes.

19   Q    Okay.  And you said she was upset.  Did you tell her to

20   do anything?

21   A    I told her to go in the house and lay in the back room

22   until I got home.

23   Q    Go to bed?

24   A    Yes.

25   Q    Did she want you to come home?

1   A    Yes.

2   Q    And what, if anything, did you do then?

3   A    I packed up my stuff, and I got home as quick as I could.

4   Q    Do you know about what time you got home that morning?

5   A    I think it was about 6:30.

6   Q    So you were back in Exeter at your house at 6:30?

7   A    Yes.

8   Q    And where was Kathy Mock when you got home?

9   A    Laying in bed in the back room.

10  Q    And she was sleeping?

11  A    Yes.

12  Q    Now, at some point after you got home, did you ever

13  receive a telephone call?

14  A    Yes.

15  Q    And Kathy Mock was still sleeping then?

16  A    Yes.

17  Q    And who did you get that telephone call from?

18  A    Kay Young.

19  Q    And what did she ask you?

20  A    She asked me if Kathy was okay.

21  Q    Okay.  And did she refer to her as Kathy, or did she have

22  another name?

23  A    It was Kat.

24  Q    Kat?

25  A    Kat.

1    Q     Okay.  She asked you if Kat was okay?

2    A     Yes.

3    Q     Okay.  And what else did she say to you?

4    A     She told me not to do or say anything to upset her and to

5    tell her that she loved her.

6    Q     Kay Young said for you to tell Kathy that she loved her?

7    A     Yes.

8    Q     Now, she said, "Don't do anything to upset her"?

9    A     Yes.

10   Q     Did she mention what Kathy might have been upset about?

11   A     No.

12   Q     During that conversation, did Kay Young mention at all to

13   you that Kathy might have seen or known that her -- had been

14   up there when Kay Young's husband was killed or murdered?

15   A     No.

16   Q     She didn't say anything about that?

17   A     No.

18   Q     She just told you not to upset her?

19   A     Yes.

20   Q     Now, at some point after that, did Kathy Mock wake up?

21   A     Yes.

22   Q     And what was her condition when she woke up?

23   A     She was wobbly.

24   Q     And what did she do?

25   A     She went into the bathroom to get sick.

1    Q    And did you ask her any question while she was in there?

2    A    I asked her if she took any pills.

3    Q    Okay.  And what'd she say?

4    A    Yes.

5    Q    And did she show you anything?

6    A    Yes.

7    Q    And what'd she show you?

8    A    A bag of pills.

9    Q    And how were they wrapped?  Were they packaged or --

10   A    They were in a gallon bag.

11   Q    What -- like a freezer bag or something?

12   A    A Ziploc bag, yes.

13   Q    A Ziploc bag.  Did she tell you what the pills were?

14   A    She said they were Vicodin.

15   Q    Now, at any point that morning, when she threw up and she

16   gave you the pills, at any point that morning, did she ever

17   tell you anything about Kay's husband?

18   A    Yes, later on, she did.

19   Q    And what did she tell you?

20   A    She told me he was gone.

21   Q    And you took that to be dead?

22   A    Yes.

23   Q    Did you have any more conversations with Kay Young that

24   morning?

25   A    Several.

1    Q    Okay.  And what were those in reference to?

2    A    She mostly asked me how Kat was doing and to let her know

3    that she loved her.

4    Q    Every time, she'd say to let her know she loved her?

5    A    Every time.

6    Q    Did she also leave any voicemails at your house?

7    A    Yes.

8    Q    Now, at some point that morning, did you take Kathy Mock

9    to the hospital?

10   A    Yes.

11   Q    Was that the hospital in Cassville?

12   A    Yes.

13   Q    And when you got to the hospital, did you have any more

14   conversation with Kathy Mock about the pills?

15   A    Yes.

16   Q    And what did she tell you about those pills?

17   A    She told me Kay Young gave it to her.

18   Q    Okay.  And did she say that Kay Young gave her any

19   instructions when she got to your house?

20   A    She was supposed to take all of them so I could take her

21   to the hospital and she would only get 30 to 60 days in an

22   insane asylum instead of penitentiary time.

23   Q    So Kathy Mock told you that Kay Young had given her the

24   pills?

25   A    Yes.

1    Q    And told her to take them when she got to your house?

2    A    Yes.

3    Q    And that you would take her to the hospital then?

4    A    Yes.

5    Q    And she'd get time in the insane ward instead of the

6    penitentiary?

7    A    Yes.

8    Q    Did she indicate to you that Kay Young had any expertise?

9    A    She said Kay knew what she was doing because she was a

10   nurse.

11   Q    Okay.  Now, was that about 9:00 that morning when you got

12   her to the hospital?

13   A    Yes.

14   Q    After you got her to the hospital on March the 24th, did

15   you stay with her for a couple hours?

16   A    Yes.

17   Q    And when you left there, where did you go?

18   A    I went out to her house to feed the bulldog puppies.

19   Q    And was Thomas Ponder out there when you got out there?

20   A    Yes.

21   Q    And did you give him anything?

22   A    I gave him the bag of pills.

23   Q    I'm going to show you a bag that's marked as Exhibit 30A,

24   30A, and it's previously been identified by Lieutenant Hall of

25   the Highway Patrol, and inside of it, there is Government's

1   Exhibit 30 that I want to show you, and there's a bag inside

2   of there.  Does that look familiar?

3   A    Yes.

4   Q    And what does that look like?

5   A    That looks like the bag of pills that Kat gave me.

6   Q    Okay.  And then you took those pills and gave them to

7   Thomas?

8   A    Yes.

9   Q    Okay.  Now, directing your attention on to March the

10  25th, which was a Saturday, and March the 26th, which was

11  Sunday, did you have occasion to meet with the Highway Patrol

12  people from up in around Kirksville?

