UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
     v.                            ) No. 4:09-CR-679-HEA
                                   )
KATHERINE A. MOCK,                 )
ELAIN KAY YOUNG,                   )
                                   )
                Defendants.        )


JURY TRIAL
VOLUME 5


BEFORE THE HONORABLE HENRY E. AUTREY
UNITED STATES DISTRICT JUDGE


MARCH 16, 2012


APPEARANCES:
For Plaintiff          Michael A. Reilly, AUSA
                       Patrick T. Judge, Sr., AUSA
                       Thomas E. Dittmeier, AUSA
                       OFFICE OF U.S. ATTORNEY

For Defendant          Christopher E. McGraugh, Esq.
Katherine A. Mock      LERITZ PLUNKERT & BRUNING P.C.

                       Kevin Curran, AFPD
                       OFFICE OF U.S. PUBLIC DEFENDER

For Defendant          Jennifer Herndon, Esq.
Elain Kay Young
                       Michael J. Gorla, Esq.


REPORTED BY:           Gayle D. Madden, CSR, RDR, CRR
                       Official Court Reporter
                       United States District Court
                       111 South Tenth Street, Third Floor
                       St. Louis, MO  63102
                       (314) 244-7987

2

## <u>INDEX</u>

*Witnesses:*

**NICHOLAS D. BERRY**
    Direct Examination by Mr. Dittmeier  . . . . . . . Page   3
    Cross-examination by Mr. Curran  . . . . . . . . Page  14
    Redirect Examination by Mr. Dittmeier  . . . . . Page  18
    Recross-examination by Mr. Curran  . . . . . . . Page  19

Motions . . . . . . . . . . . . . . . . . . . . . Page  22

**JEFF DODSON**
    Direct Examination by Mr. Gorla  . . . . . . . . Page  48
    Cross-examination by Mr. Dittmeier . . . . . . . Page  49

**GAYLE CRAIGG**
    Direct Examination by Ms. Herndon  . . . . . . . Page  50
    Cross-examination by Mr. Dittmeier . . . . . . . Page  57
    Cross-examination by Mr. McGraugh  . . . . . . . Page  59

Record re Defendant Mock's decision not to testify . Page  74
Record re Defendant Young's decision not to testify . Page  77

Motions . . . . . . . . . . . . . . . . . . . . . Page  84

3

1          (Proceedings started at 9:37 a.m.)

2          (The following proceedings were held in open court and

3     with the Defendants present.)

4          (The following proceedings were held within the hearing

5     and presence of the Jury.)

6               THE COURT:  Morning all.

7               MR. GORLA:  Good morning, Judge.

8               MR. DITTMEIER:  Good morning, Judge.

9               THE COURT:  Ready to proceed?

10              MR. DITTMEIER:  Yes, Your Honor.

11              THE COURT:  Call your next witness.

12              MR. DITTMEIER:  Nicholas Berry.

13              THE COURT:  You may proceed.

14                        **NICHOLAS D. BERRY,**

15     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

16     FOLLOWS:

17                        DIRECT EXAMINATION

18     BY MR. DITTMEIER:

19     Q    Would you state your name for the Jury, please?

20     A    Yes.  It's Nicholas D. Berry.

21     Q    And what's your occupation or profession?

22     A    I'm a Sergeant with the Missouri State Highway Patrol.

23     Q    And how long have you been with the patrol?

24     A    About 17 and a half years.

25     Q    And you were so employed on March 17th, 2008?

4

1    A    Yes, sir, I was.

2    Q    Were you contacted that day by criminal investigators of

3    the Highway Patrol to assist them?

4    A    Yes, I was.

5    Q    Okay.  And what were you to assist them in?

6    A    With the execution of an arrest warrant.

7    Q    And what was that warrant for?

8    A    It was for murder.

9    Q    Okay.  And was your assistance needed to effect the

10   arrest of Kay Young?

11   A    Yes.

12   Q    Now, did you have information -- about what time did you

13   effect that arrest that afternoon?

14   A    About 6:15 in the evening.

15   Q    Was it Kay Young?

16   A    Yes, sir.

17   Q    And did you have information that she was heading home?

18   A    Yes, I did.

19   Q    Were criminal investigators up at her house at that time?

20   A    Yes, they were.

21   Q    And where did you station yourself?

22   A    I was on Highway O, just a little outside of Novinger,

23   just down from the soon to be arrestee's residence.

24   Q    Okay.  And could you see her home from your vantage

25   point?

5

1    A    Yes.  Her home is up on a hill.  I could.

2    Q    Okay.  And was there -- there was a reason a decision was

3    made to effect the arrest on the road?

4    A    Yes, sir.

5    Q    And what was that?

6    A    Mainly just officer safety issues, just to --

7    Q    Okay.  Now, when you stopped Ms. Young, were you looking

8    for a particular truck or --

9    A    Yes, yes.  I had a description.

10   Q    And what were you watching for?

11   A    A white three-quarter-ton pickup, an F250.

12   Q    And did you see Ms. Young?

13   A    Yes, I did.

14   Q    And what did you see when you saw -- what did you do when

15   you saw her?

16   A    Turned on my lights, the emergency lights, activated

17   those, and effected a traffic stop.

18   Q    Okay.  And she pulled right over?

19   A    Yes, sir.

20   Q    Okay.  Now, in your patrol cars, are they equipped with,

21   like, video recorders?

22   A    Yes, they are.

23   Q    And was the arrest on videotape?

24   A    Yes, it was.

25   Q    Was that video subsequently retrieved?

6

1    A    Yes.

2    Q    And have you had occasion to review it?

3    A    I have, sir.

4    Q    Okay.  Now, let me -- let me show you what's been

5    previously marked as Government's Exhibit 40 and 40A.  Would

6    you look at Government's Exhibit 40 and tell the Court and the

7    Jury whether you've seen that before?

8    A    Yes, sir, I have seen it before.

9    Q    And what is that?

10   A    It is a -- a copy of the arrest video that was taken by

11   the in-car video of my patrol car.

12   Q    And that's a true and accurate representation?

13   A    Yes, sir.

14   Q    And when you listened to this video and reviewed it,

15   is -- is there audio on it?

16   A    Yes, there is.

17   Q    Okay.  Does the audio -- is the audio on from the

18   beginning of the video, or is there something that kicks the

19   audio on?

20   A    There's a -- there's about 30 seconds, approximately 30

21   seconds, where there's no audio.  There's a prerecord, so when

22   it's first turned on, the system is turned on, it shows you

23   what happened 30 seconds before it was turned on.

24   Q    Okay.

25   A    The same thing happens at the end.

1    Q     Okay.  I now want to show you Government's Exhibit 40A.

2    Do you recognize that?

3    A     Yes, sir.

4    Q     And is that a transcript of the audio on the video?

5    A     Yes, sir, it is.

6    Q     And you reviewed that?

7    A     I did.

8    Q     And that's a true and accurate representation of what's

9    on the video?

10   A     Yes, it is.

11         MR. DITTMEIER:  At this time, Your Honor, I would

12   offer Government's Exhibit 40 into evidence.

13         THE COURT:  Any objection?

14         MR. DITTMEIER:  And I --

15         MR. CURRAN:  No objection.

16         MS. HERNDON:  No.

17         THE COURT:  Admitted.

18         MR. DITTMEIER:  And I would also offer Government's

19   Exhibit 40A into evidence for the record, not to publish to

20   the Jury, simply that we have it as part of the record.

21         THE COURT:  Very well.  Any objection?

22         MR. CURRAN:  No objection, Judge.

23         THE COURT:  40A will likewise be admitted.

24         MR. DITTMEIER:  I'd ask leave to play the video,

25   Judge.

1          THE COURT:  Very well.

2      (Video played.)

3  Q    (By Mr. Dittmeier) Now, Officer, the Exhibit 40, the

4  video we just watched, that was a true and accurate

5  representation of what took place?

6  A    Yes, sir, it was.

7  Q    Okay.  And when you pulled Ms. Young over and went up and

8  talked to her about the -- the warrant for her murder, she

9  indicated she had no idea what murder you were talking about?

10  A    Yes, that is correct.

11  Q    And at some point in there, did she say, "Murder of who?"

12  A    Yes, that's exactly what she said.

13  Q    Okay.  Now, there was some reference to an individual in

14  there by the name of Darrell that was going to come down to

15  get the truck?

16  A    Yes, sir.

17  Q    Okay.  And who was -- was that Darrell Hamilton?

18  A    I believe that's the name.  At the time, I knew it was

19  Darrell.  It was a person who had been reported to be living

20  at Ms. Young's address.

21  Q    Okay.  Somebody who was living with her?

22  A    Yes, that was what I was told.

23  Q    And was the truck subsequently turned over to him?

24  A    Later, after -- after my departure.

25  Q    Okay.

1    A    But that was the plan.

2    Q    Okay.  Now, did you have occasion to check the inside of

3    the truck before you turned it back to Darrell?

4    A    Yes, sir.

5    Q    And could you tell the Jury what you did?

6    A    Just kind of looked for anyplace where a large item could

7    be.  I wound up -- eventually wound up dumping her purse over,

8    just to make sure there was nothing that shouldn't be there.

9    Q    Because that was going to be turned back?

10   A    Yes, yes.

11   Q    And when you dumped the purse over, did anything come to

12   your attention?

13   A    Yes, sir.

14   Q    And what was that?

15   A    There was a stack of personal papers.  There was also a

16   small spiral notebook, and they were all kind of bound

17   together with a rubberband that was maybe twisted two or three

18   times.

19   Q    Okay.  And did you see some language there that you

20   thought you should draw --

21        MS. HERNDON:  Your Honor, I'm going to object.  Can

22   we approach?

23        THE COURT:  You may.

24        MR. DITTMEIER:  I'm not asking him to go into the

25   language.

1        MS. HERNDON:  Well, I --

2        MR. DITTMEIER:  Oh, okay.

3        MS. HERNDON:  -- think I still need to approach.

4        MR. DITTMEIER:  Oh, okay.  All right.

5        THE COURT:  All right.

6     (A bench conference was held on the record and outside of

7  the hearing of the Jury as follows:)

8        THE COURT:  I assume this is regarding your previous

9  objection?

10        MS. HERNDON:  Yeah, and I don't know why I feel like

11  I should object right now to any further mention of this just

12  based on our motion to suppress.  I'm not sure exactly where

13  he's going with it, but I would just object to any further

14  reference to it based on the motion to suppress it and keep it

15  out of evidence even if he isn't introducing it.

16        THE COURT:  Mr. Dittmeier.

17        MR. DITTMEIER:  Judge, I was just going to ask him if

18  he -- if he seized this packet of stuff and turned it over to

19  investigators.  I wasn't going to ask him anything further,

20  and I wasn't going to introduce it.

21        THE COURT:  All right.  Very well.

22        MS. HERNDON:  Okay.

23        MR. CURRAN:  I should give you the heads-up.  We're

24  planning on -- I'm going to make a little more record with

25  him, but when we get to -- the only thing we do in our case --

1   we're going to plan to move for the admission of at least that

2   top paper.  It may bear discussion later.

3            THE COURT:  Okay.

4            MR. CURRAN:  I'm not going to get into the contents.

5   I'm going to have it marked.  I'm going to have to have it

6   marked, but I can't move for its admission in our case, I

7   don't think.

8            THE COURT:  All right.

9            MR. CURRAN:  I just wanted to let you know.  We may

10  want to talk about it later, but --

11           THE COURT:  Okay.

12           MR. CURRAN:  So I'm going to have some questions, but

13  I'm not going to get into the contents.

14           THE COURT:  All right.

15           MS. HERNDON:  You're going to wait and recall him

16  or --

17           MR. CURRAN:  No.  I'll have him identify it, right,

18  and mark it.

19           MS. HERNDON:  Oh, okay.

20           MR. CURRAN:  Okay.

21           MS. HERNDON:  Yeah, you're going to do that now --

22           MR. CURRAN:  Yes.

23           MS. HERNDON:  -- is what you're saying?  Okay.

24           MR. CURRAN:  We'll do it on cross.

25           MR. DITTMEIER:  But if we're talking procedurally

12

1   here then, I mean, rather than have him mark it, I'm not going

2   to introduce this.  Okay.  If the defense wants to introduce

3   it and wants to mark it as an exhibit, I'm not sure they can

4   do that on our case, but in the interest of efficiency, I am

5   not going to object to that.  If we've got him on the stand,

6   we may as well hash out what he's going to do.

7          MS. HERNDON:  Yeah.  Well, no, I agree.  I mean I

8   would object to him doing it, but I won't object to him being

9   procedurally wrong.

10          THE COURT:  Okay.  All right.  Good deal.  And then

11  we'll cross that bridge when we actually get to it.

12          MS. HERNDON:  Okay.

13          MR. CURRAN:  Okay.  I'm not going to be laying the

14  foundation.  I'll have it marked as a defense exhibit but not

15  move for its admission until it's our case.  That's what I was

16  thinking.

17          THE COURT:  I got you.

18      (The following proceedings were held within the hearing

19  of the Jury.)

20          THE COURT:  Proceed.

21  Q    (By Mr. Dittmeier) Now, Officer, I believe you said that

22  these papers that had the rubberband around them, there was

23  something there that drew your attention?

24  A    Yes, sir.

25  Q    And what did you do with that?  Who'd you turn that over

1   to?

2   A    I brought it to the attention of Sergeant Troy Linneman,

3   one of our criminal investigators.

4   Q    Okay.  All right.  And then they seized it?

5   A    Yes, sir.

6   Q    Okay.  After that, did you put the items back in the

7   purse and leave it in the truck?

8   A    I think I left them just sitting right where they were

9   right on the seat.

10  Q    Okay.  Did you find anything else that drew your

11  attention in the inside of the vehicle?

12  A    Yes, sir.

13  Q    And what was that?

14  A    In the upper right portion of the pickup truck, there was

15  a black case, and inside the case, there was a -- what I would

16  have to describe as a stun gun, an electronic-controlled type

17  of weapon.

18  Q    Did you have any reason to seize that?

19  A    No, sir, I did not.

20  Q    Was that left with the vehicle when it was turned back to

21  Darrell Hamilton?

22  A    As far as I know, it was, sir.

23       MR. DITTMEIER:  Okay.  I have no further questions of

24  this witness.

25       THE COURT:  Cross, Mr. Curran.

1          MR. CURRAN:  Thanks, Judge.

2                   CROSS-EXAMINATION

3    BY MR. CURRAN:

4    Q    Trooper Berry, you were -- you were in that area because

5    they anticipated at some point Ms. Young would be driving by,

6    is that fair to say?

7    A    Yes, sir.

8    Q    Okay.  And then you knew what vehicle she'd be in, is

9    that correct?

10   A    Yes.

11   Q    You had a license plate number and all of that?

12   A    Yes, that's correct.

13   Q    Okay.  And it happened as planned; the vehicle goes by;

14   you recognized it, right?

15   A    Yes, sir.

16   Q    And then you recognized her in it?

17   A    Yes, sir.

18   Q    Okay.  So then what -- and then -- I think we just saw on

19   the tape, once the vehicle is curbed, she's the only passenger

20   there, is that right?

21   A    She's the only person, yes.

22   Q    I'm sorry.  She's the driver.  Yeah, she's the only

23   person in the truck?

24   A    She's the only occupant, yes, sir.

25   Q    Yeah, okay.  And -- and I think you said that once she's

1   secured, once she's cuffed and taken away, then it's normal

2   procedure to check inside the cab to make sure there's no

3   contraband or weapons or anything, is that fair to say?

4   A    Yes, sir.

5   Q    Okay.  And that's one of the reasons you were checking

6   the purse, just to make sure -- well, one of the reasons is to

7   make sure there's no weapons?

8   A    Yes, sir.

9   Q    Okay.  And that's just standard procedure for an arrest?

10  A    Correct.

11  Q    Okay.  Now, that was the only purse in the cab?

12  A    Yes.

13  Q    Okay.  And it's your understanding that was her purse?

14  A    Umm, I don't know if I had an understanding, sir.

15  Q    Okay.

16  A    She was driving, and there was a purse.

17  Q    Okay.  All right.  But there are other -- okay.  And then

18  what was the plan to do with the purse?  You were going to

19  give it back to Darrell, or were you going to keep it, have it

20  go with her?

21  A    My understanding was that the truck and its contents were

22  going to be released to Darrell.

23  Q    Okay.  All right.  And you didn't want anything being

24  released that was contraband?

25  A    Correct.

1    Q    Okay.  Now, you said there was -- when you were looking

2    in the purse for the weapon, something else caught your eye,

3    is that right?

4    A    Yes, sir.

5    Q    All right.  Now, I don't want you to tell us what the

6    contents were.  I just want to see if you can identify it, all

7    right?

8    A    Okay.

9         MR. CURRAN:  Okay.  I'm going to mark this exhibit as

10   Defendant's Exhibit D, but I'm going to mark it on the

11   envelope rather than on the exhibit itself, just to let the

12   Court know.

13        THE COURT:  All right.

14   Q    (By Mr. Curran) Did you -- after you seized this item

15   we're talking about, which I'm calling Defendant's Exhibit D

16   and I'm going to show you in a minute, are you the one that

17   packaged it, or did somebody else?  Do you remember?

18   A    Sir, I didn't actually seize it.  I located it --

19   Q    All right.

20   A    -- and --

21   Q    And then you turned it over to one of the others, the

22   detectives maybe?

23   A    Sergeant Linneman or then Corporal Wilhoit probably is

24   the one that packaged it.

25   Q    Okay.  So just to have the sequence right, you were

1    looking in the purse for possible contraband, right?

2    A    I actually dumped, just dumped --

3    Q    Dumped it out?

4    A    -- the purse over on the seat.

5    Q    Okay.  And that -- and that was the reason, to look

6    for -- to see if there was anything in there that shouldn't

7    be, is that right?

8    A    Yes, sir.

9    Q    Okay.  And then this exhibit caught your eye?

10   A    That's correct.

11          MR. CURRAN:  Okay.  I want to approach.  May I

12   approach, Judge?  Sorry.

13          THE COURT:  Of course.

14   Q    (By Mr. Curran) Now, I don't want you to get into what

15   the writings are or the contents, but do you recognize what

16   I've just showed you?

17   A    Yes, sir.

18   Q    All right.  And is that -- the top page that you're

19   looking at now, is that what caught your eye?

20   A    Yes, it is.

21   Q    All right.  And that's what led you to direct either

22   Linneman or one of the other officers there because it might

23   be something of interest to them, is that fair to say?

24   A    That is correct, sir.

25   Q    Okay.  And is that how -- I notice there's a spiral

 1   notebook and then also there's some papers and it's all

 2   rubberbanded; is that in the condition in which you saw it?

 3   A    It's fairly -- I mean the rubberband was maybe in a

 4   little different position, but the spiral notebook was on the

 5   bottom, and this was the top page.

 6   Q    Okay.

 7   A    I can't confirm what might be in between, but --

 8   Q    Okay.  And then you said when you dumped the purse out,

 9   that caught your eye?

10   A    Yes, sir.

11   Q    Okay.  All right.  I'm just taking it back.  All right.

12   Just so I'm clear, this is what came out of the purse -- what

13   we just looked at?

14   A    Yes, sir.

15         MR. CURRAN:  Defendant's Exhibit D.  All right.

16         No further questions.  Thank you.

17         MS. HERNDON:  I don't have any questions.  Thank you.

18         MR. DITTMEIER:  Judge, I have just one question.

19         THE COURT:  Yes, sir.

20                    REDIRECT EXAMINATION

21   BY MR. DITTMEIER:

22   Q    Officer, you identified that what Mr. Curran showed you

23   is what came out of the purse.  Actually, this pack of papers

24   you described that's wrapped with the rubberband, you

25   recognized some of the language on that loose first sheet

1    that's there, is that correct?

2    A    Yes, sir.

3    Q    Okay.  And as far as the other things and the notebook

4    looking similar, you can't really vouch that any -- all the

5    other stuff -- that this is the exact stuff that was in there,

6    I guess?

7    A    Correct.  It looks --

8    Q    You didn't go through it?

9    A    I did not go through it.

10   Q    Basically, all you saw was like rubberband around this

11   and the language on --

12   A    On the top page, sir, yes.

13        MR. DITTMEIER:  I have no further questions, Judge.

14        THE COURT:  All right.  Anything else, Mr. Curran?

15                    RECROSS-EXAMINATION

16   BY MR. CURRAN:

17   Q    I just want to make sure I'm clear.  I think I'm probably

18   asking you the same question.  The top note is what you saw,

19   right?

20   A    Yes, sir.

21   Q    And you didn't -- and I think you just said you didn't

22   thumb through and look at any of the other documents?

23   A    No, sir.

24   Q    Okay.  Generally, it generally looks like what you

25   seized, is that right?

1   A    Other than the placement of the rubberband might be a

2   little different, but yes.

3   Q    Okay.  All right.  And then you did get a chance to look

4   at the note again when I just gave it to you?

5   A    Yes, sir.

6   Q    Okay.  And that's the note that you remember?

7   A    Yes, it is.

8           MR. CURRAN:  Okay.  Thank you.

9           MS. HERNDON:  No.  Thank you, Judge.

10          THE COURT:  All right.  Thank you, sir.

11          THE WITNESS:  Thanks.

12          THE COURT:  You're free to go.

13          Call your next witness.

14          MR. DITTMEIER:  Judge, at this time, the Government

15  is prepared to rest its case with the caveat that we would

16  like the opportunity with the Court and defense lawyers to go

17  through all the exhibits to make sure that the exhibits have

18  been admitted.

19          THE COURT:  All right.  Very well.  Sidebar.

20      (A bench conference was held on the record and outside of

21  the hearing of the Jury as follows:)

22          MS. HERNDON:  Can we go now?

23          THE COURT:  Huh?

24          MS. HERNDON:  Can we go now?

25          THE COURT:  Can I go now?  Umm, do you want to take

1  up the motions now, or do you want to take a little recess for

2  the Jury and do the logistics of the motion and the exhibits?

3          MR. GORLA:  That probably makes sense.

4          MS. HERNDON:  Yeah.

5          THE COURT:  Do you want to do that?

6          MS. HERNDON:  Yeah, let's do that because, yeah, we

7  don't want to let them sit there while we go through all that.

8          THE COURT:  All right.

9          MR. DITTMEIER:  Do you have your witnesses here yet?

10          MR. GORLA:  I'm going to go out there and see.

11          MR. DITTMEIER:  Well, I know you said they're coming

12  about 11:00.

13          MR. GORLA:  10:30.

14          MR. DITTMEIER:  Okay.

15          MR. GORLA:  So by the time we do all this, they'll

16  probably be here.

17          THE COURT:  Okay.  All right.

18      (The following proceedings were held within the hearing

19  of the Jury.)

20          THE COURT:  Ladies and gentlemen, the Government

21  having announced that they've rested, we'll take a brief

22  temporary recess at this time.  During the course of the

23  recess, do not discuss the case amongst yourselves or with

24  anyone else.  Do not allow anyone to discuss it within your

25  hearing or presence.  Do not form or express any opinions

1  about the case until it is given to you to decide, and

2  certainly, again, do not utilize any social networking sites

3  during the course of the recess.  Temporary recess, Carrie.

4      (The following proceedings were held outside the hearing

5  and presence of the Jury.)

6          THE COURT:  You may be seated.  Motions.

7          MR. MCGRAUGH:  Judge, we would move for, with leave

8  of court to file a written motion, a motion for a directed

9  verdict at the close of the Government's case.  The specifics

10  of the -- of the argument, I would leave to Mr. Gorla as we

11  will, obviously, join in the same, same motion.

12          THE COURT:  Very well.

13          MR. MCGRAUGH:  Oh, we don't need leave, Judge.  We've

14  got a motion right here.

15          THE COURT:  Okay.  Mr. Gorla.

16          MR. GORLA:  Yes, Your Honor.  Judge, we would also

17  move for judgment of acquittal at the close of the

18  Government's case on both counts of the indictment.  Ask leave

19  to file a written motion later with the Court electronically.

20          THE COURT:  Very well.

21          MR. GORLA:  Judge, I'd just like to say with respect

22  to Count I of the indictment, the conspiracy charge, if you

23  put these statements of Keri Ponder and Thomas Ponder to the

24  side, there's no evidence of a conspiracy.  There's no proof

25  that there was an agreement between the Defendants to commit

23

1   the offense.  What the Government is trying to do is they're

2   trying to use the statements which -- of Thomas Ponder -- the

3   statements that Kathy -- the testimony of Thomas Ponder and

4   the testimony of Keri Ponder as to the statements of Kathy

5   Mock and trying to use those statements to bootstrap them into

6   proof of the conspiracy, and the -- the law is clear, the

7   evidentiary rule is clear that while statements of

8   coconspirators can be considered, they can't make the

9   conspiracy just based upon the statements, and that's what we

10  have as to Count I.

11         As to Count II, the murder-for-hire charge, what the

12  Government has to show in the murder-for-hire charge is they

13  would have to show that there was either payment going from

14  one Defendant to the other or a promise to pay going from one

15  Defendant to the other to commit the homicide.  At best, at

16  best, they have an expectation that there would be some

17  payment in the future.  The expectation of pecuniary gain in

18  the future is not covered by the statute.  There's a case out

19  of the Tenth Circuit, *United States versus Wicklund*,

20  W-I-C-K-L-U-N-D.  I believe the cite is *114 F.3d 151*, and the

21  case is very, very appropriate, and in that particular case,

22  there was a planned homicide, and they were going to be paid

23  in the future, and there wasn't a direct promise, and there

24  wasn't direct -- there wasn't any payment, and there wasn't

25  any promise to pay, okay, upfront, and what the court did is

24

1   the court had to interpret the murder-for-hire statute, and

2   the issue was whether the provision that says "consideration

3   for a promise or agreement to pay anything of pecuniary value"

4   covered the expectation of pecuniary gain, and what the court

5   did is it compared the language in § 1958 to the language in

6   the death penalty statute, the one where they talk about the

7   pecuniary gain aggravator, and in the death penalty statute,

8   the pecuniary gain aggravator does include expectation of

9   pecuniary gain in the future.  This statute does not, and what

10  the Tenth Circuit said was that, obviously, Congress, if they

11  wanted to put expectation of pecuniary gain in the

12  murder-for-hire statute, they could because they've done it in

13  the other statute, in the death penalty aggravator statute,

14  and they didn't do it, and they basically said then that it

15  doesn't apply and that, you know, the murder-for-hire scenario

16  under the statute is you have to pay now or a promise or an

17  agreement upfront to pay in the future but not the fact that,

18  you know, hey, you know, you're going to expect to be paid

19  because there's going to be some -- in this case, there's

20  going to be some insurance money that's going to come and

21  you're going to be paid out of that in the future, and that's

22  at best what we have here on the murder-for-hire charge,

23  Judge, and there's just not sufficient evidence to support,

24  you know, the submission of that case to the Jury.

25            THE COURT:  Mr. McGraugh.

1           MR. MCGRAUGH:  Your Honor, I would just join in

2    Mr. Gorla's argument, but I would also point out that given in

3    the most favorable light, the evidence in the most favorable

4    light to the Government, I don't believe there's sufficient

5    evidence for a conspiracy to commit murder in the first degree

6    because even the Government's own evidence is that no one

7    accepted an agreement, no agreement was formed that there'd be

8    a murder-for-hire, and -- and I also believe, Your Honor,

9    there's insufficient evidence that the actual murder of

10   Mr. Griesbauer was for hire as there's been no evidence that

11   anything of pecuniary gain passed between either Ms. Mock or

12   Ms. Young.  Those are the two addendums I would add to

13   Mr. Gorla's argument.

14          MR. GORLA:  Judge, I would join in Mr. McGraugh's

15   argument as well.

16          THE COURT:  Very well.  Mr. Dittmeier.

17          MR. DITTMEIER:  Well, Judge, the Court's listened to

18   all the evidence, and from the evidence, I believe it's

19   obvious that there in fact was a conspiracy here.  The

20   statements of the Defendants can be considered as finding the

21   conspiracy, but prior to the statements, you've got both

22   Defendants at the scene of the body; you've got both

23   Defendants telling a story that is lockstep that they now try

24   and avoid, but it's a lockstep story.  The gun used in the

25   murder is Kay Young's, and Kathy Mock is up there with her DNA

1   in the gloves with gun residue, and she has the ski mask.

2   That's without any statements to anybody.  Then when you build

3   off of that, you have Kathy Mock soliciting people to do the

4   murder, and if the state recalls, there was a lady that

5   testified in this case, Amanda Bax, who said that Kay Young

6   told her that the murder was for insurance and that she had

7   Kathy Mock trying to get people to do the murder, and it's one

8   step further that Kathy Mock is telling them that they are

9   going to get paid for the murder.  So I'd submit to the Court

10  that there's overwhelming evidence of a conspiracy here.

11          As far as the case that Mr. Gorla cited, as far as

12  somebody doing a murder and expecting something -- "I'll do

13  the murder because this is a nice, generous guy" -- I don't

14  know if that's the way that case read.  I'm not familiar with

15  it, but I do know not long ago this Court tried a case where

16  there was an offer of a vehicle to do a murder, an old

17  vehicle, and it was a murder-for-hire, and it was affirmed by

18  the Eighth Circuit court, and the statute clearly says a

19  promise or an agreement to pay, and we've got Kathy Mock here

20  passing on, offering to pay people money.  The evidence is

21  clear she has no money.  We have Kay Young going to collect

22  the insurance, and I would say clearly there's an offer to

23  pay.  She tells Jean Ballard she's going to come into some

24  money just shortly before the murder, so I'd submit to the

25  Court that we've met every element and that we've also met the

1    element of the promise or agreement to pay money.

2            THE COURT:  Thank you.  Response, if any.

3            MR. GORLA:  Just briefly, Judge.  You know, I think

4    Mr. McGraugh has previously addressed Count I, and again, the

5    murder-for-hire charged in Count II -- I think at best -- and

6    I think Mr. Dittmeier -- what Mr. Dittmeier just said kind of

7    goes along to prove this, is you had an expectation of payment

8    in the future at best.  You know, you don't have any evidence

9    of any promise to pay now.  You don't have any evidence of

10   payment now.  You've got someone's testimony at best that

11   expects to be paid in the future, expects to come into some

12   money in the future.  It's an expectation of pecuniary gain in

13   the future.  It's insufficient to prove an offense under the

14   murder-for-hire statute, and it's totally different than the

15   conspiracy statute.  They actually have to prove each and all

16   the elements of the murder-for-hire.  Obviously, as you know,

17   in the conspiracy statute, you know, you don't even have to

18   prove a murder was committed, but for a murder-for-hire, I

19   mean, you do, and that's -- that's the problem that they have.

20   Judge, if you'd like, I've got an extra copy of the case --

21           THE COURT:  Please.

22           MR. GORLA:  -- if it please the Court.  I'll give a

23   copy to the other side as well.

24           THE COURT:  Thank you, Ms. Carrie.  Anything further?

25           MR. DITTMEIER:  I have nothing further, Judge.

1          THE COURT:  All right.  As to Defendant Young's and

2    Defendant Mock's motion for judgment of acquittal at the

3    conclusion of the Government's case, on the arguments

4    presented by counsel in support of the motion and the

5    arguments presented by the Government in opposition to the

6    motion, it is clear to the Court that on the evidence adduced

7    that there is abundant evidence in support of the conspiracy

8    independent of any statements that were made.  The statements

9    as far as the evidence is concerned are statements that, in

10   effect, put the icing on the cake as far as conspiracy.  There

11   is independent -- sufficient independent evidence on the part

12   of the conduct of the Defendants individually as well as

13   collectively with regard to the conspiracy, and, of course,

14   the additional statements by Ponder, testimony by Ponder and

15   Bax sufficiently establish a conspiracy.

16          As to the murder itself, there is no doubt based upon

17   the evidence that a murder was committed.  Accident has been

18   excluded.  Suicide has been excluded.  The only thing left is

19   whether there was a homicide or a murder.  The evidence has

20   clearly established that in relation to the location of the

21   wound, the nature of the weapon used to perpetrate the

22   offense, the sudden death of the victim, which excludes the

23   possibility of suicide, combined with certain items that were

24   found at or near the scene, which would be a ski mask and

25   gloves, as Mr. Dittmeier indicated, bearing the unique DNA of

1    Defendant Mock as well as stippling on the face in the area of

2    the wound by the victim.  Defendant's motions on the evidence

3    thus far adduced -- and the Court concluding that the

4    Government has established a prima facie case for submission

5    to the Jury -- are overruled individually and collectively.

6    Having overruled the Defendants' motion for judgment of

7    acquittal by Young and by Mock, are we ready to proceed?  Are

8    you guys going to present any evidence, Mr. McGraugh or

9    Mr. Gorla?

10            MR. MCGRAUGH:  Yes, Your Honor.  The -- we -- we, on

11   behalf of Ms. Mock, don't intend to call any witnesses.  We

12   had Officer Berry under subpoena.  He would have been our

13   witness to introduce -- and our only piece of evidence we wish

14   to introduce is the note which Officer Berry identified at --

15   at the time of the arrest, and so I don't know if -- if anyone

16   is going to have any issue with the introduction of the top

17   note there, but that's what we intend to do, and we might as

18   well get that out of the way now if anyone does.

19            THE COURT:  Ms. Herndon?

20            MS. HERNDON:  Well, yeah, yeah, we object to it,

21   obviously, based on our prior motions, Your Honor.

22            THE COURT:  Mr. Dittmeier, have you got anything in

23   this?

24            MR. DITTMEIER:  Judge, I can't identify the note or

25   whatever is why I didn't put it in, but I have no specific

1    objection.  I don't know.  Are you objecting to it?

2              MS. HERNDON:  Yes.

3              MR. DITTMEIER:  Oh, okay.

4              THE COURT:  Yes, go ahead, Mr. McGraugh.

5              MR. MCGRAUGH:  Judge, as I understand it,

6    Mr. Dittmeier has no objection to it, although with the caveat

7    we did not intend -- there's a -- there's a back side of this

8    note, which was not identified by -- by --

9              THE COURT:  Berry?

10             MR. MCGRAUGH:  -- Officer Berry.  So we wouldn't

11   intend to put the back side of the note.  Just the front side

12   of the note is what he identified.  And as to the -- as to

13   Defendant Young's objection, that objection, a motion to

14   suppress, only goes to the Government's obtaining of the

15   evidence by a constitutional violation.  It doesn't restrict

16   us.

17             MS. HERNDON:  Well, I guess I would argue against

18   that if I thought you were going to over -- you were going to

19   change your ruling, but, umm, yeah, I mean the only -- the

20   only problem that I guess that I have with it, Judge, in

21   addition to the motion to suppress, is it's not in her

22   handwriting, and it's clearly not in her -- the portion that

23   Mr. McGraugh wants in is clearly not in her handwriting as

24   evidenced by the stuff that we've seen introduced through the

25   insurance documents that are her handwriting, and so it's just

 1    out there.  It's just this thing floating out there for

 2    anybody to argue anything about since there's no connection

 3    between this and actually being something that she was aware

 4    of or knew about or wrote.  Clearly, she didn't.  I think

 5    it's -- I think it's -- the probative value of it is,

 6    therefore, outweighed -- the prejudicial effect outweighs the

 7    probative value of it because of that, because it's so -- it's

 8    just such an unknown.  It was in a big bag or purse or

 9    whatever that was in her truck.  I'll give them that, but

10    especially because it's not in her handwriting, it's -- I mean

11    there's no evidence to tie her to it.  There's no evidence

12    that she knew it was there.  There's no evidence about who

13    wrote it.  There's no evidence about anything, and because of

14    that, I think it's just too out there to be relevant because

15    of the circumstances that nobody -- you know, nobody can

16    identify it or authenticate it or anything else.  It just

17    leaves too much up to speculation.

18             MR. MCGRAUGH:  Can I address that, Your Honor?

19             THE COURT:  Uh-huh.

20             MR. MCGRAUGH:  Ms. Herndon's argument is an

21    authenticity argument, and that's under the Rule 901, and if

22    the Court refers to the Federal Rules of Evidence 901, the --

23    the requirement for authentication or identification is a

24    condition precedent to admissibility is satisfied by evidence

25    sufficient to support a finding that the matter in question is

1    what the proponent claims, and -- and -- and number four,

2    subparagraph four of that, is the distinctive characteristics

3    and the like, and it further says appearance, contents,

4    substance, internal patterns, and other distinctive

5    characteristics taken into conjunction with the circumstances.

6    That rule has been interpreted by a number of cases. *U.S.*

7    *versus Reyes*, *798 F.2d 380*.  It's a Tenth Circuit case, 1986.

8    It relates to a notebook which was found amongst a series of

9    drug conspirators, and in that case, the Tenth Circuit says,

10   "The notes were seized from Reyes' residence.  The source of

11   the notes and the correspondence of information contained in

12   the notes to members of the conspiracy provided ample

13   foundation for their admissibility.  Moreover, the contents of

14   the notes indicated that they were written by someone involved

15   in the conspiracy."

16         Now, in this, this note directly says, "Use her

17   drugged state to convince her she shot him."  Now, we already

18   have evidence in this case that Kay Young had supplied Kathy

19   Mock with a bagful of Vicodin.  Further, the note says,

20   "Offered 10,000 to kill him.  Was turned down."  Again, the

21   information contained on the note directly corroborates the

22   evidence that this Court has heard.

23         I would also refer to *U.S. versus Banks*, which is an

24   Eighth Circuit case, *514 F.3d 769*.  This has to do with

25   evidence retrieved from trash, from the -- from a

1    defendant's -- I'm sorry.  This has to do with an ATF

2    application filled out as an alias of the defendant, and

3    again, the Eighth Circuit interpreting Rule -- the rule found

4    it admissible.

5             *U.S. versus Baker* -- this is the case, Judge, where

6    trash was found outside the defendant's house and the items in

7    the trash, based on the Rule 901, was admitted into evidence.

8             As far as whether she wrote it or didn't write it,

9    that's something that the -- the -- the Defendant Young can

10   argue.  It goes to possible weight but not the admissibility

11   of it.  They're free to contest it in any manner that they'd

12   like to as far as whether it's in her hand or not.

13             MS. HERNDON:  Well, doesn't --

14             THE COURT:  So with that in mind, Ms. Herndon,

15   does --

16             MS. HERNDON:  I mean I don't have --

17             THE COURT:  -- does that mean that you're a

18   handwriting expert now?

19             MS. HERNDON:  Well, you know what, Judge?  I think

20   that my seven-year-old could tell that this is not her

21   handwriting.  I don't think you have to be an expert.  It's

22   just so different than what her handwriting is, but I mean

23   even -- and I don't -- that just makes it all the worse to me.

24   I think the problem is none of Mr. McGraugh's cases show how

25   this note should be admissible in this case.  There's nothing

1    out there that's similar.  He didn't even talk about the last

2    two, but there's nothing out there that's similar to what's

3    going on here.  The main problem is just nobody can tie it up.

4    Nobody can make any connection to it is the main problem as we

5    just don't -- you know, everybody is -- this comes in and

6    everybody is just free to argue anything they want, and

7    that's -- about -- about who wrote this or what it means.

8    It's not -- I mean it's a confusing note.  It really doesn't

9    make sense.  Open to any interpretation.

10        THE COURT:  Well, for the record, let's specifically

11    identify the note in terms of what it says, so that it's clear

12    what we're talking about here.

13        MS. HERNDON:  Okay.  The handwritten portion on the

14    lines say, "Use her drugged state to convince her she shot

15    him.  Offered 10,000 to kill him.  Was turned down.  If I

16    collaborate her story.  Bucks.  Sheriff here 3:30 p.m."  And

17    then on the top of the note, there's writing that says, "Cindy

18    in with marijuana.  Has jail and inmates convinced.  Openly

19    discussing," and it says 3-13 of '06.

20        Do you want to look at it?

21        THE COURT:  Yes.

22        MS. HERNDON:  You do?

23        THE COURT:  Uh-huh.

24        MR. MCGRAUGH:  Judge, I think you're looking at the

25    back side of the note, and that's not what we're --

1          MS. HERNDON:  Oh, sorry.  Turn it around.

2          THE COURT:  Oh, I know.  I only have to decide on the

3    facts, so I get to see some of the more interesting things.

4          MR. MCGRAUGH:  Judge, could I just respond?  What I

5    think Ms. Herndon said was that anyone could tell that -- her

6    seventh grader or seven-year-old child.  Well, she's free to

7    argue that, Judge.  You know, she's free to make that argument

8    to the Jury, "Compare this to the other writings you've seen

9    and" -- but that goes to weight.  That doesn't go to

10   admissibility.  Admissibility has got it by 901, and if the

11   characteristics in that note confirm the authenticity of it --

12   the distinctive characteristics -- and it clearly does by the

13   evidence you've heard in this case -- it's admissible.

14         THE COURT:  You sure you want this in?

15         MR. MCGRAUGH:  Yep.

16         THE COURT:  Positive?

17         MR. MCGRAUGH:  I am.

18         MS. HERNDON:  Judge, if I may, I think the other

19   thing worth noting about the note is that if we look at how it

20   was recovered with this notebook and it was rubberbanded on

21   top of that -- and it's clearly -- it seems -- appears to me

22   to be a photocopy of something, which I think further -- I

23   mean this is all original papers and stuff, and that looks

24   like a photocopy of something, which I think further questions

25   what it is or where it came from or its relevance.

1          THE COURT:  I don't know what this is, Chris.

2          MR. MCGRAUGH:  What's that, Judge?

3          THE COURT:  I don't know what this is.

4          MR. MCGRAUGH:  Well, Judge, what we do know what it

5     is is we know it was taken from the Defendant at the time she

6     was arrested.

7          THE COURT:  Uh-huh.

8          MR. MCGRAUGH:  The officer saw it on top, realized

9     its importance given the facts of this case, and provided it

10    to the Missouri State Highway Patrol for evidence.  That's all

11    I think you need to know, and why it's relevant is that it was

12    in the Defendant's possession and it was -- it's obviously

13    relevant to issues in this case.

14          THE COURT:  How?

15          MR. MCGRAUGH:  Well, Judge, for two reasons.  One, it

16    showed use her drugged condition to believe she shot him.

17    It's -- my contention from my opening statement, Judge, is

18    that the Vicodin was supplied to Kathy Mock to give -- to --

19    to keep her in a drugged condition so that she believed that

20    she committed the murder when in fact she did not.  So it's

21    directly on point to that issue, Judge.  It explains the

22    pills.  It explains -- it also, Judge, is corroborated by the

23    other evidence about $10,000.  I mean, you know, that -- and

24    that it was turned down.  I think that that's directly

25    relevant to the issues in this case.

1          THE COURT:  Well, okay, but what is it?

2          MR. MCGRAUGH:  It's a note in the Defendant's

3    possession.

4          THE COURT:  Okay.  Which is -- I mean, effectively,

5    what you want to do is use this as a piece of testimony.

6          MR. MCGRAUGH:  Well, Judge, I want to use --

7          THE COURT:  Effectively, that's what you want to do.

8    You want to use this --

9          MR. MCGRAUGH:  I want to use it, Judge --

10         THE COURT:  -- as a piece of testimony from what --

11   actually, it's kind of like the secret witness because we

12   don't know where it came from; we don't know who wrote it.  We

13   do know -- we know from Sergeant Berry's testimony that it was

14   in the Defendant's purse with those other papers.

15         MR. MCGRAUGH:  We do know where it comes from.

16         THE COURT:  And I guess the extrapolation from that

17   or the conclusion from that, your argument would be from the

18   other cases that you cite, is that it would be admissible

19   because it's something that was in her possession.  Whether it

20   was in her possession as something she created or drafted is

21   another issue.

22         MR. MCGRAUGH:  It wouldn't matter, Judge.  If she

23   was -- if she asked someone to write it for her --

24         THE COURT:  Uh-huh.

25         MR. MCGRAUGH:  -- what would it matter?  What matters

1   is that it was in her possession.  That's what's -- that's

2   what's relevant about it.  It's relevant, though, to in her

3   possession and that -- what it -- you know, who wrote it or

4   who created it is not at issue.  At issue is -- and that goes

5   to -- the authenticity of it.  Authenticity is -- the

6   admissibility based on authenticity is that the

7   characteristics of it -- and the characteristics of it

8   certainly are relevant in this case.  And, again, Judge if you

9   look at those cases, I mean they're taking -- they're taking

10  evidence out of people's trash cans, and, again, that's

11  sufficient enough --

12          THE COURT:  In determining whether this comes in, how

13  do I separate this from what's on the back of it?  And, again,

14  it does appear that at some --

15          (Thunderclap.)

16          THE COURT:  That might be a sign.  It does appear

17  that this is a photocopy of something.  You know, with the

18  stuff on the back, there's also a question of whether it's a

19  photocopy of one sheet that contains things because, as I

20  said, the things that are on the back, which are these little

21  letters and words that are cut out and pasted -- it's kind of

22  like the *Creepy Crawler* movie -- is of greater interest

23  because on the back of it, in these letters that are cut out

24  or words that are cut out, you know, "Your husband said no to

25  her and she murdered.  She asked many to kill for Rita.  I

1    her.  Her and family trying to kill you from cell."  You know,

2    this is creepy stuff.  "Deeply concerned.  You and I family.

3    She's evil.  No remorse.  She crazy."  So is this all part of

4    this, too?  And, you know, if -- if it's relevant because it

5    was in her purse, all right, is the whole thing relevant

6    because it was in her purse?  Can one conclude that reasonably

7    the stuff on the back -- that this is something that --

8    whether the handwriting can be identified as her handwriting

9    by Ms. Herndon or anybody else, can one reasonably conclude

10   that this is something that the Defendant may have written or

11   drafted because it was in her purse?  You know?

12          MR. MCGRAUGH:  I don't think it matters whether she

13   drafted it, Judge.  Again, if I asked --

14          THE COURT:  Well, no, that's not my point.  My point

15   has to do with your purpose for which you want to use it, and

16   your purpose for which you want to use it, your statement of

17   relevance, is related to, as you said, what you indicated in

18   your opening statement, and what I'm saying is if you take

19   what you said in your opening statement and compare that to

20   this offer of this document as a whole with these other things

21   on the back of the document as it was folded and if you

22   conclude that there is a possibility that it was one document

23   together and photocopied, that it may not necessarily be

24   relevant and consistent with your theory, and if it's not

25   relevant and consistent with your theory, if it's just kind of

1  out there, then why should it come in as evidence on behalf of

2  Defendant Mock?

3         MR. MCGRAUGH:  For one, we're not offering the back

4  page of it, Judge, so whether that --

5         THE COURT:  We're going to pick and choose what we're

6  going to offer from this one document; is that what you're

7  saying?

8         MR. MCGRAUGH:  The only thing that was identified by

9  the officer was that front page, Judge.  That's the only thing

10  that was identified as taken.  The only specific thing he

11  identified was that front page, not the back page, Judge, so

12  that, you know, and --

13         THE COURT:  Well, in identifying the front page,

14  doesn't he identify the back page as being the thing that he

15  took from the purse because, clearly, it was together; it's

16  folded.  So if you identify the front page as being what was

17  in the purse, then you necessarily --

18         MR. MCGRAUGH:  Well, what did --

19         THE COURT:  -- excuse me -- you necessarily have to

20  identify the back page as what came from the purse because

21  it's one thing unless --

22         MR. MCGRAUGH:  Well, what would --

23         THE COURT:  -- unless you're suggesting that at some

24  point in time what was on the front page was crafted and

25  drafted and subsequently attached to the back page.  I mean,

1    how can you reasonably argue that he didn't identify the front

2    page as coming from the purse when he identified -- or the

3    back page when he identified the front page since it's one

4    thing folded?

5            MR. MCGRAUGH:  Can I answer that, Judge?

6            THE COURT:  Yeah.

7            MR. MCGRAUGH:  The reason is -- is that based on what

8    he read on the front page, he realized the importance of the

9    document, he realized the importance of the need to seize that

10   document, and, you know, it didn't matter, it's not relevant

11   what's on the back page.

12           THE COURT:  That's not my point.

13           MR. MCGRAUGH:  Well --

14           THE COURT:  At this juncture, my point is you're

15   making an argument that seems to me incredibly specious when

16   you say that he didn't identify as part of the document what

17   was on the back page since it was all one.

18           MR. MCGRAUGH:  No.  And, Judge, all I'm saying is

19   that it was identified for that purpose, and that's all we

20   wanted to introduce into evidence -- the front page -- because

21   that's what's been identified, that's why the officer took the

22   action he did in seizing the evidence, and what's on the front

23   page is what we believe is directly relevant.

24           Now, what's on the back page -- that's why it's not

25   being offered.  I'm not taking the position that it's not all

42

1  one document, but what I'm saying, Judge, is -- is that all

2  those arguments go to -- go to weight.  They don't go to

3  admissibility.  The admissibility of the document goes to

4  whether the characteristics of the -- of the document tend to

5  prove its authenticity, and it does, Your Honor, based on

6  that -- that -- the information contained on the front of --

7  on the front of that note.

8          THE COURT:  You really want this in, huh?

9          MR. MCGRAUGH:  Yes.

10          THE COURT:  This is the fourth time I've asked this.

11          MR. MCGRAUGH:  Yes.

12          THE COURT:  All right.  If I ask a fifth time, I'm

13  not responsible.

14          MR. MCGRAUGH:  I understand.

15          THE COURT:  All right.  You sure you want this in?

16          MR. MCGRAUGH:  I do.

17          THE COURT:  Okay.  Ms. Herndon, yes.

18          MR. DITTMEIER:  Judge, at that point, though, I would

19  interject and object to the back page being shown to the Jury

20  because the officer saw that front page and that's all that's

21  been identified.  There's no foundation for anything else on

22  there, and I don't know that anybody disagrees with the back

23  page not being shown.

24          MR. MCGRAUGH:  I don't, Your Honor.

25          THE COURT:  That's a good thing because it's not --

1   because this is -- this back page belongs in some Hitchcock

2   movie, but it doesn't belong in this trial.

3           Fifth time -- you sure you want it in?

4           MR. MCGRAUGH:  I want it in, Judge.

5           THE COURT:  Okay.  Over your objection, Ms. Herndon?

6           MS. HERNDON:  Over my objection, Judge.

7           THE COURT:  I'm going to let it in, although I have

8   to note for the record that it's not something that I would

9   offer.  I'm just saying.

10          MR. MCGRAUGH:  Okay.  You can testify at my 2255

11  hearing, Judge.

12          THE COURT:  Well --

13          MS. HERNDON:  It's already on the record.

14          THE COURT:  It's --

15          MR. MCGRAUGH:  Judge --

16          THE COURT:  It's all a matter of strategy.  It

17  wouldn't be my strategy to do it because, you know, I just --

18  I always liked to make things way more difficult for myself in

19  different ways when I tried a lawsuit.

20          MR. MCGRAUGH:  Judge, could I propose we mark the

21  envelope Exhibit D?  Could we --

22          THE COURT:  D1?

23          MR. MCGRAUGH:  Could we make this Exhibit D1 for the

24  purposes of -- because we don't intend to offer the whole --

25          THE COURT:  Got you.  Okay.  Yeah, do you have

1   another sticker?

2           MR. MCGRAUGH:  Yeah.

3           THE COURT:  Okay.  Now, here's the deal, though.

4   What are we going to do about this back page?  If it's

5   published or if they ask for it and we're talking about giving

6   it to them, I mean, do we cut it off or what?

7           MR. DITTMEIER:  Judge, if the parties agree, I don't

8   know why we couldn't --

9           THE COURT:  Photocopy just the front?

10          MR. DITTMEIER:  -- mark that, photocopy the part

11  that's going to go in, and just use that as an exhibit.

12          MS. HERNDON:  Yeah, that's fine.  I mean it's already

13  a photocopy.  What's the harm of a photocopy of a photocopy?

14          THE COURT:  And it could very well be the photocopy

15  of a photocopy of a photocopy --

16          MS. HERNDON:  That's the problem with --

17          THE COURT:  -- or some other photocopy, but you know.

18          MS. HERNDON:  -- with Wite-Out used to change the

19  words.

20          THE COURT:  Well, that was for the Hitchcock stuff on

21  the back, though, that they're not going to see.  Here you go.

22          MR. MCGRAUGH:  Do we want to make a copy of that,

23  Judge, and then mark the copy?

24          THE COURT:  Good idea.  Would you, Mindy?  No

25  shadows, okay?

1          All right.  Anything else on behalf of Defendant

2    Mock?

3          MR. MCGRAUGH:  Nothing, Your Honor.  Just introduce

4    that piece of evidence and publish it.

5          THE COURT:  Okay.  And then you guys will be ready,

6    Ms. Herndon?

7          MS. HERNDON:  I don't know, Judge.  We better take a

8    break and see, but can I say one more thing before we --

9          THE COURT:  Yes.

10         MS. HERNDON:  -- before we take a break?  Could we

11   renew our motion for severance that we previously filed?  I

12   think it's an appropriate and maybe even required thing to do

13   at the end of the Government's case, and I think especially in

14   light of the hearsay statements that came in against Ms. Young

15   that, in my legal opinion, would not have come in against

16   Ms. Young if she had been in trial by herself, and other

17   evidence such as the note the Court just admitted, which

18   obviously would not have come in if Ms. Young had been in

19   trial by herself.  So for all of the reasons that we stated in

20   our original severance motion and based on all the evidence

21   that has come in here that would not have come in if Ms. Young

22   had been in trial by herself, we want to renew our severance

23   motion and ask the Court to grant that at this time.

24         THE COURT:  All right.  Mr. McGraugh.

25         MR. MCGRAUGH:  It's probably a good time to join in

1   something like that, Judge, so it's kind of gone both ways,

2   you know.

3            THE COURT:  All right.  Defendant Young and Defendant

4   Mock's motions for severance are denied.

5            And as a commentary, on the last exhibit that was

6   admitted, I'm not so sure, Ms. Herndon, that your conclusion

7   is correct that that would not have come in had Ms. Young or

8   would not have been offered in the case of Young if she were

9   on trial by herself.  That's kind of difficult to say at this

10  juncture.  It could very well be that the Government might

11  have attempted to introduce that at that time, but that's just

12  a commentary.

13           MS. HERNDON:  Well, and my response, Judge, would be

14  since Mr. Dittmeier said he didn't introduce it because he

15  couldn't identify it, then I doubt that he would have tried to

16  introduce it against Ms. Young when he can't identify it.

17           THE COURT:  That's a good point.

18           MS. HERNDON:  Thanks.

19           THE COURT:  It is.

20           MR. DITTMEIER:  Judge, but I would agree with the

21  Court's analysis on that.

22           THE COURT:  All right.  Thank you, sir.

23           All right.  You guys need some time to talk about

24  where we go from here?

25           MR. GORLA:  We do, Judge.

 1          THE COURT:  All right.  Ten minutes, Michael.  All

 2    right.

 3          MR. DITTMEIER:  We've got ten?

 4          THE COURT:  Yes.

 5       (Court recessed from 10:45 a.m. until 11:31 a.m.)

 6       (The following proceedings were held within the hearing

 7    and presence of the Jury.)

 8          THE COURT:  You may proceed, Mr. McGraugh.

 9          MR. MCGRAUGH:  Thank you, Your Honor.  The Government

10    has called the witnesses that Defendant Mock would have called

11    to trial, so we have no witnesses to offer at this time

12    except, Your Honor, I would move for introduction of defense

13    DM1, which is an exhibit which was marked when Officer Berry

14    testified.  This was the document identified by Officer Berry

15    that he turned over to the Missouri State Highway Patrol, and

16    so this would be the piece of evidence I would like to offer

17    at this time.  I'd like to offer it into evidence.

18          THE COURT:  Very well.

19          MS. HERNDON:  Over our objection, Your Honor, as

20    previously stated.

21          THE COURT:  Very well.  Noted.  Overruled.  DM1?

22          MR. MCGRAUGH:  DM1.

23          THE COURT:  Is admitted.

24          MR. MCGRAUGH:  And, Your Honor, I would just like to

25    publish this to the Jury.

1          THE COURT:  Very well.

2          MR. MCGRAUGH:  And that would conclude my evidence,

3    Your Honor.  Defendant Mock would close her evidence.

4          THE COURT:  All right.  Mr. Gorla.

5          MR. GORLA:  Judge, we have two witnesses to present.

6    Our first witness will be Jeff Dodson.

7          THE COURT:  Very well.  Step forward right here and

8    be sworn in by the clerk.  Right here, sir.

9                          **JEFF DODSON,**

10   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

11   FOLLOWS:

12                       DIRECT EXAMINATION

13   BY MR. GORLA:

14   Q    Will you state your name for the record, please?

15   A    My name is Jeff Dodson.

16   Q    And were you -- you're appearing today under subpoena, is

17   that correct, Mr. Dodson?

18   A    Yes, sir, I am.

19   Q    Okay.  Where do you live?

20   A    In Novinger, Missouri.

21   Q    And what's your occupation?

22   A    I am the Mayor of Novinger, and I pastor West Chariton

23   Fellowship Church.

24   Q    Okay.  How long have you lived in the Novinger area?

25   A    Thirty-four years.

1   Q    Okay.  So, obviously, you're familiar with the community,

2   is that correct?

3   A    Very familiar.

4   Q    Okay.  Do you know a person by the name of Norman Newlin?

5   A    Yes, sir, I do.

6   Q    And does he live in Novinger?

7   A    Yes, sir, he does.

8   Q    How long has he lived there, do you know?

9   A    Approximately 10 years.

10  Q    Okay.  Are you familiar with Mr. Newlin's reputation for

11  truthfulness or untruthfulness in the community?

12  A    He's been known to be an untruthful person.

13           MR. GORLA:  Okay.  That's all I have, Judge.

14           THE COURT:  Cross.

15           MR. DITTMEIER:  Just briefly, Judge.

16                      CROSS-EXAMINATION

17  BY MR. DITTMEIER:

18  Q    Mr. Dodson, I take it on March the 23rd, 2006, you

19  weren't out at Kay Young's farm --

20  A    Oh, no, sir.

21  Q    -- when whatever happened?

22  A    No, sir.

23  Q    So you don't know anything about what happened there that

24  night?

25  A    Absolutely not.

1   Q    Okay.  And in 2002 and early 2003, when Mr. Newlin was

2   living on Kay Young's farm, you wouldn't have been present for

3   any conversations the two of them had together?

4   A    No, sir, and was not acquainted with him either.

5        MR. DITTMEIER:  Okay.  That's all.  I have no further

6   questions.  Thank you.

7        THE WITNESS:  Thank you, sir.

8        THE COURT:  Anything else?

9        MR. MCGRAUGH:  No questions, Your Honor.

10       MR. GORLA:  No, Your Honor.

11       THE COURT:  Thank you, sir.  You're free to go.

12       THE WITNESS:  Thank you.

13       THE COURT:  Call your next witness.

14       MS. HERNDON:  Your Honor, our next witness will be

15  Gayle Craigg.

16       THE COURT:  Step up this way, ma'am, and be sworn in

17  by the clerk right here.

18       Proceed.

19       MS. HERNDON:  Thank you, Judge.

20                        **GAYLE CRAIGG,**

21  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

22  FOLLOWS:

23                     DIRECT EXAMINATION

24  BY MS. HERNDON:

25  Q    Ma'am, can you tell the Jury your name, please?

1    A    Janet, but I go by Gayle Craigg.

2    Q    And is "Gayle" your middle name?

3    A    Yes.

4    Q    Okay.  Do you know Kay Young?

5    A    I do.

6    Q    How do you know Kay Young?

7    A    She was my employer when I was teaching at the Callao C-8

8    school, and then I also worked for her in her kennel.

9    Q    You worked for her in her kennel, did you say?

10   A    Yes.

11   Q    Okay.  How long have you known Kay Young?

12   A    Since 1999.

13   Q    I'm going to ask you to -- you were familiar when her

14   husband Mel Griesbauer was killed, is that correct?

15   A    Yes.

16   Q    At some point after his death, did you come to her farm

17   to help take care of the dogs?

18   A    Yes, I did.

19   Q    Can you tell us when that was?

20   A    The evening of the occurrence happened at 2:00 or 3:00 in

21   the morning.  My husband and I came up that evening after I

22   finished teaching that day.

23   Q    Okay.  And did you in fact go into Ms. Young's kennel?

24   A    Yes.

25   Q    And take care of the dogs?

1  A    Yes, I did.

2  Q    Can you tell us how many dogs were in the kennel at the

3  time?

4  A    This is a very good estimate, I would say.  She had

5  several smaller dogs that she used for fillers in between

6  bulldog litters, but I would estimate 12 to 14 females, two

7  breeding males, and a couple of females with puppies in the

8  nursery side.

9  Q    Okay.  Let's start from the very beginning of your

10 answer.  You said she had several smaller dogs?

11 A    Right.

12 Q    And those were not bulldogs?

13 A    No.

14 Q    Those were --

15 A    Min Pins, Boston Terriers.  I think there was some Pom,

16 Pomeranians.

17 Q    Do you have an idea approximately how many dogs -- how

18 many of those smaller dogs there were?

19 A    Six to eight.

20 Q    Six to eight?

21 A    Uh-huh.

22 Q    Do you have an idea of what the value of those dogs, the

23 six to eight smaller dogs, was?

24 A    Well, like everything else, it depends on the market, but

25 mostly, I would say 75 to 50 to 75, 100 dollars.

1   Q    So 50 dollars per dog up to 100 dollars per dog on the

2   higher end?

3   A    Right.

4   Q    Okay.  Now let's go past the smaller dogs.  She also had

5   bulldogs, correct?

6   A    Right.

7   Q    And you separated that between full-grown dogs and

8   puppies?

9   A    Right.  Well, there were -- I can't remember the exact

10  number of puppies, but there were two litters, and I am

11  estimating 10 to 12 puppies.

12  Q    Okay.  So there were 10 to 12 bulldog puppies?

13  A    Uh-huh.

14  Q    And then how many of --

15  A    Fourteen -- 12 to 14 adults.

16  Q    Okay.

17  A    Maybe 16.

18  Q    Okay.  And do you know the value of those dogs?

19  A    I have seen them go as inexpensively as $850.  I've seen

20  them go as high as 3,500.

21  Q    Okay.  Thank you.  Now, were you aware of whether some of

22  those dogs were male and some were female as far as the grown

23  dogs?

24  A    Yes.

25  Q    How many were male?

1   A    There were two males.

2   Q    And is there a significance as male versus female when it

3   comes to breeding dogs?

4   A    Right.  The males are more expensive.

5   Q    Okay.  And do the males have the ability to breed several

6   times?

7   A    Oh, yeah, yeah.

8   Q    Produce several litters?

9   A    Right.

10  Q    With different females?

11  A    Right.

12  Q    Thank you.  Now, you said on the night that

13  Mr. Griesbauer was killed, 2:00 in the morning or so, and you

14  were up there by --

15  A    5:00.

16  Q    5:00 that night?

17  A    Uh-huh.

18  Q    When you got there to the farm, did you have a chance to

19  see Kay Young?

20  A    We were directed from the farm to Kay's son's house

21  because they had not returned to the farm yet.  The police

22  were still investigating the crime scene, so we were --

23  actually, the first contact that I had with her that evening

24  was at her son's house.

25  Q    Okay.  And approximately what time was that?

```
1    A    5:30.

2    Q    Okay.  So you went straight from the farm to her son's

3    house?

4    A    Right.

5    Q    Okay.  And can you tell us physically what you observed

6    about Ms. Young when you saw her?

7    A    Very ashen looking.  Total state of shock.  Slightly

8    communicative, not very much.  Kind of a walking zombie.

9    Q    Okay.  I'm assuming then that you continued to support

10   Kay after her husband was killed?

11   A    I did.

12   Q    And did -- do you know whether she continued to stay

13   there at the farm that she lived on after he was killed?

14   A    As long as there was someone with her.

15   Q    And how were you involved in that process?

16   A    Well, there were several of us that alternated nights

17   staying with her so she wouldn't be alone.

18   Q    And what if someone was not able to stay with her?

19   A    Then she would go to a friend's house in Kirksville.

20   Q    And were there occasions where she would spend three or

21   four nights in a row with that friend --

22   A    Right.

23   Q    -- if no one could stay with her?

24   A    Right.

25   Q    How long did this go on, if you recall, where someone was
```

1  always with her?

2  A    Several months.

3  Q    Now let me take you back in time to when Mr. Griesbauer

4  was alive and he and Kay were married.

5  A    Uh-huh.

6  Q    Were you aware of when he was being deployed to Iraq?

7  A    Yes, I was.

8  Q    And did you attend a pre-deployment gathering with Kay

9  and Mel?

10 A    I did.

11 Q    And what was the purpose of that gathering?

12 A    Mainly for final arrangements for the soldiers so they

13 could do their power of attorneys, their life insurances, all

14 legal things that needed to be taken care of prior to their

15 deployment.

16 Q    And were there a large number of soldiers getting ready

17 to deploy who were there?

18 A    Yes.  His whole group.

19 Q    And what did you witness happening while you were there?

20 A    I saw a lot of people, you know, going up and making

21 their final paperwork, getting their paperwork notarized for

22 their insurance policies, their power of attorneys, you know,

23 their wills.

24 Q    And was -- was the service to assign someone to be your

25 power of attorney available that day?  You could do it there?

1   A    Yes, yes.

2   Q    And could you have purchased insurance there that day?

3   A    Yes.

4   Q    And did you witness Mel and/or Kay purchase insurance

5   that day?

6   A    Mel.  Well, I didn't -- I wasn't standing right beside

7   him, but I saw him at the station, and I was told that he

8   had --

9   Q    Okay.  That's all.

10  A    -- signed up for it.

11       MS. HERNDON:  All right.  Thank you, ma'am.  I don't

12  have any other questions.

13       THE COURT:  Mr. Dittmeier.

14       MR. DITTMEIER:  Yes.

15                    CROSS-EXAMINATION

16  BY MR. DITTMEIER:

17  Q    Ms. Craigg, I've only got a few questions for you, okay?

18  A    That's fine.

19  Q    You were good friends with both Mel Griesbauer and Kay

20  Young, is that correct?

21  A    Yes.

22  Q    And I believe at some point -- well, I'll ask you.  They

23  started dating in the fall of 2003; is that about right?

24  A    Yeah.  I think, yeah.  I have to go back too many years.

25  Q    Okay.  I know you've given statements to people several

1    times.

2    A     Yeah, yeah.

3    Q     Does that sound about right to you?

4    A     That's right, uh-huh.

5    Q     And were you aware when they got married September the

6    5th of 2004?

7    A     Yes.

8    Q     Okay.  And then he was deployed.  What you're talking

9    about -- he was deployed shortly after that?

10   A     Right, right.

11   Q     And then he was gone approximately a year, is that

12   correct?

13   A     He came back early.  He came back in December, I think.

14   He was supposed to be gone a year, and he -- but he came back

15   early.  Gosh, I can't remember.

16   Q     That's okay if you don't remember.

17   A     I don't.

18   Q     We've got the dates.  I'm just asking you what -- what

19   you recall.  That's fine.  He was gone, though, during the

20   summer of '05, is that correct?

21   A     Yes, yes.

22   Q     And you were out at the farm?

23   A     Yes.

24   Q     And Ms. Young -- you were out there on the farm helping

25   her?

1    A    Yes.

2    Q    And Ms. Young was familiar with guns, wasn't she?

3    A    Yes.  We all are.  We're farm wives.

4    Q    And in fact, you said in the past that she would use a

5    gun to shoot stray dogs with it from time to time?

6    A    Yes.

7            MR. DITTMEIER:  I have no further questions of this

8    witness.

9            THE COURT:  Mr. McGraugh.

10           MR. MCGRAUGH:  Just briefly, Your Honor.

11                    CROSS-EXAMINATION

12   BY MR. MCGRAUGH:

13   Q    Ms. Craigg, my name's Chris McGraugh.  I represent Kathy

14   Mock.  I just have a few questions for you.

15   A    Okay.

16   Q    Mr. Dittmeier just asked you about the guns on the

17   property of Ms. Young and Mr. Griesbauer.  Do you remember

18   that?

19   A    Yeah.

20   Q    And do you recall specifically a .30-30 Winchester type

21   of lever action rifle?

22   A    No, sir, I don't.

23   Q    Okay.  There's mention in some of the reports that we

24   have of your contact with law enforcement talking about a

25   traveler, a gun that was a traveler, meaning it was carried

1   around the property quite a bit.  Do you recall that?

2   A    I -- I knew they had weapons.  I knew that there were

3   guns available for varmint control, so on and so forth, but

4   I've never heard it referred to as a traveler.

5   Q    Do you recall speaking with law enforcement August 1st of

6   2006, speaking with a Lieutenant Platte from the Missouri

7   State Highway Patrol?

8   A    Yes, sir.

9   Q    Okay.  Had you had an opportunity to look over the many

10  police reports that are attributed to your statements?

11  A    No, sir.

12  Q    I'm going to mark this police report EM and ask you if --

13  whether this report refreshes your memory about what you told

14  the officer then, okay?

15  A    Okay.

16         MR. MCGRAUGH:  May I approach the witness, Your

17  Honor?

18         THE COURT:  You may.

19         MR. MCGRAUGH:  May I approach the witness, Your

20  Honor?

21         THE COURT:  You may.

22         MR. MCGRAUGH:  I'm sorry.  Do you --

23         MS. HERNDON:  I don't know where you even are.

24         MR. MCGRAUGH:  It's the second interview, August 1st,

25  2006.  It's on page 2.

1  Q     (By Mr. McGraugh)  Ms. Craigg, I just want to show you

2  what's been marked Defendants EM and refer you to the second

3  page of the -- of the report.  It appears it was a question

4  and answer between you and Lieutenant Platte, and just as to

5  the first question --

6  A     Oh, okay.

7  Q     -- does that refresh your recollection?

8  A     It's been way too many years, but --

9  Q     I know it has.

10  A     Okay.

11  Q     Does that refresh your recollection a little bit?

12  A     Okay.  All right.

13  Q     And so this weapon that you referred to -- do you recall

14  referring to this weapon as a traveler?

15  A     No, I really don't.

16  Q     Okay.  Is -- as you noted in the report that -- that Kay

17  and Mel would carry in the pasture; the gun was in the

18  pasture; wherever they went, the gun was?

19  A     Well, as needed, yes.

20  Q     Okay.  Do you recall that?

21  A     Yes.

22  Q     Okay.  And do you recall telling the officers that?

23  A     Yes, I do remember that.

24  Q     Okay.  And that's what you were referring to, meaning the

25  gun was a traveler, I guess?

1   A     I guess.

2   Q     Okay.  All right.  And you spent quite a bit of time at

3   Ms. Young's property?

4   A     I have.

5   Q     And did you -- Ms. Young had a number of pharmaceuticals,

6   drugs that are --

7             MS. HERNDON:  Judge, I'm going to object to the

8   relevance of this.  It's beyond the scope of direct

9   examination.  I don't know where he's going, but it doesn't --

10  I can't imagine how it's relevant.

11            MR. MCGRAUGH:  Well, we've heard a lot about drugs

12  and --

13            MS. HERNDON:  Judge, we should probably approach.

14            THE COURT:  Yeah, I think so.

15       (A bench conference was held on the record and outside of

16  the hearing of the Jury as follows:)

17            MS. HERNDON:  First of all, it's beyond the scope of

18  my direct examination with her, so it's improper.  Second of

19  all, I don't -- it's not relevant.

20            MR. MCGRAUGH:  I don't think I'm bound by what --

21  they put a witness up.  Except if it was the Defendant, I'm

22  not bound by what's asked in the direct examination, and so

23  the fact that it's outside the scope of her direct examination

24  is not -- I don't think is a redressable objection.  The -- as

25  to what I'm getting at is -- is that there's been a lot of

1   discussions in this as to that my client was given a bag of

2   pills, and where these pills came from, there's been evidence

3   of that, and I just want to establish with this witness that

4   Kay Young had a number of pharmaceutical drugs at her

5   residence.

6           MS. HERNDON:  I don't have anything else to say.  I

7   mean if that's all he's going to establish, I don't have

8   anything else, any other complaints other than I don't think

9   he can go beyond -- whenever I try to go beyond the scope of

10  what the prosecutor asked somebody on direct, then I'm told I

11  can't do it, so it seems like he should be told he can't do

12  it.

13          THE COURT:  I never told you that.

14          MS. HERNDON:  You didn't, but a lot of other judges

15  have told me that.

16          THE COURT:  It's a matter of perspective.

17          MS. HERNDON:  There you go.

18          THE COURT:  Okay.

19          MR. MCGRAUGH:  That's all I'm going to ask, Judge.

20          THE COURT:  All right.

21          MS. HERNDON:  Okay.

22      (The following proceedings were held within the hearing

23  of the Jury.)

24          THE COURT:  Proceed.

25          MR. MCGRAUGH:  Thank you, Your Honor.

1    Q    (By Mr. McGraugh) Ms. Gayle, I was asking you, at the

2    time that you had spent at Ms. Young's residence over the

3    years, did you note that she had quantities of pharmaceuticals

4    at her house, drugs at her house?

5    A    She had prescription medications, yes.

6    Q    Okay.  And did you describe at one time like she was a

7    walking pharmacy?

8    A    Between the -- the prescriptions and the natural

9    supplements that she took, there was a lot of pills, yes.

10            MR. MCGRAUGH:  Okay.  Thank you, ma'am.  That's all

11   the questions I have.

12            THE COURT:  Anything else, Mr. Dittmeier?

13            MR. DITTMEIER:  I have nothing further, Judge.

14            THE COURT:  Anything else?

15            MS. HERNDON:  I don't have anything further.  Thank

16   you.

17            THE COURT:  All right.  Thank you, ma'am.  You're

18   free to go.

19            Call your next witness.

20            MS. HERNDON:  Your Honor, can we approach to talk

21   about our final --

22            THE COURT:  Certainly.

23            MS. HERNDON:  -- submission?

24       (A bench conference was held on the record and outside of

25   the hearing of the Jury as follows:)

1          THE COURT:  Yes, ma'am.

2          MS. HERNDON:  The other thing that we have to do is

3    to admit Jim Goodwin's medical records into evidence, and I

4    understand the Government has an objection to it, so I wanted

5    to let you know what we want to do and let them say what they

6    want to say.

7          THE COURT:  Is that the guy from Iowa?

8          MS. HERNDON:  It's the guy from Iowa who says he took

9    the two blue pills and had a bad reaction and went to the

10   emergency room, and we have, provided by the Government, his

11   medical records from that admission to the emergency room that

12   night where he doesn't tell anybody that he took two blue

13   pills.  He tells about all the medications he's on and took

14   and doesn't make any reference to taking two blue pills or

15   anything else out of the ordinary, so I think they're

16   admissible to impeach his credibility on that.

17         MR. DITTMEIER:  Judge, my objection -- and there is

18   no objection to the authenticity of the records.  My objection

19   is there's no relevance and there was no foundation laid to

20   put them in to make them relevant.  I was very careful.  This

21   was one of the items that came up in 404(b), and I indicated I

22   was putting this witness on and I was never going to ask him

23   about any attempt to kill him or about him going to the

24   hospital.

25         THE COURT:  Uh-huh.

1        MR. DITTMEIER:  I asked him if she had given him two

2  pills on direct.  He said she had.  My purpose in doing that

3  is because there are allegations that pills were given to

4  Mrs. Mock.  It wasn't until Ms. Herndon got up that she asked

5  him, "Didn't you go to the hospital on October 17th and 18th?"

6  And he said, "Yes."  Even then, he never said it was as a

7  result of the pills.  He never said he told the people at the

8  hospital it was a result of the pills.  So I don't think this

9  is relevant.  She put the dates in that he went to the

10  hospital.  She interjected it, so I don't see that this -- he

11  has not denied anything in there.  I don't think it's

12  relevant.

13        MS. HERNDON:  Well, Judge, here's the problem,

14  though.  When they first -- when they first submitted this

15  404(b) evidence to us, they said, "We're going to introduce

16  evidence that she knew that Jim Goodwin had a heart problem

17  and she gave him Viagra as an attempt to kill him," and that

18  what they wanted to try to show was that she was put on his --

19  a beneficiary on his life insurance policy before she gave him

20  the Viagra.  Well, that didn't work out because it wasn't

21  true.  So then they want to backtrack and say, "Oh, well,

22  since we can't prove that, we just want to put him on to show

23  this little slice of she gave him the two pills and not tell

24  the whole story," and when Mr. Dittmeier got back up on

25  redirect, he specifically asked him, "You went to the hospital

```
 1    because you had a reaction, a bad reaction, to these two blue

 2    pills?"  And so I mean I have to be able to -- you can't just

 3    put a little tiny piece of that in.  I have to be able to

 4    explain that whole situation, and there has been a foundation

 5    laid for it because he has said that this is why he went.

 6            MR. DITTMEIER:  Your Honor, what -- first of all, we

 7    made that decision before trial that we weren't going to get

 8    into this, so it doesn't matter what we got these records for

 9    initially.  Ms. Herndon asked him if he went to the hospital

10    on October 17th and 18th, and he said yes.  The evidence is in

11    on the insurance that it was October the 23rd that the

12    insurance was -- so it's in front of the Jury that he went to

13    the hospital before that beneficiary statement was ever

14    signed.  So the purpose she -- it's already into evidence.

15    There's nothing that this adds to relevance.  He's responded

16    truthfully to her that he went in October 17th and 18th.  The

17    Government has an exhibit, and it shows that the beneficiary

18    is signed October 23rd, so --

19            MS. HERNDON:  But these impeach his credibility.  I

20    don't -- he -- she never gave him -- she never gave him these

21    blue pills, and if she had given them to him and he was having

22    a reaction to them and went to the hospital, why didn't he say

23    it?  And so this goes to impeach his credibility on the

24    testimony that she ever gave these to him.

25            MR. DITTMEIER:  But he was never asked if he told
```

1    them, so this doesn't impeach that.

2         THE COURT:  And that's the problem that I have with

3    using these records for impeachment purposes.  There's nothing

4    through his testimony, either direct or in cross, that

5    indicates that the purpose for which he went to the hospital

6    was related to the pills or not, and Mr. Dittmeier is correct;

7    he admitted everything that there was to admit on the inquiry.

8    He didn't deny anything on the inquiry, so how can you impeach

9    him with something that isn't an issue?

10        MS. HERNDON:  Well, because it's --

11        THE COURT:  Well, and as I understand your argument,

12   your argument is for impeaching him, in essence, that he never

13   said that he went to the hospital and either told them or

14   didn't tell them about the pills and so, therefore, I'm going

15   to put on the medical records from the dates that he said he

16   went to the hospital to show that the medical records are

17   absent of any statement by him that he took some medication,

18   the blue pill medication.

19        MS. HERNDON:  But he did say that he went to the

20   hospital because he had an adverse reaction to these.  He did

21   say that.

22        THE COURT:  I don't think so, Jennifer.  You're going

23   to make me look this up, aren't you?

24        MS. HERNDON:  Well, I mean, because if he didn't say

25   that, then I screwed up and that would be a bad thing,

1  wouldn't it?

2          THE COURT:  Well, why don't we do this; why don't we

3  let them go to lunch; I'll have Gayle look through the

4  transcript or I'll go through it.  I'll have Gayle look

5  through the transcript, and I'll look through my notes on his

6  testimony and find that out, so I'll make a ruling when we

7  come back from lunch, and if we assume -- either way the

8  ruling goes, is there anything else that you guys are planning

9  to put on?

10          MS. HERNDON:  No, huh-uh, no, no.

11          THE COURT:  Is there anything that you guys plan on

12  putting on?

13          MR. MCGRAUGH:  No, Judge, but we assume you want to

14  make a record on the Defendants not testifying in the case,

15  and when did you want to do that?

16          THE COURT:  Well, we could do that when we break for

17  lunch.

18          MS. HERNDON:  That's fine.  Yeah, that's fine.

19          THE COURT:  All right.

20          MS. HERNDON:  And I think it was -- it was either

21  when I questioned him or when Mr. Dittmeier did redirect was

22  in my notes.

23          THE COURT:  All right.  And the other thing is -- is

24  it likely that we'd be able to submit this to the Jury today?

25          MS. HERNDON:  No.

1          MR. DITTMEIER:  Judge, we've all talked.  I mean, I

2   guess if everybody crunched, but we all thought -- we've made

3   tremendous time.  We thought we'd all prefer to argue the case

4   Monday morning.

5          THE COURT:  Monday morning.

6          MR. GORLA:  And the instructions this afternoon, get

7   everything out of the way.

8          THE COURT:  And do the instruction stuff this

9   afternoon, get that all done.  That makes sense.  Okay.  We'll

10  do it that way.  All right.

11         MR. MCGRAUGH:  Thanks, Judge.

12    (The following proceedings were held within the hearing

13  of the Jury.)

14         THE COURT:  Ladies and gentlemen, we're going to

15  recess for lunch at this time.  During the course of the

16  luncheon recess, do not discuss the case amongst yourselves or

17  with anyone else.  Do not allow anyone to discuss it within

18  your hearing or presence.  Do not form or express any opinions

19  about the case until it is given to you to decide.  Do not

20  utilize any web-based social networking sites.  If you want to

21  take a little longer lunch today and reconvene at 1:30, okay,

22  so we'll see you back from lunch at 1:30.

23         THE CLERK:  All rise.

24         THE COURT:  Counsel, stick around and we'll do now

25  what we talked about.

1     (Court recessed from 12:04 p.m. until 12:15 p.m.)

2     (The following proceedings were held outside the hearing

3   and presence of the Jury.)

4         THE COURT:  All right.  Gang, listen up.  These are

5   the pertinent parts of Mr. Goodwin's testimony.

6         You ready, Gayle?

7         COURT REPORTER:  Yes.

8         THE COURT:  Go ahead.  Read away.

9     (The court reporter read back the following portions of

10  the testimony of James R. Goodwin from Volume 4:)

11  READING FROM CROSS-EXAMINATION BY MS. HERNDON:

12  Q    Now, you told Mr. Dittmeier that at some point in October

13  Ms. Young gave you two blue pills, is that correct?

14  A    Yes.

15  Q    And that happened on two separate occasions, correct?

16  A    Yes.

17  Q    And the two occasions that she gave you those pills were

18  October 17th and October 18th, according to your testimony,

19  correct?

20  A    Yes.

21  Q    But she never told you what those were?

22  A    No.

23  Q    And right around this time, October 17th, October 18th,

24  you ended up in the emergency room, correct?

25  A    Yes, I did.

1  Q    And you were diagnosed as having dizziness, heart

2  problems, and hyperglycemia, correct?

3  A    Yes.

4  READING FROM REDIRECT EXAMINATION BY MR. DITTMEIER:

5  Q    Ms. Herndon asked you about when you took those little

6  blue pills --

7  A    Yes.

8  Q    -- that she gave you?  And then she asked you about

9  having a reaction and going into the hospital?

10  A    Yes.

11  Q    Did you have the reaction after you took the pills?

12  A    Yes.

13  Q    And you took them twice?

14  A    Yes.

15  Q    And both times, there was a reaction?

16  A    Yes.

17  Q    Okay.  But that's -- that's all; you just had a reaction

18  and went to the hospital and you were okay?

19  A    I don't recall anything that happened during that time,

20  but, yes.

21        MR. DITTMEIER:  Okay.  All right.

22  READING FROM DIRECT EXAMINATION BY MR. DITTMEIER:

23  Q    Do you know approximately how much this insurance policy

24  was for?

25  A    60,000.

1  Q    60,000.  Okay.  Now, that was October 23rd, '06.  In the

2  month of October of that year, did Ms. Young have occasion to

3  give you any pills?

4  A    Yes.

5  Q    And what did she give you the pills for?

6  A    So I could get an erection.

7  Q    But she gave you the pills?

8  A    Yes.

9        (End of reading back testimony from Volume 4.)

10        THE COURT:  So that is the entirety of the testimony

11  regarding the blue pills, direct, cross, and redirect.

12        Ms. Herndon.

13        MS. HERNDON:  You know, it is what it is, Judge.  I

14  don't have anything else to add to what I said to you at the

15  bench.

16        THE COURT:  All right.  Mr. Dittmeier.

17        MR. DITTMEIER:  It should be noted I didn't even say

18  blue.  It was as innocuous as I could make it.

19        MS. HERNDON:  So noted.

20        MR. CURRAN:  But you know the significance --

21        THE COURT:  That's what I was going to say.

22        MR. CURRAN:  But you know the significance of the

23  blue pills.

24        THE COURT:  All right.  Based on the rereading of the

25  record, Ms. Herndon, I don't see that there's a basis for the

1    impeachment testimony with those records.

2            MS. HERNDON:  Okay.

3            THE COURT:  So your request will be denied.

4            MS. HERNDON:  Thank you, Judge.

5            THE COURT:  Do you want to make the record on the

6    testimonial aspects of your client or lack thereof?

7            MS. HERNDON:  Whenever you're ready?

8            THE COURT:  I'm ready.  Let's proceed.

9            MR. CURRAN:  And which do you want us to -- how do

10   we --

11           THE COURT:  You can just do it from where you are or

12   from the podium anyway.

13           MR. CURRAN:  Ms. Mock.

14           THE COURT:  Have Ms. Mock come up to the podium.

15           Yes, Mr. Curran.

16           MR. CURRAN:  Your Honor, I've discussed and actually

17   co-counsel and I have discussed with Ms. Mock her right to

18   testify.  Obviously, these discussions began well before the

19   trial, you know, as the case was ongoing, and it's also been

20   set for trial twice before.  I discussed that she had a right

21   to testify.  I told her that that was -- that decision was

22   entirely up to her and if she wanted to testify we'd put her

23   on and we would prepare her and we would question her if

24   that's what she so chose to do, and I also told her that we

25   wouldn't really need to have the decision until we got to this

1    point when it got to our case, so we gave her all week to

2    watch the evidence, although we did have discussions from time

3    to time.  She's decided after discussions with me that she

4    elects not to exercise her right to testify, Judge.

5              THE COURT:  All right.  Very well.  Swear in the

6    Defendant.

7         (Defendant Katherine A. Mock sworn by the clerk.)

8                             EXAMINATION

9    BY THE COURT:

10   Q    Ms. Mock, did you hear the statement that your attorney

11   just made?

12   A    Yes, sir.

13   Q    All right.  And do you have any questions regarding

14   anything he just said?

15   A    No.

16   Q    All right.  And you have been sitting here the entirety

17   of this week during the course of the trial, correct?

18   A    Yes.

19   Q    All right.  And you heard all the testimony that came

20   from those witnesses that were presented by the Government,

21   correct?

22   A    Yes.

23   Q    All right.  And you had occasion to observe your

24   attorneys, Mr. Curran and Mr. McGraugh, engage in the

25   cross-examination of each and every witness that testified,

1   correct?

2   A    Yes.

3   Q    All right.  And before this, you'd discussed the

4   possibility or lack thereafter of testifying in the case,

5   right?

6   A    Yes.

7   Q    And you understand that it's your constitutional right to

8   testify if you want to testify.  It's also your constitutional

9   right to not testify if you don't want to testify.  You

10  understand that?

11  A    Yes, I do.

12  Q    All right.  And you understand further that if you don't

13  testify, nobody can use the fact that you didn't testify

14  against you for any purpose; do you understand that?

15  A    Yes.

16  Q    All right.  Do you also understand that if you do

17  testify, well, sometimes that can be a double-edged sword?

18  A    Yes.

19  Q    Sometimes it can help you.  Sometimes it can hurt you.

20  There are times where it won't make any difference one way or

21  another.  You'll just get an opportunity to speak your peace,

22  if you will.  Do you understand that?

23  A    I understand.

24  Q    Okay.  So you've had the full range of experiences with

25  regard to making the decision on whether you want to testify

1    or not?

2    A    Yes, I do.

3    Q    And in light of all those experiences and in light of the

4    discussions that you've had with Mr. Curran and Mr. McGraugh

5    and knowing what you know about the evidence that has been

6    presented thus far -- the Government has now rested -- what's

7    your decision on whether you want to testify or not?

8    A    I do not want to testify.

9    Q    Okay.  Do you have any questions about that at all at

10   this time?

11   A    No, I do not.

12   Q    Is there anything that is confusing to you at this time

13   that might affect on your decision to testify or not testify?

14   A    No.

15   Q    All right.  Do you have any questions of me about that?

16   A    No.

17   Q    All right.  Or anything that might be connected with it?

18   A    No, sir.

19   Q    All right.  Thank you, Ms. Mock.

20   A    Thank you.

21        THE COURT:  Thank you, Mr. Curran, Mr. McGraugh.

22        Mr. Gorla, Ms. Herndon.

23        MS. HERNDON:  Ready?

24        THE COURT:  Ms. Herndon.

25        MS. HERNDON:  Judge, I -- obviously, Mr. Gorla and I

1    and Ms. Smith when she was Ms. Young's attorney months ago

2    have all talked with Ms. Young about her right to testify or

3    not testify and the considerations that go into that.  I have

4    advised her -- Mr. Gorla and I have advised her that we think

5    that she should not testify.  I believe that she understands

6    her options.  Obviously, you know her educational level; she's

7    able to understand the choices like this, and she's made the

8    decision not to testify.

9              THE COURT:  Swear in the Defendant.

10         (Defendant Elain Kay Young sworn by the clerk.)

11                           EXAMINATION

12   BY THE COURT:

13   Q    Ms. Young, did you hear everything that Ms. Herndon said?

14   A    Yes.

15   Q    Is there anything that you wish to now dispute about what

16   she said?

17   A    No.

18   Q    All right.  During the course of the pendency of this

19   case and as she indicated from the time that you had Ms. Smith

20   up to the time that you got Ms. Herndon and Mr. Gorla and up

21   to today, you've had the opportunity to contemplate as well as

22   discuss with your attorneys the proprieties of testifying or

23   not testifying in the case, have you not?

24   A    Yes.

25   Q    All right.  And you've been here all week long and had

1    occasion, as I asked Ms. Mock, to see and hear the witnesses

2    that were presented and their testimony, correct?

3    A    (Nods head up and down.)

4    Q    All right.  And I would also assume in light of what

5    Ms. Herndon said that during that time you may have had one or

6    more discussions about whether you might testify or not

7    testify when it came to that time?

8    A    Yes.

9    Q    All right.  Generally speaking, do you have any questions

10   of me regarding the issue of whether you should testify or not

11   testify or your right in general to testify?

12   A    No.

13   Q    All right.  You understand that if you don't testify in

14   the case it can't be used against you by anybody for any

15   purpose?

16   A    Yes.

17   Q    Do you understand if you do testify, though, it could

18   help you; it could hurt you; the fact that you did testify

19   could be used because then comments can be made about your

20   credibility in relation to the other witnesses; do you

21   understand that?

22   A    Yes.

23   Q    All right.  With all that in mind, what do you want to do

24   at this point in time?

25   A    I won't testify.

80

1  Q    All right.  Any questions at all about that in your mind?

2  A    No.

3         THE COURT:  All right.  Very well.  Thank you.  Thank

4  you, Ms. Herndon.

5         MS. HERNDON:  Thank you, Judge.

6         THE COURT:  All right.  So other than the medical

7  records, Ms. Herndon, is there going to be any further

8  evidence from the defense.

9         MS. HERNDON:  We're finished, Your Honor.

10         THE COURT:  Anything further from the Defendant Mock?

11         MR. MCGRAUGH:  No, Your Honor.

12         THE COURT:  So when we come back at lunch, you need

13  to formally announce, Ms. Herndon, Mr. Gorla, that the Young

14  defense rests.

15         MR. GORLA:  The defense never rests, Judge.

16         THE COURT:  Well, that's -- isn't there a book about

17  that?

18         MR. GORLA:  Absolutely.

19         THE COURT:  It was one of my favorite books in law

20  school.  I read it five times.  I did.  All right.  So,

21  logistically then, after that, as we discussed at sidebar, I

22  guess we'll recess for the day, let the Jury go home, put our

23  instructions together.  We should be able to -- I would hope

24  we should be able to get them all together and have our

25  instruction conference so that when we leave here this evening

1   and come back in Monday morning we'll be ready to go straight

2   out of the box with instructions and arguments, right?  Okay.

3   At this point in time, Mr. Gorla and Ms. Herndon, are there

4   any instructions in particular that you intend to offer?

5             MR. GORLA:  Judge, we're going to get together with

6   Mr. Curran and Mr. McGraugh --

7             THE COURT:  Okay.

8             MR. GORLA:  -- you know, and kind of go over that.

9             THE COURT:  Okay.

10            MR. GORLA:  Obviously, there's a few that we need to

11  have.

12            THE COURT:  All right.

13            MR. GORLA:  It's probably -- you know, there are

14  probably ones that we both would like.

15            THE COURT:  Okay.

16            MR. CURRAN:  I think at the most there will be a

17  couple, Judge.  I really have to refresh what the Government

18  submitted.

19            THE COURT:  Okay.

20            MR. CURRAN:  We're going to look at it over the noon

21  hour.

22            THE COURT:  We can put all that together, you know,

23  when we get back.  Okay.

24            MR. CURRAN:  Yeah, and I'll bring the book back over

25  if that's all right.

1          THE COURT:  All right.  Sure.

2          MR. DITTMEIER:  Judge, after we come back, I think we

3  should go through all the exhibits and make sure we agree on

4  what's -- what's been --

5          THE COURT:  What's been in?

6          MR. DITTMEIER:  -- offered and accepted.

7          THE COURT:  Okay.  And also then we need to make --

8  consider any motions that might be provided, so we'll do all

9  of that after the Jury is cut lose for the day, and we'll make

10  all our record on those things then.  Okay.  See you back at

11  1:30.  Is that what time I told them?  Okay.  All right.

12      (Court recessed for lunch from 12:32 p.m. until 1:46p.m.)

13      (The following proceedings were held within the hearing

14  and presence of the Jury.)

15          THE COURT:  Mr. Gorla.

16          MR. GORLA:  Judge, the defense on behalf of Ms. Young

17  rests.

18          THE COURT:  Very well.  Anything further on behalf of

19  the defense in behalf of Defendant Mock?

20          MR. CURRAN:  No, Judge.

21          THE COURT:  Any rebuttal on behalf of the Government?

22          MR. DITTMEIER:  No, Your Honor.

23          THE COURT:  All right.  Ladies and gentlemen, it is a

24  quarter 'til 2:00.  All the evidence has been presented.  The

25  next thing that typically occurs is instructions and argument

 1   of counsel, all right, which in and of itself does not -- goes

 2   pretty smoothly.  It's the things that we have to do before

 3   that that will take up some time, and that's getting the

 4   instructions together, what I have to do to get the

 5   instructions together that we try to anticipate what it's

 6   going to be like to save some time, but even when you do that,

 7   it still requires a lot of time.  I could have you wait and

 8   see if we're going to get to that point so that we can argue

 9   the case to you, which is going to require a long time to do,

10   and there's no guarantee that we would actually get to that

11   point today.  So with that in mind, rather than have you wait

12   around and waste your time and not have any assurances that

13   we'll be able to get to that point today, what we're going to

14   do is we're going to recess for the day, and we will reconvene

15   Monday morning at 9:30, have you folks come back, and we

16   should have everything together at that time.  Now, you know,

17   while you folks are gone, we're going to be working on the

18   instructions to have all that together so that when you come

19   in Monday morning we can proceed straight out of the box.

20   Okay.

21           So the admonition that has been given to you

22   throughout the week is -- I will give to you again, which is

23   especially more significant and important now.  Do not discuss

24   the case amongst yourselves or with anyone else.  Do not allow

25   anyone to discuss it within your hearing or presence.  Do not

84

1    form or express any opinions about the case until it is given

2    to you to decide.  Do not read, view, or listen to any media

3    accounts regarding the trial, and that includes not reading,

4    viewing, or listening to any media accounts over the Internet

5    regarding the trial.  Do not utilize any Internet websites

6    that are social networking in nature or any other aspect of

7    the Internet to discuss the case or, perhaps, inadvertently

8    come upon discussions about the case, and we'll see you Monday

9    morning at 9:30 then.  Okay.  All right.  Thank you, folks.

10        (The following proceedings were held outside the hearing

11   and presence of the Jury.)

12            THE COURT:  Okay.  So motions.

13            MR. MCGRAUGH:  Judge, we would move for judgment of

14   acquittal at the close of all the evidence.  We would ask

15   based on the same grounds that we moved this morning on the

16   motion for a directed verdict at the close of the Government's

17   case.

18            THE COURT:  Mr. Gorla.

19            MR. GORLA:  On behalf of Ms. Young, Judge, I would

20   also like to move for judgment of acquittal at the close of

21   all the evidence both as to Count I and Count II for all the

22   reasons previously stated at the time we filed our motion for

23   judgment of acquittal at the close of the Government's case.

24            THE COURT:  Mr. Dittmeier.

25            MR. DITTMEIER:  Judge, I would submit that we have

85

1   submitted the evidence and the evidence is sufficient.

2          THE COURT:  All right.  Any further arguments on the

3   motion?

4          MR. GORLA:  Yes, Your Honor.

5          MR. MCGRAUGH:  None Your Honor.

6          MR. GORLA:  I'm sorry.  No.

7          THE COURT:  All right.  As to Defendant Mock's motion

8   for judgment of acquittal at the close of all the evidence,

9   the motion will be denied.  The evidence presented is

10  sufficient to allow the case to be submitted to the Jury for

11  their consideration.  As to Defendant Young's motion for

12  judgment of acquittal at the close of all the evidence, that

13  motion will likewise be denied for the same reasons.

14         All right.  Instructions.  I guess we don't need this

15  on the record, Gayle.

16      (Court adjourned at 1:51 p.m.).

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

      I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

      I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

      I further certify that this transcript contains pages 1 through 85 inclusive.

      Dated at St. Louis, Missouri, this 6th day of August, 2012.


_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter