# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-2527

_____

United States of America

*Plaintiff - Appellee*

v.

Elain Kay Young

*Defendant - Appellant*

_____

No. 12-2593

_____

United States of America

*Plaintiff - Appellee*

v.

Katherine A. Mock

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 26, 2013
Filed: May 23, 2014

_____

Before WOLLMAN, SMITH, and KELLY, Circuit Judges.

_____

SMITH, Circuit Judge.

After a six-day trial, a jury convicted Elain "Kay" Young and Katherine "Kathy" Mock of conspiracy to commit murder-for-hire, resulting in death, in violation of 18 U.S.C. § 1958 and murder-for-hire, resulting in death, in violation of 18 U.S.C. §§ 1958 and 2 based on the death of Young's husband. Young argues that the district court[1] erroneously (1) admitted testimony of three witnesses regarding Young's prior bad acts that reflected a propensity to commit the crimes charged under Federal Rule of Evidence 404(b); (2) admitted into evidence coconspirator statements despite the lack of corroborating evidence as to the conspiracy's existence; (3) admitted Mock's out-of-court statements in violation of Young's confrontation rights; and (4) admitted into evidence a note found with Young despite the note's lack of authentication. Mock raises one issue unique to her, contending that the district court erroneously prohibited Mock from introducing Young's subsequent inconsistent statement involving Mock's whereabouts following the murder. Both Young and Mock argue that the district court erroneously (1) denied their motions to sever their joint trial; (2) overruled their *Batson*[2] challenges; and (3) overruled their motions for judgment as a matter of law because the government failed to prove an essential element of the offenses—the presence of a bargained-for exchange between the defendants. We review the facts in a light most favorable to the guilty verdict. *United*

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

[2]*Batson v. Kentucky*, 476 U.S. 79 (1986).

Appellate Case: 12-2527     Page: 2     Date Filed: 05/23/2014 Entry ID: 4157083

*States v. McCauley*, 715 F.3d 1119, 1121 (8th Cir. 2013). We affirm the convictions of both defendants.

## I. *Background*

Young married Melvin Griesbauer in 2004. They lived together on a farm in northern Missouri. The farm had been in Young's family for several years. Young bred dogs on the farm and befriended Mock through their common interest in the avocation.

Shortly after Young and Griesbauer married, the Missouri Army National Guard deployed Griesbauer to Iraq for nearly one year, beginning in October 2004. Immediately before and during his deployment, Young purchased multiple life insurance policies on Griesbauer that listed Young as the primary beneficiary. Under the policies, Young stood to receive over $1.1 million in the event of Griesbauer's death.

By early 2006, Young began to experience financial difficulty. Young mortgaged the farm. To qualify for the loan, Young added Griesbauer to the farm's title. The loan proceeds enabled Young to pay off several farm debts. She also explicitly requested and received an additional $10,000 from the lender. Young and her lender finalized the loan less than twenty-four hours before Griesbauer's death.

Mock lived approximately three hundred miles away in southern Missouri. Mock had two sons, each of whom were experiencing problems, causing Mock significant stress. Mock also struggled financially. Keri Ponder ("Keri"), Mock's former daughter-in-law, traveled from Massachusetts to Mock's home to assist Mock during this difficult time. Keri testified that Mock was "at the end of her rope." Approximately nine days before Griesbauer's death and in Keri's presence, Mock received a phone call from Young. After the call, Mock told Keri that Young was upset because Griesbauer purchased a life insurance policy on Young's life. According

-3-

to Keri, Griesbauer told Young that he planned to buy items that he would not allow Young to enjoy. Keri testified that the phone call upset Mock. Mock then asked Keri if she knew anyone that would kill somebody. Keri responded that she did not, so Mock asked Keri if she would be willing to kill someone. Keri declined, but out of curiosity, Keri asked "how much a life went for." Mock told her, "They're willing to pay $6000."

The following day, Mock and her other daughter-in-law, Rita Lee Ponder ("Rita"), traveled to Young's farm to visit Young and deliver dogs. Rita overheard Young tell Mock that Young was afraid of Griesbauer and intended on leaving him because he threatened to kill her. Mock agreed to help Young get away from Griesbauer. Two days later, Mock asked her son Thomas Ponder ("Thomas") if he knew anyone that could kill somebody. Mock told him that Young wanted someone killed and was willing to pay $10,000. Mock told Thomas that Griesbauer was abusing Young, causing Mock to fear for Young's safety. Thomas declined Young's solicitation because he did not take the conversation seriously. Five days later on March 22, 2006, Mock traveled back to Young's farm. Mock asked Thomas to drive her there, but he declined. Mock lied to Rita, saying she was simply going to get stress relief at a nearby hospital.

According to Young's initial statement to Adair County Sheriff Leonard Clark, on the night of Griesbauer's death, Young picked up Griesbauer from work just after 1:04 a.m. to bring him home. Mock had already arrived at Young's farm by this time. After arriving at home, Griesbauer went outside to the barn to check on some puppies. Young then heard a gunshot in the direction of the barn. Young awakened Mock so that Mock could accompany her to the barn to check on Griesbauer. Young noted that Griesbauer frequently carried the gun recklessly—loaded and cocked. Young and Mock located Griesbauer and discovered that he had been shot in the face and killed. They called 911.

-4-

Deputy Tracy Salsberry of the Adair County Sheriff's Office arrived first on scene. Mock led Deputy Salsberry to Griesbauer's body near the front of the barn. After verifying Griesbauer's recent death, Deputy Salsberry examined the firearm at the death scene. It was Young's 30-30 caliber, lever-action rifle. Deputy Salsberry discovered that the rifle was cocked and had a live round in the chamber. Deputy Salsberry concluded that Griesbauer's death was not the result of an accident or suicide because a suicide shooter could not have reloaded the lever-action rifle. Deputies Salsberry and Brian Burns, who had just arrived on scene, swept the area but discovered no one else present. Sheriff Clark arrived shortly thereafter and separately interviewed both Young and Mock, who were the only individuals at the scene. Their initial accounts and alibis largely matched.

The police discovered other critical pieces of evidence at the crime scene. During the protective sweep, they found a 30-30 shell casing inside the doorway to the barn. The police also discovered shoe prints in a star pattern near the body that later matched Mock's shoes. Pursuant to a warrant, police searched the entire area and discovered a three-hole ski mask wrapped around a pair of used latex gloves away from the barn near the residence. The police later determined that Mock purchased the mask at a Wal-Mart en route to Young's home hours before Griesbauer's death. Mock signed the receipt for the mask when she purchased it with her credit card. Police found a copy of this receipt in Mock's purse. Mock's DNA was also present on the interior of the mask and the gloves. The gloves also contained detectable amounts of gunshot residue and a partially burnt particle of gunpowder, which matched gunpowder removed from the remaining live shells in the murder weapon.

The next day, Young presented a different account of the night's events to Sheriff Clark. Young told Sheriff Clark that, after hearing the gunshot outside, she searched for Mock but could not find her. She stated that she found Mock after three or four minutes sitting fully dressed in the bathroom and "flipping out." Young altered

-5-

her account of events. Previously, she had told Sheriff Clark that she had awakened Mock from sleep and that they had proceeded outside together.

Mock left Young's farm the following morning and traveled to the home of a close friend named Jean Ballard. Mock asked Ballard for help because Mock had ingested several Vicodin pills that Young had provided to her.[3] Mock alleges that Young told Mock to ingest over 100 pills so that "she would get thirty to sixty days in an insane asylum instead of penitentiary time." Mock, who owed Ballard approximately $2800, had recently told Ballard that Mock was going to pay everything back with interest, indicating that she expected to receive money soon.

While Ballard cared for Mock, Young called Ballard multiple times to check on Mock. Young instructed Ballard not to upset Mock and to tell Mock that Young loved her. Young did not mention Griesbauer's death to Ballard at that time. Mock later disclosed Griesbauer's death to Ballard. Ballard then transported Mock to a nearby hospital. En route, Ballard asked Mock if she murdered Griesbauer. Mock responded, "I think I shot him, but I don't remember it. Wouldn't I remember doing something like that?"

Approximately two years after Griesbauer's death, Missouri authorities arrested Young and charged her in state court with first-degree murder. Upon her arrest, Young feigned ignorance by asking, "Murder of who?" After performing a search incident to arrest, police discovered a photocopied note located in the only purse in the truck where Young was driving alone. The note read in pertinent part, "Use her drugged state to convince her she shot him. Offered 10,000 to kill him. Was turned down. If I collaborate her story. Bucks." Mock was also arrested. State authorities eventually transferred Young and Mock into federal custody in October 2009.

---

[3]Young was a nurse, and according to one witness, she was a "walking pharmacy."

Appellate Case: 12-2527      Page: 6      Date Filed: 05/23/2014 Entry ID: 4157083

While in custody, Young allegedly spoke with a jailhouse informant named Amanda Bax. The government called Bax to testify against Young. Bax testified that Young told her that she killed Griesbauer for insurance money because she was about to lose her farm. She also stated that Young told her she would "rather lose her husband than lose that farm." Bax further testified that Young told her, "[S]he was trying to get [Mock] to find somebody to commit the murder for her and that she was going to end up being the fall guy for her." Bax admitted that she was sentenced to prison for twelve years stemming from convictions related to writing bad checks and for stealing by deceit. She also admitted that she may benefit personally by testifying against Young. Additionally, one of Young's paramours, Kris Robbins, testified that Young proclaimed many times in relation to Griesbauer, "I would like to kill the son-of-a-bitch" and "I wish he was dead."

A joint, six-day jury trial commenced on March 12, 2012. The district court denied the defendants' multiple motions to sever the trial. The jury found Young and Mock guilty of both counts. The district court sentenced them both to two concurrent life sentences.

## II. *Discussion*

On appeal, Young argues that the district court erroneously (1) admitted testimony of three witnesses regarding Young's prior bad acts that reflected a propensity to commit the crimes charged under Federal Rule of Evidence 404(b); (2) admitted into evidence coconspirator statements despite the lack of corroborating evidence as to the conspiracy's existence; (3) admitted Mock's out-of-court statements in violation of Young's confrontation rights; and (4) admitted into evidence a note found with Young despite the note's lack of authentication. Mock raises one issue unique to her, contending that the district court erroneously prohibited Mock from introducing Young's subsequent inconsistent statement involving Mock's whereabouts following the murder. Both Young and Mock argue that the district court erroneously (1) denied their motions to sever their joint trial; (2) overruled their *Batson* challenges;

-7-

and (3) overruled their motions for judgment as a matter of law because the government failed to prove an essential element of the offenses—the presence of a bargained-for exchange between the defendants. We affirm the convictions of both defendants.

## A. *Rule 404(b)*

Young objected to the admission of testimony of three government witnesses: Norman Newlin, Tim Eschmann and Jim Goodwin. On appeal, Young contends that the district court erred by allowing the government to elicit testimony from these witnesses showing that Young had a propensity to commit murder-for-hire, in violation of Federal Rule of Evidence 404(b). We review a district court's decision to admit 404(b) evidence for an abuse of discretion and reverse "only when the evidence clearly had no bearing on the case and was introduced solely to show defendant's propensity to engage in criminal misconduct." *United States v. Gant*, 721 F.3d 505, 509 (8th Cir. 2013) (quotation and citation omitted).

Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, evidence may be admitted for another purpose like proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Thus, Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). "The threshold inquiry . . . is whether that evidence is probative of a material issue other than character." *Id.* at 686. "Rule 404(b) is a rule of inclusion, prohibiting only evidence that tends solely to prove the defendant's criminal disposition." *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995). "[F]or evidence of prior bad acts to be admissible, the evidence must be: (1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative

-8-

value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." *United States v. Jourdain*, 433 F.3d 652, 659 (8th Cir. 2006) (quotation and citation omitted). Before we reverse, we must conclude that the evidence "clearly ha[d] no bearing on any issue involved." *Id.* (quotation and citation omitted). Finally, when admitting evidence under Rule 404(b) to show the defendant's intent, the prior act need not duplicate the charged conduct but be similar enough to support an inference of criminal intent. *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006).

### 1. *Norman Newlin*

Newlin testified that, while living on Young's farm as a tenant in 2002, Young and Newlin discussed Young's problems with her then-husband David Crawford. Newlin testified that Young solicited him to murder Crawford. In exchange, Young would pay Newlin $10,000 and murder Newlin's wife by staging a horseback-riding accident. Young also instructed Newlin to purchase a life insurance policy on his wife's life because Young had a policy on Crawford. Young eschewed divorcing Crawford for fear that a court could award him the farm. Newlin testified that Young had several serious conversations with him about this arrangement. Newlin rejected her offer, and Crawford was never harmed.

Young asserts that the government introduced Newlin's testimony to demonstrate that Young has a propensity to solicit murder. Young argues primarily that her statements to Newlin about killing Crawford for $10,000 to protect her farm are not similar in kind or close in time to Griesbauer's murder. In support of her contention, Young cites *United States v. Fawbush*, where this court reversed a district court's decision to admit evidence that the defendant molested his daughters and impregnated one daughter eight years prior to the molestation charge at issue. 634 F.3d 420, 421–23 (8th Cir. 2011). The impregnated daughter was fifteen at the time, and the unrelated victim of Fawbush's charged offense was three. *Id.* at 421. This court determined that the district court abused its discretion in admitting the testimony

-9-

because the prior acts were unrelated to the charged acts. *Id.* at 422. Additionally, the sexual abuse did not show any unique methods, motive, intent, plan, or knowledge. *Id.* Furthermore, the district court violated Federal Rule of Evidence 403 because the testimony was so inflammatory that its resulting unfair prejudice outweighed its probative value. *Id.* at 423.

"[W]e apply a reasonableness standard, considering the facts and circumstances of each case," to determine whether the prior bad act is too remote in time. *Walker*, 470 F.3d at 1275. Generally, we are reluctant to allow evidence of prior bad acts that "occurr[ed] more than 13 years prior to the charged offense." *Id.* However, we have upheld admission of a prior bad act that occurred twenty years earlier. *Id.* (citing *United States v. Williams*, 308 F.3d 833, 836–37 (8th Cir. 2002)). Young's solicitation of Newlin occurred only three years prior to the charged crime. Considering that it involved a different husband, the lapse of three years is quite short.

Here, unlike *Fawbush*, Newlin's testimony helped the jury understand Young's intent, motive, knowledge, and plan for Griesbauer's death. Therefore, Newlin's testimony demonstrates more than Young's propensity to commit murders for hire. The circumstances surrounding Young's solicitation of Newlin are strikingly similar to the circumstances surrounding the charged offense. In both instances, Young solicited another to murder her husband for $10,000 because she feared losing the family farm. They both involved the same crime, a similarly-situated victim, a threat to the farm, and the promise of a life insurance payout. Newlin's testimony helped the jury understand that Young knowingly and intentionally hired Mock to murder Griesbauer for the purposes of saving her farm and collecting life insurance proceeds. Newlin's testimony demonstrated how Young's desire to protect her farm motivated her to kill. The prior bad act demonstrated a particular plan of action.

In addition, the district court instructed the jury not to consider Newlin's testimony for propensity purposes. *See United States v. Strong*, 415 F.3d 902, 906 (8th

-10-

Cir. 2005) ("[T]he presence of a limiting instruction diminishes the danger of any unfair prejudice arising from the admission of other acts." (quotation and citation omitted)). Newlin's testimony is therefore sufficiently close in time and similar in kind under Rule 404(b) such that the district court did not abuse its discretion in admitting it.

Because Newlin's testimony demonstrated Young's intent, motive, knowledge, and plan for Griesbauer's death, the district court's 404(b) instruction was proper where the district court instructed that Young was "on trial only for the crimes charged, and you may consider the evidence of prior acts only on the issue of motive, intent, knowledge, or plan."

Additionally, we hold that the district court did not abuse its discretion by allowing the testimony under Rule 403.

### 2. *Tim Eschmann and Jim Goodwin*

Eschmann testified that he met Young through Young's online-dating profile on the internet website "Adult Friend Finder" in the fall of 2005. Eschmann testified that Young discussed divorcing Griesbauer. He dated Young on the evening before Griesbauer's murder, and Young gave him a birthday present. Additionally, he testified that Young had asked for his advice on how to best invest life insurance proceeds that she would soon receive.

Goodwin testified to meeting Young one month after Griesbauer's death. He noted how they developed a sexual relationship, often spending weekends together. He also loaned her money, and he testified that Young requested that he list her as a beneficiary of a life insurance policy. Goodwin ended his relationship with Young after he discovered an email conversation between Young and Robbins that occurred after Griesbauer's murder where Robbins promised not to alert police to Griesbauer's death in return for sexual favors.

-11-

Young argues that the government introduced the testimony of these men to paint her in a bad light. She contends that the testimony was merely extrinsic evidence of Young's promiscuous character with other men during and immediately after her marriage to Griesbauer. The government argued at trial that the testimony is instead intrinsic because Young's dating profile and dating habits prove her discontent with Griesbauer and pursuit of companionship with other men. Furthermore, she discussed life insurance with each of them, further showing her motivation for killing Griesbauer.

Rule 404(b) applies only to extrinsic, not intrinsic, evidence. *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006). "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred." *Id.* "Such evidence is admitted because the other crime evidence 'completes the story' or provides a 'total picture' of the charged crime." *Id.* (citation omitted). Evidence may be intrinsic if "it 'explain[s] the circumstances of' [a] charged murder conspiracy." *United States v. Hall*, 604 F.3d 539, 544 (8th Cir. 2010) (quoting *United States v. McGuire*, 45 F.3d 1177, 1188 (8th Cir. 1995)). Intrinsic evidence may help to fill the gaps in the jury's understanding of the crime charged. *See Hall*, 604 F.3d at 543–44.

We have also determined that intrinsic evidence is "inextricably intertwined as an integral part of the immediate context of the crime charged." *United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998) (quotation and citation omitted). Young argues that this language implies that intrinsic evidence must be *necessary* to an understanding of the current crime; without that evidence, the jury could not make sense of the crime charged. The government argues that intrinsic evidence need not be *necessary* to the jury's understanding of the issues, only that the evidence contribute to the narrative of the story. We agree with the government. Young seeks a standard that is incongruent with the more-inclusive standard articulated in *Johnson* and *Hall*. Consequently, intrinsic evidence includes both evidence that is inextricably

-12-

intertwined with the crime charged as well as evidence that merely "completes the story" or provides context to the charged crime. *See Johnson*, 463 F.3d at 808; *Hall*, 604 F.3d at 543–44.

The government properly supported introduction of Eschmann's and Goodwin's testimonies. First, their testimonies show that Young actively sought another male companion although Griesbauer was still alive, indicating his disposability. Second, their testimonies demonstrate her preoccupation with realizing a financial return on her husbands' deaths with life insurance proceeds. Although their testimonies reflect poorly on Young, their testimonies nonetheless carry sufficient probative value relating to Young's motives for hiring Mock to murder Griesbauer. As a result, their testimonies are intrinsic because they complete the story surrounding the murders and go beyond mere propensity evidence.

Consequently, the district court did not err in admitting Eschmann's and Goodwin's testimonies over Young's 404(b) objections because their testimonies provided intrinsic evidence of Young's offense.

## B. *Evidence of Conspiracy*

Young contends that the district court erred in admitting Keri's and Thomas's statements against Young that Mock solicited their help in finding someone to murder Griesbauer for Young. Young contends that these statements should have been admitted against only Mock; however, the district court admitted these non-hearsay statements pursuant to Federal Rule of Evidence 801(d)(2)(E) as coconspirator statements. Specifically, Young argues that the government failed to provide corroborating evidence that Young and Mock entered into a conspiracy. In response to Young's objection, the government told the district court that it was "in the process of proving up the conspiracy" and that the conspiracy would be proven as they proceeded. The court overruled Young's objection and allowed the government to elicit the testimony. "We review the district court's interpretation of Federal Rule of

-13-

Evidence 801(d)(2)(E) de novo . . . ." *United States v. Cazares*, 521 F.3d 991, 998 (8th Cir. 2008). However, we "review the district court's admission of the out-of-court statements as coconspirator statements made during and in furtherance of the conspiracy under Rule 801(d)(2)(E) for an abuse of discretion, 'keeping in mind that its discretion is particularly broad in a conspiracy trial.'" *Id.* (quoting *United States v. Davis*, 457 F.3d 817, 824–25 (8th Cir. 2006)).

Federal Rule of Evidence 801(d)(2)(E) provides that a coconspirator's out-of-court statement is not hearsay if the statement was made "during and in furtherance of the conspiracy." A party may admit evidence pursuant to this Rule only if the party demonstrates a conspiracy between the declarant and the defendant. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The district court must also find by a preponderance of the evidence that the declarant made the statement "in the course of and in furtherance of the conspiracy." *United States v. Spotted Elk*, 548 F.3d 641, 661 (8th Cir. 2008) (citing *Bourjaily*, 483 U.S. at 175). A court may conditionally admit a coconspirator statement subject to later proof of the conspiracy to satisfy the coconspirator rule and defer a final ruling on its admissibility until after hearing all evidence. *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978). Additionally, although courts may consider the contents of the statements, the government must produce independent evidence outside of the statements themselves to establish the existence of the conspiracy. *United States v. Ragland*, 555 F.3d 706, 713 (8th Cir. 2009). Finally, independent evidence of a conspiracy or illicit association may be completely circumstantial. *United States v. Martin*, 866 F.2d 972, 980 (8th Cir. 1989) (citing *United States v. Scholle*, 553 F.2d 1109, 1117 (8th Cir. 1977)).

We conclude that the government provided substantial evidence of Young and Mock's conspiracy outside of the statements themselves. This evidence includes their joint 911 call, their common alibi, their presence at the murder scene at the exclusion of all others, the clear lack of suicide or accident, the ski mask that Mock purchased that was found at the murder scene, Young's disdain for Griesbauer, the note found

-14-

in Young's vehicle at her arrest, the life insurance policies, their financial distress, the additional $10,000 Young requested when she refinanced the farm, Mock's belief that she would receive money soon, and Bax's testimony relating to Young's jailhouse statements. Furthermore, although some of the government's evidence related to events that occurred after the events comprising Keri's and Thomas's testimonies, they nonetheless indicate the presence of a conspiracy at the time Mock solicited their help to kill Griesbauer. The government provided ample evidence of a conspiracy.

## C. *Confrontation Clause*

Young argues that the admission of Deputy Salsberry's testimony stating Mock's alibi violated Young's confrontation rights under the Sixth Amendment because Young never had the opportunity to cross-examine Mock. The government counters that the Confrontation Clause does not apply because Deputy Salsberry's statements were not offered to prove the truth of Mock's assertion. Instead, the statements showed that Young and Mock purposely matched their accounts to police. "We review a district court's evidentiary rulings for clear abuse of discretion . . . ." *United States v. Watson*, 650 F.3d 1084, 1088 (8th Cir. 2011). But "[w]e review Confrontation Clause objections to the admission of evidence de novo." *United States v. Watson*, 650 F.3d 1084, 1088 (8th Cir. 2011). *Id.*

After Deputy Salsberry arrived at the crime scene, he interviewed both Mock and Young regarding Griesbauer's death. Mock and Young told Deputy Salsberry the same story, essentially that Young heard a gunshot, hurried upstairs to wake Mock, and the two ran outside to check on Griesbauer only to find him dead. The government elicited Deputy Salsberry's statements about his conversations with Young and Mock to illustrate that they had developed a common alibi.

The Sixth Amendment's Confrontation Clause provides that an accused in a criminal case shall enjoy the right to confront witnesses who testify against him. *Crawford v. Washington*, 541 U.S. 36, 42 (2004). In *Crawford,* the Court held that the

-15-

Confrontation Clause bars testimonial out-of-court statements against a defendant who has no opportunity to cross-examine the declarant. *Id.* at 68–69. Thus, a statement may be admissible under the Rules of Evidence but be inadmissible under the Confrontation Clause. Statements that police officers take pursuant to an interrogation are testimonial. *Id.* at 52.

*Crawford's* reach has been limited in one key respect. The *Crawford* Court indicated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59, n.9. Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Accordingly, some courts have determined that the Confrontation Clause does not apply to out-of-court statements that are non-hearsay. *See, e.g.*, *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) ("If statements are admissible because they are non-hearsay, there is no confrontation clause problem.").

Most notably, this court has also acknowledged that non-hearsay out-of-court statements do not implicate the Confrontation Clause. *United States v. Yielding*, 657 F.3d 688, 700 (8th Cir. 2011). In *Yielding,* we noted, "Statements are not hearsay when 'the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false.'" *Id.* (quoting *Anderson v. United States*, 417 U.S. 211, 219–20 (1974)). Furthermore, we concluded in *Yielding* that "[b]ecause the statement [at issue] was not used to establish the truth of the matter asserted, the evidence was not hearsay, and its admission also did not violate the Confrontation Clause." *Id.*

Deputy Salsberry interviewed Mock after Deputy Salsberry knew that a homicide occurred. Thus, he elicited testimonial statements from Mock during this

-16-

interview. However, the government did not introduce these statements to prove the truth of the matter asserted; rather, the government introduced these statements to show that Young and Mock had a common alibi, scheme, or conspiracy. In fact, Mock's statements to Deputy Salsberry are valuable to the government because they are false. Therefore, the Confrontation Clause does not bar Deputy Salsberry's testimony.

### D. *Authentication of the Note*

Young contends that the district court erred by allowing Mock to admit into evidence a photocopied note that Young supposedly wrote. Police found the note during a search incident to Young's arrest in a purse located in the passenger seat of Young's truck.[4] The note read, in relevant part, "Use her drugged state to convince her she shot him. Offered 10,000 to kill him. Was turned down. If I collaborate her story. Bucks. Sheriff here 3:30 p.m." Young specifically avers that Mock never properly authenticated the note. The government did not attempt to introduce the note into evidence because it could not "identify" the note. We review whether the district court erred by admitting improperly authenticated evidence for an abuse of discretion and disregard errors that do not affect a substantial right of a party. *Kaplan v. Mayo Clinic*, 653 F.3d 720, 725 (8th Cir. 2011).

Federal Rule of Evidence 901(a) provides that, to authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Proponents of evidence may authenticate an item through several methods including, "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). A proponent of evidence may use

---

[4]Young contends that neither the government nor Mock established that the purse belonged to Young. However, Young was the only person in the truck at her arrest. Furthermore, the purse sat atop the passenger seat within her reach. Thus, it is reasonable to infer that the purse belonged to her.

Appellate Case: 12-2527     Page: 17     Date Filed: 05/23/2014 Entry ID: 4157083

circumstantial evidence to satisfy this standard. *Kaplan*, 653 F.3d at 725–26. Once the proponent satisfies this burden, the jury determines any further questions as to the evidence's authenticity. *Id.* at 726. The contents of the writing may be considered to authenticate it. *United States v. Helmel*, 769 F.2d 1306, 1312 (8th Cir. 1985). Notes and other documents may be admitted despite the author's anonymity, especially when the writings demonstrate the author's intimate familiarity with the events in question. *See id.*

Young cites a Fifth Circuit case where the government failed to authenticate a drug ledger when the government could not connect it to the crime at issue. *United States v. Jackson*, 636 F.3d 687, 693–94 (5th Cir. 2011). *Jackson* is distinguishable. First, the proponent in *Jackson* attempted to introduce the ledger under the business-records exception to the hearsay rule, which requires establishment of a different foundation before admission. *Id.* at 693. Based on this different foundation, the *Jackson* court noted that it could not decipher "whether the ledgers were prepared by someone with knowledge of the transactions they supposedly record, or whether they record transactions at all." *Id.* Second, the codefendant produced the ledgers voluntarily seeking a lighter sentence. *Id.* The ledgers were not found on the defendant or in an item belonging to the defendant. *Id.* Third, the contents of the writing contained numbers that could not be connected to the conspiracy by any conspirators. *Id.* at 693–94. The subject matter of the ledger was therefore unclear. *Id.*

Here, on the other hand, the contents of the writing connect the writing to the defendant. First, the writing was found in Young's purse. Second, the contents of the note refer to drugging someone to get them to accept responsibility for a murder as well as mentioning a $10,000 offer for killing someone and obtaining "bucks." The writing did not contain mere numbers but a description, albeit brief, of a unique, factual scenario to which the defendant was involved. Finally, Mock did not introduce the writing under the business-record exception, which contains additional foundational requirements. For these reasons, *Jackson* does not apply.

-18-

Additionally, the contents of the writing and the presence of the writing in Young's purse satisfy the low threshold requiring the government to show that the evidence is what it claims. The note was not admitted as a confession but merely as a note in Young's possession that corroborated Mock's defense that Mock was Young's intended "fall guy" for Griesbauer's murder. Mock therefore demonstrated that this note is what she claimed it is by showing that the note's contents and surrounding circumstances tied the note to Griesbauer's murder. The jury then decided the weight to give this evidence and any additional questions of authenticity.

Furthermore, assuming that the district court erred, this court will disregard a district court's error in admitting evidence if the error does not affect a party's substantial rights. *See Kaplan*, 653 F.3d at 725. In other words, we will not reverse the district court's decision if the note's admission was harmless. Here, admission of the note was harmless. First, while Mock introduced the note into evidence, the note was never discussed or highlighted to the jury until Mock referenced the note briefly during closing arguments. Second, abundant evidence supported the finding of conspiracy without consideration of the note; in fact, the government had already rested its case-in-chief without admitting the note. Instead, Mock introduced the note after the government had already presented its case against Young.

E. *Young's Second Account to Sheriff Clark*

Mock sought to elicit testimony from Sheriff Clark that would inform the jury of Young's second, conflicting account of the events that occurred on the night of Griesbauer's death. Mock hoped that presentation of Young's conflicting accounts to Sheriff Clark would provide evidence of Young's guilty conscience as well as corroborate Mock's theory that Young set Mock up to be the "fall guy" for Griesbauer's murder. The district court forbade the questions to Sheriff Clark at that time, stating,

-19-

> [T]he most salient part of the discussion I think is the last thing that [the Assistant United States Attorney] alluded to, which is that the statement is in large part self-serving at this point in time. Now looking down the road though, it's clear to me that more likely than not at some point in time, we will be revisiting this statement, and more likely than not if circumstances are right, it's probably going to come in. There is also an incidental problem to the use of the statement now. That is a timing issue. There are some things that most likely need to be brought out or established before the statement can come in because it's just kind of there and hanging there now. So having said that, I guess I'm sustaining the Government's objection at this point in time.

Mock never again sought to introduce this testimony at trial; however, Mock now challenges on appeal the district court's decision to exclude this testimony. We hold that Mock failed to preserve this issue for appellate review.

Mock avers that the district court's ruling as to her objection was definitive because the district court stated that it was "sustaining" the government's objection. Federal Rule of Evidence 103(b) was amended in 2000 to provide, "Once the court rules *definitively* on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." (emphasis added.) The rule focuses on the definitiveness of the district court's ruling because renewed objections to a district court's definitive decisions are an unnecessary formalism. Fed. R. Evid. 103 advisory committee's note to 2000 Amendment. However, when the district court reserves its ruling or otherwise indicates that the ruling is provisional, then the proponent should reintroduce the court to the issue at the appropriate time. *Id.* "The amendment imposes the obligation on counsel to clarify whether an *in limine* or other evidentiary ruling is definitive when there is doubt on that point." *Id.*

This court has never defined precisely the bounds of a "definitive" ruling. We have determined that a party failed to preserve an issue for appeal when the district court made a tentative pretrial ruling and expressly invited the party to raise the issue

-20-

during trial where it could better assess the issue's relevance in the case. *United States v. Echols*, 346 F.3d 818, 820 (8th Cir. 2003). The district court in *Echols* refused to rule as to the relevance of the defendant's illegal-immigrant status, requiring instead that the government approach the bench before eliciting this testimony. *Id.* The district court never stated that it was "overruling" or "sustaining" any objection; however, by reserving its ruling, the district court effectively excluded the evidence until the parties presented additional facts that would make immigration status relevant. We have reiterated the *Echols* holding where the district court expressly postpones ruling on an evidentiary matter until the parties develop the factual context at trial. *See United States v. Morales*, 684 F.3d 749, 755 (8th Cir. 2012).

We have also indicated that definitive rulings do not invite reconsideration. In *Sprynczynatyk v. General Motors Corp.*, we stated, "In the instant case the district court made a definitive pre-trial ruling that affected the entire course of the trial. The district court's denial of the motion was not made conditionally *or with the suggestion that the matter would be reconsidered*." 771 F.2d 1112, 1118 (8th Cir. 1985) (emphasis added).

Therefore, a district court's invitation to re-raise evidentiary challenges renders its ruling non-definitive. The inquiry does not focus on magic words like "sustained" or "overruled" but on the overall context of the ruling. When that context includes a district court's invitation to re-raise the issue later at trial, then the ruling is not definitive. As the advisory committee note to the 2000 amendment suggests, counsel bears the burden of obtaining clarification as to whether a district court's ruling is definitive. Here, the district court's invitation to re-raise the issue of whether it should allow introduction of Young's conflicting account prevented its ruling from being definitive. As a result, Mock failed to preserve this issue for normal appellate review.

-21-

Assuming, without deciding, that plain-error review is appropriate, Mock fails to satisfy that standard.[5] To prevail under plain-error review, the appellant must show "(1) there was an error that was not affirmatively waived, (2) the error was . . . clear and obvious, (3) the error affects . . . substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Lindsey*, 702 F.3d at 1100 (alterations in original) (quoting *United States v. Johnson*, 688 F.3d 494, 504 (8th Cir. 2012)). Assuming, without deciding, that plain error occurred in this case, the error did not affect Mock's substantial rights because the evidence supporting her conviction was overwhelming. *See Lindsey*, 702 F.3d at 1100–01 (noting that a party's substantial rights are not violated where overwhelming evidence of guilt supports verdict). This evidence includes Mock's presence at the crime scene, her purchase of the ski mask, the presence of her DNA on the ski mask and latex gloves, the gunpowder and gunshot residue on the gloves, her solicitations of Keri and Thomas to kill Griesbauer, her financial struggles, and her statements to Ballard the day after Griesbauer's death. Furthermore, introduction of Sheriff Clark's testimony would be of little probative value considering that one of the primary purposes for its introduction was to demonstrate Young's guilty conscience. The jury apparently did not need additional evidence of Young's guilty conscience because the admitted evidence was sufficient to convince the jury of Young's guilt. As a result, the district

---

[5]Our cases are unclear as to the next step in the analysis following a determination that the appellant failed to preserve an issue under Rule 103(b). We have taken at least three positions. First, we have determined that a party's failure to seek a final ruling waives the issue such that the appellate court undertakes no review. *Morales*, 684 F.3d at 755; *Echols*, 346 F.3d at 821. Second, we have determined that a party's failure to seek a final, definitive ruling allows us to review for plain error. *United States v. Lindsey*, 702 F.3d 1092, 1100 (8th Cir.), *cert. denied*, 133 S.Ct. 2842 (2013). Finally, we have determined that we will conduct plain-error review when the appellant fails to obtain a definitive ruling as a matter of oversight rather than from a tactical decision not to object. *United States v. Frokjer*, 415 F.3d 865, 871 (8th Cir. 2005). This court will not review a district court's non-definitive ruling where the appellant makes the tactical decision to refrain from further objections. *Id.*

-22-

court did not adversely affect Mock's substantial rights by excluding testimony relating to Young's second account to Sheriff Clark.

### F. *Severance*

Young and Mock both contend that the district court erred by refusing to sever their trial pursuant to Federal Rule of Criminal Procedure 14(a), which provides, "If the joinder of . . . defendants . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Young's arguments stem from her previous arguments, namely that none of Mock's statements to Keri and Thomas, Mock's statements to Deputy Salsberry, or the note found in Young's possession at her arrest would have been admitted against her had their trials been severed. Mock rests her objection on three arguments: (1) Young and Mock had mutually antagonistic defenses that substantially impaired their rights to a fair trial; (2) the district court's exclusion of Young's second, conflicting account of the night of the murder would have been admitted except for Young's presence at the trial; and (3) introduction of evidence involving Young's "sordid" sexual exploits prejudicially tainted Mock before the jury. The government counters that the district court was well within its discretion to allow the joint trial of coconspirators and that no clear prejudice resulted. This court will not reverse a denial of a motion to sever absent abuse of discretion and clear prejudice. *United States v. Sandstrom*, 594 F.3d 634, 642 (8th Cir. 2010).

Three of Young's and Mock's contentions have no merit. First, Young contends that the district court would not have admitted Mock's statements to Keri and Thomas except that the district court erred in admitting them as coconspirator statements. She also contends that her Confrontation Clause rights were violated when the government introduced Mock's statements through Deputy Salsberry. As previously addressed, Young's arguments fail because the district court properly admitted Keri's and Thomas's testimonies under Rule 801(d)(2)(E) such that the statements were admissible against Young. *See* Part II.B., *supra*. Additionally, the government's

-23-

introduction of Deputy Salsberry's testimony did not violate Young's confrontation rights because the statements were not offered to prove the truth of the matter asserted. *See* Part II.C., *supra*. The government would likely have introduced these items of evidence at a separate trial because they show that Young and Mock conspired together. Thus, severance on these grounds would not assist Young.

Second, Mock contends that the district court should have granted the motion to sever because Mock was unable to present Sheriff Clark's testimony regarding Young's second contradictory account of the night of the murder. As previously discussed, Mock failed to preserve her objection to the district court's exclusion of this testimony, and the district court did not plainly err. *See* Part II. E., *supra*. Thus, Mock cannot prevail on this argument. The remaining grounds for severance are that the note found in Young's purse should not have been admitted at the joint trial, that Young and Mock advanced mutually antagonistic defenses, and that the sexually explicit testimony directed toward Young substantially tainted Mock in the eyes of the jury.

"[W]here a defendant demonstrates that a joint trial will prejudice [her] right to a fair trial, the court must sever the trials." *United States v. Engleman*, 648 F.2d 473, 480–81 (8th Cir. 1981) (citation omitted). The district court may sever trials if it appears that compelling or severe prejudice will result to the defendant. *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003). Prejudice is "some appreciable chance that defendants would not have been convicted had the separate trial they wanted been granted." *Sandstrom*, 594 F.3d at 644 (quotation and citation omitted). Defendants may show real prejudice to their right to a fair trial by demonstrating that their defense is irreconcilable with a codefendant's defense, or the jury will be unable to properly compartmentalize the evidence as it relates to the separate defendants. *United States v. Mueller*, 661 F.3d 338, 347–48 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 1951 (2012). Thus, the defendant must demonstrate more than a higher probability of acquittal had severance been granted. *Zafiro v. United States*, 506 U.S. 534, 540

-24-

(1993). Consequently the defendant carries a heavy burden in demonstrating that severance is mandated. *Sandstrom*, 594 F.3d at 644. This is especially true when the district court, like here, provides limiting instructions to the jury on the use of evidence against only one defendant. *See Zafiro*, 506 U.S. at 539. Finally, severe prejudice may occur when evidence against one defendant is admitted despite it not being admissible had a defendant been tried alone. *Id.*

"Generally, persons charged in a conspiracy should be tried together, especially when proof of the charges against the defendants is based upon the same evidence and acts." *Mueller*, 661 F.3d at 347 (quotation and citation omitted). A joint trial is preferable because it "gives the jury the best perspective on all of the evidence and, therefore, increases the likelihood of a correct outcome." *Pherigo*, 327 F.3d at 693 (quotation and citation omitted). Finally, the decision to grant severance to a defendant from a joint trial is within the district court's discretion. *United States v. Ortiz*, 315 F.3d 873, 898 (8th Cir. 2002).

### 1. *Authentication of the Note*

Young contends that the note found in her purse at arrest would not have been introduced at a severed trial. Young also argues that the district court erroneously admitted the note because of a lack of authentication; however, as previously discussed, Mock sufficiently authenticated this note. *See* Part II.D., *supra*. Young is correct that the note likely would not have been introduced against her except that the district court tried Young and Mock together. However, the jury apparently gave the note little credence, if any, considering that it still found Mock guilty. In light of the overwhelming evidence of her guilt, we conclude that Young has not shown severe prejudice, and the district court did not abuse its discretion.

Appellate Case: 12-2527    Page: 25    Date Filed: 05/23/2014 Entry ID: 4157083

## 2. *Mutually Antagonistic Defenses*

The Supreme Court has held that mutually antagonistic defenses are not prejudicial per se. *Zafiro*, 506 U.S. at 538. Mutually antagonistic defenses necessitate severance only when the jury may unjustifiably infer that the defendants' conflicting defenses alone demonstrate that both are guilty. *Sandstrom*, 594 F.3d at 644. The government may nonetheless offer sufficient evidence that both are guilty independent of the parties' antagonism. *Id.* at 645. Severance is not required where one defendant merely shifts blame to a codefendant. *United States v. Bordeaux*, 84 F.3d 1544, 1547 (8th Cir. 1996). Where codefendants blame each other as the sole actor, severance is not required where the government does not ask the jury to decide which defendant murdered the victim but rather that they murdered the victim together or conspired to murder the victim. *Ortiz*, 315 F.3d at 898.

Mock contends that the parties' joint trial compromised their right to a fair trial because they advanced mutually antagonistic defenses. Mock and Young essentially accuse each other of killing Griesbauer alone. Here, like in *Ortiz,* two codefendants accuse each other of committing a shooting alone. *Id.* In determining whether the law required severance in that situation, we explained in *Ortiz* that "[w]hile only one man committed that act, the government's theory of the case did not require the jury to decide who shot [the victim]. The indictment charged defendants with crimes, including conspiracy and aiding and abetting, that did not require jurors to choose a particular defendant as the shooter." *Id.* The government's theories here are the same. The government charged Young and Mock with conspiracy to commit murder-for-hire and murder-for-hire under an aider and abetter theory. Thus, the jury was not required to determine who pulled the trigger. We conclude that the district court did not abuse its discretion in denying the defendants' motions to sever their trial.

## 3. *Taint on Mock's Reputation*

Mock additionally contends that she was severely prejudiced by the taint she received when the government produced evidence of Young's "sordid" sexual exploits

-26-

to show Young's disdain for Griesbauer, as well as her motivation to save her farm by collecting life insurance proceeds. We have affirmed rulings permitting evidence far more inculpatory than Young's sexual misbehavior. For example, in *United States v. Kuenstler*, this court determined that severance was not required despite introduction of evidence involving a codefendant's criminal record, his greater involvement in the crimes charged, his participation in other attempts and schemes to make methamphetamine, and his threats to witnesses. 325 F.3d 1015, 1024 (8th Cir. 2003). Furthermore, we have noted that proper limiting instructions can alleviate or minimize any potential harm that codefendants contract from evidence that reflects poorly on them. *See United States v. Adams*, 401 F.3d 886, 895 (8th Cir. 2005); *United States v. Crouch*, 46 F.3d 871, 875 (8th Cir. 1995).

Here, the court twice instructed the jury to consider the evidence in question against Young only. Additionally, this court has determined that district courts did not err by refusing to sever the trials of codefendants in situations where the "stain" created by evidence used against one defendant was far more inculpatory than the evidence presented here. *See Kuenstler*, 325 F.3d at 1024. As a result, we hold that Mock has not shown that the testimony introduced against Young prejudiced her such that reversal on severance grounds is warranted.

## G. *Batson Challenges*

Young and Mock, both Caucasian,[6] challenge the government's use of peremptory strikes on certain potential African-American jurors. The government contends that it had valid, non-discriminatory reasons for the strikes. This court reviews a district court's denial of *Batson* challenges for clear error. *United States v. Hart*, 544 F.3d 911, 914 (8th Cir. 2008).

---

[6]One may lodge a *Batson* challenge despite a difference in the challenger's race and the race of those against whom discriminatory strikes have been made. *Powers v. Ohio*, 499 U.S. 400, 415–16 (1991).

Appellate Case: 12-2527    Page: 27    Date Filed: 05/23/2014 Entry ID: 4157083

In *Batson*, the Supreme Court held that the prosecution's use of peremptory strikes on qualified jurors for purely racial reasons violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). *Snyder v. Louisiana* outlined the proper procedure for deciding a *Batson* challenge based on race. 552 U.S. 472, 476–77 (2008). First, the challenger must make a prima facie showing that the opponent exercised the peremptory challenge on the basis of race. *Id.* at 476. Second, the opponent must provide a race-neutral reason for striking the juror in question. *Id.* at 476–77. Third, the trial court must determine whether the opponent purposely discriminated such that its race-neutral reasons were mere pretext for discriminatory intent. *Id.* at 477. A *Batson* challenger may rely on "all relevant circumstances to raise an inference of purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quotation and citation omitted). These circumstances include whether the government's race-neutral justifications also applied to similarly situated jurors who belong to a race against whom the government did not allegedly discriminate. *Id.* at 241. The characteristics of similarly situated jurors need not match perfectly with the excluded jurors, for "potential jurors are not products of a set of cookie cutters." *Id.* at 247 n.6. The district court's consideration of the persuasiveness of the prosecutor's justification is important. *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003). Implausible or fantastic reasons demonstrate pretext. *Id.* at 329.

Trial courts thus play a critical role during a *Batson* challenge. *Snyder*, 552 U.S. at 477. The trial court is responsible for viewing the jurors' demeanor, which can be a race-neutral justification in the exercise of a peremptory challenge.[7] *Id.* Thus, the

---

[7] This court has upheld a variety of race-neutral justifications that are relevant here. First, one's status as a renter can be a race-neutral reason for exercising a peremptory strike because it demonstrates a lack of connection to the community. *United States v. Adams*, 604 F.3d 596, 601 (8th Cir. 2010). Second, a juror's employment may make the juror more sympathetic to a criminal defendant such that the exercise of a peremptory strike would be race neutral. *United States v. Maxwell*, 473 F.3d 868, 872 (8th Cir. 2007). For example, a juror's job as a teacher or social worker could make the juror more sympathetic to a criminal defendant. *Id.* (teacher);

-28-

trial court must determine "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder*, 552 U.S. at 477. These determinations of demeanor and credibility are exclusively within the province of the trial court. *Id.* Finally, in the absence of exceptional circumstances, reviewing courts will defer to the trial court. *Id.* In order for a reviewing court to give deference to the trial court on a demeanor question, the trial court must confirm in the record that the juror's demeanor was a sufficient basis for the peremptory challenge. *Id.* at 479.

Here, the government provided sufficient race-neutral justifications for each of the challenged jurors. During jury selection, the government struck five African-American jurors as well as one alternate via peremptory challenge. The defendants challenged strikes to Panel Members 2, 12, 28, and alternate 35 after conceding their challenges on two strikes. Mock and Young also struck three African-American jurors, and five African-Americans sat on the resulting jury.

### 1. *Juror #2*

The defendants contend that the government's use of a peremptory strike on Juror #2 violated *Batson*. The government offered several reasons for striking Juror #2. First, Juror #2 rented her apartment for eleven years, indicating a potential lack of connection to the community. Second, Juror #2 hardly spoke during voir dire. Finally,

---

*United States v. Meza-Gonzalez*, 394 F.3d 587, 593–94 (8th Cir. 2005) (social worker). Third, body language and demeanor can be a sufficient reason to strike a juror. *Id.* Fourth, this court has rejected the argument that the government should have questioned a juror further during voir dire about race-neutral concerns when the information later becomes known or is already known such that additional questions are not needed. *Adams*, 604 F.3d at 601. Finally, this court has upheld strikes against jurors who have close family members whose job indicates bias. *United States v. Atkins*, 25 F.3d 1401, 1406 (8th Cir. 1994) (friends or relatives that worked for government).

Appellate Case: 12-2527     Page: 29     Date Filed: 05/23/2014 Entry ID: 4157083

Juror #2 worked at the St. Patrick's Center—a facility with a goal of rehabilitating criminals following their release from prison.

The district court opined that the most significant reason for a strike was Juror #2's silence. However, as the defendants correctly indicate, Juror #2 spoke more than other similarly situated white jurors. Other white jurors also rented their residences and were unemployed. However, none of the other similarly situated white jurors worked to help rehabilitate criminals. Although the trial court concluded that Juror #2's relative silence was the primary reason for allowing the strike, the government never advanced Juror #2's silence as its main reason. In fact, the government stated during voir dire that "the significant thing is that she worked at the St. Patrick's Center for five years, which I would consider somebody that you might not want on a criminal jury from the prosecution's standpoint." Juror #2's employment with the St. Patrick's Center provides a race-neutral justification for the government's peremptory challenge, so the district court did not clearly err by denying the defendants' *Batson* challenge. Furthermore, the government need not have questioned Juror #2 further when the government already possessed a race-neutral justification for striking Juror #2. The government knew that the St. Patrick's Center rehabilitated criminals. We conclude that the district court did not clearly err in rejecting the *Batson* challenge despite the government's decision not to pose additional questions to Juror #2 about her employment.

### 2. *Juror #12*

The government struck Juror #12 because of her unemployment and a story that she related about a daughter who was attacked by three girls while walking to school. Her daughter did not identify the attackers. The government contended that Juror #12's hesitation in telling this story raised suspicions about her objectivity.

The defendants argue that Juror #12's unemployment was a pretextual reason because other similarly situated white jurors were also unemployed. While this could

-30-

Appellate Case: 12-2527    Page: 30    Date Filed: 05/23/2014 Entry ID: 4157083

be true, Juror #12's hesitant description of the attack on her daughter provides a race-neutral justification for striking her. Although the defendants argue that the mother of a crime victim is more likely to align with the government, the district court observed:

> I think [the Assistant United States Attorney] said in essence it was unclear as to really where she stood on this crime victim question. Now did she think her daughter should have done something else, was she unhappy with the police about how they investigated, should her daughter have been more detailed in the description or in her ability to identify those who she alleged attacked her, or was she dissatisfied with what her daughter did or didn't do or how her daughter may have behaved. All those things were unclear by her response.

The district court's analysis of Juror #12's demeanor while she told the story, coupled with the story itself, satisfies the *Snyder* requirement that the trial court discuss juror demeanor when the juror's demeanor is a reason for the strike. Furthermore, while Juror #12 might favor the government as the mother of a crime victim, she also could disfavor the government because she felt the police poorly investigated her daughter's attack. The government provided a sufficient race-neutral justification to overcome any allegations of pretext.

### 3. *Juror #28*

The government contends that it struck Juror #28 because she was unemployed, rented her residence, and appeared confused during voir dire. The defendants contend that other similarly situated white jurors also rented and were unemployed; however, the government and the district court noted on the record that Juror #28 appeared confused while asking a question, providing a race-neutral justification for striking her.

Juror #28 asked whether both defendants were charged with two crimes. As the defendants point out, the trial transcript certainly indicates that Juror #28 posed a

Appellate Case: 12-2527    Page: 31    Date Filed: 05/23/2014 Entry ID: 4157083

thoughtful question. However, the trial transcript fails to disclose Juror #28's demeanor while asking the question. As the Court noted in *Snyder*, the trial court has the responsibility to evaluate a juror's demeanor and credibility and must comment on the record about the juror before allowing the government's peremptory challenge. Here, the district court properly addressed Juror #28's confused demeanor on the record, stating:

> The response that [the Assistant United States Attorney] gave in explaining his peremptory challenge of her, that she appeared somewhat confused and baffled about what the charges were and how many charges there were as to each defendant, yes, on its face it seems to be an intriguing and thoughtful question, but as you think about it and observe her language, body language, and the expressions on her face when asking the question, I think [the Assistant United States Attorney] has hit it on the head in explaining his challenge for her. The way I would describe [Juror #28] in her inquiry is the same thing I say about my son. If you listen to him when he first makes statements to you that you might have an issue about, it sounds like it's perfectly logical and makes sense. But if you look a little deeper and think about the language and the body language, you conclude that it doesn't make a lot of sense and there is some difficulty there.

The district court properly fulfilled its *Snyder* duty to comment on a juror's demeanor when the juror's demeanor is the primary reason for the strike. Judges, no doubt, might differ in their evaluation of this juror for purposes of *Batson*. On appeal, we cannot say that the district court erred in denying the defendants' *Batson* challenge to the government's peremptory strike of Juror #28.

### 4. *Alternate Juror #35*

Young also contends that the government wrongfully struck Juror #35. Young's argument fails because the government provided a sufficient race-neutral justification for the strike. Juror #35's mother worked at a nonprofit organization that helped transition people from prison to outside employment. The government argued that

Appellate Case: 12-2527    Page: 32    Date Filed: 05/23/2014 Entry ID: 4157083

Juror #35 was relatively young and lived with her mother, making her susceptible to potential bias from her mother's occupation. This reason is race neutral. We hold the use of a peremptory strike for Alternate Juror #35 was not improper.

### H. *Sufficiency of the Evidence Regarding a Bargain-for Exchange*

Finally, Young and Mock both contend that the district court erred by denying their motion for judgment as a matter of law because, according to them, the evidence failed to establish that either party received valuable consideration for commission of the offense. This court reviews questions as to the sufficiency of the evidence de novo, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Gray*, 700 F.3d 377, 378 (8th Cir. 2012) (quotations and citations omitted). This court will not weigh the evidence or witnesses' credibility, for the jury alone resolves conflicts in the testimony. *Gray*, 700 F.3d at 378. "We reverse only if no reasonable jury could have found guilt beyond a reasonable doubt." *Id.* (quotation and citation omitted). The standard that this court applies "to determine the sufficiency of the evidence is a strict one, and the finding of guilt should not be overturned lightly." *United States v. Hyles*, 521 F.3d 946, 954 (8th Cir. 2008) (quotation and citation omitted).

The defendants' crime of conviction provides,

Whoever . . . uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be . . . imprisoned for not more than ten years . . . and if death results, shall be punished by death or life imprisonment . . . .

-33-

18 U.S.C. § 1958(a). The defendants challenge whether the government provided sufficient proof that Young promised to pay Mock for her assistance in murdering Griesbauer. The defendants do not challenge whether the government proved any other elements of this crime.

The government must prove three elements to convict a defendant for violating the substantive portion of 18 U.S.C. § 1958(a). These include that the defendant: "(1) used or caused another to use the mail or a facility in interstate commerce, (2) with the intent that murder is committed, (3) for hire." *United States v. Mueller*, 661 F.3d 338, 345 (8th Cir. 2011). The "for hire" element typically requires consideration or some form of bargained-for exchange. A quid pro quo contractual arrangement can satisfy the "for hire" element. *United States v. Washington*, 318 F.3d 845, 854 (8th Cir. 2003). Thus, the payment for the murder could consist, theoretically, of a promise to give a peppercorn. *See, e.g.*, *United States v. Acierno*, 579 F.3d 694, 701 (6th Cir. 2009) (holding that a promise of giving $100 is sufficient consideration).

The defendants cite *United States v. Wicklund* for the proposition that the "for hire" element requires something more than a mere "expectation of receiving pecuniary value," for the statute requires "consideration." 114 F.3d 151, 153–54 (10th Cir. 1997). Thus, consideration under the statute means either payment of consideration or a promise to pay it. *Id.* at 154. As a result, the defendants posit that the jury must speculate that Young paid Mock or promised to pay Mock money as consideration for Griesbauer's murder.

However, in evaluating the sufficiency of evidence to sustain a verdict, circumstantial evidence must be treated no differently than direct evidence. *United States v. Lam*, 338 F.3d 868, 871 (8th Cir. 2003). Here, the government provided significant circumstantial evidence to support a jury verdict that Young promised to pay Mock money in consideration for Griesbauer's murder. First, Keri's and Thomas's testimony reveal that Mock solicited others to murder Griesbauer for money on

-34-

Young's behalf. Second, Young insisted on receiving an extra $10,000 from her lender above that needed to pay off her debts on the farm mere hours before Griesbauer's death. Third, Young had previously solicited Newlin to murder an ex-husband for exactly $10,000. Fourth, despite Mock's financial hardships, she informed Ballard that she would soon be able to settle her debts with interest. Fifth, the defendants' presence at the crime scene and overlapping alibis demonstrate the presence of a scheme to murder Griesbauer. Consequently, when one considers the evidence in a light most favorable to the jury verdict, this evidence leads to the reasonable inference that Young promised to pay Mock $10,000 to murder Griesbauer. Thus, the defendants' argument must fail.

### III. *Conclusion*

Based on the foregoing, we affirm the judgment of the district court.

KELLY, Circuit Judge, concurring.

Young and Mock were charged with two federal crimes: (1) using facilities of interstate commerce in the commission of a murder-for-hire (Count 2); and (2) "conspir[ing] to do so" (Count 1), both in violation of 18 U.S.C. § 1958. While I concur in the court's judgment to affirm these convictions, I write separately because I sense an increasing misunderstanding of the relevant statute at issue in this case.

"Section 1958(a) is not a murder statute; it is a carefully-drafted federal criminal law of constitutionally limited scope." United States v. Delpit, 94 F.3d 1134, 1150 (8th Cir. 1996). Section 1958 reads as follows:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the

Appellate Case: 12-2527   Page: 35   Date Filed: 05/23/2014 Entry ID: 4157083

receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be [punished according to this statute].

18 U.S.C. § 1958(a).  As we have previously explained:

> This statute is relatively straightforward, both in what it prohibits and in what it does not reach.  It does not prohibit murder or attempted murder. Instead, it outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed.  Once the interstate-commerce facility is used with the required intent the crime is complete.  One who travels or causes another to travel in interstate commerce with the necessary murderous intent need not do anything else to violate the statute.  See [United States v. ]McGuire, 45 F.3d [1177,] 1186–87 [(8th Cir. 1995)].  It is clear, moreover, that a defendant can violate § 1958(a) without actually hurting or killing anyone, because the statute provides for *enhanced* punishment when death or injury results from the defendant's violation of the statute.  If there were any doubt, it would be dispelled by the clear legislative history:

>> The gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent and *the offense is complete whether or not the murder is carried out or even attempted*.

Delpit, 94 F.3d at 1149–50 (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 306 (1984), reprinted in, 1984 U.S.C. Cong. & Admin. News 3182, 3485).  Thus, the elements of Count 2, as relevant to this case, are that a defendant (1) used a facility in interstate commerce, or caused another to do so; (2) with the intent that a murder be committed; (3) "as consideration for a promise or agreement to pay," i.e., "for hire."  Id. at 1149.

In this case, the government started its closing argument by addressing the elements of the offense.  After listing a few examples of the use of a facility in interstate commerce, including the use of a telephone or a debit card, the government

-36-

argued to the jury: "So clearly interstate facilities have been used in furthering this crime."  But Young and Mock were not charged with using a facility of interstate commerce "in furtherance of" the crime of murder or murder-for-hire.  Rather, they were charged with using a facility of interstate commerce, with the requisite intent.[8]  To the extent some of our cases suggest otherwise, I respectfully submit that Delpit provides the more accurate reading of the statute.  Compare Delpit, 94 F.3d at 1149–51, with United States v. Basile, 109 F.3d 1304, 1310–13 (8th Cir. 1997), and United States v. Mueller, 661 F.3d 338, 345–47 (8th Cir. 2011).[9]

---

[8]The government also argued that "every phone call to the insurance companies" would be sufficient to establish the element of "use" beyond a reasonable doubt.  Any phone call made *after* the murder, however, cannot be the "use" that amounts to the crime.  Logically speaking, a person cannot "use" a facility of interstate commerce with the requisite intent *after* the murder has occurred.

[9]Similarly, the conspiracy charged in this case was not a simple conspiracy to commit murder or even to commit a murder-for-hire, which happens to involve the use of a facility of interstate commerce.  "To prove a conspiracy, the government needed to prove an agreement, between at least two people, the objective of which was to violate federal law."  Delpit, 94 F.3d at 1151.  Under § 1958, the object or illegal purpose of the charged conspiracy is to use a facility of interstate commerce with the intent to commit a murder-for-hire.  See id. (reversing § 1958 conspiracy conviction because "[t]he government presented no evidence suggesting that Lynn *conspired to cause [another person] to travel*, or that she *conspired with [another person] to travel*, with the intent that a murder-for-hire be committed" (emphasis added)).

Appellate Case: 12-2527     Page: 37     Date Filed: 05/23/2014 Entry ID: 4157083

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

May 23, 2014

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

      RE:  12-2527  United States v. Elain Young
            12-2593  United States v. Katherine Mock

Dear Sirs:

      A published opinion was filed today in the above cases.

      Counsel who presented argument on behalf of the appellant Young was Jennifer Herndon, of Florissant, MO.  Counsel who presented argument on behalf of the appellant Mock was Kevin Christopher Curran of St. Louis, MO.  The following attorney(s) appeared on the appellant Young's brief;  Jennifer Herndon, of Florissant, MO and Michael J. Gorla, of St. Louis, MO.  The following attorney(s) appeared on the appellant Mock's brief; Kevin Christopher Curran of St. Louis, MO.

      Counsel who presented argument on behalf of the appellee was Thomas Dittmeier, AUSA, of Saint Louis, MO.  In addition to Mr. Dittmeier, the following attorney(s) appeared on the appellee's brief;  Patrick T. Judge, AUSA, of Saint Louis, MO., and  Michael A. Reilly, AUSA, of Saint Louis, MO.

      The judge who heard the case in the district court was Honorable Henry E. Autrey.  The judgment of the district court was entered on June 18, 2012.

      If you have any questions concerning this case, please call this office.

                          Michael E. Gans
                          Clerk of Court

LMT

Enclosure(s)

cc:  Lois Law
     MO Lawyers Weekly

District Court/Agency Case Number(s):   4:09-cr-00679-HEA-2
                                        4:09-cr-00679-HEA-1

# United States Court of Appeals
### *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

May 23, 2014

Mr. Kevin Christopher Curran
FEDERAL PUBLIC DEFENDER'S OFFICE
Suite 200
1010 Market Street
Saint Louis, MO 63101-0000

Ms. Jennifer Herndon
224 N. Highway 67
Florissant, MO 63031-0000

RE: 12-2527 United States v. Elain Young
12-2593 United States v. Katherine Mock

Dear Counsel:

The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00a.m. today. Please hold the opinion in confidence until that time.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

Michael E. Gans
Clerk of Court

LMT

Enclosure(s)

cc: Mr. Thomas Dittmeier
Mr. Michael J. Gorla
Mr. Patrick T. Judge
Ms. Katherine A. Mock
Mr. Michael A. Reilly

Mr. James G. Woodward
Ms. Elain Kay Young

District Court/Agency Case Number(s):   4:09-cr-00679-HEA-2
                                        4:09-cr-00679-HEA-1