UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:09CR 679 HEA |
| | ) | |
| ELAIN KAY YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE

The United States of America, through undersigned counsel, opposes Defendant's Emergency Motion for Compassionate Release. ["Motion," Doc. # 51] Defendant Elain Kay Young (hereinafter "Defendant" or "Young"), having been convicted of murder-for-hire resulting in death and conspiracy to commit murder-for-hire, has failed to identify any "extraordinary and compelling reasons" that qualify her for a reduced sentence under the statute, much less satisfy the separate requirement of showing that she is no longer a danger to community. An analysis of factors set forth in 18 U.S.C. § 3553(a), where Young has served less than eleven years of the life sentence, also weighs heavily against release. Thus, Defendant's motion should be denied.

## BACKGROUND

Young married Melvin Griesbauer in 2004. Shortly thereafter, the Missouri Army National Guard deployed Griesbauer to Iraq for nearly one year, beginning in October 2004. Immediately before and during his deployment, Young purchased multiple life insurance policies on Griesbauer

that listed Young as the primary beneficiary. Under the policies, Young stood to receive over $1.1 million in the event of Griesbauer's death.[1]

Young began to experience financial difficulty. Young mortgaged a farm where she and Griesbauer resided. To qualify for the loan, Young added Griesbauer to the farm's title. The loan proceeds enabled Young to pay off several farm debts. She also explicitly requested and received an additional $10,000 from the lender. Young and her lender finalized the loan less than twenty-four hours before Griesbauer's death.

In the days leading up to Griesbauer's murder, Young's friend, Katherine Mock ("Mock") asked her former daughter-in-law, Keri Ponder ("Keri"), and Mock's son if they knew anyone who would kill someone for money. Nine days before the murder, after a phone conversation with Young, Mock told Keri, "They're willing to pay $6000" to have someone killed. Mock later asked her son, Thomas Ponder ("Thomas"), if he knew anyone that could kill somebody. Mock told him that Young wanted someone killed and was willing to pay $10,000. Thomas declined Young's solicitation because he did not take the conversation seriously. Mock lived approximately three hundred miles away, in southern Missouri. Mock also struggled financially.

Five days later, on March 22, 2006, Mock traveled to Young's farm. The murder occurred in the early morning hours of March 23, 2006. According to Young's initial statement to Adair County Sheriff Leonard Clark, on the night of Griesbauer's death, Young picked up Griesbauer from work just after 1:04 a.m. to bring him home. Mock had already arrived at Young's farm by this time. After arriving home, Griesbauer went outside to the barn to check on some puppies. Young then heard a gunshot in the direction of the barn. Young awakened Mock so that Mock could accompany her to the barn to check on Griesbauer. Young noted Griesbauer frequently

---

[1] The facts recited herein are a very general summary of some of the evidence presented at trial.

carried the gun recklessly – loaded and cocked. Young and Mock located Griesbauer and discovered that he had been shot in the face and killed. They called 911.

Deputies discovered Young's 30-30 caliber, lever-action rifle near the body. A deputy discovered that the rifle was cocked and had a live round in the chamber. The deputy concluded that Griesbauer's death was not the result of an accident or suicide because a suicide shooter could not have reloaded the lever-action rifle. Young and Mock, the only individuals on the scene, were interviewed separately and provided almost identical alibis.

Investigators discovered additional evidence at the crime scene, including a three-hole ski mask wrapped around a pair of used latex gloves, away from the barn near the residence. They learned Mock had purchased a mask at a Wal-Mart en route to Young's home hours before Griesbauer's death. Mock's DNA was also present on the interior of the mask and the gloves. Further, the gloves contained detectable amounts of gunshot residue and a partially-burnt particle of gunpowder that matched gunpowder removed from the remaining live shells in the murder weapon.

## PROCEDURAL HISTORY

As a result of the above facts, and others, on October 22, 2009, a federal grand jury returned an indictment against Young and Mock charging them with conspiracy to commit murder-for-hire (Count I) and murder-for-hire (Count II), both in violation of Title 18 U.S.C. § 1958. District Court Docket ("DCD") 1, 2. Young, having been taken into federal custody in or about late October 2009, has not served eleven years of her life sentence. DCD 1-1-10, 22, 25.

The Court issued an order of detention, finding Young to be a flight risk and a danger to the community. DCD 25. The Court considered a letter written by Young during her pretrial confinement in which she stated words to the effect that Costa Rica was a non-extradition country.

She further explained, "I was told to go to Miami--- Costa Rica." In evaluating the statements, the Court found them to be consistent with the intent to flee. The Court concluded "that because of the nature of the offense charged and the potential penalty, if convicted, there are no conditions or combination of conditions that will assure her appearance and the safety of the community. " DCD 25.Young proceeded to trial with Mock on March 12, 2012. DCD 348. On March 19, 2012, the jury returned a guilty verdict against both defendants on both counts. DCD 366, 368.

The Probation Office prepared a Presentence Investigation Report ("PSR"). DCD 395. The PSR concluded that Young's Total Offense Level was 43. This, coupled with a Criminal History Category I, resulted in an advisory guideline range of life. PSR ¶ 73. The statutory mandatory sentence on Counts I and II under 18 U.S.C. § 1958 is life. PSR ¶ 74. *See* 18 U.S.C. § 1958 ("if death results, [the defendant] shall be punished by death or life imprisonment"). Young appeared before this Court for sentencing on June 18, 2012. The Court sentenced her to a term of imprisonment of life on both counts, to be served concurrently. The Court also ordered a five-year term of supervised release. (DCD 407)

Defendant is presently serving her sentence at Waseca FCI in Minnesota, with a projected release date of LIFE (http:bop.gov/inmateloc).

## THE MOTION

The U.S. Probation Office's Presentence Investigation Report noted that Defendant suffered from a variety of medical conditions. PSR ¶ 52-55.

Young's Motion, filed by Counsel, requests that the Court modify her life sentence to release her immediately to home confinement and a period of supervised release. Alternatively, Young proposes that the Court modify the sentence and that BOP immediately transfer her to home confinement. [Motion, at 1, 15] Defendant argues that the Court should grant this relief because

she has a compromised immune system and is particularly vulnerable to COVID-19. Young alleges that, at age 65, she suffers from the following medical conditions that make her more likely to have severe complications or death: fourth stage renal disease; a right kidney that has completely ceased to function; a left kidney that is damaged and in need of transplant; high blood pressure (with a prior stroke); PTSD; diabetes (which at one time resulted in insulin dependency); neck and back injuries; a fractured foot and torn ligaments; broken teeth; glaucoma and a need for new glasses; a history of heavy smoking; and hypothyroidism. [Motion, at 2-5]

On April 3, 2020, Young filed a "Request to Staff" expressing her concerns about COVID-19 risk factors in relation to her physical condition.

## THE VICTIMS

The Victim Witness Coordinator from the United States Attorney's office has contacted Mr. Griesbauer's family. Mr. Griesbauer's immediate family, including his elderly parents, strongly oppose this Motion. The mother of Griesbauer's minor child, who was ten years old when Young caused this murder to happen, stated, "It devastated him. He was close to his dad and loved him so much." PSR ¶ 27.

## ARGUMENT

Young's request for a sentence reduction fails for at least two reasons. First, although COVID-19 is a global pandemic, it does not qualify as an "extraordinary and compelling" reason "warrant[ing]" a reduction of Defendant's sentence. *See* U.S.S.G. § 1B1.13 cmt. n.1. Second, and equally problematic, Young has failed to demonstrate that she no longer poses a danger to the community or that the factors in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction. By contrast, the record leaves no room to doubt that the opposite is true on both fronts. As such, even if the Court finds that it has the authority to consider Defendant's motion, her request for compassionate release must be denied.

As this Court recently instructed in denying a request for early release based on COVID-19: "The law is clear: absent statutory authority, the Court cannot reduce a final sentence." *United States v. Adem*, No. 4:19-cr-00676-AGF, slip op. at 1 (Mar. 19, 2020) (ECF No. 242) (rejecting an unopposed request for early release of just six days in light of the coronavirus pandemic); *Dillon v. United States*, 560 U.S. 817, 825 (2010) ("'A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment' and may not be modified by a district court except in limited circumstances." (quoting 28 U.S.C. § 3582(b)). Here, Defendant seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act.

"In December 2018, as part of the First Step Act, Congress worked a change to the rule of long standing that a court could only modify a sentence upon motion from the Bureau of Prisons." *United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (quotation and brackets omitted). To allow prisoners to petition courts directly for compassionate release while still giving BOP the first opportunity to evaluate such requests, Congress amended section 3582(c) to include the following language:

(c) The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons*, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c) (emphasis added). Thus, a defendant may now move the sentencing court for compassionate release but only "after (1) fully exhausting his administrative remedies, or (2) a lapse of 30 days from the warden's receipt of the defendant's request." *United States v. Miller*, No. 2:16-CR-00269-BLW, 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020).

While the First Step Act changed *who* could file a motion for compassionate release, it did not alter the requirements for granting relief. *United States v. Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) ("Congress in fact only expanded access to the courts; it did not change the standard."). Under the unmodified language in section 3582(c)(1)(A)(i), a sentencing court may reduce a term of imprisonment only for "extraordinary and compelling reasons." This phrase, in turn, is defined by the Sentence Commission's binding policy statement in section 1B1.13 of the Guidelines Manual. *See United States v. Korn*, No. 11-CR-384S, 2020 WL 1808213, at *3 (W.D.N.Y. Apr. 9, 2020) ("Congress delegated to the Sentencing Commission the task of [defining this phrase]."). Significantly, section 1B1.13 "limits the universe of extraordinary and compelling reasons to five categories": (1) terminal illness, (2) debilitating medical conditions, (3) advanced age, (4) death or incapacitation of certain family members, and (5) other extraordinary and compelling reasons determined by BOP.[2] *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *2 (S.D. Ala. Aug. 13, 2019) (citing U.S.S.G. § 1B1.13 cmt. n.1). Additionally, before granting an early release, the court must verify that the "defendant is not a danger to the safety of any other person or to the community" and consider whether a lesser sentence is appropriate under the section 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13(2).

---

[2] Shortly after the enactment of the First Step Act, BOP published a revised Program Statement 5050.50, which "provides guidance regarding subsection (D) and what qualifies as 'other reasons' that are 'extraordinary and compelling.'" *United States v. Gutierrez*, No. CR 05-0217 RB, 2019 WL 2422601, at *3 (D.N.M. June 10, 2019); *see also* FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

Applying this framework to the present case, the Court must deny Defendant's request because she does not qualify for compassionate release under the criteria set out in the First Step Act and the Sentencing Guidelines.

## I.     Young does not qualify for compassionate release under section 3582(c)(1).

Defendant, having been convicted of murder-for-hire after a jury trial, has not met the high bar of showing that she is entitled to an early release under section 3582(c)(1)(A). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019) ("It is the Petitioner's burden to prove a sentencing reduction is warranted [on a motion for compassionate release].") (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)).

### a.     Defendant has not identified any "extraordinary and compelling reasons" that qualify under the Sentencing Guideline that governs reductions in sentences.

First, Defendant fails to identify any circumstances that can justify release. To qualify for early release, a defendant must demonstrate that at least one of the "extraordinary and compelling reasons" identified in section 1B1.13 of the Sentencing Guidelines warrants a reduced sentence in his or her particular case. *See, e.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3082202, at *1 (S.D. Ala. July 15, 2019) ("The Commission's policy statement thus establishes the boundaries of what may and may not be judicially determined to be extraordinary and compelling reasons for a sentence reduction."); *United States v. Brummett*, No. 6:07-103-DCR, 2020 WL 1492763, at *3–4 (E.D. Ky. Mar. 27, 2020) ("[B]ecause [the defendant's] grounds for relief do not accord with any of these categories, he cannot successfully obtain a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).").

Section 1B1.13 limits the universe of extraordinary and compelling reasons to:

(A)     Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

    i. suffering from a serious physical or medical condition,

    ii. suffering from a serious functional or cognitive impairment, or

    iii. experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C) Family Circumstances. —

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.[3]

---

[3] Shortly after the enactment of the First Step Act, BOP published a revised Program Statement 5050.50, which "provides guidance regarding subsection (D) and what qualifies as 'other reasons' that are 'extraordinary and compelling.'" *United States v. Gutierrez*, No. CR 05-0217 RB, 2019 WL 2422601, at *3 (D.N.M. June 10, 2019); *see also* FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

Here, Defendant claims she has a compromised immune system that renders her vulnerable to COVID-19. Young, alleges that, at age 65, she suffers from the following medical conditions that make her more likely to have severe complications or death: fourth stage renal disease; a right kidney that has completely ceased to function; a left kidney that is damaged and in need of transplant; high blood pressure (with a prior stroke); PTSD; diabetes (which at one time resulted in insulin dependency); neck and back injuries; a fractured foot and torn ligaments; broken teeth; glaucoma and a need for new glasses; a history of heavy smoking; and hypothyroidism. [Motion, at 2-5]

Thus, the only "extraordinary and compelling" reason(s) that arguably apply relate to medical condition under Application Note 1(A) and age under 1(B). *See* U.S.S.G. § 1B1.13 cmt. n.1. However, as this Court observed just last year, "a compassionate release due to a medical condition is an extraordinary and rare event." *White*, 378 F. Supp. 3d at 787. Without conceding the accuracy of Young's representations about the severity of her conditions, the Government acknowledges Defendant's heath concerns. Nonetheless, Young fails to meet her burden of proving that she suffers from a terminal illness or a "serious physical or mental condition . . . that substantially diminishes the ability . . . to provide self-care . . . and from which he or she is not expected to recover." Young also fails to prove that she is experiencing a serious deterioration in physical or mental health because of the aging process.

Specifically, Defendant claims that her age and physical conditions detailed above, coupled with the spread of the coronavirus, justify her immediate release from imprisonment. In other words, Defendant advances the *possibility* that she will become infected with COVID-19 as grounds for erasing the remainder of her sentence. Even assuming that Defendant has established

that she has medical conditions, she has overstated the severity of the conditions, thereby failing to provide adequate proof of the severity of her conditions.[4]

While some individuals with diabetes or renal disease requiring dialysis are more susceptible to COVID-19 or more likely to become severely ill if they contract the virus, Defendant does not fall into this category because there is no indication that she is in the advanced stages of renal failure requiring dialysis. *See* Centers for Disease Control, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.Nor is there any indication that Young's Chronic Kidney Disease, affects her cognitive functioning. Moreover, there is no evidence that Young's diabetes is severe or uncontrolled.

Under section 1B1.13, a defendant must establish she is suffering from either a "terminal" illness or a "serious physical or mental condition . . . that substantially diminishes the ability . . . to provide self-care . . . and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1. Those circumstances do not include a defendant being at higher risk of contracting a pandemic virus in prison. *Clark*, 2020 WL 1557397, at *4 ("Defendant cites no authority for the proposition that the *fear* of contracting a communicable disease warrants a sentence modification."); *Lynn*, 2019 WL 3082202, at *1–2 (denying compassionate release despite "a

_____

[4] A number of courts have denied requests for release related to COVID-19 because the defendant did not present medical records or documentation substantiating alleged health conditions. *See, e.g.*, *Albertson*, 2020 WL 1815853, at *2 ("The Court will not grant compassionate release on medical grounds without documentation of an inmate's current medical condition."); *United States v. Aguila*, No. 2:16-cr-00046-TLN, 2020 WL 1812159, *2 (E.D. Cal. Apr. 9, 2020) ("Although defendant claims he has high blood pressure, high cholesterol, sleep apnea, and diabetes, Defendant fails to provide evidence to verify these claims."); *see also United States v. Lotts*, No. CR 08-1631 JAP, 2020 WL 835298, at *3 (D.N.M. Feb. 20, 2020) (refusing to consider asserted health problems in pre-COVID case because "Defendant ha[d] not provided the Court with any evidence substantiating these conditions, much less their severity."). Defendant likewise has failed to meet her burden of proof as to the severity of the conditions.

welter of health issues" identified by defendant because he failed to show that they would "substantially diminish his ability to care for himself in a prison setting").

Young's motion indicates otherwise. For instance, Young alleges that she has "fourth stage renal disease, a right kidney which has completely ceased to function, a left kidney which is damaged and in need of transplant." [Motion, at 3-4] But Young offers no evidence this is true, and BOP medical records paint a different picture. For instance, BOP records indicate that Young has "Chronic kidney disease, Stage III." The records (March 12, 2020) also reveal that Young has an "atrophic right kidney since childhood which is being followed by nephrology." An initial review of the records does not reveal that Young is undergoing dialysis or suffers from lack of cognitive ability due to her renal issues. This is significant because the relevant CDC risk factor is "Chronic kidney disease being treated with dialysis." *See* CDC, *Groups at Higher Risk for Severe Illness*.

The same is true with Young's other medical conditions. On a September 11, 2019 visit to a Nephrology and Hypertension Medical Doctor, Young reported her hypertension to be "well controlled." She reported that "When she was young she had infection of her kidneys and was told that she has a very minimal function coming from the right kidney." The primary diagnosis is reported as "Chronic Kidney Disease Stage 3 Glomular Filtration Rate 30 to 59 (HCC)." By failing to provide specific evidence of her allegations to rebut these BOP records, Young fails to meet her burden.

Moreover, Young's description of her outstanding coursework, employing her skills as a nurse and a teacher, at BOP also cuts against the existence of any diminished mental capacity caused by renal failure, any other of her physical maladies, or the aging process. [Motion, at 5-6] In her motion, Young emphasizes that she was able to "put her R.N. and School Superintendent

Skills to work ..." pointing out her significant educational and vocational accomplishments, including her more recent successful educational and teaching endeavors while at Waseca. [Motion, at 5-6]  To the extent Young relies upon her educational classes, curriculum planning, and other matters related to her behavior at BOP, "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 18 U.S.C. § 994(t)

There is also no evidence that BOP is failing to provide adequate care for Young or failing to control her physical conditions.  For instance, in relation to hypertension, Young explained on October 29, 2019, "The medicine seems to be doing good, my blood pressure is doing good." Other records (October 1, 2019) describe her blood pressure as "controlled," and her hypothyroidism as "well controlled." An initial review of the BOP medical records reveals that Young was diagnosed with diabetes, but there there is no indication that the condition is uncontrolled or severe. *See* CDC, *Groups at Higher Risk for Severe Illness* ("People with diabetes whose blood sugar levels are often higher than their target are more likely to have . . . health problems [that] can make it harder to overcome COVID-19.").

 Facility-specific considerations do not factor into the "extraordinary and compelling" analysis under section 1B1.13, but even if they did, Defendant fails to show that her continued incarceration at Waseca FCI warrants a reduction in sentence. In this regard, it is important to highlight the efforts that BOP has undertaken to mitigate coronavirus-related risks at its facilities. Effective March 13, 2020, BOP implemented Phase Two of its COVID-19 Action Plan, which required all facilities to "to mitigate the spread of the COVID-19" with proactive measures that included: (1) prohibiting all social and volunteer visits; (2) restricting legal visits (with case-by-case exceptions); (3) suspending inmate facility transfers (with allowances for medical treatment); (4) requiring staff health screening; (5) adopting a variety of coronavirus-specific protocols for

inmates, such as screening new inmates and isolating and testing inmates with risk factors; and (6)

modifying operations to maximize social distancing and to limit group gatherings. *Id.* Since then,

BOP has continued to refine its efforts with regular updates. *See* Fed. Bureau of Prisons, *COVID-19*

*Action Plan: Phase Five*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

(Mar. 31, 2020). For example, Phases Four through Six include new measures, like quarantining

all incoming inmates for at least fourteen days and securing inmates in their quarters to decrease the

potential for transmission. *Id.*; Fed. Bureau of Prisons, *COVID-19 Action Plan: Phase Six*,

https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (Apr. 14,

2020). As a result of these proactive steps, BOP has kept the majority of its 122 facilities virus free

and generally has limited transmission to a fraction of inmates where positive cases have occurred.

By failing even to discuss the safeguards in place at Waseca FCI, Defendant has "not shown that

the [BOP] plan . . . is inadequate to manage the pandemic at Waseca FCI, or that the facility is

specifically unable to adequately treat [her]." *See Gileno*, 2020 WL 1307108, at *4. Not a single

inmate has tested positive for COVID-19 at Waseca FCI to date. *See* Fed. Bureau of Prisons, *Covid-*

*19 Cases*, https://www.bop.gov/coronavirus/index.jsp (last visited May 22, 2020). It is

increasingly less likely that an outbreak will occur now that most states are past their "peaks."

Moreover, even if the virus were introduced into the facility, courts consistently have found that

"[t]he mere presence of the virus . . . does not automatically translate to the release of [a

defendant]." *See United States v. Veras*, No. 3:19-CR-010, 2020 WL 1675975, at *5 (M.D. Pa.

Apr. 6, 2020) (collecting cases). For example, in denying a compassionate-release motion from an

inmate at a facility with a significant coronavirus outbreak, the *Korn* Court explained that "the

mere *possibility* of contracting a communicable disease such as COVID-19, without any showing

that [BOP] will not or cannot guard against or treat such a disease, does not constitute an

extraordinary or compelling reason for a sentence reduction under the statutory scheme." 2020 WL 1808213, at *6; *see also United States v. Seymon*, No: 11-cr-10040-JES, 2020 WL 2468762, at *1, *4 (C.D. Ill. May 13, 2020) (finding no "extraordinary and compelling reason" to release defendant with diabetes, high cholesterol, and a history of smoking from facility with nearly 250 inmates testing positive for COVID-19); *Roberts*, 2020 WL 1700032, at *1 (denying release for HIV-positive inmate at a facility with several confirmed cases of COVID-19). Other courts have questioned whether defendants are "actually at any greater risk of contracting the virus inside [a facility] than outside," even at prisons where there have been confirmed cases, because "BOP is able to impose restrictions" on prisoners in compliance with CDC guidelines, which there is no guarantee they would follow "outside prison walls." *See United States v. Wright*, No. 17-CR-695 (CM), 2020 WL 1922371, at *3 (S.D.N.Y. Apr. 20, 2020).

Here, there is nothing to indicate that Waseca FCI has failed to "provide[] requested medical attention to Defendant" for her existing medical conditions or will be unable to care for Defendant were she to contract COVID-19. *See Seymon*, 2020 WL 2468762, at *4. Moreover, any potential harm to Defendant of remaining at Waseca FCI must be weighed against the danger granting release poses to the community and others, which in this case includes the risk of spreading COVID-19. *See Clark*, 2020 WL 1446895, at *7. Just like quarantine situations outside of prisons, "the tragic paradox [is] that if conditions somewhere outside the [facility] are better, then transferring an exposed inmate into those conditions could threaten the safety of those already there." *See United States v. Russo*, No. 1:16-cr-00441-LJL, slip op. at 5 (S.D.N.Y. Apr. 3, 2020) (ECF No. 54). Thus, Defendant has failed to meet her burden of showing that facility-specific considerations qualify as an "extraordinary or compelling reason" that would make release appropriate here. *See Gileno*, 2020 WL 1307108, at *4 (noting that, without particularized

evidence of inadequate care, "the Court cannot assume that [BOP] will be unable to manage the outbreak or adequately treat [the defendant]").

In sum, while Defendant's concerns about COVID-19 are understandable, they simply do not qualify her for early release under section 1B1.13 of the Sentencing Guidelines.

### b. Defendant still poses a significant danger to the community and the 3553(a) factors weigh strongly against release in this murder-for-hire case.

"In determining whether to grant a motion to modify a sentence, a court must consider the factors set forth in 18 U.S.C. § 3553(a)." *Gileno*, 2020 WL 1307108, at *1; *see also* 18 U.S.C. § 3582(c)(1)(A) (directing courts to consider these factors for every request for early release). Additionally, "a reduction in sentence under [the First Step Act] requires a determination that '[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'" *Eberhart*, 2020 WL 1450745, at *2 (citing U.S.S.G. § 1B1.13(2)). However, a defendant's failure to show that *both* section 3142(g) *and* section 3553(a) favor a reduced sentence is fatal to such a request. *See Brummett*, 2020 WL 1492763, at *3–4 (concluding that the danger defendant posed to the community and the section 3553(a) factors each provided an independent basis for denying a request for compassionate release). Here, Defendant's motion fails to show that she no longer poses a danger to the community or that the factors in section 3553(a) favor a reduced sentence. Accordingly, her request for release must be denied.

§ 3553(a) details the following factors:

> 1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> 2) the need for the sentence imposed --
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3)  the kinds of sentences available;

4) the kinds of sentences and the sentencing range established for--
(A) the applicable category of offenses committed by the applicable category of defendant as set forth in the guidelines...

5) any pertinent policy statement ---
(A) issued by the Sentencing Commission...

6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct...

The jury convicted Young of the deliberate, orchestrated, and manipulative murder-for-hire of Melvin Griesbauer.  Defendant's motive for the murder was for her own financial gain, with callous disregard for Griesbauer and his family, including his son, who was a minor child at the time of the murder.  These facts relate to the nature and circumstances of the offense and the danger defendant presents to the community.  There is no rational basis upon which to conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  The nature and circumstances of the offense are self-evident.

In *United States v. Arana*, No. 2:95-cr-80272-LJM-13, 2020 WL 2214232 (E.D. Mich. May 7, 2020), the court denied the 68-year-old defendant's motion for compassionate release based upon pancreatitis, other health concerns, and COVID-19 pandemic after he served 24 years of his life sentence for drug and murder offenses.  The court there explained, "In addition to large scale drug trafficking, this case involves the ultimate violence—the taking of a human life." *Arana*, 2020 WL 2214232 at 8.

It is no coincidence that Young's motion fails to mention the offenses for which she was convicted.  The fact that she acted with and conspired with another further establishes her

dangerousness, and provides another basis to conclude that she would continue to be dangerous were she to be released from custody. Young's willingness to act through and enlist others to commit acts of violence on her behalf is particularly probative of the danger she presents to society. As another court put it in denying a similar motion, "murder-for-hire requires little physical agility or youth to be effectuated, and defendant is clearly mentally capable of forming detailed strategies." *See United States v. Levine*, No 2:91CR 3, 2020 WL 2537786, at *5 (N.D. Ind., May 19, 2020)

The evidence introduced at Young's trial raises additional concerns about her character and danger to the community. Shortly after the murder of Griesbauer, Young initiated a relationship with an older male, J.G., with a medical history including heart attacks, five stents, a mild stroke, and significant diabetes. Despite having a nursing background, Young twice provided J.G. with medication to help him obtain an erection, which had a predictable adverse reaction and caused him to go to the hospital. During the course of this relationship, Young successfully induced J.G. to change the beneficiary on his life insurance policy from his daughter to Young. Young also borrowed money from J.G. to attempt to obtain a death certificate so she could collect the proceeds of the life insurance policies on Griesbauer. J.G. eventually terminated the relationship and contacted law enforcement after discovering that Young was having a relationship with another man. (Trial Transcript (T.Tr.), Vol. 4, at 157-75)

The investigation related to J.G. revealed yet another witness, K.R. Young was seeing K.R. in July 2005, while Griesbauer was in Iraq. Young, when speaking to K.R. about Griesbauer, repeatedly said, " I would like to kill the sonofabitch," and "I wish he was dead." (T.Tr., Vol. 2, at 125-30) In August 2005, Young was also posting her profile on Adult Friend Finder, an adult dating website, which led to evidence that she was dating T.E. In the profile Young provided for

the website under pnurse_kate@hotmail.com, she stated, among other things, that she was "[l]ooking for men for one-on-one sex." (T.Tr., Vol. 4, at 131-43; 135)

In 2002, Young propositioned a witness, N.N., that she would kill his wife by hitting her in the head with a rock and making it look like a horseback riding accident, and give him $10,000. In exchange, Young wanted N.N. to kill Young's husband at the time, David Crawford. N.N. explained that Young was getting divorced from Crawford, whose name was also on her farm title, and she did not want to lose the farm. Young wanted N.N. to take out insurance on N.N.'s wife. N.N., who was living near Young in a mobile home on her property, moved shortly thereafter. (T.Tr., Vol. 4, at 108-16)

The investigation also revealed that Young solicited another man to kill her previous husband, F.N., by drowning him and making it look like an accident. This evidence, documented in an FBI investigative report, was not introduced at trial.

Analysis of the remaining § 3553(a) factors, particularly § 3553(a)(2), weighs heavily in favor of the life sentence that Congress mandated and this Court imposed for these offenses. In *Levine*, the court explained that the seriousness of a case involving the murder of one's own family members cannot be overstated. *United States v. Levine*, 2020 WL 2537786, at *4-5. *Levine* found that requiring the defendant to complete his life sentence has deterrent value, for the defendant and others. The court in *Levine* continued, "Finally, requiring defendant to continue to serve his life sentence would promote respect for the law and provide just punishment for defendant's offense. This is especially true because defendant has failed to accept any responsibility for his actions." *Id.*

The 3553(a) considerations in *Levine* and *Arana* are applicable in this case. The nature and circumstances of the offense are paramount, the murder-for-hire "involves the ultimate violence—

the taking of a human life." *Arana*, 2020 WL 2214232, at *8. The seriousness of a murder

involving one's family member(s) "cannot be overstated." *Levine*, 2020 WL 2537786, at *4–5.

Requiring Young to continue to serve her life sentence is necessary to reflect the seriousness of

the offense, to promote respect for the law, and to provide just punishment for the offense. Young

has served less than eleven years of her life sentence. To grant her immediate release would make

a mockery of the seriousness of this offense, fail to promote respect for the law, and entirely fail

to provide just punishment for the cold-blooded murder of Griesbauer. Consistent with *Levine*,

Young has failed to accept responsibility for this offense. Young's release after serving less than

eleven years of a life sentence would fail to deter her or others from committing similar crimes.

Finally, releasing Young from custody would entirely fail to protect the public from her future

crimes. See *Levine*, No 2:91CR 3; 2020 WL 2537786, at *5 ("… murder-for-hire requires little

physical agility or youth to be effectuated, and defendant is clearly mentally capable of forming

detailed strategies."). For all of these reasons, the Court should deny Young's unwarranted request

for early release.

## II.    The Court lacks jurisdiction to resentence the Defendant to home confinement, as BOP has "plenary control" over designation of inmates.

Defendant also requests that the Court resentence her to home confinement as part of her

request for compassionate release. [Motion, at 1, 14-15] The Court must deny this request because

it "has no authority to designate the place of confinement." *Eberhart*, 2020 WL 1450745, at *3.

Instead, well-settled precedent recognizes that the BOP has complete authority to determine where

an inmate is confined.

"While a [district court] judge has wide discretion in determining the length and type of

sentence, the court has no jurisdiction to select the place where the sentence will be served.

Authority to determine place of confinement resides in the executive branch of government and is

delegated to the Bureau of Prisons." *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) (citation omitted). Indeed, as the Supreme Court has made clear, "the BOP has *plenary control . . .* over 'the place of the prisoner's imprisonment'" after the court imposes its sentence. *Tapia v. United States*, 564 U.S. 319, 331 (2011) (citing 18 U.S.C. §§ 3621, 3624) (emphasis added). Furthermore, a number of courts have concluded that the COVID-19 pandemic does nothing to unsettle this long-standing rule. *See, e.g.*, *United States v. Oliver*, No. CR JKB-16-0485, 2020 WL 1505899, at *1 (D. Md. Mar. 30, 2020) ("[I]t is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement pursuant to 18 U.S.C. § 3624(c)."); *United States v. Williams*, No. CR JKB-15-0646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020) (same); *Garza*, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020) ("[T]he Court lacks authority to designate home confinement."). Thus, regardless of the Court's determination on compassionate release, the authority to determine Defendant's placement for the remainder of her sentence rests solely with the BOP. Any suggestion to the contrary must be rejected out of hand.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny Defendant's motion, consistent with the overwhelming majority of courts that have considered requests for compassionate release in light of COVID-19 pandemic.[5] *See Adem*, slip op. at 1; *Albertson*, 2020 WL 1815853, at *1-2; *Brown*, 2020 WL 1479129, at *1; *Clark*, 2020 WL

---

[5] The Court should not grant a sentence modification absent a release plan that includes specific conditions for avoiding COVID-19. Additionally, the Government requests that any order granting release accommodate the need to quarantine a defendant for a period of at least fourteen days to protect public health. Specifically, the Court should retain jurisdiction over the motion for fourteen days if it makes a determination to grant release, while advising the parties of that decision. BOP will then place the inmate in quarantine. If the defendant has not displayed symptoms or tested positive for COVID-19 during that period, the Court may then order release. If the defendant does tests positive during the initial fourteen-day period, the Government will notify the Court and seek an extension of the release date until the defendant has tested negative.

1557397, *1, 3; *Eberhart*, 2020 WL 1450745, at *2; *Garza*, 2020 WL 1485782, at *1–2; *Gileno*, 2020 WL 1307108, at *4; *Hernandez*, 2020 WL 1445851, at *1; *Johnson*, 2020 WL 1663360, at *2–6; *Korn*, 2020 WL 1808213, at *8; *Raia*, 954 F.3d at 597; *Reeves*, 2020 WL 1816496, at *1; *Roberts*, 2020 WL 1700032, at *2; *Weber*, No. 4:18-CR-01035-ERW, slip op at 4; *Zywotko*, 2020 WL 1492900, at *1.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

 */s/ Michael A. Reilly*
Michael A. Reilly, #43908MO
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2020, the foregoing was filed electronically with the Clerk of the Court; because this file is sealed, the undersigned will cause an electronic copy of this pleading to be mailed to Counsel for Defendant Young.

 */s/ Michael A. Reilly*
Michael A. Reilly, #43908MO