13  A    Yes.

14  Q    They came down to talk to you?

15  A    Yes.

16  Q    And you told them what you knew about the situation?

17  A    Yes.

18  Q    Also, on March the 26th, did you have occasion to pick up

19  Kathy Mock's husband?

20  A    Yes.

21  Q    And that's Ralph Butch Mock?

22  A    Yes.

23  Q    And where did you pick him up at?

24  A    The Kansas City Airport.

25  Q    And where had he flown in from?

1    A    Arizona.

2         MR. DITTMEIER:  I have no further questions of this

3    witness.

4         THE COURT:  Cross.

5         MR. CURRAN:  Thank you.

6                       CROSS-EXAMINATION

7    BY MR. CURRAN:

8    Q    Ms. Ballard, I want to ask you some questions about you

9    and Kathy Mock.  Up until March 22nd of '06, is it fair to say

10   you and Kathy were friends?

11   A    Yes.

12   Q    And how long do you think you'd known each other until

13   that day?

14   A    About three, three and a half years.

15   Q    Okay.  And you both met; it was sort of dog breeding that

16   brought you together; is that fair to say?

17   A    Pardon?

18   Q    It's dog breeding that brought you together?

19   A    Yes.

20   Q    You had a dog you wanted to breed, and someone gave you

21   her name?

22   A    Yes.

23   Q    And it went from sort of that professional relationship

24   to a friendship, fair to say?

25   A    Yes.

1    Q    And your husband is disabled?

2    A    Yes.

3    Q    And Kathy knew him also?

4    A    Yes.

5    Q    And she'd spent time at your home over that three and a

6    half years, is that right?

7    A    Yes.

8    Q    And you and your husband had spent time at her home over

9    that three and a half years, is that right?

10   A    Yes.

11   Q    And you also knew her children?

12   A    Yes.

13   Q    Okay.  And when you first met her, were you living in

14   Clinton at that point?

15   A    Yes.

16   Q    Okay.  And she was living in Cassville?

17   A    Yes.

18   Q    And at some point, did you decide that you wanted to move

19   closer to where she was?

20   A    Yes.

21   Q    Okay.  Was she helping you with that?

22   A    Yes.

23   Q    Okay.  And -- and there were times that you would

24   entertain her family; you had her children over sometimes?

25   A    Yes.

1   Q    And sometimes she entertained you and your husband?

2   A    Yes.

3   Q    Okay.  So it was a good friendship up until then?

4   A    Yes, it was.

5   Q    Now, you also knew Kay Young.  Well, you knew Kay Young

6   not as well as you knew Kathy?

7   A    I did not know her very well, no.

8   Q    Well, you'd met her; you'd seen her twice?

9   A    That's it, yes.

10  Q    One time was at Kathy's house?

11  A    Yes.

12  Q    And she wasn't there for a real long time, but you did

13  see her?

14  A    Yes.

15  Q    You saw Ms. Young?

16  A    Yes.

17  Q    All right.  And you got to saw -- you saw how she acted,

18  and you saw how Kathy and she acted when they were together,

19  is that right?

20  A    Yes.

21  Q    And then the next time was at -- did you all eat at

22  Golden Corral?

23  A    Yes.

24  Q    Now let me -- I want to jump back for a second.

25  Ms. Young had talked to you about her husband and getting

1  disability for her husband?

2  A    Yes.

3  Q    All right.  And that's something you were familiar with

4  because your husband was disabled?

5  A    Yes.

6  Q    And you told Ms. Young that, you know, maybe you could

7  give her some advice on how to get that, is that right?

8  A    Very little, yes.

9  Q    Okay.  But at Golden Corral -- and Kathy was at that

10  dinner at Golden Corral, is that right?

11  A    Yes.

12  Q    Okay.  Ms. Young talked to you a little bit more about

13  her husband, isn't that correct?

14  A    Yes.

15  Q    All right.  And she told you that she thought her husband

16  was trying to kill her?

17  A    No.

18  Q    She never told you that?

19  A    No.

20  Q    You never told anybody that she told you that, that

21  Ms. Young told you that her husband was trying to kill her?

22  A    No.

23  Q    All right.  Now, we're going to get back to that.  I'm

24  going to ask you some other questions.  Now let's go back to

25  the night that Kathy Mock called you.  It would have been the

1    early morning of March the 23rd.  You said you got the call

2    from Kathy but you weren't home, is that correct?

3    A    Correct.

4    Q    All right.  But you did everything you could to get home

5    because you felt she was in need, is that right?

6    A    Yes.

7    Q    And when you got there, she appeared that she was in

8    need, fair to say?

9    A    She was asleep when I got there, yes.

10   Q    Okay.  In the fetal position?

11   A    Well, she was laying on the bed.  I didn't go in and

12   check her.  She was laying on the bed asleep.

13   Q    Okay.  At some point, she did get up and you saw her?

14   A    Yes.

15   Q    She threw up?

16   A    Yes.

17   Q    All right.  Now, I looked at your prior statements.  I

18   counted that you told the sheriffs that Kathy may have thrown

19   up at least three or four times while the two of you were

20   there; does that sound right?

21   A    I don't remember that now, but --

22   Q    Okay.  But it was more than once?

23   A    Yes.

24   Q    She was visibly sick?

25   A    Yes.

1   Q    Okay.  And so when -- when the decision was made to take

2   her to the hospital, that made sense to you, obviously,

3   because she didn't seem like she was herself, is that right?

4   A    She told me she took pills, and I wanted to take her to

5   the hospital.

6   Q    All right.  And she was also throwing up?

7   A    Yes.

8   Q    Okay.  So that would be another indication to get her to

9   the hospital, is that correct?

10  A    Yes.

11  Q    Now, this conversation about how Beau died, that took

12  place when -- was there a conversation about that with Kathy

13  when she was on her way to the hospital?

14  A    We was sitting at the kitchen table.

15  Q    Okay.  All right.  And when you said Kathy -- you said

16  something like she wasn't sure if she was involved or not; was

17  that then at the kitchen table?

18  A    No.  That was in the car.

19  Q    Okay.  But that's when you're taking her to the hospital?

20  A    Yes.

21  Q    And that's after she's been throwing up, is that right?

22  A    Yes.

23  Q    And she also appeared to you to be upset?

24  A    Yes.

25  Q    Very upset?

1   A    Yes.

2   Q    And at that point, you were -- you were responding to her

3   as a friend, right?

4   A    Yes.

5   Q    You wanted to take care of her?

6   A    Yes.

7   Q    And she needed it?

8   A    Yes.

9   Q    Okay.  Now, I think you've already said you observed Kay

10  Young and Kathy at least together only twice, is that right?

11  A    Yes.

12  Q    And was your opinion that Kay Young was the dominant one?

13  A    Yes.

14       MS. HERNDON:  Judge, I'd object to the speculation.

15       THE COURT:  Rephrase.

16  Q    (By Mr. Curran) Well, you knew -- you knew Kathy -- by

17  the time you met Kay Young, you knew Kathy for at least a

18  couple of years, is that right?

19  A    Yes.

20  Q    And you spent time with her, and you saw how she behaved

21  around other people --

22  A    Yes.

23  Q    -- is that right?  And then when you saw her with Kay

24  Young, were you able to observe how she interacted with Kay?

25  A    Yes.

1   Q    Okay.  And, now, based on what you knew about Kathy, did

2   she behave differently when she was with Kay?

3   A    Yes.

4   Q    All right.  And can you explain what you observed as to

5   how they interacted?

6   A    She -- Kathy seemed helpless.

7   Q    When she was around Kay?

8   A    Yes.

9   Q    All right.  And you're saying that based on having known

10  Kathy --

11  A    Yes.

12  Q    -- is that correct?  Okay.  Now I want to get back to

13  this -- I asked you about this statement that Kay Young --

14  whether Kay Young had told you that she thought her husband

15  was trying to kill her.  Okay.  Remember I just asked you

16  that?

17  A    Yes.

18  Q    And you're saying you don't remember any conversation

19  like that?

20  A    No.

21  Q    Okay.  Now, if I said the word "Topix", T-O-P-I-X, do you

22  know what that means; do you know what that is?

23  A    Yes.

24  Q    Why don't you tell us what that is?

25  A    It was a thing on the Internet that people wrote on.

1   Q    Okay.  Did you contribute to it?

2   A    Yes.

3   Q    So you -- and it was on the Internet, and there were

4   comments about this case, is that right?

5   A    Yes.

6   Q    Was it from the Kirksville newspaper?

7   A    I don't remember where it was from.

8   Q    Well, it was topics related to news in and around

9   Kirksville, fair to say?

10  A    Yes.

11  Q    And people would make comments; there'd be a news

12  article, and then people would do comments relating to that

13  news article, is that correct?

14  A    Yes.

15  Q    And there was a period of time in '06 through '07 where

16  you were contributing comments relating to this incident,

17  isn't that right?

18  A    Yes.

19  Q    And you were telling people on Topix what you knew about

20  the case, is that right?

21  A    Yes.

22  Q    You also told people what you knew about Kay and what you

23  knew about Kathy, isn't that right?

24  A    Yes.

25  Q    Okay.  And now I assume you can't remember everything you

1   wrote?

2   A      No.

3   Q      Because I counted about 17 separate comments that you had

4   made.

5   A      Okay.

6   Q      Okay.  All right.  And let me ask you this; when you were

7   making the comments, was it under your name, "Jean Ballard"?

8   A      Yes.

9   Q      "Jean Ballard AOL"?

10  A      Yes.

11  Q      Is that right?  Okay.  And I think you've already said

12  that you made comments about, you know, what you knew about

13  Kathy and what you knew about Kay, right?

14  A      Yes.

15  Q      Okay.  Now, and you're "Jean Ballard AOL"?  Did I already

16  ask you that?

17  A      Yes.

18  Q      That sounds like you?

19  A      Yes.

20  Q      All right.  And did you say -- now, this is discussing

21  the time you talked to Kay Young at the Golden Corral.  "I

22  asked her if her husband had worked on getting his 100

23  percent."  Now, I assume that relates to 100 percent

24  disability; does that sound right?

25  A      Yes.

1   Q     And you --

2            MR. DITTMEIER:  What's the number?

3            MR. CURRAN:  Oh, I'm sorry.  I'm sorry, Tom.  This is

4   Comment #35, and it's February 27th.

5            MR. DITTMEIER:  Okay.  All right.

6            MR. CURRAN:  I'm sorry.  It's Comment 35.  I'm sorry.

7            MR. DITTMEIER:  Thank you.

8            MR. CURRAN:  All right.  And, actually, I'm on the

9   next page.  It starts at the bottom.

10  Q     (By Mr. Curran) "She then told me something had to be

11  done before he killed her."  Did you write that on Topix?

12  A     I don't remember.

13  Q     "She told me he followed her everywhere; he would look

14  over her shoulder when she was on her computer."

15  A     I remember that.

16  Q     Okay.  "And I changed the subject by telling her, 'Good

17  luck.'"

18  A     I remember that.

19  Q     All right.  Would it be helpful if I showed you this?

20  A     Please.

21           MR. CURRAN:  Okay.  May I approach, Judge?

22           THE COURT:  You may.

23           MR. CURRAN:  I'm writing Defendant's Exhibit C on

24  this, Judge.

25  Q     (By Mr. Curran) Have you had a chance to look at it?

1    A    Yes, yes.

2    Q    All right.  Do you remember writing that now?

3    A    Yes.

4    Q    Okay.  I'm going to let you hang onto that just in case

5    we need it some more.  All right.  Now, a couple more

6    questions about Topix.  Also involved in the chat was someone

7    who said they were writing a book?

8    A    Yes.

9    Q    All right.  And then you told them that you'd be -- you

10   would talk to them when this is over to give them information

11   for the book, is that right?

12   A    Yes.

13   Q    Okay.  Are you still -- are you still communicating with

14   them about the book?

15   A    I haven't talked to him for a long time.

16   Q    All right.  At some point, you -- it's in the chat that

17   you emailed him separately of this chat, is that right?

18   A    Yes.

19   Q    The guy who is writing the book, you contacted separately

20   to give him information for the book, right?

21   A    Yes.

22   Q    Okay.  And then also on one of the comments, it's -- it's

23   #42, and that's on May 1st of 2007.  You say to this -- well,

24   the person who's writing the book is BJS; does that sound

25   right?

1   A    Yes.

2   Q    Okay.  And that's from Kirksville, Missouri?

3   A    Yes.

4   Q    Now, from my reading this, this BJS was pretty upfront.

5   His first post is, "I'm working on a book, and people give me

6   information."  Does that sound right?

7   A    Yes.

8   Q    And then a number of comments later, you chime in that

9   you know things about the case?

10  A    Yes.

11  Q    Okay.  And then some point later on, that's when you

12  contact him off the chat; you email him directly, right?

13  A    Yes, but it didn't pertain to this case.

14  Q    Okay.  Now, at some point, this is -- this Posting #42,

15  March 1st, 2007, you say, "I can tell you a long story about

16  Kathy and her family.  It would be a good but strange book."

17  You wrote that, right?

18  A    Yes.

19  Q    So you volunteered to this author that you were going to

20  give him information about Kathy Mock and her family so he

21  could include it in his book, right?

22  A    Yes.

23  Q    All right.  Now, this is in '07, correct?  Well, that's

24  the date, is that right?

25  A    Yes.

1   Q    All right.  Ms. Mock's -- she's incarcerated at this

2   point, facing these charges, is that correct?

3   A    Yes.

4   Q    All right.  And you've already been interviewed by the --

5   well, at least twice, you were interviewed by the Highway

6   Patrol, is that right?

7   A    Yes.

8   Q    And then you know that this case is pending and hasn't

9   gone to trial yet, right?

10  A    Yes.

11  Q    And you also know that you're a witness?

12  A    Yes.

13  Q    Okay.  And you're making public statements about the case

14  in this "Comments" section, right?

15  A    Yes.

16         MR. CURRAN:  All right.  I have nothing further,

17  Judge.  Thank you.

18         THE COURT:  Ms. Herndon.

19         MS. HERNDON:  Thank you, Judge.

20                    CROSS-EXAMINATION

21  BY MS. HERNDON:

22  Q    Ms. Ballard, you said you only met Kay Young on the two

23  occasions that you testified about, correct?

24  A    Yes.

25  Q    You would describe yourself as best friends with Kathy

1   Mock?

2   A     We were good friends.

3   Q     Well, you said that she was the only friend you had since

4   you came to Cassville, right?

5   A     Yes.

6   Q     Now, Kathy Mock told you that Kay Young's husband was

7   physically and verbally abusive to her, correct?

8   A     Yes.

9   Q     And those words came from Kathy Mock's mouth?

10   A     Yes.

11   Q     And she also told you that something needed to be done

12   about him before he killed Kay?

13   A     Yes.

14   Q     You -- let's move forward to when you took Kathy to the

15   hospital.  You've testified about how she showed up at your

16   house unexpectedly in the early morning hours, correct?

17   A     Yes.

18   Q     And you asked her if Kay killed her husband, correct?

19   A     I don't remember that.

20   Q     You don't remember asking Kathy Mock if Kay killed her

21   husband?

22   A     No.

23   Q     Okay.  Do you remember testifying in front of the Grand

24   Jury?

25   A     Yes.

1   Q    And that was on August 27th of 2009, correct?

2   A    Yes.

3   Q    Okay.  I'm going to hand you, Ms. Ballard, a copy of what

4   I am going to tell you is your Grand Jury transcript, although

5   you're free to look at it and take as much time as you need,

6   but is that in fact a transcript of the testimony that you

7   gave to the Grand Jury on August 27th of 2009?

8   A    Yes.

9   Q    I'm going to ask you to turn to page 45 of that

10  transcript, please.  And on the very bottom of that page, did

11  Mr. Reilly, the Assistant U.S. Attorney, ask you, "Did you

12  ever ask -- you asked if Kay shot him, if Kay shot -- did you

13  ask Kathy Mock if Kay shot her husband?"  Is that the question

14  Mr. Reilly asked you?  On the very -- the last question on the

15  bottom of page 4 -- I'm sorry -- page -- you know what?  I

16  gave you the wrong page number.  It's 44.  I apologize.  Page

17  44.  I'm sorry.  Looking at the wrong page numbers.  Let's go

18  back to the very last question on page 44.  Mr. Reilly asked

19  you, "Did you ever ask -- you asked if Kay shot him, if Kay

20  shot -- did you ask Kathy Mock if Kay shot her husband?"  Is

21  that what Mr. Reilly asked you?

22  A    Yes.

23  Q    And on the next page then, did you respond, "I asked her

24  if she killed her husband"?

25  A    Yes.

1    Q    And Mr. Reilly asked, "If Kay killed her own husband?"

2    A    Yes.

3    Q    And you responded, "Yes.  I didn't know he was shot at

4    that time"?

5    A    Correct.

6    Q    And he asked, "And what did she say?"

7    A    Yes.

8    Q    And you answered, "She looked at me and shook her head no

9    very slowly"?

10   A    Yes.

11   Q    And he asked you, "So she shook her head no very slowly

12   as to indicate that Kay didn't shoot him?"

13   A    What was that question again, please?

14   Q    Did Mr. Reilly then ask you, "So she shook her head no

15   very slowly as to indicate that Kay didn't shoot him?"

16   A    Yes.

17   Q    And you responded, "Yes"?

18   A    Yes.

19   Q    And did Kathy Mock also in fact tell you that "I think I

20   shot him, but I don't remember it"?

21   A    It wasn't exactly in those words.

22   Q    Okay.  Well, let's go down a little bit further on page

23   45 of your Grand Jury testimony.  The last question on that

24   page, did Mr. Reilly ask you, "So her words were something" --

25         MR. DITTMEIER:  Your Honor -- excuse me, Jennifer.  I

1    want to object here that this is improper use of the

2    deposition.  The question should be asked of the witness as

3    opposed to being read, and then if the witness needs her

4    memory refreshed or testifies to something different than in

5    the deposition, then she can be -- that can be put out there

6    to see if it refreshes her memory.

7            MS. HERNDON:  Well, that's what I --

8            MR. DITTMEIER:  This is improper just going down the

9    page and reading.

10           MS. HERNDON:  Oh, no.  That's what I did, Judge.  I

11   asked her, I said, "Did she tell you, 'I think I shot him, but

12   I don't remember it'?"  And she said it wasn't those words, so

13   I want to show her that in her Grand Jury testimony that's the

14   words she said she used.

15           THE COURT:  Let's proceed.

16   Q    (By Ms. Herndon) So the last question on page 45, did

17   Mr. Reilly ask you, "So her words were something to the effect

18   that she thinks she shot -- what were her -- if you could just

19   kind of capture that for us, what were her words -- what her

20   words were."  Is that what he asked you?

21   A    Yes.

22   Q    And did you respond, "She said, 'I think I shot him, but

23   I don't remember it.  Wouldn't I remember doing something like

24   that?'"

25   A    Exactly, yes.

1  Q    Okay.  Thank you.  Let's talk about these pills that you

2  got from Kat.  Kathy volunteered, gave the pills to you,

3  correct?

4  A    Yes.

5  Q    And she told you that they were Vicodin, correct?

6  A    Yes.

7  Q    And you gave them to Thomas Ponder, correct?

8  A    Yes.

9  Q    And Thomas Ponder told you that he was going to sell

10 those pills?

11 A    Yes.

12        MR. CURRAN:  I'm going to object.  That's hearsay.

13 It's unrelated to Mrs. Mock.

14        MS. HERNDON:  Well, Judge, when Mr. Ponder testified,

15 he denied telling Ms. Ballard that, so I'm allowed to impeach

16 him with her.

17        MR. CURRAN:  Well, actually, if Mr. Ponder was

18 sitting here, it might make -- you know, it might be relevant,

19 but he's not.

20        MS. HERNDON:  It's a prior inconsistent statement of

21 Mr. Ponder's, Judge.

22        THE COURT:  Overruled.

23        MR. CURRAN:  But, Judge, it's a collateral issue, and

24 you're bound by his answers.  It has nothing to do with the

25 guilt or innocence of Ms. Mock as to whether she can impeach

1    Mr. Ponder.

2         MS. HERNDON:  It goes to his credibility, Judge.

3         THE COURT:  It goes to his credibility.  It's not

4    entirely collateral.  It might be by a hair, but it does go to

5    his credibility.  The objection is overruled, and you may

6    answer.

7    Q    (By Ms. Herndon) So Mr. Ponder told you -- Thomas Ponder

8    told you he was going to sell those pills, correct?

9    A    Yes.

10   Q    Now, you talked about Kathy Mock telling you that Kay

11   Young gave those pills to her, correct?

12   A    Yes.

13   Q    And then you told us also about conversations that you

14   had with Kay Young about that very matter, correct?

15   A    Yes.

16   Q    And just to kind of put it in context, after Kathy came

17   to your house, Kay called you to check on her?

18   A    Yes.

19   Q    Excuse me.  And over the next -- I don't know what --

20   couple of days, you and Kay Young had several phone

21   conversations back and forth?

22   A    Yes.

23   Q    And that had to do with the well-being of Ms. Mock?

24   A    Yes.

25   Q    And you asked Kay Young about the pills, correct?

1   A    Yes.

2   Q    And she told you that -- "What pills?" was basically her

3   response, correct?

4   A    Yes.

5   Q    And she denied giving the pills to Ms. Mock?

6   A    Yes.

7   Q    Now, you said that in addition to these phone calls,

8   Ms. Young left you some voicemails when you all weren't able

9   to reach each other by phone?

10  A    Yes.

11  Q    And in one of those voicemails, she indicated to you that

12  she had been going through the house, trying to figure out if

13  any medications were missing from her house?

14  A    Yes.

15  Q    And she recommended that --

16       MR. DITTMEIER:  Judge, I'm going to object that this

17  is just calling for hearsay.

18       MS. HERNDON:  Well, I mean if they can bring out that

19  Kathy said that Kay gave her the pills, then I can bring out

20  that Kay said she didn't give her the pills.

21       MR. DITTMEIER:  She's not a party-opponent, Judge.

22  It's hearsay.

23       THE COURT:  Yeah.  This one is sustained.

24  Q    (By Ms. Herndon) Okay.  Let's talk about your

25  conversation with Thomas Ponder.  Thomas Ponder told you that

1    his mom had asked him to commit the murder, is that correct?

2            MR. CURRAN:  Judge, let me object to this as hearsay.

3            THE COURT:  Sidebar.  Actually, ladies and gentlemen,

4    while we're resolving this legal issue, why don't we go ahead

5    and take a recess for you.  During the course of the recess,

6    do not discuss the case amongst yourselves or with anyone

7    else.  Do not allow anyone to discuss it within your hearing

8    or presence.  Do not form or express any opinions about the

9    case until it is given to you to decide, and do not utilize

10   any social networking websites during the course of the

11   recess.  Fifteen.

12       (The following proceedings were held outside the hearing

13   and presence of the Jury.)

14           THE COURT:  You may be seated.

15           Young lady, if you want to take a break yourself,

16   too, and step out into the hall because we're not going to be

17   doing anything else with you until they all come back in,

18   so -- and when you come back, you'll still be under oath,

19   okay?

20           THE WITNESS:  Okay.

21           THE COURT:  Did you want them to stay?  Do you want

22   your clients to stay?

23           MR. CURRAN:  No.  If they want to use the facilities,

24   that's all right.

25           THE COURT:  Okay.  Yeah.

1      (Defendants left the courtroom.)

2          THE COURT:  Do you want to do it at the podium then?

3   All right.  All right.

4          MR. CURRAN:  Judge --

5          THE COURT:  And let me preface Mr. Curran's argument

6   in favor of his objection by saying I'm kind of lost where

7   you're going, Ms. Herndon, so -- but I'm sure you'll explain

8   it to me when Kevin is finished.  Go ahead, Kevin.

9          MS. HERNDON:  I'd be happy to.

10         MR. CURRAN:  Well, first of all, Thomas Ponder hasn't

11  come -- didn't come up on direct, so it's outside the scope of

12  direct.  I didn't get into it on cross.  We've already --

13  we've heard from him, and any conversations that Ms. Ballard

14  did or didn't have with Mr. Ponder, they're not relevant and

15  it's hearsay and it doesn't -- it's not going to go to prove

16  or disprove whether Ms. Mock, you know, is guilty of anything,

17  so I don't know if there's more -- I anticipate there may be

18  more they want to get into, so maybe we should hash it out

19  now, but, you know, nobody got into it; I didn't get into it

20  in my cross, so it's not like the gate was opened.

21         THE COURT:  All right.  Ms. Herndon.

22         MS. HERNDON:  Well, I mean I can -- technically, I

23  can call her back in my case if that's how you want to do it,

24  but I asked Thomas Ponder on his cross-examination, "Didn't --

25  didn't you tell Jean Ballard that your mom had asked you to

1  commit the murder?"  And he said, "No."  And then I asked him,

2  "Didn't you tell Jean Ballard that your -- that you told your

3  mom to wear gloves and a mask so she wouldn't get gunpowder on

4  her hands?"  And he said, "No."  And so to impeach his

5  credibility, I'm allowed to elicit from her that, "Yes, he did

6  tell me those things," and that's -- I mean those are the two

7  questions I'm going to ask him or ask her, and it's solely

8  just to impeach his credibility.

9          THE COURT:  All right.  So the first question that

10  you're going to ask Ms. Ballard is --

11          MS. HERNDON:  "Mr. Ponder told you his mom asked him

12  to commit the murder?"

13          THE COURT:  And the second question is --

14          MS. HERNDON:  "Mr. Ponder told you that he informed

15  his mom how to wear gloves and a mask so that she would not

16  get gunpowder on her hands?"

17          THE COURT:  Mr. Curran.

18          MR. CURRAN:  Well, let's follow this to its logical

19  conclusion.  The Government put on a witness, Thomas Ponder,

20  that implicates Kathy Mock, right, that he's solicited, "Kathy

21  Mock solicited me to kill Mr. Griesbauer," is that correct?

22          THE COURT:  Uh-huh.

23          MR. CURRAN:  All right.  So what does she need to

24  impeach his credibility for?  I mean that's a straw man or a

25  straw woman, a very strong straw woman.  I mean that's not why

1    she's trying to do it.  She wants the statement out for the

2    truth of the matter.  There's no reason for them to impeach

3    Thomas Ponder's credibility because everything he says

4    helps -- you know, mostly helps them and hurts us.  So they're

5    saying they want to impeach a witness who basically is in

6    their favor, so it's not about impeachment, okay.

7            Next thing is it's a collateral issue.  I mean Kathy

8    Mock's not involved in this conversation.  Nothing directly

9    goes to her.  You know, it's one witness talking to him about

10   hearsay.  Okay.  Primarily, it is extremely prejudicial to

11   Ms. Mock because the direction we're going is -- is -- why

12   they want this in is because she, Ms. Ballard, is going to --

13   they anticipate Ms. Ballard is going to describe that Thomas

14   told Ms. Mock how to do the murder close to the way that it

15   was done, okay, so that's extremely prejudicial, and none of

16   these words are out of Kathy Mock's mouth.  Okay.  So we're

17   not talking about impeachment.  We're talking about they want

18   this out for the truth of the matter because it doesn't make

19   any sense they would want to impeach this witness, so if you

20   balance that against the prejudice to Ms. Mock, then, you

21   know, it doesn't get in.  Now, it's fair game to ask Thomas,

22   and we didn't object because if Thomas said, "Yes, I told my

23   mom" or "My mom told me," but I think beyond that, you know,

24   it's collateral, it's extremely prejudicial, and it's not

25   admissible.

1          MS. HERNDON:  Well, Judge, it's anything but

2    collateral.  It goes to the issue that we're here about, and I

3    mean it's just -- I'm sorry that it's prejudicial to

4    Mr. Curran.  I wish you would have given us severance, but you

5    didn't, so I can't not do what's right --

6          THE COURT:  Yeah, it's my fault.

7          MS. HERNDON:  It is your fault.  It all goes back to

8    you, but I can't not do what's right because it hurts

9    Mr. Curran, and I mean this is sort of the stuff you learn

10   your first year in law school.  When somebody comes in and

11   says something and you have evidence that they said something

12   contrary to that, you bring a person in to impeach them, and

13   to say that we don't need to impeach Thomas Ponder is

14   craziness because he said, "Kay Young wants her husband

15   killed; Kay Young is willing to pay $10,000 to have her

16   husband killed."  That's certainly prejudicial to me.  So I

17   mean I -- I need to show that this guy is all over the place,

18   making statements inconsistent and lying about what he's

19   saying, and that's -- I mean, yeah, he's one of the main

20   witnesses against Ms. Young, so it's -- I think it's anything

21   but collateral or anything else.

22         THE COURT:  Anything else?

23         MR. CURRAN:  Judge, I just -- you've seen everything

24   we've seen, and if you think that, you know, Ms. Young's

25   lawyers are going to get up and say, "Don't believe Thomas

1  Ponder," you know, it's just not going to happen.

2          MS. HERNDON:  Well, yes, it is.

3          THE COURT:  Well, that's -- that's the way they

4  framed it, you know, and it would be professionally insane to

5  get up and say something contrary to the way they framed the

6  objection or the statement in favor of overruling the

7  objection.  I think you get this question, so I'm going to

8  overrule the objection.  That doesn't mean that when he

9  objects to anything else --

10          MS. HERNDON:  Those are the only two questions I'm

11  asking.  That's it for that topic, and I'm moving on.

12          THE COURT:  All right.  Kind of like the Jeffersons.

13          MS. HERNDON:  Exactly.

14          THE COURT:  No.  They were moving on up.

15          MS. HERNDON:  I'm moving on up.

16          THE COURT:  All right.  You're not old enough for

17  that, though, so you never saw that show.  There's no way.

18          Yes.

19          MR. DITTMEIER:  Can we have a little break before you

20  call them back out?

21          THE COURT:  Yes.

22      (Court recessed from 4:00 p.m. until 4:22 p.m.)

23      (The following proceedings were held within the hearing

24  and presence of the Jury.)

25          THE COURT:  Proceed, Ms. Herndon.

217

1  Q    (By Ms. Herndon) Ms. Ballard, I just have a few more

2  questions for you.  When we took a break there, I was asking

3  you about a conversation you had with Thomas Ponder; do you

4  recall that?

5  A    Yes.

6  Q    And Mr. Ponder, Thomas Ponder, told you that his mom had

7  asked him to commit the murder, is that correct?

8  A    Yes.

9  Q    And Mr. Thomas Ponder also told you that he told his mom

10  how to wear gloves and a mask so that she wouldn't get

11  gunpowder on her hands, is that correct?

12  A    Yes.

13  Q    Let's talk for a minute about -- well, let me ask you

14  about a trip.  You took a trip to Arizona with Kathy Mock,

15  correct?

16  A    Yes.

17  Q    And the purpose of that trip was to pick up some dogs

18  from Cindy Davis?

19  A    Yes.

20  Q    And you, in fact, picked up -- what -- about 40 dogs and

21  brought them back?

22  A    I don't remember the number.

23  Q    Okay.  Do you recall the trip being in February of 2006

24  sometime?

25  A    Possibility, yes.

218

1   Q     And some of those dogs went to Kay Young, correct?

2   A     Yes.

3   Q     When -- I now want to forward you in time a little bit to

4   when you were talking with Kathy Mock after she came to your

5   house, after she showed up unexpectedly at your house.  Okay.

6   She told you that Kay Young owed her $2,800 for dogs, correct?

7   A     I don't remember.

8         MR. DITTMEIER:  Your Honor, I'm going to object to

9   this as calling for hearsay.

10         MS. HERNDON:  Well, Judge, they've entered into this

11   area by talking about Ms. Mock saying that she was going to

12   come into some money and how is she going to come into some

13   money, and the answer here is that Kathy Mock told her that

14   Kay owed her $2,800 for dogs.

15         MR. DITTMEIER:  I'll withdraw the objection on that.

16         THE COURT:  Okay.  You may answer it.

17   Q     (By Ms. Herndon) Okay.  I'll ask you the question again.

18   Do you recall Kathy Mock telling you that Kay owed her $2,800

19   for dogs?

20   A     I do not remember that.

21   Q     Okay.  Would it, perhaps, help refresh your memory if you

22   looked at your Grand Jury testimony?

23   A     Yes.

24   Q     Okay.  I'll ask you to look at that.  You can just look

25   at it and read it.  I believe it's on page 44 of your

1   testimony, although I might be wrong.  Let's see.  Actually,

2   it's on page 43.  I'm sorry.  About the middle of the page.

3          MR. DITTMEIER:  Line 15.

4          MS. HERNDON:  I'm sorry.  That's helpful.  Lines 15

5   through 18.

6   Q    (By Ms. Herndon) Did you get a chance to look at that?

7   A    Yes.

8   Q    And did you in fact tell the Grand Jury that Kathy told

9   you Kay owed her money for dogs?

10  A    Yes.

11  Q    Thank you.  Now I'm going to maybe stretch your memory

12  here, but do you recall, in March of 2006, Kathy Mock's cell

13  phone number as 417-342-0167?

14  A    I do not remember that.

15  Q    Okay.  If I asked you if you recalled Ralph Mock's cell

16  phone number, could you potentially recall that?

17  A    No.

18         MS. HERNDON:  No.  Okay.  Thank you.  I don't have

19  any other questions.

20         MR. DITTMEIER:  I have no further questions, Judge.

21         MR. CURRAN:  I have some, Judge.

22         THE COURT:  All right.

23                        RECROSS-EXAMINATION

24  BY MR. CURRAN:

25  Q    I want to ask you about the phone calls from Kay Young

220

1   when you were with Kathy before she went to the hospital.

2   Okay.  You said you had -- well, you probably didn't keep

3   count, but you certainly had more than one phone call from Kay

4   Young during that period, is that right?

5   A    Is that before I took Kathy?

6   Q    Well, before you went to the hospital.  Kathy called you

7   at 2:30 a.m., right?

8   A    Yes.

9   Q    And then you rushed to meet her; you don't see her until

10   around 6:00 a.m.?

11   A    Yes.

12   Q    All right.  And then at some point during the day when

13   you're -- before you get to the hospital, you get some calls

14   from Kay, is that right?

15   A    I remember one.

16   Q    Okay.  And then Kay says -- that's the call where Kay

17   says, "Tell Kathy I love her"?

18   A    Yes.

19   Q    All right.  Were there other calls from Kay during that

20   period of time when you got to the hospital or when Kathy was

21   in the hospital?

22   A    There were several that day.

23   Q    Okay.  And several that day -- is it fair to say that the

24   general conversation was Kay calling, asking about Kathy, and

25   telling you to tell Kathy that she loved her or was thinking

1   of her and those sorts of things, is that right?

2   A    Yes.

3   Q    Okay.  And Kay never volunteered to you that her husband

4   was gone, is that right?

5   A    Say that again.

6   Q    Well, Kay never volunteered and said, "Oh, I've also lost

7   my husband"?  She never said that to you?  You had to ask?

8   A    Yes.

9   Q    All right.  Okay.  So at the time that Kay is calling you

10  and telling you to look after Kathy and "Tell Kat I love her,"

11  you find at some point that Beau is deceased, is that right?

12  A    Yes.

13  Q    Okay.  And I think at some point you told one of the

14  officers you thought it was strange that Kay didn't volunteer

15  that to you, didn't tell you that?

16  A    Yes.

17  Q    Okay.  And also, Kay didn't seem to have a lot of

18  emotion --

19        MS. HERNDON:  Judge, I'm going to object to this.

20  It's improper speculation, her opinion.

21        THE COURT:  Rephrase your question.

22        MR. CURRAN:  I'll withdraw it.

23  Q    (By Mr. Curran) All right.  And then when did the -- and

24  you were talking to Kay on Kathy's phone?

25  A    Yes.

222

1   Q    All right.  Did you ever put Kay's number in your phone?

2   A    No.

3   Q    Okay.  So all your phone calls with Kay were through

4   Kathy's phone?

5   A    Most.  I didn't have good reception on my phone.

6   Q    Okay.  And at what point do you think the phone calls

7   stopped from when you -- after you took Kathy in the hospital,

8   how long was she in the hospital before Kay stopped calling?

9   Let me change that.  At some point, you stopped taking the

10  calls, is that right?  You didn't answer?

11  A    Yes.

12  Q    Okay.  And was that the last conversations you ever had

13  with Kay Young --

14  A    Yes.

15  Q    -- when Kathy was in the hospital?  All right.  Now, I

16  want to ask you about what you just told Kay's lawyer that you

17  had a discussion with Thomas about this incident.

18  A    Yes.

19  Q    Okay.  Now, you said that he told you that Kathy had

20  asked him if he'd be willing to participate or kill Beau, is

21  that right?

22  A    Yes.

23  Q    Okay.  Where was that?  Where were you when you had that

24  conversation?

25  A    We was sitting out in front of his truck.

223

1   Q    All right.  And was that at his home, at Kathy's home?

2   A    Yes.

3   Q    Okay.  And you were staying at Kathy's home at that

4   point?

5   A    No.  I was taking care of her dogs.

6   Q    Okay.  You were taking care of the dogs to help Kathy

7   out?

8   A    Yes.

9   Q    Okay.  And then you talked to Thomas about this incident,

10  right?

11  A    Yes.

12  Q    So one of the things he said, as already said, is that he

13  said that Kathy had approached him about this; you've already

14  admitted that a couple times, right?

15  A    Yes.

16  Q    And now you're also telling us that at that point he told

17  you that he instructed her how to do it, how to kill Beau?

18  A    Yes.

19  Q    Now, you were interviewed within a day or two of that

20  conversation by law enforcement, right?

21  A    Yes.

22  Q    Actually, and they recorded you on one of those days, is

23  that right?

24  A    Yes.

25  Q    Okay.  There was no mention of that latter part of the

1   conversation in your recording or those interviews in March of

2   '06, is that right?

3   A    I don't know.

4   Q    You didn't tell them that Thomas said he instructed her

5   how to do it when you were interviewed in March of '06?

6   A    If they didn't ask me, I -- I followed their questions.

7   Q    Well, that's a pretty significant piece of information,

8   isn't it?

9   A    Yeah.  Yes.

10  Q    Okay.  Let me ask you; at that point when you were

11  interviewed on March 26th, did you have all the details of how

12  this happened?  I mean, you knew Beau had been shot, but you

13  didn't know much more than that, is that correct?

14  A    No.

15  Q    All right.  But at some point, through the publicity and

16  also the Internet, you found out more details; you found out

17  about the ski mask, is that right?

18  A    I found out about that from Kathy.

19  Q    All right.  And then you found out about the gloves,

20  right?

21  A    From Kathy.

22  Q    Okay.  But then you were also following the case on --

23  either online or in the newspapers, is that right?

24  A    Yes.

25  Q    I mean, you were talking about it on Topix --

1   A    Yes.

2   Q    -- right?  And people are giving information, and you're

3   giving information, too, on Topix?

4   A    Yes.

5   Q    You're saying, "I know these people, and this is what I

6   know about it," right?

7   A    Yes.

8   Q    Okay.  Now, the first time you mention that Thomas had

9   said to you that he told his -- you know, gave his mother

10  instruction was when you go to the Grand Jury, is that right?

11  A    That's a possibility.

12  Q    That's in August of '09?

13  A    Yes.

14  Q    Okay.  That's when you talk about it?

15  A    Yes.

16  Q    Okay.  And that's a few years later than when this

17  happened, is that right?

18  A    Yes.

19  Q    All right.  Now -- and we've already talked about this,

20  that in one of your comments, you say to the author, "I can

21  give you information about the Mock family; it would be a

22  strange but interesting book."  Do you remember writing that?

23  A    Yes.

24  Q    Okay.  Now, the book is certainly more interesting if

25  Thomas is implicated in this, is that right?

1          MR. DITTMEIER:  Your Honor --

2    A    I don't --

3          MR. DITTMEIER:  -- I'm going to object.  That's

4    calling for speculation on the part of the witness.

5          THE COURT:  Sustained as to form.

6          MR. CURRAN:  No more questions.

7          MS. HERNDON:  Nothing further, Judge.  Thank you.

8          THE COURT:  Anything on behalf of the Government?

9          MR. DITTMEIER:  I have nothing further, Judge.

10         THE COURT:  Thank you.  You're free to go.

11         Call your next witness.

12         MR. DITTMEIER:  Judge, we've moved considerably

13   faster than I thought we would this afternoon, but I think I

14   can finish in short order in the morning.

15         THE COURT:  All right.  So we'll recess for the

16   evening then?

17         MR. DITTMEIER:  Please.

18         THE COURT:  All right.  Ladies and gentlemen, we will

19   recess for the evening at this time.  During the course of the

20   recess, again, I remind you, do not discuss the case amongst

21   yourselves or with anyone else.  Do not allow anyone to

22   discuss it within your hearing or presence.  Do not form or

23   express any opinions about the case until it is given to you

24   to decide.  Do not read, view, or listen to any media accounts

25   regarding the trial.  Do not utilize the Internet in any

1    regard in that fashion and especially do not use the Internet

2    with regard to the use of any social networking sites.  We'll

3    see you all tomorrow morning then at 9:30.  Have a good

4    evening.  Have a safe evening.  See you then.

5         (Court adjourned at 4:33 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 227 inclusive.

Dated at St. Louis, Missouri, this 4th day of August, 2012.

_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter